# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE ANTHEM-CIGNA MERGER LITIGATION | ) ) | Consolidated C.A. No. 2017-0114-JTL |

## MEMORANDUM OPINION

Date Submitted: March 9, 2020
Date Decided: August 31, 2020

William M. Lafferty, Kevin M. Coen, D. McKinley Measley, Zi-Xiang Shen, Thomas P. Will, Daniel T. Menken, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Glenn M. Kurtz, Claudine Columbres, Andrew W. Hammond, Gregory Starner, Camille M. Shepherd, Vatsala Sahay, WHITE & CASE LLP, New York, New York; Heather M. Burke, WHITE & CASE LLP, Palo Alto, California; Dana E. Foster, WHITE & CASE LLP, Washington, D.C.; *Attorneys for Anthem, Inc.*

David E. Ross, Garrett B. Moritz, S. Michael Sirkin, Adam D. Gold, Benjamin Z. Grossberg, Anne M. Steadman, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Stephen R. DiPrima, William Savitt, Graham W. Meli, Adam M. Gogolak, Lauren M. Kofke, S. Christopher Szczerban, Steven P. Winter, Claire E. Addis, Bita Assad, Daniel H. Rosenblum, Jacob Miller, Jeohn Salone Favors, WACHTELL, LIPTON, ROSEN & KATZ, New York, NY; *Attorneys for Cigna Corporation.*

**LASTER, V.C.**

**TABLE OF CONTENTS**

I. INTRODUCTION .................................................................................................. 1

II. FACTUAL BACKGROUND ............................................................................... 8

A. The Parties ......................................................................................................... 14

B. Merger Talks In 2012 ........................................................................................ 17

C. Merger Talks In 2014 ........................................................................................ 19

D. The Path To The Merger Agreement ................................................................. 24

    1. The Non-Public Negotiations .................................................................... 27

    2. Anthem's Bear Hug Letter ......................................................................... 30

    3. The Management Meetings ......................................................................... 32

    4. The Agreement In Principle ....................................................................... 36

    5. The Struggle Over Cordani's Role As COO .............................................. 37

    6. The Parties' Understandings Regarding The Blues Rules .......................... 40

E. The Merger Agreement ...................................................................................... 41

F. The Need For Stockholder And Regulatory Approval ....................................... 44

    1. Stockholder Approval ................................................................................. 44

    2. Regulatory Approval .................................................................................. 45

G. The Integration Planning Process And The L2/L3 Selection Dispute ............... 53

    1. The First Months Of Integration Planning ................................................ 54

    2. The L2/L3 Selection Dispute ..................................................................... 56

    3. The Dispute Letters .................................................................................... 58

    4. The Meeting On January 11, 2016 ............................................................. 61

    5. The Cigna ELT's Response ........................................................................ 63

    6. Preparations For The February 16 Meeting ............................................... 65

    7. The February 16 Meeting ........................................................................... 67

    8. Cigna Escalates Further .............................................................................. 68

    9. The De-Scoping Of The Integration Planning Process .............................. 74

    10. The Status Of The Regulatory Approval Process ...................................... 75

H. The Impasses Of March And April .................................................................... 77

    1. Swedish Pushes Forward ............................................................................ 77

2.      The Continued Impasse Over Integration Planning ...................................78

3.      The Cigna Board's March 31 Meeting.......................................................81

4.      The Anthem Board Unsuccessfully Pursues Détente..................................84

5.      Cigna Changes Its Disclosure. ...................................................................87

I.     The Second Stage Of DOJ Review ........................................................................89

1.      The DOJ Update.........................................................................................89

2.      The White Papers ........................................................................................90

3.      Internal Integration Planning At Anthem....................................................94

4.      Teneo Leaks The Dispute Letters To The *Wall Street Journal.* ..............100

5.      Cigna Attempts To Re-Engage On Integration Planning.........................105

6.      "Bias-to-Blue" As A Go-To-Market Strategy...........................................107

J.     The DOJ Opposes The Merger.............................................................................110

1.      The June 10 Meeting With The Staff ........................................................110

2.      The Remediation Effort.............................................................................112

3.      The June 21 Meeting With The Front Office .............................................116

4.      Cigna Continues To Analyze Its Standalone Options. ..............................122

K.     The Antitrust Litigation........................................................................................124

1.      The Parties' Initial Responses To The Antitrust Litigation ......................124

2.      Cigna's Covert Communications Campaign.............................................126

3.      The Initial Phase Of The Antitrust Litigation ..........................................132

4.      Discovery In The Antitrust Litigation.......................................................135

5.      Pre-Trial Preparations...............................................................................138

6.      Trial In The Antitrust Litigation...............................................................143

L.     Anthem Extends The Termination Date................................................................154

M.    The District Court Enjoins The Merger. ..............................................................155

N.     Anthem Appeals. ..................................................................................................168

O.     This Litigation .....................................................................................................169

P.     The DC Circuit Court Decision............................................................................171

Q.    Anthem Terminates The Merger Agreement. ......................................................186

R.     This Litigation Proceeds To Trial. .......................................................................188

**III. LEGAL ANALYSIS**..........................................................................**189**

A.  The Legal Framework .............................................................................. 189

B.  The Plain Meaning Of The Efforts Covenants And The No Injunction Condition ...
    ..................................................................................................................... 193

    1.  The Reasonable Best Efforts Covenant........................................... 193

    2.  The Regulatory Efforts Covenant .................................................. 196

    3.  The Regulatory Cooperation Covenant........................................... 201

    4.  The No Injunction Condition .......................................................... 204

C.  Anthem's Claims For Breach Of The Efforts Covenants ....................... 204

    1.  Cigna's Covert Communications Campaign Against The Merger ........... 205

    2.  Cigna's Withdrawal From Integration Planning .......................... 212

    3.  Anthem's Claim Against Cigna For Obstructing A Divestiture ............... 234

    4.  Anthem's Claim Against Cigna For Resisting Mediation ......................... 246

    5.  Cigna's Undermining Of Anthem's Defense In The Antitrust Litigation 251

D.  Whether The No Injunction Condition Would Have Failed If Cigna Had Not
    Breached ..................................................................................................... 263

    1.  The National Accounts Issue........................................................... 264

    2.  The Local Markets Issues................................................................ 270

    3.  Other Regulatory Approvals .......................................................... 272

    4.  Judgment In Favor Of Cigna.......................................................... 273

E.  Cigna's Claim Against Anthem For Breach Of The Regulatory Efforts Covenant...
    ..................................................................................................................... 273

    1.  Cigna's Claim Regarding The Blues Rules................................... 273

    2.  Cigna's Claim Regarding The $704 Million In Efficiencies ................... 288

    3.  The Effect-Of-Termination Provision............................................ 289

    4.  Judgment In Favor Of Anthem...................................................... 293

F.  Cigna's Claim Against Anthem For Failing To Pay The Reverse Termination Fee .
    ..................................................................................................................... 294

    1.  The Provisions Governing The Reverse Termination Fee ....................... 294

    2.  Cigna's Attempt To Invoke The Temporal Termination Right ............... 300

    3.  Anthem's Obligation To Pay The Fee Under The Termination Right For A
        Cigna Breach ................................................................................. 304

4. Judgment In Favor Of Anthem.......................................................305
**IV. CONCLUSION...............................................................................305**

## I.     INTRODUCTION

Anthem, Inc., and Cigna Corporation entered into an Agreement and Plan of Merger dated July 23, 2015 (the "Merger Agreement"). Anthem agreed to pay total consideration of over $54 billion, reflecting a premium of 38.4% over Cigna's unaffected market capitalization. At the time, Anthem and Cigna were the second and third largest health insurers in the United States. If completed, the resulting transaction would have created the nation's largest health insurer (respectively, the "Merger" and "NewCo").

The Merger Agreement contained covenants that obligated the parties to try to close the Merger (the "Efforts Covenants"). One covenant obligated the parties to use their reasonable best efforts to satisfy all of the conditions to closing and consummate the Merger (the "Reasonable Best Efforts Covenant"). Another covenant required that the parties take any and all actions necessary to avoid any legal impediment to the Merger that a governmental entity might raise (the "Regulatory Efforts Covenant"). A third covenant obligated the parties to cooperate in various ways when seeking regulatory approval and allocated authority over the regulatory approval process to Anthem (the "Regulatory Cooperation Covenant").

The parties' obligations to consummate the Merger were subject to several conditions. The condition most pertinent to this case was the absence of any injunction that would prevent consummation of the Merger (the "No Injunction Condition").

The Merger failed to close. The United States Department of Justice (the "DOJ") concluded that the Merger would have anticompetitive effects and declined to approve it.

In July 2016, the DOJ sued to block the Merger (the "Antitrust Litigation"). In February 2017, the United States District Court for the District of Columbia (the "District Court") issued a permanent injunction that prevented the Merger from closing. *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C. 2017) (the "District Court Opinion"). In April 2017, the United States Court of Appeals for the District of Columbia Circuit (the "DC Circuit Court") affirmed the District Court Opinion. *United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017) (the "Circuit Court Opinion" and together with the District Court Opinion, the "Antitrust Decisions").

After the issuance of the District Court Opinion, but before the issuance of the Circuit Court Opinion, Cigna purported to terminate the Merger Agreement. Cigna simultaneously filed this litigation, in which it sought to establish its right to terminate the Merger Agreement. Anthem filed its own lawsuit in this court to keep the Merger Agreement in place so that it could appeal from the District Court's decision, and this court entered a temporary restraining order enjoining Cigna from terminating the Merger Agreement. After the issuance of the Circuit Court Opinion, this court denied Anthem's application to convert the temporary restraining order into a preliminary injunction, but stayed its ruling and kept the temporary restraining order in place to give Anthem an opportunity to appeal this court's decision to the Delaware Supreme Court.

On May 12, 2017, Anthem decided not to appeal and contemporaneously issued a notice terminating the Merger Agreement. That same day, Cigna issued another termination notice. The parties disagree about the effects of the competing notices, but they agree that the Merger Agreement was terminated as of May 12.

The cases that Cigna and Anthem had filed were consolidated, and this litigation continued as a damages action. Anthem contended that Cigna breached its obligations under the Efforts Covenants and sought expectation damages of $21.1 billion. Cigna contended that Anthem breached its obligations under the Regulatory Efforts Covenant and sought expectation damages of $14.7 billion. Cigna separately sought to recover a reverse termination fee in the amount of $1.8 billion (the "Reverse Termination Fee").

Anthem proved that Cigna breached its obligations under the Efforts Covenants. Rather than seeking to complete the Merger, Cigna sought to derail it.

David Cordani, Cigna's CEO, and the other members of Cigna's executive leadership team (the "Cigna ELT") originally favored a deal with Anthem, but they envisioned a transaction in which they would lead NewCo and Cordani would become CEO. During the negotiations that led to the Merger Agreement, Cordani tried to secure the role of CEO, but Cigna also demanded a significant premium for its stockholders. Anthem agreed to pay a premium, but insisted that its CEO, Joseph Swedish, would serve as NewCo's CEO. Anthem agreed that Cordani would serve as NewCo's President and COO. Cordani understood that he would succeed Swedish as NewCo's CEO.

After the parties signed the Merger Agreement, Anthem acted like an acquirer and sought to engage in detailed integration planning. In December 2015, as part of that process, Swedish tried to begin conducting interviews that would lead to the selection of the NewCo executive leadership team (the "NewCo ELT"). The Cigna ELT resisted Anthem's approach to integration planning, and they reacted angrily to Swedish's attempt to start the interviews.

Anthem's executive leadership team (the "Anthem ELT") did not take well to Cigna's resistance. After an exchange of accusatory emails, Swedish decided to reduce the scope of Cordani's responsibilities in NewCo and make clear that he was not the only potential successor as CEO. Swedish communicated this message to Cordani during a meeting on January 11, 2016.

The Cigna ELT perceived Swedish to be launching a hostile takeover of Cigna. They crafted a detailed and sophisticated response, codenamed "Project Alpha," to restore the scope of Cordani's responsibilities and his path to CEO. Cigna skillfully presented its narrative of events at the first gathering of the designees who would serve on the NewCo Board. Anthem's designees sympathized with Cigna's position and forced Swedish to defer selecting the NewCo ELT, but the meeting did not result in the specific commitments that Cigna wanted.

The Cigna ELT decided to escalate. They had identified integration planning as a pressure point to use against Anthem. In late February 2016, Cigna withdrew from the integration planning process and limited its efforts to "Day 1 activities," i.e., those activities necessary to facilitate NewCo's ability to operate immediately after closing. Despite taking these steps, the Cigna ELT still had not turned definitively against the Merger. They would have supported the Merger if Anthem had stopped acting like an acquirer and started treating the transaction as a merger of equals, including by giving substantial deference to the Cigna ELT's views.

Rather than causing Anthem to stand down, Cigna's escalation reinforced the Anthem ELT's concerns about Cordani and his team. The parties' positions became

4

increasingly adversarial, and the Cigna ELT turned definitively against the Merger. There is no signpost marking exactly when this happened, but by late March and early April 2016, the Cigna ELT wanted the transaction to fail so they could continue managing Cigna as an independent company.

In June 2016, the DOJ informed the parties that it had major concerns about the Merger. Anthem sought to line up divestitures to address the DOJ's concern about excessive concentration and monopsony in thirty-five local markets. The divestitures would not have addressed the DOJ's concern about excessive concentration in the market for national accounts. It therefore was unlikely that the divestitures would have resulted in an overall settlement, but they would have strengthened Anthem's position with the DOJ and in the ensuing Antitrust Litigation. Cigna obstructed Anthem's efforts to line up divestitures. Through its interactions with the DOJ, Cigna signaled that it opposed the Merger, which emboldened the DOJ.

In July 2016, the DOJ filed suit. Throughout the Antitrust Litigation, Cigna undermined Anthem's defense. Cigna opposed Anthem's efforts to mediate and took litigation positions that supported the DOJ. During his deposition and at trial, Cordani gave vivid testimony that was a boon to the DOJ. Cordani is a skilled communicator who does not inadvertently concede points to the opposition, and yet he provided exaggerated and unsupported testimony that bolstered the DOJ's case. Cordani's performance in the Antitrust Litigation contrasted sharply with his resistance during hostile cross-examination in this litigation. It is clear that during the Antitrust Litigation, Cordani intentionally testified in a manner that would help the DOJ obtain a decision blocking the Merger.

5

Cigna's opposition to the Merger was so obvious that the District Court described it as the "elephant in the courtroom." *Dist. Ct. Op.*, 236 F. Supp. 3d at 183. The District Court noted that Cigna had joined the DOJ in "warning against" the Merger and cited "the doubt sown into the record by Cigna itself." *Id.*

Although Anthem proved that Cigna breached the Efforts Covenants, Anthem failed to prove that Cigna's breaches led to causally related damages. The Antitrust Decisions caused the No Injunction Condition to fail, meaning that the parties never became obligated to close. To prevail on a claim for breach of the Efforts Covenants, Anthem therefore had to prove that Cigna's breaches of the Efforts Covenants contributed materially to the failure of the No Injunction Condition. Anthem did not have to prove that the Merger would have been approved but for Cigna's breaches, only that Cigna's breaches made approval less likely. Once Anthem made this showing, Cigna had the burden of proving that even if it had fulfilled its obligations under the Efforts Covenants, the No Injunction Condition would have failed.

Both steps in the causation analysis are difficult to conduct in such a complex and multi-faceted case. On balance, Anthem proved by a preponderance of the evidence that Cigna's breaches of the Efforts Covenants contributed materially to the failure of the No Injunction Condition. Cigna's withdrawal from integration planning, its opposition to divestitures, its resistance to mediation, and its undermining of Anthem's defense in the Antitrust Litigation made it less likely that the condition would be satisfied. Cigna, however, proved by a preponderance of the evidence that even if it had fulfilled its obligations under the Efforts Covenants, the DOJ still would have sought to block the

6

Merger based on its anticompetitive effects on the market for national accounts, the District Court still would have enjoined the Merger on that basis, and the DC Circuit Court still would have affirmed the District Court's decision. Cigna thus proved that the No Injunction Condition would have failed in any event. Judgment will be entered in Cigna's favor on Anthem's claims for breach of the Efforts Covenants.

For its part, Cigna failed to prove that Anthem breached its obligations under the Regulatory Efforts Covenant. Anthem sought at all times to complete the Merger. Cigna disagreed with Anthem's strategy in real time, and with the benefit of hindsight, it is easy to criticize Anthem's approach to obtaining regulatory approval. Anthem nevertheless chose a sound strategy and took all of the actions necessary and appropriate to pursue it. Judgment therefore will be entered in Anthem's favor on Cigna's claims.

Assuming for the sake of argument that Cigna had proved that Anthem breached the Regulatory Efforts Covenant, Cigna still could not recover damages. Under the language of the Merger Agreement, termination extinguished any liability on the part of any party except for damages for "Willful Breach." The Merger Agreement defined that term as conduct that both constituted a material breach and which the breaching party subjectively knew would constitute a material breach. Cigna's breaches of the Efforts Covenants were so strikingly egregious that Anthem would have proven a Willful Breach if those breaches had resulted in damages. The same is not true of Anthem's conduct. Assuming that Anthem's regulatory efforts fell short, the evidence demonstrates that Anthem attempted in good faith to consummate the Merger.

7

Finally, Cigna failed to prove that Anthem is liable for the Reverse Termination Fee. Anthem validly terminated the Merger Agreement under a termination right that did not trigger the fee. Anthem's termination preceded Cigna's termination, foreclosing Cigna's ability to recover the fee. Cigna understandably complains that a race to termination should not determine its entitlement to a fee. In this case, the race only occurred because Anthem continued attempting to close the Merger even after Cigna's breaches of the Efforts Covenants had caused Anthem's termination right to ripen. Had Anthem not been so committed to completing the Merger, then Anthem could have terminated the Merger Agreement long before Cigna gained a right to terminate. Judgment will be entered in Anthem's favor on Cigna's claim for the Reverse Termination Fee.

This outcome leaves the parties where they stand. Neither side can recover from the other. Each must deal independently with the consequences of their costly and ill-fated attempt to merge.

## II.     FACTUAL BACKGROUND

The evidentiary record is vast. During a ten-day trial, seventeen fact witnesses and four experts testified live. The parties introduced 4,611 exhibits and lodged 111 deposition transcripts, 103 from fact witnesses and eight from experts.[1]

---

[1] Citations in the form "PTO ¶ —" refer to stipulated facts in the pre-trial order. *See* Dkt. 641. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX — at —" refer to a trial exhibit with the page designated by the last three digits of the control number or internal page number. If a trial exhibit used paragraph numbers or sections, then references are by paragraph or section. Many trial exhibits consist of an email with attachments, and many of those use inconsistent numbering systems, with control numbers appearing on the email but not on

8

The evidentiary landscape is even more expansive than this already considerable volume of documents and testimony might suggest, because much of this litigation concerned the parties' conduct during the DOJ's investigation and the Antitrust Litigation. The DOJ investigation was massive, involving the production of terabytes of information and the taking of forty-one depositions, seven of which were introduced as exhibits in this case. Discovery in the Antitrust Litigation involved another 115 depositions and fourteen expert reports. The parties introduced seven of those depositions and three of the expert reports as exhibits in this case. The District Court conducted a lengthy bench trial that began on November 21, 2016, and ended on January 4, 2017. The District Court bifurcated the trial, first addressing the market for the sale of commercial healthcare insurance to national accounts, and then addressing the market for the sale of commercial healthcare insurance to large employers in thirty-five local markets. The District Court heard testimony from sixteen fact witnesses in the first phase and thirteen fact witnesses in the second phase. Five experts testified in one phase and four in the other. *See Dist. Ct. Op.*, 237 F. Supp. 3d at 187. The transcript from the trial in the District Court is part of the record in this case. The parties also introduced into evidence five depositions from a multidistrict antitrust litigation involving the Blue Cross Blue Shield Association (the

the attachments. For those exhibits, this decision uses a compound citation format such as "JX — at — & [subdivision] —," where the "[subdivision] —" refers to the attachment. To constrain the proliferation of footnotes, citations to single authorities appear in the text. In some instances, typically involving short paragraphs or background information, the supporting citations for a paragraph are collected in a single footnote.

"Blues Association"), which is pending in the United States District Court for the Northern District of Alabama (the "Blues MDL").

The events at issue began in early 2014 and continued through mid-2017, yet the parties only agreed to 187 stipulated facts in the pre-trial order. Most appeared to be drawn from the joint proxy statement that the parties prepared to obtain stockholder approval for the Merger. The parties did not agree on any stipulations of fact for the crucial period from January 11, 2016, to June 10, 2016, when their relationship deteriorated profoundly.

One complication of such a vast record (and the relative shortage of factual stipulations) is a multitude of evidentiary conflicts. On many issues, a substantial body of evidence flows in one direction, but there are invariably documents and testimony that resist the current. When it suited their purposes, both sides proved adept at emphasizing the contrarian evidence. It has been challenging to evaluate the record as a whole and determine what actually occurred. This decision has erred towards the fulsome (in both senses of the word) in an effort to present what the weight of the evidence shows.

Further complicating the fact-finding process, the key witnesses suffered from serious credibility problems. This decision addresses some of the major issues in the text and cites others in footnotes. A general overview is nevertheless helpful in framing the challenges that this case presented.

Cigna's credibility problems stemmed initially from Cordani's self-interested conduct during the negotiations that led to the Merger Agreement. Throughout this litigation, Cordani denied the positions he took. From a human standpoint, that was understandable, but it caused Cordani to give implausible testimony on a series of issues.

Nicole Jones, Cigna's General Counsel, testified in lockstep with Cordani on these and other issues, damaging her credibility as well.

Cordani and the Cigna ELT later turned against the Merger, giving rise to a different set of credibility issues. To resist Anthem's attempts to complete the Merger, the Cigna ELT adopted stances that conflicted with the positions that they had taken when Cordani thought that he had a path to become CEO. In this litigation, Cigna's witnesses often gave less than credible testimony when attempting to justify their changes of positon.

The Cigna ELT's resistance to the Merger also gave rise to another credibility issue. The Cigna ELT could not openly undermine the Merger without advertising that Cigna was breaching its obligations under the Efforts Covenants, so the Cigna ELT worked to hide their efforts and manufacture an alternative narrative. In that substitute storyline, Cigna tried hard to complete the Merger but was thwarted by Anthem's incompetence.

For help in crafting the alternative narrative, the Cigna ELT retained a cadre of additional advisors, including Teneo Holdings, a strategic communications and consulting firm. Evidencing the covert nature of the anti-Merger effort, the Cigna ELT treated the hiring of the additional advisors a closely guarded secret and hid their work against the Merger from the Cigna Board. During this litigation, Cigna withheld evidence of Teneo's anti-Merger activities under claims of privilege. Once revealed, that evidence eliminated any doubt about whether the Cigna ELT had attempted to prevent the Merger from closing. Cigna witnesses struggled when testifying about the anti-Merger work that their advisors performed, further damaging their credibility.

11

Anthem's credibility problems matched Cigna's, but had their roots in the opposite motivation. The Anthem ELT strived to complete the Merger. Unfortunately, the Anthem executives' desire to consummate the transaction led them to make statements, advance arguments, and give testimony that were at times questionable, at other times unsupported, and on some occasions untrue.

For example, when testifying in depositions taken by the DOJ, when speaking about the Merger in a media interview after the filing of the Antitrust Litigation, and when testifying at trial in the Antitrust Litigation, Swedish spoke positively about his relationship with Cordani, the level of cooperation between the parties, and the absence of any disputes between Anthem and Cigna. Those statements were inaccurate. At trial in this action, Cigna repeatedly impeached Swedish with his prior testimony from the DOJ investigation and the Antitrust Litigation and with internal Anthem documents.

Thomas Zielinski, Anthem's then-General Counsel, likewise made positive comments to the public markets about the level of cooperation between the parties that are inconsistent with the record. He gave optimistic predictions to the DOJ about the prospect of settlement in the Blues MDL, but in this litigation, he was forced to concede that he had no factual basis for those statements. Cigna successfully impeached Zielinski's testimony on other issues as well.

During the Antitrust Litigation, Anthem witnesses gave testimony on a variety of subjects that the District Court found unpersuasive, and the District Court Opinion repeatedly noted that the testimony from Anthem's witnesses conflicted with Anthem's internal documents. *See, e.g.*, *Dist. Ct. Op.*, 236 F. Supp. 3d at 182, 197–98, 210, 258 n.63.

12

Worse, in its zeal to defend the Antitrust Litigation, Anthem maintained that it was still considering exercising the so-called "affiliate clauses" in its provider agreements, *id.* at 233, even though the Anthem ELT had decided not to do so. Anthem's position was technically accurate because Anthem could have revisited the decision or exercised the clauses on a case-by-case basis, but Anthem was not fully candid with the District Court. Fortunately, the District Court recognized that Anthem was unlikely to exercise the clauses and did not credit Anthem's litigation position. *Id.* at 182–83, 239 & n.40, 244.

Like Cigna, Anthem took positions during discovery that undermined its credibility. Throughout the Antitrust Litigation and initially in this litigation, Anthem claimed that the Blues Association had created a special task force to address issues related to the Blues MDL, making the task force's documents privileged. That was not true. The special task force was created to address the Merger.

Both sides anticipated this lawsuit, and they engaged in careful record-making to prepare for it. Cigna began this process in February 2016, when it retained its cadre of additional advisors. From that point on, it is difficult to accept at face value certain carefully crafted and heavily vetted documents, such as Cigna's board minutes, formal presentations, and dispute letters with Anthem. That is not to suggest that the documents were fabricated or fraudulent, only that the language in these documents was chosen for the impression it would create and must be read in light of what the larger record shows.

Anthem was slower on the draw with record-making and seems to have engaged in it to a lesser degree. By May 2016, however, Anthem had brought on a litigator who reviewed and commented on key documents, such as Anthem's dispute letters with Cigna.

13

Anthem's record-making behavior was less serious than Cigna's, both because it started later and because the Anthem ELT and its advisors were not as skilled at it. They identified and objected in real time to problems that Cigna was creating. Cigna manufactured a narrative to conceal and, if necessary, justify its opposition to the Merger. Anthem operated linearly; Cigna operated in three dimensions.

The standard of proof on all issues was a preponderance of the evidence. Because both sides advanced claims for breach of contract, the allocation of the burden of proof was complex. Each side claimed that its counterparty breached the Efforts Covenants. For purposes of those claims, the party asserting breach bore the burden of (i) proving the facts necessary to establish breach and (ii) showing that that the breach contributed materially to the failure of the No Injunction Condition. Once a party carried that burden, then the breaching party bore the burden of proving that the No Injunction Condition would have failed even if the breaching party had fulfilled its obligations. Cigna bore the burden of proving the facts supporting its claim for the Reverse Termination Fee, including the valid exercise of a termination right that would trigger Anthem's obligation to pay the fee.

A. **The Parties**

During the period relevant to this case, Anthem and Cigna were two of the nation's five largest providers of private health insurance. The other major players were Aetna, United Healthcare, and Humana.

As of December 31, 2015, Anthem managed health insurance plans covering approximately 38.6 million individuals, making it the nation's second largest health insurer. Anthem was the largest member of the Blues Association.[2]

The Blues Association owns the Blue Cross and Blue Shield trademarks (the "Blues brands"), which it licenses to thirty-six member plans to use in exclusive service areas. Each member has the exclusive right to use the Blues brands within its service area. Outside of its service area, each member can access its fellow members' networks, which allows each member's customers to receive nationwide coverage.[3]

The Blues Association has established rules that its members must follow to use the Blues brands and access their fellow members' networks (the "Blues Rules"). Under the National Best Efforts Rule, each member must use its best efforts to generate at least 66.67% of its total annual revenue using the Blues brands (the "NBER" or "2/3 Rule"). The CEOs of the member companies comprise the board of directors of the Blues Association (the "Blues Board") and administer the Blues Rules.[4]

---

[2] PTO ¶¶ 20–21, 63; *see* JX 846 at '342. Until 2014, Anthem was known as Wellpoint, Inc. *See* JX 39 at '207. For simplicity, this decision refers only to Anthem.

[3] *See* JX 581 at '719; JX 4147 at '676.

[4] *See* PTO ¶ 92; JX 4147 at '629, '631, '651. There is also a Local Best Efforts Rule, which requires that each member use its best efforts to generate at least 80% of its annual revenue using the Blues brands in the territories where it holds an exclusive Blues license. Compliance with the Local Best Efforts Rule was not a significant issue for NewCo, and so it did not figure prominently in this case.

Anthem held exclusive licenses to use the Blues brands in all or part of fourteen states (the "Anthem Blue States").[5] In other states, Anthem marketed its plans under non-Blues brands, such as Amerigroup, Simply, and CareMore. Anthem enjoyed comparatively little success marketing products under its non-Blues brands. Anthem derived the vast majority of its revenue by selling products under the Blues brands in the Anthem Blue States. Within those states, Anthem used its size to negotiate deep discounts from healthcare providers. Anthem's business model relied on its discounts to attract and retain customers. To service national accounts, Anthem relied on its membership in the Blues Association.[6]

Cigna's business model was different. As of December 31, 2015, Cigna covered approximately 13 million members, making it the third largest health insurer in the United States. Unlike Anthem, Cigna had a national network of providers covering all fifty states. Because Cigna was smaller and its members were more geographically dispersed, Cigna often could not obtain the lowest discounts from providers. Cigna instead specialized in "value-based" care. Under that model, Cigna worked with providers to establish measures of overall patient health, then paid providers for improving those metrics. The value-based

---

[5] PTO ¶ 22. The fourteen Anthem Blue States are "California (Blue Cross license only), Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri (excluding thirty counties in western Missouri), Nevada, New Hampshire, New York (excluding certain areas), Ohio, Virginia (excluding certain counties near Washington, D.C.), and Wisconsin." *Dist. Ct. Op.*, 236 F. Supp. 3d at 185 n.1.

[6] *See* PTO ¶¶ 21, 63, 90; *Dist. Ct. Op.*, 236 F. Supp. 3d at 185–86; JX 36 at '158; JX 581; JX 1948 at '303.

model required more engagement from providers, but could lower the total cost of care through improved health outcomes.[7]

Using its value-based model, Cigna nearly doubled its revenue between 2010 and 2015, growing at a rate of 14% annually. During the same period, Anthem's growth hovered around 3% annually, the lowest growth rate in the industry.[8]

## B. Merger Talks In 2012

In August 2012, Cordani contacted Swedish's predecessor about a merger. Because Anthem derived the vast bulk of its revenue from Blue-branded plans, it was essential that Anthem's licenses to use the Blues brands remain in place. The Blues Rules required consent from the Blues Association for any acquisition of a member plan. To avoid the consent requirement and preserve its licenses, Anthem needed to be the surviving legal entity in any transaction and continue as NewCo.[9]

Cordani envisioned a transaction in which Anthem would nominally be the acquirer, but he and the Cigna ELT would manage NewCo. On December 27, 2012, Cigna proposed a stock-for-stock merger that would result in Anthem's stockholders owning 55% of NewCo's equity. Seats on the NewCo Board would be split equally between Anthem and

---

[7] PTO ¶ 24; *Dist. Ct. Op.*, 236 F. Supp. 3d at 178, 230–31.

[8] JX 298 at '495; JX 518 at '792–93.

[9] *See* PTO ¶ 90; JX 24; Zielinski Tr. 178–79.

Cigna, and leadership would rest with Cigna. Cordani, would be the CEO, and Ike Harris, Cigna's Chairman, would chair the NewCo Board.[10]

Anthem viewed Cigna's proposal as opportunistic: Cigna stock was trading near all-time highs, while Anthem's stock price was depressed. The Anthem Board decided not to pursue a transaction.[11]

During the discussions, the parties recognized that NewCo would have to comply with the 2/3 Rule. They understood that if NewCo was not initially in compliance with the 2/3 Rule, then it would have 120 days to provide the Blues Association with an action plan for achieving compliance. A committee of the Blues Board would review the action plan and make a recommendation to the Blues Board. The action plan then would have to be approved by the Blues Board and the members of the Blues Association. Once the action plan was approved, then NewCo would have two years from the date of approval to achieve compliance.[12]

---

[10] *See* PTO ¶ 94; JX 23.

[11] *See* JX 24 at '202; JX 26. Cordani testified that Anthem declined to proceed in 2012 because of "some complications with the Blues Rules that [Anthem was] confronting." Cordani Tr. 1751. That testimony was inaccurate. It was part of Cigna's effort throughout this litigation to portray the Blues Rules as always having been an insurmountable obstacle to a transaction. Although the parties identified the Blues Rules as an issue for consideration in 2012, they did not view them as an impediment. Anthem declined to pursue discussions for reasons other than the Blues Rules. *See* JX 43; *see also* JX 24; JX 25.

[12] *See* PTO ¶ 93; JX 846 at '357; JX 1103 at '394 & slide 3; Serota Tr. 2826–27.

18

## C.    Merger Talks In 2014

In March 2013, Swedish became CEO of Anthem. In early 2014, Cordani reached out to Swedish to see whether he would be open to a deal.[13]

Strategically, both Anthem and Cigna recognized that the already-consolidated market for health insurance companies left a limited number of "pieces on the chessboard."[14] Both Anthem and Cigna believed that the next major transaction could be the last one that antitrust regulators would approve.[15]

Anthem noted that any deal would "require navigating the Blue's [sic] quagmire . . . ." JX 28 at '411. As a standalone entity, Anthem easily satisfied the 2/3 Rule. But after a combination with Cigna, NewCo would only generate 53% of its revenue using the Blues brands, falling short of the two-thirds requirement.[16] Cigna cited the Blues Rules as one of the "Integration Considerations" for a deal with Anthem and noted that to obtain antitrust approval, NewCo's "[l]ocal market depth may require divestitures."[17]

---

[13] *See* PTO ¶¶ 96–97; Cordani Tr. 1752.

[14] JX 28 at '411 (internal quotation marks omitted); *accord* JX 46 (Anthem analysis); JX 78 (Cigna analysis).

[15] *See* JX 46 at 14; JX 78 at '715.

[16] JX 46 at '994–95 & slide 16; JX 98 at '964; JX 138 at '646.

[17] JX 78 at '721; *see* Gray Dep. 294 (Apr. 2017) (agreeing that during 2014 and early 2015, Cigna contemplated divestitures as part of transaction with Anthem); *id.* at 322 (agreeing that the divestitures "would include Cigna or Cigna-associated accounts and clients").

Zielinski, Anthem's General Counsel, was initially skeptical about NewCo's ability to comply with the 2/3 Rule. In an internal email to other Anthem executives, he offered his "preliminary thoughts" on the risks of entering into a deal with Cigna on "an expedited timeline." JX 62. He explained that Anthem should assume that the 2/3 Rule would remain in effect at closing, meaning that NewCo would have to divest business to achieve compliance. He also identified two outside-the-box alternatives. One was for NewCo to terminate its membership in the Blues Association, which would trigger a termination fee of $2.4 billion, deprive NewCo of access to the Blues network, and jeopardize all of Anthem's Blues-based revenue. The other was for NewCo to tell the Blues Association that it would not comply with the 2/3 Rule on the grounds that it violated the antitrust laws, leading to a lawsuit either by the Blues Association to enforce the Blues Rules or by Anthem to invalidate them. Zielinski believed the possibility of litigation against the Blues Association would "cause irreparable damage and harm to [Anthem] within the Association and amongst [the] Plans," which would "damage [or] negatively impact [Anthem's] ability to do business." *Id.*

Zielinski agreed that "[t]he economics of the transaction" with Cigna were "very compelling and [would] generate substantial shareholder value" and thus concluded that "this transaction needs to be pursued." JX 66. But he also believed that the 2/3 Rule posed an "insurmountable barrier to doing the transaction" in the near term because "the economics of the transaction are NOT compelling if we need to divest assets to comply with the [2/3 Rule]." *Id.*

20

Zielinski instead identified a possible strategy for eliminating or modifying the 2/3 Rule, which would clear the way for a transaction in the future. The plaintiffs in the Blues MDL (where Anthem was a defendant) had challenged the 2/3 Rule as an illegal restraint on competition, and their claims had survived a motion to dismiss. *See In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172, 1179 (N.D. Ala. 2014). Zielinski recommended pursuing a transaction "AFTER the resolution of the Blues [MDL] since it is highly likely that the resolution will substantially modify, if not eliminate, the [2/3 Rule]." JX 66.

Zielinski also recognized that the strategic situation might change and that "[e]xternal actions/factors may dictate that we would have to pursue the transaction BEFORE a resolution of the Blues [MDL] and thus, a modification or elimination of the [2/3 Rule] will not have occurred." *Id.* He observed that it would likely take between nine and twelve months to get from a signed transaction agreement to closing, and that after closing, NewCo would have at least two years to comply with the 2/3 Rule. He concluded, "Thus, we have a window of 33 to 36 months to resolve the Blues [MDL] which [is] more than adequate time to get the litigation settled." *Id.* He posited that

> In the unlikely scenario that the settlement of the litigation does not modify or eliminate the [2/3 Rule], we need to be prepared to challenge the enforcement of the [2/3 Rule] with respect to the transaction. Obvious risks are (1) the hostility created w/n the Association towards [Anthem]; (2) our challenge to the [2/3 Rule] is unsuccessful which would require us to divest assets to become compliant with the [2/3 Rule]; or (3) the termination of our Blue licenses which has material financial/business consequences.

*Id.*

The Anthem ELT communicated to their Cigna counterparties that they had "looked at many different scenarios . . . which would avoid the application of the [2/3 Rule] and have concluded that there is no structure or design which accomplishes that goal." JX 76 at '649. The question therefore was whether to pursue a transaction "even if the [2/3 Rule] applies." *Id.* At that point, Anthem did not regard that path as a viable option.[18]

Cigna was more bullish. Cigna viewed the issues presented by the 2/3 Rule as manageable, with the primary solution being to rebrand Cigna revenue in the Anthem Blue States.[19] In a presentation to the Cigna Board, the Cigna ELT reported that compliance

---

[18] *See* JX 74; JX 76; JX 94 at '927. Swedish inexplicably testified at trial that he did not believe that the 2/3 Rule would affect a transaction with Cigna in any way, shape, or form. Swedish Tr. 1144. He also claimed that he did not know whether NewCo would be in compliance with the 2/3 Rule after closing. *Id.* at 1144–45. That testimony was not credible.

[19] JX 81; *see, e.g.*, JX 79 (analyzing NewCo's compliance with the 2/3 Rule for Cigna CFO; noting "[t]o avoid being in default, [NewCo] would need to rebrand revenue and members; practically this means moving [Cigna] members in [Anthem Blue States] to a product written on a blue license and using the BlueCard network instead of ours"; observing that "[r]egulatory divestitures would be best from Cigna and dollar for dollar reduce the exposure to the [Blues] Rules"; commenting that "[c]omplying will mean reduced volumes to our network outside of the license states"); JX 87 (Cigna CFO anticipating "a high degree of success in moving the C[igna] business in the [Anthem Blue States] to a branded status"); JX 91 at '163−64 (Cigna analysis of the 2/3 Rule); JX 97 at '344 (talking points for update to Cigna Board; noting that there "did appear there was a path to comply with the [Blues] rules" and that "actions to comply with the rules" included "[r]ebranding of acquired C[igna] members," "[a]djusting growth strategies," and "[p]otential deal structure alternatives"); JX 98 (Cigna executive's summary of the 2/3 Rule for Cordani noting that NewCo would "fail the revenue test at ~57/43" and that "[t]o resolve this, we would need to rebrand between 23 and 27% of revenue nationally and between 64 and 73% of [Cigna] revenue in the [Anthem Blue States] (the most likely lever)"; "Initial view [of both parties] is enough C[igna] revenue can be rebranded to come into compliance with [2/3 Rule] in the short term"); *see also* JX 64 at '182 (Cigna notes on Blues Rules, indicating that primary lever is to "rebrand local C[igna] business"); JX 94 at '928 ("Although more homework to be done, did appear there was a path to comply with

22

could be achieved by having "[Cigna] business in Blue licensed territories . . . substantially migrate to Blue business, resulting in compliance with the [2/3 Rule] at or shortly after closing." JX 105 at '751. The Cigna ELT also reported that "[Cigna] business in non-Blue licensed territories may have to be divested."[20] Cigna concluded that the termination of Anthem's Blues licenses "would be significantly damaging to [NewCo] from a business perspective and require a substantial out-of-pocket payment." *Id.* at '752.

Ultimately, Cigna agreed with Anthem that "the best path" was to wait until the 2/3 Rule was altered or eliminated through a settlement in the Blues MDL. Like Anthem, however, Cigna "wanted to be ready . . . to move sooner" in response to industry consolidation.[21]

The parties therefore continued moving forward with due diligence and discussing how NewCo could comply with the 2/3 Rule.[22] Cigna consistently identified the primary levers for achieving compliance as (i) divestitures of non-Blue-branded business, i.e., portions of Cigna's operations or Anthem's non-Blue-branded plans, and (ii) "rebranding"

---

the [Blues Rules]"); *id.* at '929 ("Agreed we likely could get into compliance, and while growth limitations would erode some value, there was still significant value in a combination.").

[20] *Id.* After the Cigna ELT began opposing the Merger, Cigna expressed different views regarding these issues.

[21] JX 81; *accord* JX 94 at '928; Zielinski Tr. 15–16.

[22] PTO ¶ 101; *see, e.g.*, JX 134; Zielinski Tr. 12–14, 139–41.

non-Blue-branded business as Blue-branded business, which generally meant moving Cigna members in the Anthem Blue States onto Anthem plans.[23]

In February 2015, Anthem put the discussion on hold.[24] The Blues Rules played a role in Anthem's decision, but not because NewCo could not achieve compliance. Both Anthem and Cigna believed that the Blues Rules and the Blues MDL created an excessive level of interloper risk.[25] At that point, Anthem did not see a transaction happening "anytime soon." JX 150.

## D. The Path To The Merger Agreement

After Anthem called off the talks, Cigna made a bid for Humana. Humana rejected Cigna's bid, but said it was launching a limited sale process.[26]

Anthem believed that Humana's sale process would be the catalyst for a final round of industry consolidation, and Anthem did not want to be left without a merger partner. Anthem decided "it was time to reengage in discussions with Cigna about a potential combination." PTO ¶ 111. Although the risks that caused Anthem to call off discussions ten weeks earlier had not changed, Anthem believed that they were outweighed by "the risk of being left out of the remaining consolidation in the health benefits industry . . . ."[27]

---

[23] *See, e.g.*, JX 98 at '964; JX 119 at '884–85; JX 3121 at '376; Zielinski Tr. 14–16.

[24] PTO ¶ 108; JX 150; Swedish Tr. 1154.

[25] *See* JX 150 at '762; JX 154; *see also* JX 81; Zielinski Tr. 16, 18; Gray Tr. 1638.

[26] *See* PTO ¶ 110; JX 154.

[27] *Id.* Cigna begins its account with Anthem's outreach to Cigna and claims it was driven by Anthem's need for growth. *See* Dkt. 700 at 7. That is a partial narrative. Cigna

24

Swedish called Cordani to tell him that "Anthem wanted to aggressively reengage." PTO ¶ 112. Cordani was interested, but wanted to understand what had changed. PTO ¶ 113. The main reason was the strategic imperative of consolidation, but Swedish felt that Anthem needed to address the 2/3 Rule. *See* JX 193. There was only one Blues-related development: The court in the Blues MDL had ordered the parties to mediate. *See* JX 172.

The mediation order did not play a meaningful role in Anthem's decision to re-engage.[28] Swedish nevertheless told Cordani that "[t]here have been a number of recent developments which I was able to share with my Board last week that I would now like to share with you." JX 172 at '615. Those included:

- "We are moving forward on court ordered mediation [in the Blues MDL] and have the General Counsels of the various Blue Plans meeting in the next couple weeks to put forward a proposed 'offer' regarding modifications to the existing [Blues] rules that [the Blues Association] would be willing to offer as part of a settlement." *Id.*

- "We are fully anticipating and intend to influence a modification to the current best effort rules as part of our settlement offer." *Id.*

- "While we do not know the ultimate outcome of the mediation, we have shared this information with our Board along with the potential implications of us not being able to come to a satisfactory resolution in the near term." *Id.*

- "We have also updated [our Board] regarding the changing landscape . . . and our belief that the timing of a proposed combination of our companies is at a uniquely beneficial stage." *Id.*

---

had twice approached Anthem about a deal before Anthem's outreach to Cigna, which was driven by strategic consolidation in the industry.

[28] Zielinski Tr. 227–28, 232–33, 237–38; Swedish Tr. 1161–63. Swedish and Zielinski also told the Anthem Board that the mediation affected their views on re-engaging with Cigna, which was, at best, an exaggeration. *See* JX 193; Zielinski Tr. 235–37; Swedish Tr. 1167–69.

- "Our Board is comfortable with the level of interloper risk that the [Blues MDL] had enhanced and believes that risk has diminished." *Id.*

The Cigna ELT always had been more bullish than Anthem about the risks posed by the Blues Rules, so they willingly re-engaged.

As with the talks in 2012, Cordani envisioned Anthem as "technically acquiring" Cigna, but with Cigna management "tak[ing] control" of the combined entity.[29] He anticipated a merger like JPMorgan's acquisition of Bank One, JX 3001, where Bank One's CEO, Jamie Dimon, was guaranteed the CEO role of the combined company two years after closing, JX 8. Cordani wanted to gain control "in a more accelerated way than BancOne [sic]."[30]

Cigna developed talking points to convey to Anthem the type of offer that would be received favorably. Cigna's number one objective was to "[c]learly articulate [its] position on [the] CEO role," which was that Cordani needed to be CEO. JX 184 at '188. A related goal was for "several of the other key management and integration positions to be identified and sourced from the talent pools at both organizations prior to announcement."[31] Cigna's number two objective was to "[s]ignal expectation for meaningful premium (i.e., greater

---

[29] JX 3001; *see* JX 183.

[30] JX 3001; *see* JX 183.

[31] *Id.* at '189. After Cordani was unable to secure the CEO role, the Cigna ELT took a different position regarding the timing of the leadership selection process. *See* Part II.G, *infra*. The timing ultimately was a matter of judgment on which reasonable minds could disagree. Cigna's changing positions were influenced by the personal interests of Cordani and the Cigna ELT.

26

than 10%)." *Id.* at '188. Cigna's third objective was to "creat[e] board / governance structure that is efficient, fair and balanced." *Id.*

### 1. The Non-Public Negotiations

On June 3, 2015, Anthem offered to pay $174 per Cigna share, reflecting a 28% premium over the market price. The consideration would consist of 40% cash and 60% stock, resulting in Cigna's stockholders owning 40% of NewCo. Swedish would serve as the CEO and chairman of the NewCo Board. Cordani would be President and COO and serve as a director. Anthem envisioned a board of fourteen, with eight from Anthem and six from Cigna.[32]

On June 7, 2015, Cigna asked Anthem to raise its offer to the mid-$180s per share. Cigna countered that Cordani should be CEO. Cigna agreed that Swedish could chair the NewCo Board, but wanted an equal number of directors for Cigna. Cigna also wanted Cordani and Swedish to serve as co-chairs of the integration team, which would give Cordani influence over how NewCo was organized. PTO ¶ 118.

Over the following weeks, the parties went back and forth on price, the executive roles, and the board split. On June 10, 2015, Anthem raised its offer to $178 per share (a 31% premium), consisting of 46% cash and 54% stock. Anthem agreed that Cordani and Swedish could co-chair the integration team, but did not change its other leadership and governance terms. On June 14, Cigna reiterated its demand for a price in the $180s and

---

[32] *See* PTO ¶ 116; JX 199. Anthem viewed these governance terms as "consistent with paying a premium" for Cigna. Zielinski Tr. 20.

proposed a board with eight Anthem designees and seven Cigna designees. PTO ¶¶ 120–22. Cigna also asked for "additional clarity on leadership." PTO ¶ 121.

On June 16, 2015, Anthem stood on its prior offer. PTO ¶ 123. Internally, Swedish viewed Cigna's pushback as a "charade" and wanted to "get aggressive." JX 250. Anthem's bankers were "surprised that [Cordani] hasn't accepted such a shareholder friendly offer" and encouraged Anthem to "assume he will be as aggressive as possible to either pursue H[umana] or use the blue rules" as a reason to reject a deal with Anthem. *Id.* Cordani's insistence on the CEO role continued to be the major sticking point.[33]

On June 18, 2015, Cordani sent a letter to Swedish that reiterated Cigna's demands. PTO ¶ 125; JX 261. Although Cordani stressed that he should "assume the role of Chief Executive Officer at closing," Cordani referenced a proposal that Swedish had made for Cordani to start as President and COO and then transition to CEO. JX 261. Cordani wrote that Cigna was "open to working with [Swedish's] proposal . . . if we can reach an acceptable position on our specific roles and responsibilities as well as the timing of the transition."[34]

---

[33] *See* JX 251; JX 254; Zielinski Tr. 24.

[34] *Id.*; *see* Cordani Tr. 1908.

By this point, the Anthem ELT was convinced that Cordani was blocking a deal to secure his path to CEO.[35] Zielinski believed that Anthem needed to find a way "to get rid of Cordani, for [Swedish's] benefit, as well as the combined company's future."[36]

Later on June 18, 2015, Anthem sent Cigna a best and final offer. Anthem met Cigna's price demands by offering $184 per share (a 35.5% premium), payable 68.6% in cash and 31.4% in Anthem stock. The NewCo Board would include ten Anthem designees and three Cigna designees. The proposal did not contemplate any role for Cordani. Anthem asked Cigna to agree to two weeks of exclusivity, telling Cigna that it would break off discussions if Cigna did not agree by the next day.[37]

Confirming his focus on his own role, Cordani characterized Anthem's proposal as going "backwards in many key areas," notwithstanding the substantial increase in price.[38] Thomas McCarthy, Cigna's CFO, dismissed the proposal as "[n]ot constructive." JX 273.

In a letter dated June 19, 2015, Cordani rejected Anthem's request for exclusivity. He wrote that Cigna was willing to proceed at $184 per share, but only if Anthem agreed to a 50/50 mix of cash and stock and a NewCo Board with eight Anthem designees and six

---

[35] *See* JX 268; *see also* JX 231.

[36] JX 268; *see* Zielinski Tr. 256–58.

[37] PTO ¶¶ 126–27; JX 269; *see* Zielinski Tr. 30–32; *see also* JX 299.

[38] JX 271. Cordani testified implausibly that by referring to "key areas," he meant regulatory issues. Cordani Dep. 722–23. The proposal did not address regulatory issues, and at trial, Cordani retreated from his deposition testimony. Cordani Tr. 1913–15. Cigna's directors understood that the "backwards" moves referred to the changes to Cordani's position and the number of Cigna designees. *See* Harris Dep. (Feb. 2019) 66–67; Partridge Dep. 173–74; Zollars Dep. 129–30.

Cigna designees. He accepted that Swedish would serve as CEO and chair, but asked for a succession plan under which Swedish would cede the CEO role after twelve months and the chair role after twenty-four months. PTO ¶¶ 128–129.

After these exchanges, the parties discussed possible transition plans. Swedish was willing to step down as CEO after twenty-four months, but the Anthem Board would not commit to Cordani taking over as CEO. They were prepared to agree that if Cordani did not become the CEO, then he could terminate his employment and would be paid severance, but that was not acceptable to Cordani.[39]

### 2. Anthem's Bear Hug Letter

On June 20, 2015, Anthem sent Cigna a public bear hug letter that reiterated its offer. Cigna's directors and the Cigna ELT rallied around Cordani. They viewed Anthem as shortsighted for not having locked in Cordani as Swedish's successor.[40]

---

[39] *See* JX 281 at '355. Despite the overwhelming evidence that Cigna focused primarily on securing the CEO role for Cordani, either immediately or through an agreed-upon succession plan, Cordani testified that it was Anthem who wanted him to become CEO. *See* Cordani Tr. 1868–71 (impeaching Cordani with prior testimony). He also claimed that it was Swedish who wanted more Cigna directors on the NewCo Board. *See Id.* at 1871–74. At trial, Cordani claimed that Swedish never told him that the Anthem Board would not commit in advance to transition him to the CEO role. *Id.* at 1872. He also could not recall requesting supermajority voting requirements to protect his position and the Cigna designees, *see id.* at 1875–76, which Cigna had requested, *see* JX 261 at '137; JX 274 at '373; Zielinski Tr. 26. Cordani's testimony on these points was contrary to the factual record. Jones was the only witness who backed Cordani's assertions. *See* Jones Dep. 29–30; Jones Tr. 2708–10. Jones also claimed implausibly that she could not recall whether Cigna was interested in securing a position for Cordani. Jones Tr. 2709.

[40] *See* JX 289; JX 291.

On June 21, 2015, Cigna responded with a public letter of its own. Cordani had instructed his team to shift the focus away from the struggle over the CEO position by attacking Anthem. *See* JX 300 at '301. Cigna's letter cited "Anthem's lack of a growth strategy, complications relating to your membership in the [Blues Association] and the related antitrust actions, and other significant challenges, such as the massive data breach you experienced in February." JX 298 at '494. None of these issues had been points of discussion in the negotiations. *See* Zielinski Tr. 33–34.

Cigna's letter also asserted that Cigna had "not been able to validate that a combination of Cigna and Anthem could be integrated successfully under the [Blues Rules], and the stakes are too high and the penalties too great to move forward without that validation." JX 298 at '496. That was inaccurate. The Blues Rules had not been a major negotiation point, and Cigna had been comfortable with NewCo's ability to achieve compliance, both during the current round of negotiations and during the two prior rounds of discussions.[41] The sticking points were Cordani's role and the composition of the NewCo Board.[42]

The media played up the power struggle between Cordani and Swedish. Cigna investors complained that Cordani and the Cigna Board seemed to be impeding a deal based on how it affected them personally.[43]

---

[41] *See* Part II.B & C, *supra*; Zielinski Tr. 33–34; Zollars Tr. 2484–85.

[42] *See* Zollars Tr. 2483–84.

[43] *See* JX 319; JX 321; JX 325; JX 333.

On June 23, 2015, Anthem made a further proposal, this time offering a mix of 60% cash and 40% stock and a NewCo Board consisting of nine Anthem designees and four Cigna designees. The proposal contemplated that Cordani would hold the roles of President and COO.[44]

Cigna decided "not to engage" with Anthem's offer. JX 327 at '395. Instead, Cigna made an offer for Humana. PTO ¶ 136. But to hedge its bets, the Cigna Board instructed the Cigna ELT to "ask for a meeting" with Anthem to "better understand the risks of the [Blues] rules, the Blues [MDL], and [a recent Anthem] data breach, as well as to determine whether the companies had a common vision for the strategic direction of a combined company." JX 327 at '395–96.

On June 25, 2015, Bloomberg published an article reporting that Humana had received bids from Aetna and Cigna and that its board preferred the Aetna offer. *See* JX 339 at '324. On June 27, the Cigna Board decided not to pursue Humana further. JX 340.

### 3. The Management Meetings

Meanwhile, on June 26, 2015, the members of the Cigna ELT (other than Cordani) met with their Anthem counterparts for a full-day meeting that included discussion of the Blues MDL and the 2/3 Rule. Anthem "[c]onfirmed there are potential paths forward," but cautioned that the "dynamic is very complex, with uncertain outcomes and the potential for other Blues to disrupt the combined company through unforeseen changes they can implement outside our control." JX 339 at '325. The Anthem ELT expressed optimism

---

[44] PTO ¶¶ 134–35; *see* JX 322.

32

because they had received fourteen supportive responses from other Blues members to the announcement of their bid for Cigna, with only three unfavorable responses. *Id.* Zielinski viewed the Blues MDL as "manageable, maybe even favorable" to a merger, and he was "optimistic" on the timing of a settlement. *Id.*

On June 30, 2016, the parties held a second in-person meeting between the two CEOs (Swedish and Cordani), the two General Counsels (Zielinski and Jones), the two CFOs (Wayne DeVeydt from Anthem and McCarthy from Cigna), and the chairs of the two Boards (George Schaefer from Anthem and Harris from Cigna). They addressed "value drivers" and the "vision for the combined company."[45]

In a presentation for the Cigna Board, the Cigna ELT reported that "operating outside the Blues Rules [was] not a realistic option."[46] They also reported that NewCo was likely to be "out of compliance at closing and will need to submit a mitigation plan," with the first action to bring NewCo into compliance being to "[r]ebrand [Cigna] revenue as Blue" in the Anthem Blue States. JX 351 at '076. And they told the Cigna Board that Anthem could not "change the rules without the support of other Blues." *Id.* at '072; *see id.* at '075.

The Cigna ELT also provided the Cigna Board with an analysis of antitrust risk.

- "Given current regulatory conditions, it is a virtual certainty that antitrust agencies will conduct a lengthy, in-depth review of any transaction in this space, even if there

---

[45] JX 339 at '326; *see* PTO ¶ 138; JX 344.

[46] JX 351 at '072; *accord* Zollars Tr. 2489.

33

is only one transaction. . . . If there are multiple transactions pending at the same time, the scrutiny will be heightened." JX 4000 at '240.

- o "At a minimum, divestitures in local geographies likely would be required for antitrust clearance . . . , although litigation challenges . . . are a distinct possibility . . . ." *Id.*

- "[I]f [Aetna/Humana] is announced before or roughly at the same time as [a Cigna/Anthem transaction], the antitrust risk . . . . generally increases. The increased risk stems from not only the potential for additional local divestiture and national competition issues . . . , but also the optics and resulting pressure on regulators from a perceived reduction in nationally significant health insurers from 5 to 3." *Id.*

- "Given current regulatory conditions . . . , we believe that there is a 20-30% chance that DOJ will seek to challenge a [Cigna/Anthem] transaction, despite an offer to make local divestitures in line with our prior estimates." *Id.* at '241.

- "This risk assessment would increase if the parties do not have compelling responses to questions we will likely face about the Blues Rules mediation [sic] plan and the potential impact of the Blues Rules on post-merger competition . . . ." *Id.*

- "On the one hand, the Blues Rules could slow down the regulatory review and increase the risk profile of a [Cigna/Anthem] transaction." *Id.*

- o "For example, DOJ is likely to inquire about the parties [sic] mediation plan as well as the impact of the Blues Rules on post-merger competition. Questions could focus on the Blues Rules [sic] effect on [NewCo's] incentive and ability to grow post-merger relative to the pre-merger status quo, [NewCo's] incentive and ability to provide access to [its] network to other Blues, the incentive and ability of the other Blues to compete against [NewCo], and on the final disposition of the parties' pre-merger assets." *Id.*

- o "The fact that there is antitrust litigation involving the Blues Rules also will likely provide an educated set of complainants that may be motivated to stress to DOJ how the Blues Rules will limit competition post-merger." *Id.*

- "On the other hand, the Blues Rules could provide some arguments in favor of the transaction—for example, there are arguments that the Blues Rules enable small Blues to compete more effectively and the [Cigna/Anthem] transaction would strengthen that competition." *Id.* at '242.

Cigna thus accepted that divestitures were likely and viewed the Blues Rules as a mixed bag, with both positive and negative implications for the transaction. Overall, Cigna's outside counsel thought there was a 70–80% chance of securing regulatory approval.[47]

These assessments echoed similar conclusions in another antitrust analysis prepared by the Cigna ELT. That analysis described "the most likely scenario (~65%-70%)" as one in which both the Anthem-Cigna deal *and* the Aetna-Humana deal were "cleared subject to local divestitures consistent with past DOJ precedent in the industry." JX 209 at '483. The assessment noted that the DOJ might focus on national accounts or argue that "one of the merger parties is a unique, procompetitive 'maverick' in the industry whose influence would be removed as a result of the transaction." *Id.* at '484. The analysis explained that

> [Cigna] has several arguments in response, including:
>
> - Local [managed care organizations (MCOs)] are a serious competitive force and cannot be discounted.
>
> - Even assuming that nationwide "market" exists, these deals are not properly viewed as "5 to 3" but are better viewed as "4 to 4." . . .
>
> - Neither [Cigna] nor [Anthem] is a uniquely disruptive maverick in the industry.

*Id.* (formatting in original). The analysis stressed that "[i]n order to maximize the odds of clearance, it should be clear to the DOJ that the parties would put up a fight in court." *Id.*

---

[47] Rule Tr. 3041; *see* Jones Tr. 2594. Anthem's outside counsel shared this view, anticipating a 75% chance of approval with divestitures in the range of 3.5 million lives. Paul Tr. 592; *see also* Rosen Tr. 780 ("I thought [the Merger] was likely to get cleared.").

The analysis also noted that "reasonable remedies can sometimes still be achieved after a suit has commenced, even when national theories are asserted . . . ."[48]

### 4. The Agreement In Principle

On July 4, 2015, Anthem and Cigna reached an agreement in principle. Anthem would pay $187 per share, consisting of 55% cash and 45% stock. The NewCo Board would have nine Anthem designees and five Cigna designees. Swedish would serve as CEO and Chair. Cordani would be President and COO and serve as a director.[49]

Although Cordani had agreed to this arrangement, he did not like it. The next morning, Harris wrote to Cordani: "David, Congratulations to you and the team. Much work ahead of you, but this is a major step, and the right step for our shareholders." JX 370. Cordani responded, "Brain knows yes. Heart is heavy." *Id.* In an email to a Cigna executive, Cordani wrote that the outcome was "correct," but that he was "still struggling to accept it all." JX 369 at '945. Cordani told Jones that his "soul [was] still unsettled."[50]

---

[48] *Id.* at '485. Cigna took different positions on these issues after the Cigna ELT turned against the Merger.

[49] PTO ¶ 143; *see* JX 365; JX 366; JX 367.

[50] JX 400 at '299. Even though the subject line of his email to Jones was "Call on Merger Agreement Tomorrow," and despite the obvious context, Cordani testified in his deposition and at trial that his soul was unsettled because of "a really dense, intense work environment." Cordani Tr. 1971–72 (reading from deposition transcript). Cordani also claimed that having a "heavy heart" is not an indication of sadness. *Id.* 1965–66. More generally, Cordani denied being unhappy about the Merger. *See id.*; Cordani Dep. 41–43, 46. Jones claimed she did not know what they were writing about. Jones Tr. 2710. Their testimony on these points was not credible.

Swedish remained uncomfortable with Cordani. Part of his concern stemmed from the hard-nosed negotiations over the CEO role, but it also is clear that the two leaders embodied different corporate cultures. Swedish was a traditional CEO who valued hierarchy. Cordani was a charismatic visionary who inspired deep personal loyalty. To Swedish, Cigna seemed like a "cult associated with [Cordani's] ego drive."[51]

### 5. The Struggle Over Cordani's Role As COO

After reaching an agreement in principle, Anthem and Cigna conducted due diligence and negotiated the terms of the transaction documents.[52] From the Anthem team's perspective, Cigna "continue[d] to act as if it [was] the acquiring entity" by making

---

[51] JX 375; *cf.* JX 925. Swedish's assessment, although tending to the pejorative, rings true. Cordani is successful and ambitious, and he established remarkably close personal relationships with his directors and senior executives. Jones noted in an email that Cordani and Harris, the chair of the Cigna Board, "are very close and Ike is incredibly supportive of David . . . ." JX 93; *see, e.g.*, JX 2274. Other Cigna directors displayed considerable loyalty to Cordani. *See, e.g.*, JX 448; JX 1024; JX 2379. So did the members of the Cigna ELT. *See, e.g.*, JX 369; JX 384; *see also* JX 1528. *See generally* JX 375 (reporting that Cigna employees were "'rallying behind David' to avoid the acquisition [and] that 'many employees feel that Anthem is the enemy'"); JX 1182 ("[Cordani] is the heart and soul of our organization."). Jones in particular appears to have prioritized her role as Cordani's principal supporter over the interests of her corporate client, or at least viewed the two as one in the same. *See, e.g.*, JX 2916 at '746 (Jones's performance evaluation identifying as one of her "Watch Outs" that "Nicole supports our leader [Cordani] to feel he is invincible and able to fight the big battles and often travels with him—all good, just need her to also continue to be a truth teller to [Cordani] both 1:1 and in the [Cigna] ELT."); Jones Tr. 2705 (Jones confirming that she "intended to leave NewCo if Mr. Cordani was not going to be given a position there").

[52] PTO ¶ 144; *see, e.g.*, JX 410; JX 411; JX 414; JX 417.

demands on issues like the headquarters location and NewCo's name.[53] The Cigna team took umbrage at Anthem acting like the acquirer. John Murabito, Cigna's Chief Human Resources and Services Officer and a member of the Cigna ELT, criticized Swedish for making "zero commitments to [Cordani]" and not seeming "to get or care about the issues [Cordani] [was] raising," JX 384. He viewed Swedish as "a cross between unprepared, insensitive, arrogant, and unaware." *Id.* He also thought it was "ridiculous" and "[n]ot acceptable" that Anthem planned to "run the people side of [Cigna's] business after signing." JX 447.

The scope of Cordani's responsibilities as COO became a major focal point in discussions. Anthem turned to Vivian Riefberg of McKinsey & Company, Inc., to help define Swedish and Cordani's respective roles. *See* JX 405. Riefberg's initial draft had the C-suite executives reporting to Swedish as CEO and gave Swedish principal responsibility for NewCo's strategy, while giving Cordani principal responsibility for all of NewCo's operations, including all of NewCo's lines of business. *See id.* at '191−94. Cordani immediately responded that he "ha[d] a big problem with the positioning"—to the point where he did not even want to discuss it. JX 408. Cordani instructed Murabito to research COO roles at other Fortune 50 companies and to focus on those where the COO had transitioned to CEO. *See* JX 413.

---

[53] JX 377; *see* JX 440 (debating which executives would call which public officials); *see also* JX 427 (Zielinski stressing that "[t]his is an acquisition; not a merger and therefore the messaging and talking points need to state that").

Cordani's main objection was that Riefberg gave the CEO primary responsibility for determining NewCo's strategy. Summarizing Cigna's objection, Jones wrote Cordani "must be involved and have influence over strategic [and] any other decisions that affect the current and future direction of the company." JX 412 (describing it as one of "3 foundational principles [to be] agreed" that the "President/COO role is viewed as a transition role for [Cordani] to CEO – not a destination role").

After working through several drafts, Swedish, Cordani, and Riefberg agreed to a structure broadly consistent with the initial draft. Cordani would be responsible for all four of NewCo's lines of business and for product and segment marketing. Swedish and Cordani would have "[s]hared accountability for integration (its planning and execution)." JX 439 at '347. They agreed that "during the integration, there will be some tough calls that [Swedish] would have to make, even with joint responsibility for the integration planning and execution." JX 431 at '830.

During the final negotiations over the Merger Agreement, one of the Cigna directors, John Partridge, wrote to Cordani:

> I think [Anthem] has possibly made a tactical mistake and it gives me a ray of hope. That mistake may be putting you on the board. During the early days of the transition, the board will have more frequent meetings than usual. I believe that [it] will expose the real differences between you and [Swedish] to the board through the dialog that should ensue. There will be no way to exclude you and no where [sic] for [Swedish] to hide. Possibly, we could have an event similar to the one we had when I joined the board. The board sees that a change will be needed in the CEO to extract the value and has the courage to take that decision early in the transition.

JX 448; *see also* JX 400. The "similar" event was Cordani's displacement of his predecessor at Cigna, Ed Hanway. At the time, Cordani was serving as President and COO

39

of Cigna, the same roles that he would have at NewCo. Some members of the Cigna Board had questioned Hanway's leadership, and when Cordani did an excellent job presenting on Cigna's standalone strategy, the Cigna Board replaced Hanway with Cordani.[54] Cordani told Partridge that his note was "very well laid out" and "[h]ard to argue" with. JX 448 at '390. Cordani added, "as for the board room. Good points. And therefore I need the 4 best partners possible. Keep an open mind when I come knocking." *Id.* Partridge later became one of the designees to the NewCo Board. Cordani Tr. 1964.

### 6. The Parties' Understandings Regarding The Blues Rules

While the parties negotiated to finalize the transaction documents, they also continued to discuss the Blues Rules.[55] Among other things, they discussed how to rebrand Cigna business as "Blue" to comply with the 2/3 Rule. McCarthy anticipated rebranding all of the Cigna clients with a headquarters in an Anthem Blues State. *See* JX 423 at '348.

During a Cigna Board meeting on July 15, 2016, the Cigna ELT reported that they had conducted significant due diligence into "key risk areas," including the Blues Rules.[56] Due diligence confirmed the Cigna ELT's earlier assessments, including on the following points:

---

[54] *See* Harris Dep. (Dec. 2018) 26–27; Partridge Dep. 307–08; 332. Cordani testified that Hanway chose to leave voluntarily, "thought it was the right time," and was "great with the decision." Cordani Tr. 1959. That was not accurate. The Cigna Board "determined that [Cordani] should be named the CEO of the company and that Ed should retire." *Id.* 1960–61 (playing video of Partridge deposition).

[55] *See, e.g.*, JX 421; Zielinski Tr. 139–41.

[56] JX 428 at '304, '312; *see* JX 434 at '406.

- "Affiliation with Blues brings substantive benefits including access to the well regarded [sic] Blues brand and additional provider network choices for clients and customers." JX 428 at '312.

- "We would need to comply with 'Blues Rules' that regulate how the brand is used and overall mix of branded and unbranded business." *Id.*

- "Changes in the overall structure of the rules ('standards') require a double supermajority vote. Unfavorable changes are unlikely while the current litigation is continuing." *Id.* at '313.

- "Changes in the practical application of the rules ('guidelines') require a simple majority of plans present. Unfavorable changes are similarly unlikely while the current litigation is continuing." *Id.*

Cigna identified the two most likely outcomes as either (i) "[r]ules stay in place as is and we adapt our model to comply through a mixture of rebranding and other actions, in line with the current business case," or (ii) "[g]uidelines are relaxed, which is favorable to the current business case."[57]

**E.     The Merger Agreement**

On July 23, 2015, the parties signed the Merger Agreement. It memorialized the agreement in principle except on the issue of price, where Anthem had raised the cash component by $1. JX 468 ("MA"); *see* JX 454. The final consideration of $103.40 in cash, plus 0.5152 shares of Anthem common stock reflected total consideration of $188 per Cigna share based on Anthem's closing price on May 28, 2015. The package represented a premium of 38.4% over Cigna's unaffected closing price on the same day. On a pro forma

---

[57] *Id.* at '313. After the Cigna ELT turned against the Merger, Cigna took different positions on these issues.

basis, former Anthem stockholders would own approximately two-thirds of NewCo's equity, and former Cigna stockholders would own approximately one-third. JX 480.

On July 24, 2015, Anthem and Cigna announced the Merger. PTO ¶ 148. During an investor call, Swedish explained that Cordani would serve as President and COO and "focus on operational performance, with responsibility for our domestic and international business units across our commercial and government segments, including our core medical and specialty solutions." JX 490 at '744. He also said that he and Cordani would "share accountability for the successful integration of this transaction, both its planning and execution." *Id.* During the call, Cordani spoke positively about the Merger and described the antitrust risk as "wholly manageable." *Id.* at '752.

Analysts and investors expressed concern about how the parties would obtain antitrust approval and comply with the 2/3 Rule.[58] In response, the parties issued a joint set of FAQs about the Merger. One question asked, "Why do you have confidence that you will be able to obtain regulatory approval?" JX 522 at '806. The companies' joint answer stressed three points:

- "We are confident in our ability to obtain regulatory approval, as our operations are highly complementary and will provide greater choice, increase access to care, and deliver better affordability to current and prospective customers and clients." JX 522 at '806.

- "The marketplace is, and will remain, highly competitive, and customers will continue to have a wide range of competitors to choose from." *Id.*

---

[58] *See* JX 491; JX 492; JX 495; JX 505; JX 519.

- "Both companies have engaged antitrust counsel and economists to provide an assessment of competitive overlap. The results of those assessments support our confidence in the transaction obtaining DOJ approval." *Id.*

The FAQs predicted that the DOJ would use "a local framework" in assessing the combination, but explained that even if the DOJ used a national framework, "Our businesses and the industry would be shown to be highly competitive and we're confident this transaction will receive clearance under either framework." *Id.* at '806–07.

The joint FAQs also addressed the Blues Rules:

- In response to a question about whether Anthem's membership in the Blues Association would "impact the DOJ analysis," the FAQs stated, "We have considered this item, and we do not think this will be an issue." *Id.* at '807–08.

- In response to questions about NewCo's ability to achieve compliance with the Blues Rules, the FAQs stated, "[W]e view the Blues Rules requirements as very manageable." *Id.* at '808.

- In response to a question about how Cigna was able to "get comfort with the ability to be in compliance with the Blues Rules," the talking points stated that "the parties determined after extensive analysis that the Blues Rules should not act as an impediment to the transaction" and that Cigna had "been able to confirm that there are adequate mechanisms to maintain compliance."[59]

The Anthem-Cigna deal was not the only major transaction in the health insurance industry. Three weeks before Anthem and Cigna announced the Merger, Aetna had announced an acquisition of Humana that would combine two other top-five industry players. If both deals were approved, then the five largest companies in the health insurance industry would become three.

---

[59] *Id.* at '809; *see also* JX 498 at '969; JX 505 at '256–57. After the Cigna ELT turned against the Merger, Cigna took different positions on these issues.

43

**F.     The Need For Stockholder And Regulatory Approval**

The signing of the Merger Agreement marked the start of a lengthy period during which the parties sought to secure the approvals necessary for the Merger to close. Anthem and Cigna needed to obtain approval from their respective stockholders. They also needed to secure approvals from federal antitrust regulators and state insurance regulators.

**1.     Stockholder Approval**

Securing stockholder approval proved relatively straightforward. In September 2016, Anthem and Cigna issued a joint proxy statement in support of the Merger. Consistent with the conclusions that Cigna had reached before entering into the Merger Agreement and the parties' joint disclosures after signing, the proxy statement contained the following statements:

- "Cigna senior management had the opportunity to resolve their diligence questions with respect to the [Blues] rules . . . , the [Blues MDL] and the data breach disclosed by Anthem in February 2015." JX 793 at 124–25.

- "Due to the size of Cigna's business, Anthem may not be in compliance with the [2/3 Rule] immediately after completion of the merger." *Id.* at 75.

- If NewCo was not in compliance with the 2/3 Rule at closing, then NewCo would submit a plan achieve compliance to the Blues Association and would have twenty-four months to implement the plan, starting from the date on which the Blues Association approved it. *Id.*

- NewCo had multiple options to achieve compliance, including "rebranding Cigna health care plans and related services so they are sold, marketed, administered or underwritten under the [Blues brands], ceding national Cigna accounts from other [Blues Association] member plans to Anthem or divesting certain business." *Id.*

On December 3, 2015, both Anthem and Cigna held special meetings of stockholders, at which their respective stockholders approved the Merger. Cigna announced that the

44

transaction was "expected to close in the second half of 2016, pending the receipt of customary approvals." JX 904.

## 2. Regulatory Approval

The far bigger task was securing regulatory approval. The process of obtaining approval for a major transaction under the federal antitrust laws involves three different decision-makers. The first is the DOJ, which reviews the merger and decides whether to allow it, to condition closing on the parties making divestitures or complying with other requirements, or to sue to block it.[60] The second is a federal district court, which hears any litigation concerning the transaction. And the third is a federal court of appeals, which hears the appeal from the district court's ruling. State attorneys general and state insurance regulators also conduct reviews of health insurance company mergers, but often follow the DOJ's lead.

The first step in the review of a major merger is for the parties to file a notification under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a. The notification provides various statutorily required categories of information about the industry and the parties' businesses.[61] If the agency takes no action within thirty days, then

---

[60] The DOJ and the Federal Trade Commission ("FTC") have concurrent authority to investigate and challenge mergers, subject to certain exceptions to the FTC's jurisdiction. *See* 15 U.S.C. § 45(a). In practice, the agencies cooperate with little duplication. Major health company mergers generally are handled by the DOJ. *See* JX 2971 ¶ 18 & nn.2 & 3 (citing Am. Bar Ass'n Antitrust Section, *Health Care Mergers And Acquisitions Handbook* 118 (2d ed. 2018) (describing the DOJ as "the primary reviewer of health plan mergers at the federal level")).

[61] *See* 15 U.S.C. § 18a; JX 2971 ¶ 22; Paul Tr. 608–09.

the parties can close their transaction. If the agency decides to take further action, then it issues a "second request" that seeks business documents, data, and other information.[62] Once the parties certify that they have substantially complied with the second request, then the agency has another thirty days to determine whether to take action regarding the merger.

The agency also typically meets with the parties and receives or collects information from customers, suppliers, competitors, and other industry participants. The agency has authority to serve civil investigative demands—effectively administrative subpoenas—to obtain documents and testimony from the merging parties and from third parties. JX 2971 ¶ 23 & n.22.

If the DOJ is concerned about a merger, then it may negotiate a resolution that imposes conditions before the merger can close. For example, the parties may agree to divest certain assets in areas where their businesses overlap. Merging parties also may line up a divestiture remedy on their own. If the DOJ challenges the transaction, then the merging parties can argue that their divestiture remedy addresses or mitigates the DOJ's concerns. This is generally called "litigating the fix."[63]

### a. Initial Outreach To The DOJ

When the parties announced the Merger, their regulatory counsel placed courtesy calls to the DOJ. *See* JX 445. Anthem used White & Case LLP and Arnold & Porter Kaye

---

[62] *See* JX 2971 ¶ 23; Paul Tr. 609.

[63] JX 2972 ¶ 84; Noether Tr. 3406; *see* Paul Tr. 657–58.

Scholer LLP as its regulatory counsel. George Paul led the White & Case team, and Richard Rosen led the Arnold & Porter team. Cigna used Cadwalader, Wickersham & Taft LLP. Rick Rule, then with Cadwalader, led its team. PTO ¶¶ 77, 79, 89.

On July 29, 2015, five days after the announcement, the DOJ opened an investigation into the Merger. PTO ¶ 149. That same day, the DOJ sent the parties a set of voluntary information requests, which included questions about the Blues Rules.[64] The DOJ also sent an information request to the Blues Association. *See* JX 604. The parties expected DOJ's early interest in the Blues Rules, and Anthem's counsel did not anticipate that the Blues Rules would be a problem. *See* JX 445 at '477.

On the same day that the DOJ opened its investigation, Anthem's counsel circulated a "case themes" outline to frame the plan for obtaining regulatory approval.[65] The parties knew that the Merger would have the anti-competitive effect of reducing the number of players in an already-concentrated industry, so the centerpiece theme of their case was the procompetitive efficiencies that the Merger would create. Anthem's outline stressed the possibility of "**$2 billion in efficiencies in two years**," attributable to operational efficiencies, medical network efficiencies and medical cost management, and other sources. JX 523 at '926. The outline included a section on "Blues Issues," including the 2/3 Rule. *Id.* at '933–934.

---

[64] *See* JX 521 at '696–98; *see also* JX 588.

[65] JX 523; *see* Paul Tr. 596–97.

Cigna's counsel prepared a similar outline.[66] It described the two companies as having complementary strengths and minimal areas of overlap. JX 567 at '576–82. Cigna's counsel posited that "[l]ocalized remedies are sufficient to address both potential customer and any provider monopsony concerns, consistent with past DOJ precedent." *Id.* at '584. Cigna's counsel also noted that "[d]oing the deal despite divestitures indicates the deal is not about creating market power, but rather about creating pro-competitive efficiencies."[67]

The Cigna memorandum maintained that the "Blues Structure Does Not Change [The] Analysis." *Id.* at '589. It identified five Blues-related theories that the DOJ might advance and offered potential rebuttals, including the argument that the Merger would reduce competition by making Cigna "more of a collaborator and less of a full-throated competitor against the non-Anthem Blues."[68]

In addition to approval from the DOJ, the Merger also required approval from insurance regulators in twenty-nine states and a handful of foreign countries. *See* JX 625 at '984 & slide 5. The parties anticipated that the regulatory review process would take approximately twelve months. *See* JX 675 at '161.

---

[66] JX 567; *see* Paul Tr. 597–99.

[67] *Id.* After the Cigna ELT turned against the Merger, Cigna took different positions on these issues.

[68] *Id.* at '590; *see id.* at '589–91; *see also* JX 550.

## b. The First Meeting With The DOJ

At the end of August 2016, the parties filed their notifications under the Hart-Scott-Rodino Act. *See* Paul Tr. 608–09. On September 2, 2015, the parties held an initial meeting with the DOJ. PTO ¶ 151. Approximately twenty DOJ lawyers and economists attended.

The purpose of the meeting was to provide an overview of the Merger and to introduce Anthem and Cigna to the DOJ. Zielinski and Jones were the primary presenters.[69] They described the Merger as a combination of "highly complementary businesses with minimal overlaps." JX 625 at 2. The presentation praised aspects of Cigna's business, *see id.* at 4, 8, but also noted that Cigna was weak in areas where Anthem had strengths:

- Cigna had "a small individual business, largely outside Anthem territory and no small group (2-50) offering." *Id.* at 9.

- Cigna had "a limited Medicaid presence," *id.* at 9, where it was "a very minor player," *id.* at 10, and a "fringe competitor," *id.* at 11.

- Cigna had a "very small presence" in individual accounts, *id.* at 10, where it was "a minor competitor," *id.* at 13.[70]

The presentation argued that by combining the companies' respective strengths, the Merger would reduce the total cost of care while improving quality and choice and "accelerat[ing] [the] move toward [a] value-based model, building on progress each party has made." *Id.* at 7; *see id.* at 2. The presentation anticipated that NewCo would expand Cigna's specialty

---

[69] *See* Paul Tr. 601–02; Rosen Tr. 810; Jones Tr. 2596–97.

[70] After the Cigna ELT turned against the Merger, they actively resisted any and all negative statements about Cigna's business.

49

insurance products, such as behavioral, pharmacy, vision, and dental, as well as Cigna's more stop-loss and shared-return coverage solutions. *See id.* at 8.

The parties projected "$2+ billion annual synergies at full run rate." *Id.* at 5. They noted that for large employers who purchased administrative services from NewCo and self-insured for the underlying medical expenses (approximately 75% of NewCo's customers), any savings from NewCo achieving greater discounts from medical providers would be passed through to the customers automatically. They argued that for employers who purchased for full coverage from NewCo, a large portion of the savings would be passed through to customers because of legal requirements on the amount of premiums that had to be spent on medical care. *See id.* 7, 18.

The parties stated that they hoped to close "in the second half of 2016." *Id.* at 5. They also stressed that they were "committed to engagement and cooperation with the Division." *Id.* at 19.

During the meeting, the DOJ staff identified their initial areas of interest, including "Anthem's relationship/discussions with the [Blues Association]; and how the Blues Rules impact the transaction." JX 630 at '387. The regulators specifically asked whether NewCo would be in compliance with the 2/3 Rule if the Merger were to close the next day.[71]

---

[71] JX 4010 at '005; Zielinski Tr. 427–29; Rule Tr. 3060–61.

Coming out of the meeting, Cigna believed that one of the "key areas" for the DOJ would be the Blues Rules. JX 630 at '387. Zielinski understood that the implications of the 2/3 Rule would be "very critical to our discussion with the DOJ and getting approval."[72]

Later in September 2015, the DOJ sent second requests to Anthem and Cigna. Many of the requests concerned the Blues Rules.[73]

### c. The Second Meeting With The DOJ

On November 13, 2015, Anthem and Cigna met with the DOJ for a second time. The purpose of this meeting was to provide the DOJ with an overview of the Blues Association and the Blues Rules.[74]

The parties told the DOJ that after the Merger, NewCo "likely will not be in immediate compliance with the [2/3 Rule]," but that would not result in near-term consequences because NewCo would have 120 days to submit a compliance plan to the Blues Association. NewCo then would would have up to two years to implement the plan once the Blues Association approved it. JX 846 at '352. The parties provided the following pro forma calculation of how NewCo could come close to complying with the 2/3 Rule:

- Immediately post-closing, $106.4 billion of NewCo's total revenue of $201.1 million would be branded Blue, reflecting 52.9% of total revenue.

- Ceding approximately $3.5 billion in Blue-branded revenue to other Blues would reduce the percentage to 51.2%.

---

[72] JX 707 at '002; *see* Zielinski Tr. 428–29.

[73] *See, e.g.*, JX 708; JX 767; JX 1506; JX 4151.

[74] *See* PTO ¶ 162; Rosen Tr. 817.

51

- Rebranding up to $27.1 billion of Cigna revenue in the Anthem Blue States would increase the percentage to 64.7%.

- To achieve compliance, Anthem would have to rebrand an additional $3.9 billion of revenue or reduce non-Blue-branded revenue by $5.8 billion.[75]

The parties confirmed that after the Merger, NewCo would continue to offer Cigna-branded products and that customers would have a choice between brands. *See id.* at '335–36. After the meeting, Zielinski reported to other Anthem executives that "his biggest worry inside the DOJ [was] the [2/3 Rule]."[76]

Confirming its interest in the Blues Rules, the DOJ asked for a deposition to memorialize the parties' representations.[77] On November 20, 2015, Stephen Schlegel, Anthem's Vice President of Corporate Development, gave the deposition. PTO ¶ 163. He testified that it was "very likely" that the MDL would settle during 2016, which would result in a change to the 2/3 Rule.[78]

---

[75] *See id.* at '353. After the Cigna ELT turned against the Merger, they resisted the prospect of rebranding Cigna revenue in the Anthem Blue States.

[76] JX 852; *see* Zielinski Tr. 439–40. Although the 2/3 Rule was Zielinski's "biggest worry," he remained optimistic about the prospects for obtaining regulatory approval. Jones, by contrast, was concerned, both about the level of the DOJ's interest and the extent of Anthem's preparation. She attempted to prod Zielinski and Anthem to be more proactive, but Zielinski and his team resisted. *See, e.g.*, JX 768; Jones Tr. 2601–08. Zielinski viewed himself as in charge of the regulatory process, thought he had matters under control, and regarded Jones as being overly worried and excessively focused on process. *See, e.g.*, JX 812; Zielinski Tr. 400–03. With the benefit of hindsight, Jones's assessment proved correct, and she championed what could have been a better approach.

[77] JX 772; JX 853.

[78] JX 870 at 51. Zielinski admitted at trial that Schlegel had no factual basis for his opinion about the timing of a settlement. Zielinski Tr. 434. Schlegel testified that he had consulted with Zielinski on that point. *See* JX 870 at 16, 48. Zielinski insisted that he only thought that the Blues MDL would settle before class certification, and he admitted that he

**G.     The Integration Planning Process And The L2/L3 Selection Dispute**

After the signing, the parties faced the challenge of integration planning. This massive process would determine how two formerly separate companies would operate as a single entity, not only on the first day after closing, but over the long term. The magnitude of the Merger meant that the scope of the integration process was unprecedented. The combined company would generate over $115 billion in annual revenue and cover more than 53 million individuals. *See* JX 525 at '473 & slide 4.

The integration planning process had major implications for the regulatory approval. To convince the DOJ to approve the Merger, or to prevail in any subsequent litigation, the parties needed to demonstrate that the Merger created efficiencies that substantially outweighed its anticompetitive effects. To prove those efficiencies, the parties needed to show that the efficiencies resulted from the combined strengths of the two companies. The parties also needed to demonstrate that the efficiencies were quantifiable and sufficiently likely to be achieved to be credited. To making this showing, the parties had to plan how NewCo would operate, both on "Day 1" after closing and over longer time horizons.

---

did not know when class certification would occur. *See* Zielinski Tr. at 435–36. The evidence indicates that Zielinski was overly confident about the Blues MDL settling before the end of 2016 and conveyed that to Schlegel, who then testified to that effect in the DOJ deposition. Although Zielinski testified that he did not recall telling Schlegel that the Blues MDL would settle before the end of 2016, Zielinski suggested a similar time frame for settlement when he spoke with the DOJ in June 2016. *See id.* at 443–48; JX 2830. The Blues MDL was scheduled for four days of mediation in June 2016, making the assumption reasonable. *See* JX 1849 at '002. Zielinski and Schlegel therefore do not appear to have made misrepresentations to the DOJ, but they should have been more candid about the limitations of their knowledge.

Integration planning also had significant implications for the Anthem and Cigna executives. The combined company would have a single executive team, so their jobs were on the line. Determining NewCo's business strategy would influence how NewCo was organized, which would affect who would be selected for the NewCo ELT. Because of its implications, the integration planning process resurrected and reinvigorated the power struggle between the two executive teams.

### 1. The First Months Of Integration Planning

The early organizational meetings for the integration planning process went well. The discussions between Swedish and Cordani, brokered by Riefberg, were productive.[79] The two executives in charge of implementing the effort—Dennis Matheis of Anthem and Chris Hocevar of Cigna—established a good working relationship. *See* JX 598 at '706–07. At the end of September 2016, Swedish told the Anthem Board that the parties had "[a]ligned on a set of key integration principles." JX 716 at '041 slides 1 & 2. Swedish also told investors that Anthem was "working collaboratively [and] closely with the Cigna team . . . ." JX 675 at '161.

There were disagreements. One dispute involved Cordani's role on the joint steering committee for the integration planning process (the "Steering Committee"). Swedish and Cordani had agreed that Swedish would chair the committee and that Cordani would serve as "Vice Chair," meaning that he would chair meetings that Swedish did not attend.[80] Other

---

[79] *See* JX 607; JX 632.

[80] JX 645; Swedish Tr. 1081–82.

Cigna executives, led by Jones and McCarthy, convinced Cordani to back away from that commitment.[81] When Jones told Zielinski that they needed a different model, Zielinski insisted on the agreed-upon structure.[82]

A similar dispute arose over the composition of the Steering Committee. Swedish proposed four Anthem representatives, four Cigna representatives, and himself as Chair. Cordani wanted six Cigna representatives.[83] They agreed on five representatives each, including Swedish and Cordani.[84]

A variant of the same issue played out over the hiring of consultants. Anthem wanted to hire McKinsey as the sole consultant for the integration process. Cigna wanted each company to have its own consultant. Anthem insisted on having McKinsey as the sole consultant.[85]

None of these disagreements were fatal, but they were irritants and reflected the parties' differing views of the transaction. Anthem saw itself as the acquirer; Cigna saw the parties as equals.[86]

---

[81] *See* JX 648; JX 649; JX 656.

[82] *See* JX 669; JX 672; JX 694.

[83] *See* JX 726; Swedish Tr.1081–82.

[84] *See* JX 778 at '803; Swedish Tr. 1340–41.

[85] *See, e.g.*, JX 594; JX 596; JX 621; Swedish Tr. 1177. A similar dispute also played out over the hiring of an economic expert to assist with antitrust approval. Jones wanted the companies to retain the expert jointly. Zielinski insisted on Anthem retaining the expert. JX 698; Zielinski Tr. 395–96; *see* Jones Tr. 2599−2601.

[86] *See, e.g.*, JX 525 at '473 & slide 7 ("Initial transaction **intent was friendly**, but feel has transitioned towards feeling more **hostile**, potentially negatively impacting

## 2. The L2/L3 Selection Dispute

The first meeting of the Steering Committee took place on October 21, 2015, followed by a kick-off meeting for the integration team leaders the next day.[87] The Steering Committee materials affirmed that "[d]ecision-making will be carried out on a **shared basis**," but "[i]f a collaborative decision can't be reached, the **final decision-making responsibility falls to [Swedish]**."[88]

As part of the integration planning process, Swedish wanted to lay the groundwork for eventually selecting the NewCo ELT. Both sides used abbreviations to refer to the tiers of executives that would constitute the team. As CEO, Swedish was "L1." The executives who would report to him were "L2." The executives who would report to "L2" were "L3." And so on.

The Steering Committee materials for the October meeting projected that the L2/L3 selection process would begin in November and be completed in early March. JX 778 at '830, '846. Decisions on NewCo's operating model and organizational design would be

---

integration activity."); JX 731 (Zielinski telling Swedish that he was "growing very tired of [Cordani's] childish antics"); JX 754 (Anthem executive telling Swedish, "At some point during our discussion [with Cordani], we do need to drive home that it's not a merger of equals, but an acquisition. . . . Cigna's leadership is still under the misguided impression that this is a merger."); Cordani Tr. 1793 ("Broadly speaking, Anthem's approach to the integration process was to make it clear to Cigna that they were in charge . . . ."); *id.* at 1796 ("[T]he friction between the two organizations continued to grow [through the end of 2015], starting with the selection of the integration consultant, through the configuration of the steering committee.").

[87] *See* PTO ¶ 153; JX 775; JX 778; *see also* Swedish Tr. 1080.

[88] JX 778 at '805; *see* Swedish Tr. 1082.

made during the same period. *Id.* at '830. The presentation described the selection of the NewCo ELT as "Joe / David's critical decision."[89]

The series of events that put the two companies on a war footing began when Swedish tried to schedule the interviews that were an initial step in the L2/L3 selection process. When Anthem's head of human resources reached out to the Cigna ELT, Cordani and his team reacted angrily. Murabito was "outraged on more than one plane." JX 890. Cordani called it "[w]rong on a number of accounts."[90] After Cordani objected, Swedish met with Cordani and Murabito and explained his timeline. JX 919. Cordani and Murabito "pushed back hard . . . ." JX 913 at '272.

Swedish and Zielinski saw Cordani's opposition as a threat to the success of the integration planning process, the Merger, and themselves personally. They knew that

---

[89] *Id.*; *see* Swedish Tr. 1081–82. Cordani similarly had told the Cigna Board that he expected the leadership decisions to be "made in Q1" of 2016. JX 771 at '906. Selecting these positions early comported with what Cigna wanted to do during the merger negotiations when Cigna had envisioned itself as acquiring Anthem. *See* JX 184 at '188–89. It also was consistent with advice that Cigna had received when Cordani and his ELT thought that they would be in the driver's seat. *See id.* at '189 (Cigna's banker telling Cordani and Jones that because the success of the deal would depend on executive leadership, it was "important for several of the other key management and integration positions [in addition to chair and CEO] to be identified and sourced from the talent pools at both organizations prior to announcement"); JX 678 at '600 (advice to Cordani from Heidrick & Struggles in September 2015 about the need to begin "designing the new leadership structure/operating model" and then assessing and selecting "the best players who best fit the requirements"); *see also* JX 693 at 2–3 (advice from Bain & Co., with whom Cordani was secretly consulting, recommending that the parties "[r]esolve the power and people issues quickly" and begin this work "even before the deal is announced"); Singh Dep. 19–20.

[90] *Id.*; *see* JX 907; JX 908.

57

Cordani had gained the CEO position at Cigna through a boardroom coup, and they suspected that he would try it again.[91] They already had discussed reducing Cordani's duties at NewCo because although the Merger Agreement required that Cordani be named President and COO, it did not specify what responsibilities those positions would have.[92] Cordani's offer letter also did not specify particular responsibilities.[93] Swedish and Zielinski hoped that if they narrowed Cordani's role, then he might leave voluntarily.[94]

### 3. The Dispute Letters

During the same period that Cigna was resisting Swedish's efforts to schedule the interviews that would begin the L2/L3 selection process, McKinsey reported that Cigna

---

[91] Nor were their concerns unfounded. *See* Part II.D.5, *supra*. Cordani secretly was working with Ashish Singh, a consultant from Bain, on how to influence Swedish and shape NewCo's leadership structure to his advantage. *See* JX 947; JX 959; JX 964; JX 974; JX 1007 at '212; JX 1147 at '397; Singh Dep. 47, 93–94, 113–14. To keep Singh's involvement secret, Cordani routed all communications with Singh through Hocevar, Cordani's "problem-solver" and right-hand man. *See, e.g.*, JX 948; JX 974; Hocevar Tr. 2301; *see also* JX 680; Singh Dep. 89. On December 22, 2015, Cordani secretly met with Singh in an airport hangar. *See* JX 993; JX 2746; Hocevar Tr. 2328; Hocevar Dep. 464; Singh Dep. 88–89.

[92] *See* MA § 1.13(b)(ii); JX 826; Zielinski Tr. 262–63; Swedish Tr. 1226, 1228–29.

[93] *See* JX 476; JX 793 at 167; Zielinski Tr. 545–46.

[94] *See* JX 1262; Zielinski Tr. 268–72; *see also* JX 1610; *cf.* JX 934. The direct evidence about Anthem's strategy of reducing Cordani's role came later in the timeline. It nevertheless is inferable that this was a strategy that Swedish and Zielinski had developed earlier. At trial, Zielinski testified that there was no connection between a reduction in the scope of Cordani's role and any discussions about inducing him to leave, claiming it was "just a coincidence." Zielinski Tr. 273. That testimony was not credible.

58

was not providing access to information needed for integration planning.[95] Zielinski sent a curt email to Jones, describing the situation as "not only disappointing but disturbing." JX 914. Cigna believed that the problem was with McKinsey and that the data had been provided. *See* JX 921. McCarthy, Cigna's CFO, met with Riefberg to clear the air. They also talked about the interviews for the L2/L3 selection process, with McCarthy bluntly telling Riefberg that that Anthem needed "to find another model . . . ." JX 965.

During a call on December 22, 2015, Swedish told Cordani that he was dissatisfied with the pace of integration planning. *See* JX 985. They turned to the L2/L3 selection process, disagreeing over virtually every aspect. Swedish maintained that he had the right to select his direct reports; Cordani wanted a voice in the selection. Swedish wanted to announce the L2 leadership structure by March 2016, as the Steering Committee had planned; Cordani did not want any L2 selections announced until May or June 2016. Swedish wanted to announce the remainder of the executive team before closing; Cordani wanted those decisions made after closing. Cordani also told Swedish that he wanted four more areas added to his portfolio as COO.[96]

On December 29, 2015, Swedish sent Cordani a letter in which he took a hard line on the L2/L3 selection, describing it as "a foundational necessity" for integration work. JX 998 at '390. Swedish also criticized Cigna's involvement in "the implementation and

---

[95] *See* JX 914; *see also* JX 874 at '011 slides 3 & 11 (citing issues with obtaining information and marking Value Capture in in red for "[r]equires action" because of delays in receiving data).

[96] *See* JX 995 at '351–52; *see also* JX 986; Swedish Tr. 1083–88.

execution of [the] integration plan" as "unacceptable." *Id.* at '389. Swedish asserted that Cigna's "delays in producing data, inefficient processes for resolving data classification disputes, never ending discussions regarding access to data, repeated postponement of meetings, and other conflicts have collectively caused a very ineffective and slow paced integration process."[97]

On December 31, 2015, Cordani responded with a letter of his own. He maintained that the L2/L3 selections would be "highly disruptive." JX 1002 at '133. He told Swedish that he had discussed the issue with the Cigna Board and received "clear feedback" that "creating this type of disruption . . . without agreement on approach, more insight into the regulatory timeline and a broader supporting talent management strategy is inadvisable . . . ." *Id.* He also disagreed with Swedish's claim that "execution of the [integration] plan has been unacceptable." *Id.* at '131. He countered with concerns about the "de minimis amount of time" that the Steering Committee had spent "gaining insight into the regulatory process and strategy." *Id.* at '132. To establish a path forward, Cordani suggested "[d]ecoupl[ing] integration planning from the leadership selection decisions." *Id.* at '134.

---

[97] *Id.* Cigna points out that by the time Swedish wrote his letter, the disputed data had been provided or otherwise addressed. *See* Dkt. 700 at 22 (citing Swedish Tr. 1191–92). Swedish's letter acknowledged that fact. JX 998 at '389. Swedish was concerned about the process going forward. Cigna also claims that McKinsey's tracking documents showed integration planning proceeding apace. *Id.* The dashboard as of November 16, 2015, showed value capture and pharmacy benefits management in red for "requires action" and three other areas in yellow for "need to monitor." JX 874 at '011 slide 3.

On January 3, 2016, Swedish responded with a more strongly worded letter, telling Cordani, "With all due respect, I am becoming deaf to the rhetoric." JX 1011 at '494. He continued: "You and your team 'say' all the right things, but the conduct and actions are inconsistent with the rhetoric. My focus is on tangible actions and results . . . ." *Id.* On leadership selection, Swedish maintained that "as the CEO of Anthem, it is most appropriate that I should determine the structure and choose the talent for the company that I will be responsible for running post-closing, a position made known to you and verbally supported by you during our discussions on December 4th when I presented the decision model." *Id.* Swedish dismissed Cordani's concerns about disruption as "not compelling," noting that he expected "the members of your senior leadership will be professional and dedicated to performing their duties and responsibilities if they are not selected," and that "Cigna has very generous Change in Control and retention benefits, which will ensure that these individuals will remain through closing." *Id.* at '495. On the issue of integration planning, Swedish delivered Anthem's bottom line position: "Anthem acquired Cigna and therefore it is Anthem's Board that has the responsibility for overseeing Anthem's integration of Cigna and to ensure that Anthem's shareholders, post-closing, realize the value and benefit of the transaction." *Id.*

### 4.     The Meeting On January 11, 2016

Swedish met with Cordani in person on January 11, 2016.[98] The purpose of the meeting was for Swedish to present his vision for NewCo's organizational structure. *See*

_____

[98] Swedish and Cordani met briefly on January 5, 2016, just before the January meeting of the Steering Committee. They did not discuss the letters. *See* JX 1025; Cordani

JX 1042. During the meeting, Swedish gave Cordani a set of slides and explained that he envisioned that Cordani would be President and COO, but would serve only as the head of NewCo's commercial business unit. *See* JX 1053. Swedish explained that the commercial business unit was twice the size of Cigna's total business, was critical to Anthem's success, and needed "a senior leader's singular focus."[99] Swedish explained that for the other lines of business, he chose executives who had experience and expertise that Cordani did not have. *See* Swedish Tr. 1091–94. Talking points that Swedish prepared for the meeting noted that because Cordani could leave within two years with full severance, Anthem needed to "diversity [its] business leaders and create multiple successor options for the Board's eventual consideration." JX 1033 at '010.

Regardless of the messaging, this was a significant reduction in Cordani's responsibilities. Swedish and Cordani had agreed during their discussions with Riefberg that Cordani would have responsibility for all four business units.[100] Cordani had attempted unsuccessfully to re-trade that agreement by expanding his role. Swedish was now reducing Cordani's role and telling him that he was not the anointed successor as CEO.

---

Tr. 1803–04. The January meeting of the Steering Committee was frustrating for Jones, who continued to seek more collaborative and proactive decision-making on the regulatory front. Zielinski and Anthem continued to believe that they had the regulatory process under control, and they resisted Jones's involvement. *See* JX 1020; Jones Tr. 2608–14.

[99] JX 1033 at '010; *see* Swedish Tr. 1093–94.

[100] *See* JX 1062 at '501 & slide 5; Zielinski Tr. 263–70; Swedish Tr. 1229.

Cordani did not react well to Swedish's message. After hearing Swedish explain the proposed structure, Cordani said that they had "nothing else to talk about" and left the room.[101] Cordani admitted that he was "disappointed" and "frustrated." Cordani Tr. 1983.

### 5.     The Cigna ELT's Response

Cordani viewed Swedish's attempt to cabin his role as a hostile act.[102] Before the day was over, Jones and her colleagues were reviewing the provisions of the Merger Agreement that addressed NewCo's officers and directors as well as the sections of Anthem's bylaws that described the senior officer roles.[103] That evening, Jones reached out to Wachtell Lipton Rosen & Katz LLP, which she described as "the preeminent firm on hostile deals."[104] The Cigna executives also reached out to Moelis & Company.[105] Cigna already had a suite of deal advisors, including Cadwalader, Cravath Swaine & Moore LLP, and Morgan Stanley. The Cigna ELT wanted additional advisors to focus specifically on defending against a perceived hostile takeover. *See* Cordani Tr. 1809–10.

Within three days after Swedish's meeting with Cordani, the Cigna ELT had prepared an action plan.[106] Titled "Integration Planning and Engagement Framework," its

---

[101] Swedish Tr. 1096; *see* Cordani Dep. 543–44.

[102] *See* Cordani Tr. 1808; Jones Tr. 2617–18.

[103] *See* JX 1044; JX 1051; Cordani Tr. 1984.

[104] JX 1051. At trial, Jones testified that she did not know that Wachtell Lipton had experience with hostile deals. Jones Tr. 2729–34. That testimony was not credible.

[105] *See* JX 1059; JX 1089.

[106] *See* JX 1075; JX 1079; *see also* JX 1090; JX 1093.

goals were to (i) limit integration planning and (ii) restore Cordani's role. JX 1075 at '613, '617, '620. The two were linked because decisions about how NewCo would be organized affected Cordani. The Cigna ELT did not want Swedish making "critical high-level decisions for NewCo (such as overall business strategy and leadership structure) . . . ." *Id.* at '617. To stop this from happening, they wanted to "[r]efocus integration planning on Day 1 priorities." *Id.* at '619.

To cabin Swedish's authority, the Cigna ELT sought to "[e]nsure that critical high-level planning decisions for NewCo are raised to and addressed by the NewCo Board."[107] The NewCo Board designees were scheduled to have their first meeting on February 16, 2016. The meeting was primarily an opportunity to socialize. Swedish Tr. 1104. Cigna ELT planned to use it to "[r]eset current expectations and processes with respect to integration planning." JX 1075 at '619.

The Cigna ELT also planned to use the February 16 meeting to re-establish Cordani's role. The goal again was to redirect "planning for the role of President and COO" from Swedish "to the NewCo Board." *Id.* at '620. Cordani would send a positive letter to Swedish, but with the "NewCo Board as the audience." *Id.* at '621. Cigna would also identify "friendly investors to reach out to Anthem's continuing directors to articulate D. Cordani's value." *Id.* And Cigna would "[c]ontinue D. Cordani's high-visibility with investors and the media." *Id.*

---

[107] *Id.* at '617; *cf.* JX 412 at '702 (email from Jones describing strategy to involve NewCo Board as a means of checking Swedish).

After speaking with their advisors, the Cigna ELT developed a more detailed "go forward path." *See* JX 1095. The Cigna ELT had concluded that Swedish's "actions don't likely create a path to not complete the deal." *Id.* at '002. The goal therefore was to establish an "[a]lternative structure . . . for integration planning, Day 1 with [Cordani] in [an] acceptable role." *Id.* at '735. Rather than Swedish, the NewCo Board would "determine best ongoing structure post Day 1 for NewCo."[108]

If all went well at the February 16 meeting, then Swedish would be checked. If Anthem resisted, then Cigna could "escalate publically [sic]," with the expectation that Anthem would back down "to avoid public fight." JX 1095 at '002.

### 6. Preparations For The February 16 Meeting

Over the ensuing weeks, the Cigna ELT, Moelis, and Cadwalader prepared extensively for the February 16 meeting.[109] Moelis dubbed the plan "Project Alpha," a code name that was "consistent with [the] objective." JX 1104. The purpose of the plan was to

> ensure that the integration plan with [Anthem] is developed and, ultimately implemented post-closing, in a manner that maximizes the long-term success of the combined company by ensuring [Cordani] is seated as [NewCo's] President and COO, with the authority, powers, duties and responsibilities generally considered to be incident to those titles . . . and positioning [Cordani] as the natural successor to the CEO . . . .

---

[108] *Id.*; *see* JX 1164 at '208 (discussing goal of slowing down integration planning).

[109] *See* JX 1104; JX 1106; JX 1107; JX 1109 JX 1140; JX 1164; JX 1182; JX 1206; JX 1207. Zollars, a Cigna director, testified that the Cigna Board was never told that Moelis was advising Cordani and the Cigna ELT on positioning Cordani to become the CEO of NewCo. Zollars Tr. 2502. He felt that paying Moelis to work toward that goal would have been an inappropriate use of Cigna's resources. *Id.* at 2503.

65

JX 1106 at '586. In its complete form, the plan consisted of a sixty-six page "playbook" that included lists of critical issues, scenario planning, "Hardball Q&A," "Proposed Board Pairings," and a "Plan B" to deploy if the meeting did not go well.[110]

Throughout each phase of "[t]he overall 'battle plan,'" the Cigna ELT and their advisors sought to act indirectly and covertly. Moelis advised "the C[igna] continuing directors should be the tip of [the] spear and [Cordani] should play a lead role in [the] shadows."[111]

The Cigna ELT separately mapped out the "Escalation Alternatives" to be deployed if the February 16 meeting did not go well.[112] The possible "Hostile Alternatives" included an investor campaign, a public relations campaign, a customer/provider campaign, a government affairs strategy, and legal action.[113] The public relations campaign envisioned that Cigna would (i) "[h]ire PR firm and identify friendly reporters," (ii) "[o]rchestrate press report about [Cigna] discontent," (iii) "arrange for positive profiles of [Cordani]," and (iv) "highlight[] merits of [Cigna] position." JX 1186 at '002–03.

---

[110] *See* JX 1522; *see also* JX 1178; JX 1194

[111] JX 1226; *see* JX 1186; JX 1224; JX 1233; JX 1251; JX 1291; *see also* JX 1165 at '522–23 (Moelis recommending that Cordani "[c]onsider asking C[igna] directors to be 'scapegoat' and [to] explain that [Cordani] wasn't the bad guy").

[112] JX 1186 at '310; *see* JX 1215; JX 1217; JX 1223; JX 1284.

[113] JX 1186 at '002; *see* JX 1215; JX 1217; JX 1223; *see also* JX 1165 ("To use one of David's military analogies which he seems to like so much – with the Board, we will use 'aggressive diplomacy' that could involve threats if we don't get the right response"); JX 1226 ("If February 16 meeting does not generate desired discussion . . . , then we should fight.").

Meanwhile, Swedish continued to attempt to move forward with the interviews that would enable him to select the NewCo ELT by March 1, 2016.[114] Cordani steadfastly resisted Swedish's efforts.[115] He argued that no decisions on leadership should be made until after the parties mutually agreed that the deal was four months away from closing.[116]

By this point, Swedish no longer wanted Cordani to be part of NewCo.[117] Swedish called a meeting of the Anthem Board in advance of the February 16 meeting, expecting "to get full support" for "proceeding with the process plus deleting [Cordani] from our consideration going forward." JX 1293. Swedish believed that "[f]urther conversation about [Cigna's] position [was] a total waste of time" and that Anthem needed to implement its plans "irrespective of [Cigna's] opinions."[118]

### 7. The February 16 Meeting

During the February 16 meeting, the Cigna designees conveyed their concern about Cordani's reduced role and the timing of the leadership selection process.[119] The Anthem

---

[114] JX 1169; JX 1189; JX 1266; JX 1293; *see generally* JX 1287 (collecting communications).

[115] *See* JX 1169; JX 1189; JX 1222; JX 1283; JX 1293.

[116] *See* JX 1283; JX 1466 at '368; JX 4050; Swedish Tr. 1204–06.

[117] Swedish Tr. 1225, 1258–59; *see* JX 1293; JX 1303; Zielinski Tr. 258–59, 273–74.

[118] JX 1303. Swedish testified in the Antitrust Litigation and again at trial in this litigation that he respected Cordani's position on the timing of the leadership selection process and regarded it as a constructive suggestion. *See* Swedish Tr. 1205–06, 1255–56. That testimony was not credible.

[119] *See* JX 1340 at '001–02; Swedish Tr. 1104; Zollars Tr. 2472–73. During the meeting, Jones raised concerns about the regulatory process. Swedish responded that

67

designees empathized with their future colleagues.[120] The consensus was for Swedish to meet with Harris to present his model and explain the underlying rationale.[121]

After the dinner with the Cigna designees, the Anthem Board met formally on February 17 and 18, 2016. The Anthem directors decided that Anthem should not do "anything to upset David or the directors at CIGNA and that the primary objective was to keep everything on peaceful terms in order to get the deal closed." JX 1323. To that end, they decided that "no announcements about the organization should be made without first discussing it with our board, and [Swedish] agreed with that." *Id.* Swedish interpreted the Anthem Board's direction as changing the timing but not the outcome.

### 8. Cigna Escalates Further.

The February 16 meeting did not result in a commitment that Cordani would be President and COO with responsibility for all four of NewCo's business units and a confirmed path to CEO. Nor did it reset expectations regarding the integration process. The Cigna ELT decided to escalate.

On February 23 and 24, 2016, the Cigna Board held a lengthy meeting. During an executive session, Cordani, Jones, and McCarthy reported on

> certain issues that have arisen which create "red flags" that the Anthem transaction may be trending away from the deal that the Board believed it

Zielinski was in charge of the regulatory process and was going to get the Merger approved. Zielinski then claimed that he had not heard about Jones's concerns before that point, which was not accurate. This experience caused Jones's frustration with Anthem to increase. *See* Jones Tr. 2619–21.

[120] *See, e.g.*, JX 1300; JX 1487; JX 1501; JX 1568; Zollars Tr. 2472–73.

[121] Swedish Tr. 1104–05; Jones Tr. 2623.

68

was entering into at the time of signing, including . . . (1) the pace and progress of the regulatory process; (2) the focus of the integration planning process; (3) Anthem's proposed post-closing organization structure; and (4) the health of Anthem's underlying fundamentals.

JX 1350 at '835. Despite being listed third, the "post-closing organization structure" was the real issue. Re-focusing the integration process was a way to protect Cordani's role and gain leverage against Anthem. Although Cigna was legitimately concerned about how Anthem was handling the regulatory process, Cigna used the state of the regulatory process as a justification for re-focusing the integration process.

At the conclusion of the two-day meeting, the Cigna Board "confirmed its desire" on the following points regarding the Merger:

(1) a special meeting of the Board be held at the end of March devoted exclusively to the Anthem transaction and the "red flags" discussed, as well as any others that may emerge;

(2) the Chairman of the Board meet with the Chairman of Anthem to discuss the organizational structure of the combined company that Anthem had proposed;

(3) management re-assess and, as necessary, de-scope the Corporation's integration planning efforts in light of the concerns raised on the pace and progress of regulatory efforts;

(4) management continue to keep the Board advised on an ongoing basis of the current market dynamics and refresh the Corporation's stand-alone strategy and projections at the regularly scheduled meeting in July; and

(5) management retain additional legal and other advisors to assist the Board in reviewing and evaluating the Corporation's rights and obligations under the merger agreement to ensure that shareholders are getting benefits for which they had bargained.

*Id.* at '843–44 (formatting added). Again, the principal issue was "the organizational structure of the combined company." To create leverage on that issue, the resolutions gave

69

the Cigna ELT the authority to "re-assess and, as necessary, de-scope" Cigna's involvement in integration planning, using "the pace and progress of regulatory efforts" as a justification. Notably, the Cigna Board also called for reassessing Cigna's "stand-alone strategy."

The resolutions provided authority for the Cigna ELT to formally hire Moelis and Wachtell Lipton as additional advisors. Cigna management already had decided to hire both firms.[122]

On Wachtell Lipton's recommendation, Cordani hired Teneo, "an exceptional communications/strategy advisory firm."[123] Skilled in the darker arts of influencing the media and public discourse, Teneo touted that "[a] well-run communications strategy can dramatically change the outcome of high-stakes litigation and/or enforcement action matters," and that "a good communications plan will not only support the overall legal strategy, but will serve to protect a company's reputation, as well as direct the conversation

---

[122] *See* JX 1151; JX 1289; JX 1360. In his deposition, Cordani testified that Cigna retained Wachtell Lipton to "advise the board on actions to help get the deal to the finish line." Cordani Dep. 201. That testimony was misleading. Wachtell Lipton technically was hired to advise the Cigna Board, but Wachtell Lipton did not do anything to help complete the deal. *See* Cordani Tr. 1985–86; Jones Tr. 2731. Wachtell Lipton helped Cigna to escape from the deal. For example, Wachtell Lipton provided advice about terminating the Merger Agreement and recommended that Cigna not make statements about believing in the merits of the Merger. Jones Tr. 2731–32. Wachtell Lipton did not provide any advice about how to convince the DOJ to approve the Merger, how to construct a remediation proposal to clear the Merger, how to achieve a resolution with the DOJ, or how to prevail at trial. *Id.*

[123] JX 1434; *see* JX 1389; JX 1430; JX 1436; JX 1437 at '433.

70

outside of the courtroom."[124] Wachtell Lipton previously worked with Teneo when representing another client that was seeking to avoid closing a merger.[125]

Only a handful of senior Cigna executives knew about Wachtell Lipton's involvement.[126] To conceal Wachtell Lipton's role, the executives referred to the firm as the "Tea Company," an allusion to Lipton-brand tea.[127]

---

[124] JX 2976. After Anthem deposed a Teneo representative about this language, Teneo revised its website. *See* JX 3140 ("A well run communications strategy can dramatically change the public's understanding of a company's role in high-stakes litigation and/or enforcement matters; a good communications plan will not only support the overall legal strategy, but will serve to protect the company's reputation outside the courtroom."); Cohen Tr. 2371–72.

[125] Cohen Dep. 22–23. In his deposition, Cordani testified that Cigna hired Teneo to "[s]upport and help us get the deal done." Cordani Dep. 146. That testimony was inaccurate. Teneo worked against the deal. Cigna never asked Teneo to develop any arguments in favor of the Merger, and Teneo did not put together any messaging or communications to support the Merger as pro-competitive. *See* Cohen Tr. 2384, 2386. Teneo's work ran so obviously against the Merger that Jones could not give a straight answer as to whether Teneo worked on the Merger. *See* Jones Dep. 1111 ("They did work on things that related to the merger, certainly. But -- or, well, I'm not sure if they worked on things related to the merger. They certainly -- there were things that obviously they were, that they were doing relating to the merger -- well, not doing relating to the merger. The answer is, I don't think they were working on anything specifically relating to the merger."). Jones testified inaccurately that Teneo was not "specifically retained to work on merger-related items." *Id.* She likewise testified inaccurately that "there wasn't a proactive nature to what Teneo was doing vis-à-vis the merger." *Id.* at 1112. Lisa Baucus, a Cigna executive who worked closely with Teneo as it worked against the Merger, testified inaccurately that she was "not really clear what [Teneo] did beyond our breakfast meetings," which Cigna conducted to raise awareness about the opioid crisis. Baucus Dep. 318. She also testified inaccurately that Teneo did not do any work to promote Cigna's standalone business. *Id.* at 317–19. She claimed not to know or be able to infer that "[C]" stood for Cigna and "[A]" stood for Anthem in a memorandum from Teneo. *Id.* at 701–09.

[126] *See* JX 1738; Jones Tr. 2665, 2728.

[127] *See, e.g.*, JX 1530; JX 1861; JX 2333; JX 2684; JX 2717; Jones Tr. 2665–66; Harris Tr. 3258–59.

Cigna similarly restricted knowledge of Teneo's activities. To manufacture a basis for claiming privilege over Teneo's work, Cigna and Teneo engaged in the ruse of having Wachtell Lipton retain Teneo. Cigna and Teneo also used Wachtell Lipton attorneys as conduits to provide a basis for claiming privilege.[128]

Consistent with the Cigna Board's directive to resume analyzing Cigna's stand-alone strategy, the Cigna ELT, Wachtell Lipton, and Teneo began examining topics such as "landscape w/ transaction completion and without" and "[p]reparation in the event

---

[128] *See* JX 1437; JX 1583; JX 1642; JX 1752; Cohen Tr. 2429–30. At trial, Jones denied that Cigna and Teneo channeled documents through Wachtell Lipton to manufacture privilege. Jones Tr. 2780–84. The contemporaneous record contradicts her testimony. *See* JX 2489; JX 3143; JX 3144; JX 4160; Jones Tr. 2784. Jones also participated in efforts to manufacture privilege for other Cigna documents. *See* JX 1109 at '395 (Project Alpha document with notation, "**SUGGEST THIS GO OUT FROM NSJ TO GET PRIVILEGE**"). In this litigation, Cigna withheld numerous Teneo documents as privileged before producing them a year later in the face of a motion to compel. *See, e.g.*, JX 1529; JX 1752; JX 1764; JX 2298; JX 2462; JX 2483; JX 2484; JX 2486; JX 2499; JX 2585; JX 3110.

Anthem also asserted privilege aggressively, most notably in the Antitrust Litigation for documents prepared by the Special Task Force. *See* Part II.K.4, *infra.* Anthem inaccurately claimed that the Special Task Force related to the Blues MDL, and Swedish testified to that effect. *See* JX 2594 at 13–17; Swedish Tr. 1303–08. The Special Task Force had nothing to do with the Blues MDL; it was formed to analyze how the Blues Association could respond to the Merger. Swedish Tr. 1293, 1305, 1365–66.

Anthem points out that it did not hide the existence of the Special Task Force, either in the Antirust Litigation or in this case, and that is true. *See, e.g.*, JX 1236; JX 3113; JX 3114; Zielinski Tr. 519–22, 525–26. The problem was Anthem's unfounded assertion of privilege, which the DOJ did not challenge. In this litigation, Cigna successfully challenged the improper assertion of privilege, and Special Task Force materials came to light. *See* Dkts. 404, 551, 559.

Neither side was forthright when asserting privilege. That is yet another factor undercutting both sides' credibility.

transaction is not approved."[129] Teneo developed the following three level "Post February 16 Framework" for Cigna to follow:



*See* JX 1522 at '065.

Anthem maintains that by this point, the Cigna ELT had turned definitively against the Merger, but Cordani and his colleagues had not crossed that bridge. The Cigna ELT had soured on *how Anthem was approaching the Merger*, including how the Anthem ELT was managing the integration planning process. The Cigna ELT was drawing a line in the sand on those issues. If Cigna could force Anthem to change its approach, restore Cordani's role, and treat Cigna as an equal partner, then the Cigna ELT could support the Merger.

---

[129] JX 1468 at '805; *see also* JX 1486 at '669.

### 9.     The De-Scoping Of The Integration Planning Process

On the day after the Cigna Board meeting, Hocevar sent an email to all of the Cigna team leaders telling them to prioritize "Day 1" planning and not to engage in detailed planning for later periods.[130] He stressed,

- "Day 1 activities are the key priority on integration planning now and if time permits, we can work on finalizing any of the high level [sic] post close planning assumptions. We are a long way off from locking down Day 1 requirements." JX 1367 at '243.

- "We have enough information shared at this point and truly need insights at this point rather than more information." *Id.*

- "We know at a high level that there is a line of sight to the $2B of shareholder synergies and while we need to validate high level thinking on the synergies, we do not need to lock down on the details of any lever at this point." *Id.* at '242.

- "The details of 'how we make money' or 'our secret sauce' should continue to be held closely to the vest at all times as it truly is the competitive advantage we have." *Id.*

- "Most importantly, neither Mckinsey [sic] nor Anthem should drive the pace of integration planning." *Id.*

He specifically noted that Cigna should not be "'[s]igning up' for specific growth strategies post close" or "[a]ccelerating any requirements / development of initiatives beyond Day 1 planning items." *Id.* Hocevar later described Cigna's position to Bain & Company as "a freeze on integration activities." JX 1557. He also told Bain that the parties were in a "[h]olding pattern in naming" NewCo's leadership team that was "Cigna driven." *Id.*

---

[130] JX 1367. There is evidence that the Cigna ELT began restricting the flow of information to Anthem before receiving formal authorization from the Cigna Board, particularly as it related to data on medical management, utilization, and value-based care. *See, e.g.*, JX 1211; JX 1212; JX 1214; Drozdowski Tr. 924–47.

Bain's takeaway was that Cigna "will no longer participate in the process as it is currently be[ing] run by Anthem and McKinsey." JX 1564.

After Hocevar sent his email, the various Cigna teams began informing their Anthem counterparts of Cigna's new stance.[131] His Anthem counterpart, Matheis, immediately objected and asked Swedish to intervene.[132]

### 10. The Status Of The Regulatory Approval Process

The timing of Cigna's decision to de-scope integration corresponded with a new phase of the regulatory approval process. Before then, the process largely involved collecting information in response to the second requests, and the relationship between the parties' regulatory counsel had been constructive. During 2015, they had made "good progress" on the regulatory strategy and were "working well together."[133] In December 2015, they conducted a preliminary review of the divestitures that might be necessary to obtain regulatory approval.[134] Both sides agreed that they were not far enough along with DOJ to work out a specific divestiture plan, but they nevertheless discussed what the shape of the divestitures should be, what assets might need to be included, how it could be structured, and potential buyers.[135]

---

[131] *See* JX 1380; JX 1382; JX 1383; JX 1390; JX 1398; JX 1432; JX 1439.

[132] *See* JX 1382; JX 1387; JX 1392; *see also* Zielinski Tr. 39–40 (describing Cigna's limitation of integration planning to Day 1 activities).

[133] Paul Tr. 613; *see* Zielinski Tr. 310; Rosen Tr. 780; Curran Tr. 1474.

[134] *See* JX 901; Paul Tr. 632–633; Gray Tr. 1664–65.

[135] *See* Paul Tr. 635–36; Rosen Tr. 784–85; Paul Dep. 70, 75–82, 86, 99.

On February 9, 2016, while the drama over the L2/L3 selection was playing out, Anthem certified that it had substantially complied with the DOJ's second requests. *See* JX 1235. As is customary, the parties entered into a "timing agreement" with the DOJ in which they committed not to close the Merger before July 1, 2016, unless the DOJ had completed its investigation. The agreement called for the parties to meet with the DOJ in June to hear its views on the Merger.[136] With the DOJ investigation cranking up, the parties' lawyers reviewed their strategy and developed a work plan.[137]

On February 17, 2016, Anthem and Cigna had their third meeting with the DOJ, this time to find out what areas the DOJ might want the parties to address through white papers or other submissions. The parties also sought to obtain preliminary insight into the DOJ's views on the deal.[138] Anthem signaled that it was prepared to discuss divestitures, but asked the DOJ to provide guidance on what types of divestitures might be helpful. After the meeting, Anthem's counsel sent a discussion document about divestiture strategies to Cigna's counsel, and Anthem's economist began running screens to identify local market areas where divestitures might be necessary.[139]

---

[136] JX 1775 at '511; *see* Rule Tr. 3068.

[137] *See* JX 1246; JX 1305.

[138] *See* JX 1292; JX 1326.

[139] *See* JX 1304; Paul Tr. 633–634. Rosen, one of Anthem's principal antitrust lawyers, testified that Anthem began having issues with Cigna's cooperation "in the January, February time frame of 2016," tying his recollection to "a dispute over the timing of the submission of the Hart-Scott-Rodino responses" and explaining that "it really started to decline after that, and accelerated after that." Rosen Tr. 781. Cigna failed to deliver its response to the second requests in a form that was acceptable to the DOJ, which became

76

## H. The Impasses Of March And April

As the calendar turned to March 2016, the disputes between Anthem and Cigna intensified, with Cordani's role front and center. By the end of March, the Cigna ELT had turned against the Merger. During April, Cigna's opposition to the Merger became clear.

### 1. Swedish Pushes Forward.

During the February 16 meeting, the NewCo designees reached a consensus that Swedish should meet with Harris to discuss the organizational structure. The Cigna ELT prepared Harris for that meeting with pointed questions about Swedish's plan and whether it reflected the parties' earlier discussions.[140] After the meeting, which took place on March 7, Harris told Swedish that his proposal deviated from the parties' agreement, that Harris would raise the issue with the Cigna Board, and that Cigna did not consent to any announcement on the leadership structure.[141]

Swedish responded to Harris on March 14, 2016. In his letter, Swedish doubled down on his structure and Cordani's role.[142] Consistent with the Anthem Board's instructions, Swedish agreed to "defer the assessment and selection of Cigna's leadership

---

an issue in late February. The record as a whole suggests that the level of cooperation between the parties' regulatory counsel began to decline after the de-scoping of the integration process, as Cigna's resistance to the Merger deepened. Cigna eventually delivered its response in a form that was acceptable to the DOJ on March 4, 2016. *See* JX 1641.

[140] *See* JX 1360; JX 1408; JX 1435; Swedish Tr. 1105.

[141] JX 1463; Swedish Tr. 1106–07.

[142] JX 1484; *see* Swedish Tr. 1107–10.

to fill L2-L4 roles in the new structure until obtaining an indication of clearance/approval from the DOJ for the transaction." JX 1484.

The Anthem Board met later that day, and Swedish reported on his actions. Rather than backing Swedish, the Anthem directors felt that he had overstepped his authority. They pushed for Swedish to call Cordani and restore his responsibility for all of NewCo's operating businesses.[143] Swedish was not happy with that guidance and did not do anything to implement it. *See* JX 1568.

### 2. The Continued Impasse Over Integration Planning

The disputes over integration planning were also coming to a head. At the monthly meeting of the Steering Committee on March 11, 2016, Matheis tried to get the integration planning process back on track. *See* JX 1466. In response to Anthem's requests to restart integration planning, Cigna generally stood by its limitation to Day 1 activities, but agreed to reconsider its position for some activities.[144]

To support Cigna's position on integration planning, Jones gave a presentation about the regulatory process. She identified the many tasks that still needed to be accomplished and argued that obtaining regulatory approval would take significantly longer than expected, which would delay closing and obviate any immediate need to push forward with leadership selection or other detailed aspects of integration planning.[145] Jones

---

[143] *See* JX 1480; JX 1487; JX 1501; Swedish Tr. 1111–12.

[144] *See* JX 1492; JX 1493.

[145] JX 1506 at '119 ("The attached is the primary reason why we slowed the pace of the integration planning."); JX 1469 at '884; Jones Tr. 2625–27, 2632–33.

criticized Anthem as having an "unclear strategy" and an "unclear remedy," and she argued that Anthem should begin working on a remediation strategy.[146] The Anthem executives disagreed. They felt that until the DOJ had identified its concerns, it would be premature to begin developing a divestiture strategy,[147] and they believed that it would be relatively easy to find a buyer and complete a transaction.[148] After the meeting, Matheis emailed that "[t]here is a clear disagreement about the timing to close." JX 1492. Anthem still believed that a closing could happen during the summer of 2016; Cigna thought it would take longer. Zielinski Tr. 405–06.

For the rest of the month, Anthem and Cigna went back and forth on additional areas of integration planning where Cigna would agree to engage. Generally speaking, Cigna insisted on limiting any detailed planning efforts to Day 1 activities; otherwise, Cigna only would engage on "high-level strategic direction, goals / metrics for NewCo, and major operating model decisions."[149] Based on Cigna's broad withdrawal from everything other

---

[146] JX 1506 at '119 & slide 6; *see* Jones Tr. 2628–29; Zielinski Tr. 402–05.

[147] *See* JX 2067; Zielinski Tr. 47, 405–07; Jones Tr. 2628–29.

[148] *See* JX 2074; Jones Tr. 2628–29; Rule Tr. 3077–79.

[149] JX 1518 at '997; *see* JX 1519 ("G&A Value Capture work is being paused per 3/11 Steer Co (along with quite a few other items)."); JX 1520 at '112 & slide 8 ("Network – Cigna data is still incomplete to conduct full value capture analytics."); JX 1545 at '420 (declining to provide "details on costs"); JX 1567 at '427 & slide 4 (noting that Cigna had discontinued "Value capture activities"); *see also* JX 1502; JX 1513; JX 1577.

79

than Day 1 integration planning, Anthem decided not to engage with Cigna on some areas where Cigna had indicated a willingness to re-engage.[150]

Anthem viewed Cigna's de-scoping of the integration work as so problematic that Anthem formed its own internal integration team. Called "Phase 2B," the internal team focused on "core priorities" where "select Cigna data or engagement is limited."[151] The main areas of focus included organizational structure, value capture, ways to reduce cost of care, NewCo's growth strategy, and NewCo's IT program and branding. JX 1558 at '777. The Phase 2B team was highly confidential, even within Anthem. Swedish informed Cordani that Anthem would continue to work on some items without Cigna's involvement, but Anthem did not share the list of topics with Cigna.[152]

At the end of March 2016, Hocevar reported to Cordani that work on work streams that did not involve Day 1 activities remained "stopped" or was "still in replanning mode. . . ." JX 1560 at '437. As late as April 18, Cigna and Anthem still had not agreed on the areas that Cigna would support.[153] During this period, Cigna kept certain categories of information "close to the vest," including the "details of important processes such as medical management [utilization]."[154]

---

[150] *See* JX 1549; JX 1558 at '783; Drozdowski Tr. 1005–08.

[151] JX 1558 at '776; *see* JX 1493; Zielinski Tr. 41.

[152] *See* JX 1491; JX 1495; JX 1613 at '699; JX 1618.

[153] *See* JX 1670; *see also* JX 1611 at '212; JX 1657.

[154] *See* JX 1617; *see also* JX 1548; JX 1626 at '124.

### 3. The Cigna Board's March 31 Meeting

On March 31, 2016, the Cigna Board held a meeting devoted primarily to the Merger. As during the February 2016 meeting, the minutes identified four "red flags": "(1) the pace and progress of the regulatory process; (2) the focus of the integration planning process; (3) Anthem's proposed post-closing organization structure; and (4) the health of Anthem's underlying fundamentals." JX 1570 at '491. The real issue remained "the proposed structure and leadership of the combined company." *Id.* at '492.

As part of the discussion, Cigna management presented a twenty-one page "Update on 'Red Flags.'" JX 1572 at '077; *see id.* at '077–97. It began with a lengthy discussion of the regulatory approval process, reporting that "[c]ounsel puts chances of closing at ~ 50/50," that the "best case scenario is we get to close by 1Q17," and that "[d]ivestitures, at a minimum, will be required." *Id.* at '079. The materials included an assessment by Cadwalader of twenty different regulatory items that needed to be addressed. For seventeen of those items, Cadwalader asserted that the work was well behind schedule or otherwise inadequate. *See id.* at '095–97.

The presentation reported that Cigna was insisting that all of the following tasks to be deferred until the third quarter 2016:

- post-close value capture targets for Year 1,
- post-close branding approach,
- post-close [go-to-market] approach developed,
- divestiture support if needed,
- post-close human capital approach, and

- post-close financial and reporting approach.[155]

Under that timeline, the work would not resume until after the DOJ already had made its decision on the Merger. The parties therefore would not be able to use the work product to convince the DOJ to approve the Merger, making it more likely that the DOJ would sue to enjoin the Merger.

The presentation critiqued Swedish's proposed organizational structure extensively. *See id.* at '084–85. It also criticized Anthem's business performance and claimed that without Cigna, "Anthem does not appear to have a path to sustainable growth." *Id.* at '086.

Teneo gave a separate presentation that identified ten risks to the Merger: three from the regulatory process, four from the standpoint of value creation, and three based on corporate governance and Cordani's role. JX 1561 at '917 & slide 3. Teneo argued that Cigna was "Well Positioned For Standalone Success," and that if the Merger was terminated at the end of 2016 because of regulatory issues, then Cigna would have "[s]ubstantial 'dry powder'" of between $6 and $8 billion. *Id.* at slide 5. Teneo identified three categories of other "M&A possibilities" that would be available to Cigna if the Merger failed. *Id.* The presentation carefully stated that Cigna should continue "to prepare

---

[155] *Id.* at '083 (formatting in original); *accord* JX 1570 at '491 (Cordani reporting to Cigna Board that Cigna had stopped all integration planning that did not involve Day 1 activities and would begin focusing on "(1) what will be needed for the combined company in the first 90 days post-closing; and (2) how, together, the companies will deliver sustainable value to all of its [sic] key stakeholders"); *see* JX 1560 at '437 (Hocevar reporting to Cordani that Cigna was working only on Day 1 activities and remained "in replanning mode" on activities for the next ninety days).

for the transaction to carry on and gain all regulatory approvals," but it stressed that Cigna also needed to "[p]rotect downside should the transaction fall apart." *Id.* at slide 8.

According to the minutes, the Cigna Board determined that "to preserve the value of the transaction and protect the interests of the Corporation's stockholders," Harris would send a letter to the Anthem Board notifying them of Cigna's concerns. JX 1570 at '492. The minutes also indicate that the Board directed management to

> (1) continue to support and influence the regulatory process to try to increase the chance of a timely approval; (2) consider the Corporation's disclosure obligations in light of management and the Board's concerns regarding the pace and progress of the regulatory efforts; (3) continue to build out a robust communication plan that is both reactive and proactive; and (4) keep the Board informed on the "red flag" issues, as well as the market dynamics and the Corporation's stand-alone strategy and projections . . . .

*Id.*

After the meeting, the Cigna ELT and Moelis began examining Cigna's potential as a stand-alone company. The Cigna ELT charged Teneo with preparing a proactive communications strategy. Teneo's "priority assignment remain[ed] preparation for a derailment." JX 1691.

The carefully drafted minutes attempt to paint a picture in which Cigna still supported the Merger. By this point, Cordani, Jones, Morabito, and other key members of the Cigna ELT had turned against it. They saw an opportunity in the heightened risk that the Merger would not receive regulatory approval. Their priority became to appear to comply with the Merger Agreement, while covertly engaging in passive-aggressive resistance to increase the chances of regulatory failure. A key part of Cigna's strategy involved documenting flaws in Anthem's approach to the regulatory process so that Cigna

83

later could argue that Anthem's incompetence—rather than Cigna's opposition—led to the deal's demise.

### 4. The Anthem Board Unsuccessfully Pursues Détente.

On April 9, 2016, the Cigna Board sent a lengthy letter to the Anthem Board. *See* JX 1627. The letter was carefully crafted, heavily vetted, and went through many cycles of revisions by the Cigna ELT and its advisors.

The letter claimed that Cigna remained committed to the Merger. In substance, it raised objections that read like claims for breach of the Merger Agreement:

- The Cigna Board expressed concern that Anthem had filed a lawsuit against its pharmacy benefits manager, suggesting that the suit created issues for Anthem's commitment under Section 4.2 of the Merger Agreement to conduct its business in the ordinary course and in a manner consistent with past practice.

- The Cigna Board accused Anthem of focusing on cost synergies and expense-cutting instead of strategic planning and objected to Anthem's position that it could make decisions on integration unilaterally, which Cigna claimed was inconsistent with Anthem's commitment under Section 5.10 of the Merger Agreement to have a joint committee for integration planning.

- The Cigna Board charged Anthem with reneging on the agreement that Cordani would be President and COO of NewCo, citing Sections 1.13(b), 3.3, and 3.4 of the Merger Agreement.

*See* JX 1627. Swedish and Zielinski were incensed. They wanted to send a strongly worded, point-by-point response.[156] The Anthem Board felt differently. They insisted that Swedish tell Cordani that he would have responsibility for all of NewCo's operating businesses and send a conciliatory letter to the Cigna Board.[157]

---

[156] *See* JX 1619; JX 1635; *see also* JX 1653; JX 1662.

[157] *See* JX 1629; JX 1654.

Swedish and Zielinski prepared a draft response that restored Cordani's role, but otherwise contained a pointed issue-by-issue rebuttal. *See* JX 1663. Before meeting with the Anthem Board, Swedish recorded some notes in which he summarized his thoughts on Cordani and the Merger:

> The evidence is clear regarding [Cigna's] intent to create a "reverse merger" beginning with the transaction negotiations and continuing with behaviors/integration engagement. . . .
>
> The past is prologue - [Ed] Hanway, . . .
>
> The complex challenge now before us - do we retain "ownership" of the company or cede control to the minority interest . . .
>
> We are truly at war to win or are we going to be pacifists.
>
> Yes we will accommodate until close, but there can be no future for [Cordani] and by definition for his loyalists.[158]

Swedish sent these thoughts to Riefberg, who turned them into talking points.[159]

---

[158] JX 1673 (formatting in original); *see* Swedish Tr. 1114–24.

[159] *See* JX 1683. Swedish did not testify forthrightly about JX 1673 and JX 1683. In deposition, he denied knowing the source of Riefberg's talking points or having anything to do with them, even though they plainly came from his notes. *See* Swedish Tr. 1243–44, 1246–47. At trial, he was again evasive about providing his thoughts to Riefberg. *Id.* at 1239–40, 1242. He also maintained that he did not share any of these thoughts with the Anthem Board. *See id.* at 1249–1251. Yet they clearly were intended for that purpose, and it would have been logical for Swedish to present his thoughts given the context. *See* JX 1729; Swedish Tr. 1252–54.

Swedish also did not testify forthrightly about his feelings towards Cordani. He told the DOJ that although he and Cordani had differences of opinion, they worked through those issues constructively. *See* Swedish Tr. 1215. He testified that throughout 2015 and 2016, he desired to work with Cordani in the combined company. *Id.* at 1215–16. And he claimed that he did not recall ever telling anyone at Anthem that he did not want to work with Cordani. *Id.* at 1217. That testimony was not credible.

85

The Anthem Board met on April 20, 2016. They insisted that Swedish make the letter even more conciliatory. They also decided that Anthem would delay sending a point-by-point response for at least another week and that Zielinski, not Swedish, would send it.[160]

On April 25, 2016, Swedish sent the conciliatory letter. *See* JX 1724. The Anthem Board hoped that the letter would end the conflict that began six months earlier when Swedish tried to start conducting interviews to kick off the L2/L3 selection process.

Cigna rejected the olive branch. The Cigna ELT had been on high alert since Swedish's meeting with Cordani on January 11, 2016. During the intervening months, their distrust of Anthem had deepened. They saw the Anthem ELT as adversaries, and they viewed Anthem's actions with jaundiced eyes.

The Cigna Board held its next meeting on April 26 and 27, 2016. The main subject of the first day was to review Cigna's performance and strategic alternatives as a standalone company. Both Moelis and management presented on this topic. *See* JX 1737 at '050.

During the second day, the Cigna Board focused on the Merger, and the Cigna ELT again discussed "red flags." *Id.* at '051. The Cigna Board discussed the provocative move of unilaterally making a public disclosure in Cigna's Form 10-Q about the timeline for regulatory approval. *Id.*; *see* JX 1786.

The Cigna ELT also presented on Cigna's communications plan, explaining that Cigna was planning "a steady drumbeat of actions and messaging that promotes sovereign

---

[160] *See* JX 1685; JX 1700; JX 1704; JX 1711; JX 1719.

Cigna, our business, value proposition and leadership, to protect our current book of business, and Cigna's reputation in the event of a standalone future state." *See* JX 1725.

After the meeting, Cordani responded to Swedish. In the conciliatory letter, Swedish suggested involving NewCo directors to help manage future disputes. Earlier, as part of Project Alpha, the Cigna ELT suggested something similar. Now, Cordani rejected the idea.[161] Jones sent an aggressive rebuttal to Zielinski's letter, which kicked off an ongoing series of accusatory letters and emails that continued through the filing of this litigation in February 2017.[162]

Cigna had turned definitively against the Merger. From this point on, Cigna's primary goal was to prevent the Merger from closing.

### 5. Cigna Changes Its Disclosure.

In a Form 10-Q issued on May 6, 2016, Cigna unilaterally changed its disclosure. Previously, the disclosure stated, "The transaction is expected to close in the second half of 2016." JX 1794 at '028. Now, it stated,

> While the Company continues to work toward achieving regulatory approval as quickly as possible and to target a closing date in the second half of 2016, the closing will ultimately be subject to the approval and timing of the regulators. In light of the complexity of the regulatory process and the

---

[161] JX 1763; Swedish Tr. 1126–27.

[162] *See* JX 1771; JX 1790; JX 1801; JX 1815; JX 1894; JX 1960; JX 2021; JX 2140; JX 2216; JX 2220; JX 2229; JX 2262; JX 2269; JX 2278; JX 2306; JX 2308; JX 2350; JX 2368; JX 2393; JX 2395; JX 2400; JX 2407; JX 2408; JX 2411; JX 2412; JX 2429; JX 2467; JX 2473; JX 2476; JX 2480; JX 2481; JX 2504; JX 2512; JX 2513; JX 2527; JX 2528; JX 2581; JX 2624; JX 2635; JX 2648; JX 2659; JX 2677; JX 2699; JX 2724; JX 2729; JX 2768; JX 2870.

dynamic environment, it is possible that such approvals may not be obtained in 2016.

*Id.*

Cigna's antitrust lawyers notified Anthem's antitrust lawyers of the change at 7:00 a.m., Jones emailed Zielinski at 7:31 a.m., and Cigna filed the Form 10-Q at 8:30 a.m.[163] Cigna thus gave Anthem less than two hours' notice before making the new language public.

After seeing the disclosure, Zielinski accused Cigna of violating the Merger Agreement. *See* JX 1800. Section 5.8 required that

> Cigna and Anthem shall consult with each other before issuing, and give each other the opportunity to review and comment upon, any press release or other public statements with respect to the transactions completed by this Agreement, including the Mergers, and shall not issue any such press release or make any such public statement prior to such consultation, except as such party may reasonably conclude may be required by applicable law or the rules of the NYSE (or any other securities market).

MA § 5.8.

Sophisticated observers immediately noticed the change. They inferred that because Cigna said that it still was targeting a closing in the second half of 2016, the fact that the parties might be unable to secure regulatory approval in 2016 meant that the transaction might not close at all.[164]

---

[163] *See* JX 1802; JX 1803; JX 1805.

[164] *See* JX 1805; JX 1812; *cf.* JX 1819 (Moelis presentation noting that in precedent broken deals, the acquirer and target remained aligned in their public disclosures and expressed confidence in the deal closing until receiving feedback from the DOJ).

After seeing Cigna's disclosure, Anthem supplemented its legal team with a litigator from White & Case, who began commenting on Anthem's communications with Cigna and ensuring that Anthem documented its position as the burgeoning dispute unfolded.[165] Cigna had taken that step months earlier, when it hired Wachtell Lipton. A fundamental difference remained: White & Case was trying to help Anthem complete the Merger, while Wachtell Lipton was trying to help Cigna escape from the Merger Agreement.

## I.     The Second Stage Of DOJ Review

Cigna's rejection of Anthem's conciliatory outreach closed out a phase of the transaction process in which the principal dispute was over Cordani's role. To gain leverage in that dispute, Cigna had initiated Project Alpha, choreographed the February 16 meeting, and limited the integration process to Day 1 activities. To justify its withdrawal from other integration activities, Cigna cited the pace of the regulatory process. Now, the transaction entered a new phase in which the regulatory process became the primary forum for the parties' disputes.

### 1.     The DOJ Update

On March 25, 2016, while Anthem and Cigna remained at odds over Cordani's role and Cigna's withdrawal from integration planning, the regulatory lawyers received an update from a DOJ attorney. The DOJ attorney identified four substantive issues that the

---

[165] *See, e.g.*, JX 4167; JX 4168; JX 4169; JX 4198; JX 4206; JX 4215; JX 4360; JX 4368. A White & Case litigator appears on two isolated emails before this, *see* JX 1269 (Feb. 2016); JX 4172 (Mar. 2016), but Anthem's White & Case litigators do not appear to have been meaningfully involved before May 2016.

DOJ was examining: (i) "whether national accounts are a distinct market." (ii) "whether Cigna, post-merger, will compete less vigorously with the other Blues," (iii) the "market shares" for various customers and markets, and (iv) what would happen if the 2/3 Rule remained unchanged by the time that the DOJ had to decide whether to approve the Merger. JX 1550. The DOJ attorney agreed that the DOJ would meet with the parties during the week of June 20, 2016, to provide its view on the Merger. *Id.*

During the Steering Committee meeting on April 7, 2016, the parties discussed the status of the DOJ's investigation and agreed that a "[s]ignificant amount of work is needed in the area[] of [the] value creation story." JX 1611 at '211. Anthem remained optimistic; Cigna believed that "additional time will be needed to gain approval." *Id.*

## 2. The White Papers

By late April 2016, the hostility between the executive teams had infected the relationship among regulatory counsel. The incipient dysfunction manifested itself in the preparation of white papers.

After the parties met with the DOJ on February 17, 2016, the agency identified ten topics "for white papers that would be useful for [its] investigation." JX 1395. The topics included (i) "[n]ational accounts, including how to define the market and the role of private exchanges," (ii) "[t]he sale of commercial group health insurance in local areas in [the Anthem Blue States]," (iii) "[t]he sale of commercial group health insurance in non-Anthem states where Cigna competes against other Blues plans," and (iv) "[t]he effect of the [2/3 Rule] on post-merger competition." *Id.* The parties had already committed to

90

provide the DOJ with a white paper addressing efficiencies. The DOJ identified specific

information it wanted about the efficiencies derived from lower provider rates, including

> (1) how the efficiencies will be achieved; (2) what products (commercial, Medicare Advantage, etc.) will be affected by the lower rates; (3) which geographic markets will benefit from the lower rates; (4) why the merger is necessary to achieve the lower rates; and (5) how the lower rates will affect the quality, quantity, and availability of in-network services for your members.

*Id.*

White & Case took the lead on preparing the white papers. White & Case sent the

drafts to Cadwalader so that Cigna could provide comments and provide information about

Cigna's business.[166] White & Case solicited detailed input from the Cigna team.[167] What

they received consisted of big picture comments, thematic suggestions, and questions that

invited White & Case to substantially revise or rewrite the white papers.[168]

At the end of April 2016, the members of the Cigna ELT began reviewing and

commenting on the white papers.[169] That complicated matters because rather than

providing detailed information, the Cigna executives raised high-level questions about the

---

[166] *See* JX 1641; JX 1724 at '086; Paul Tr. 615, 621.

[167] *See* JX 1697; JX 1750; JX 1889 at '021–22.

[168] Paul Tr. 615, 621–23; Rosen Tr. 782–83; *see, e.g.*, JX 1631; JX 1675; JX 1692; JX 1717; JX 1743; JX 1760. *See generally* JX 1889 at '022 (Anthem's regulatory counsel asking Cigna's regulatory counsel to engage more actively in drafting and editing the white papers).

[169] *See* JX 1736; JX 1774; Jones Tr. 2646.

regulatory strategy.[170] During meetings about the white papers, the Cigna team questioned the overall direction of the white papers and their contents.[171]

During the drafting process, Anthem's counsel asked Cigna for help assembling information that had been delayed by Cigna's withdrawal from the integration planning. For example, Paul told the Cadwalader team,

> We understood from McKinsey that Cigna has not been providing PMPM numbers to move along IT G&A integration planning. We heard similar concerns from the G&A team about the information required from Cigna to help determine whether the additional $452 million is variable cost savings or revenue opportunity or a combination of both. As you have known since last February, our advocacy work at the agency is dependent upon McKinsey's ability to review information from our clients to prepare the analysis upon which our economists can rely. Integration planning has been slowed or stopped as a result of Cigna's refusal to provide information critical to integration planning and synergies analyses.[172]

Cadwalader did not provide the detailed information that White & Case sought. *See* Paul Tr. 622–23, 626–28.

Anthem and Cigna jointly submitted a white paper on medical cost savings that projected efficiencies of $2.35 billion, which NewCo would achieve by providing "best-

---

[170] *See* JX 1761; JX 1768; JX 1781; JX 1797; JX 1838.

[171] *See* JX 1780; JX 1789; JX 1850; *see also* Jones Tr. 2645 ("So essentially what was happening is you were trying to get alignment on key issues through white papers.").

[172] JX 1697 at '193 (requesting information about IT G&A integration planning); *see* JX 1694 at '162 (requesting information on value-based reimbursement for white papers); JX 1716 at '226 (noting that "information still [is] needed from Cigna" for the medical and network synergies white paper); JX 1747 at '932–33 (following up on request for information on $452 million in savings and on IT efficiencies and synergies; noting understanding that "additional work by the parties has not been done"); JX 1780 at '782 (noting that some information for white papers was hedged "due in part to a pause on value capture work")

in-breed" discounts. JX 1953 at '246, '249–50. This approach meant that if Anthem had a better discount with a particular provider, then the efficiency calculation assumed that NewCo would benefit from Anthem's discount. If Cigna had a better discount with a particular provider, then the efficiency calculation assumed that NewCo would benefit from Cigna's discount. Anthem's economist, Dr. Mark Israel, and his team from Compass Lexecon used claims data to calculate the value of the resulting efficiencies.[173]

Because of the structure of the healthcare industry, the vast bulk of these savings would be passed through automatically to NewCo's customers. The white paper projected that after closing, approximately 75% of NewCo's members would be covered by administrative-services-only ("ASO") plans, a product in which a customer (i.e., an employer) pays for claims processing and access to the insurer's provider network, but self-insures for the medical bills of plan participants. JX 1953 at '257. Because those clients self-insure for provider costs, they receive a dollar-for-dollar reduction from lower provider rates. Zielinski Tr. 80. The white paper projected that savings of $1.8 billion would go to ASO customers. JX 1953 at '250. The remaining NewCo customers would be covered by fully-insured plans, a product in which the health insurer also pays the medical bills of plan participants. Those customers would receive some benefit at the time of re-contracting as a result of the Affordable Care Act, under which insurers must spend at least 80–85% of every premium dollar on medical care. JX 1953 at '258–59. The white paper

---

[173] *See* JX 1573 at '877; Zielinski Tr. 78–80.

projected that savings of $595 million would inure to the benefit of fully-insured customers.[174]

During the May 2016 meeting of the Steering Committee, Zielinski complained about Cigna's contributions to the regulatory approval process. Cadwalader sent an email to White & Case that abandoned any pretense of collaboration. *See* JX 1889 at '025–26. After White & Case responded with a detailed and comparatively measured response, Cadwalader became even more shrill and vituperative, writing, "There are numerous false, baseless, and misleading statements and insinuations in your e-mail. Your email has so many inconsistencies with the factual record that we may or may not spend the time to respond with a point-by-point rebuttal." *Id.* at '021.

### 3. Internal Integration Planning At Anthem

While the white papers were being prepared, Anthem worked internally on NewCo's go-to-market strategies, how NewCo would generate efficiencies from the Merger, and what growth opportunities NewCo would have over the longer term. Those strategies also had to take into account how NewCo would achieve compliance with the 2/3 Rule. *See* JX 1573 at '850.

Anthem was committed to keeping the Cigna brand as an option for all customers in all situations. At the same time, NewCo needed to comply with the 2/3 Rule, which

---

[174] JX 1953 at '250. Other estimates varied, but generally were in line with these figures. *See* JX 1684 at '824 & slides 5, 10–13; JX 1703 at '759 & slide 3.

could be accomplished most efficiently by rebranding Cigna revenue generated by employers with their headquarters in the Anthem Blue States. *See* JX 1573 at '859.

The optimal rebranding strategy was for NewCo to offer Blue-branded products that incorporated desirable features from Cigna's plans, but at better rates than Cigna could achieve on its own. *See id.* By February 2016, the commercial go-to-market team had identified two lines of hybrid products that NewCo could develop.[175] The first category of offerings would target employers who provided employees with health insurance because they felt compelled to do so. NewCo would address the "compelled" segment with an offering called "Essentials," which would combine a lower-priced offering closer to Anthem's existing products with cost-management features drawn from Cigna's products. The second category of offerings would target employers who were more engaged in the health insurance market. NewCo would address the "engaged" segment with an offering called "Signature," which would combine a multi-feature offering closer to Cigna's existing products but at a lower price than Cigna could achieve on its own.[176]

The difficulty lay in the timeline for implementing those products. One major impediment was the need for an IT system that could both support the new-product features and comply with the Blues Rules. Anthem and Cigna each had incumbent IT systems that

---

[175] *See* JX 1173 at '158 (describing (i) "evolution of the Anthem group/national account model to NewCo 'essentials'" and (ii) "evolution of the Cigna group/national account model to NewCo 'signature/enhanced'"); JX 1241 at '798 & slide 47; JX 1345 at '743 & slide 2; DeRosa Tr. 1697–98.

[176] *See* JX 1577 at '013; JX 1766 at '069–72.

supported their businesses. Cigna's system supported the additional features that a hybrid product might incorporate, but it did not comply with the Blues Rules. Modifying Cigna's system to comply with the Blues Rules required a major overhaul that would take more than two years.[177] Anthem's platform complied with the Blues Rules, but it would need to be modified to support a blended offering.[178] These upgrades could be rolled out over time, but the first features would not be in place until the second year after closing.[179]

Because of this timeline, the possibility of creating new products was not a source of near-term, quantifiable merger-related efficiencies. It rather was a means for NewCo to create additional value "in the medium/long term" by expanding into new geographies and new market segments.[180] Anthem favored using its IT system, and therefore did not anticipate being able to begin offering blended products until the second year after closing. It was only then that NewCo would begin offering versions of the Essentials and Signature

---

[177] *See* JX 1573 at '871–73; DeRosa Tr. 1707, 1709, 1713.

[178] *See* DeRosa Tr. 1708; JX 1573 at '872, '901.

[179] *See* JX 1573 at '903–04; JX 1766 at '079; DeRosa Tr. 1708–09, 1711–12; DeRosa Dep. 307; *see also* JX 1573 at '872 ("Implementation of Cigna 'secret sauce' may take time (TBD)."). Exacerbating the timing problem, most of Cigna's commercial accounts were committed to multi-year contracts, with a portion renewing in the first quarter of each calendar year. *See* JX 1573 at '892–93, '907; JX 4006. During the six to nine months (or longer) leading up to the renewal, the sales force would seek to negotiate a new contract with the customer. Anthem determined that NewCo would need to have the necessary capabilities in place "in time for <u>Q1 2018 sales cycle at the latest</u>" in order to sell a blended product that would comply with the 2/3 Rule by a 2019 deadline. JX 1573 at '892; *see* Manders Tr. 2538–39 (describing sales cycle). The difficulty posed by meeting that deadline meant that blended products would be a longer-term initiative.

[180] *See* JX 1577 at '007; JX 1792 at '797.

products and generating incremental revenue.[181] Anthem anticipated developing a go-to-market strategy for the new products after closing. Zielinski Tr. 129.

Rather than relying on new products, Anthem planned to generate efficiencies through "best-of-breed" discounts, which meant that NewCo would take advantage of whichever company's discounts were better. If Anthem received better discounts from a particular provider, then NewCo would plan to use Anthem' discounts. If Cigna had obtained better discounts, NewCo would plan to use Cigna's.

Because Anthem generally had better discounts, the bulk of the efficiencies would be achieved by enabling Cigna's customers to take advantage of Anthem's discounts. There were three main ways to achieve that outcome. The first was for Anthem to exercise the "affiliate clauses" in its contracts with providers. As the name implied, these clauses empowered Anthem to extend its rates to its affiliates, and after the Merger, Anthem could designate Cigna as an affiliate for purposes of the clause.[182] The second option was not to trigger the affiliate clauses and instead to re-contract with providers to secure lower rates based on NewCo's increased volume, either when the providers' existing contracts expired

---

[181] *See* JX 1577 at '008, '014–17; JX 1766 at '073. Anthem anticipated that the new products would achieve incremental reductions in medical costs. Anthem expected to pass on 80% of those savings to its customers and to capture 20% by increasing its premiums. *See* JX 1577 at '036.

[182] *See* JX 1684 at '824 & slides 2, 18; JX 1727 at '646 & slide 3; Zielinski Tr. 130–31; Drozdowski Tr. 952.

or by terminating the existing contracts and forcing a renegotiation.[183] A third option was to mix and match the techniques by provider type, geography, or for specific providers.[184]

Triggering the affiliate clauses across the board would generate the most value for NewCo's customers as quickly as possible. Anthem believed that it was what providers expected, and it would demonstrate the value of the combination to Cigna's customers. The main downside was that it would "make it more difficult to convert Cigna customers to Blue." JX 1727 at '646 & slide 2. Once the affiliate clauses were exercised, then Anthem's products would no longer have a cost advantage over Cigna's products, making it less likely that customers would move to Blue-branded products absent other incentives.[185]

In late April 2016, the Anthem ELT unanimously decided *not* to trigger the affiliate clauses.[186] Instead, the Anthem ELT decided to continue to sell Anthem's products and Cigna's products separately, with the expectation that Cigna's customers in the Anthem Blue States would move to Anthem products. *See* JX 1788.

---

[183] JX 1727 at '646 & slide 5; *see* JX 1684 at '824 & slides 2, 5, 19; JX 1705; Drozdowski Tr. 952.

[184] *See* JX 1684 at '824 & slide 2; JX 1727 at '646 & slide 7; JX 1766 at '063; Zielinski Tr. 130–31; Drozdowski Tr. 952.

[185] *See id.*; JX 1684 at '824 & slide 15; Zielinski Tr. 130–31; Drozdowski Tr. 973–75, 1040.

[186] *See* JX 1788*; see also* JX 1705; JX 1727; JX 1783; JX 1818; JX 1823 at '304; JX 2096. Anthem kept open the possibility that the affiliate clauses might be exercised on a case-by-case basis, but needed input from Cigna to make those determinations. With Cigna having withdrawn from integration planning, no detailed work was done to determine when or where that might happen. *See* Drozdowski Tr. 976–77, 1046–47, 1051.

Despite having made this decision, Anthem stated in the white paper on medical cost synergies, submitted to the DOJ on May 25, 2016, that Anthem could achieve medical cost savings for Cigna's customers after the merger by exercising the affiliate clauses. *See* JX 1948 at '307–08. Anthem told its counsel that no final decision had been made on whether to invoke the affiliate clauses. Rosen Tr. 865.

Throughout the DOJ's investigation and the Antitrust Litigation, Anthem did not reveal that it had made that decision. During a deposition that he gave to the DOJ on June 13, 2016, Matheis de-emphasized triggering the affiliate clauses as a means of achieving the efficiencies, pointing instead to renegotiating provider contracts and shifting Cigna members to Anthem products, but he did not say that Anthem had already made a decision not to invoke the affiliate clauses. *See* JX 2029 at 277–79. Matheis testified at trial that Anthem could exercise the affiliate clauses. *See Dist. Ct. Op.*, 236 F. Supp. 3d at 233. Another Anthem witness testified that Anthem's "current intention [was] to proceed with a hybrid approach" that included triggering the affiliate clauses for some providers. *Id.*

Anthem's position in the Antitrust Litigation on the potential use of the affiliate clauses was technically correct because Anthem could have revisited the decision not to exercise the clauses broadly, but Anthem should have been more candid about its plans. The issue, however, did not affect the outcome of the Antitrust Litigation. Both the District Court and the DC Circuit Court correctly concluded that Anthem would not exercise the

affiliate clauses, noting that doing so would undermine the incentive for Cigna's customers to switch to Anthem products, which was important for complying with the 2/3 Rule.[187]

### 4. Teneo Leaks The Dispute Letters To The *Wall Street Journal*.

Beginning in late March 2016, Cigna worried that Anthem might leak information to the press about the dispute over Cordani's role and Cigna's withdrawal from integration planning. To be ready, Teneo developed a "leak strategy."[188] By early May, the strategy called for Cigna to issue an anodyne public statement while Teneo would give reporters different messages, such as:

- "It remains unclear that Anthem is properly managing the processes necessary to bring the deal to completion." JX 1860 at '114.

- "Many of the core regulatory work streams have fallen behind schedule . . . ." *Id.*

- "The transaction leverages Cigna's unique and robust capabilities." *Id.*

- "In the event the merger does not obtain regulatory approval, we are well positioned for standalone success," citing a "[w]ell-balanced diversified business model," "[s]ubstantial 'dry powder' of $6-8 billion," and "M&A possibilities and market leading revenue, earnings, and capital efficiency." *Id.*

Through these and other messages, Teneo would criticize the Merger and praise Cigna's capabilities as a standalone company.

In early May 2016, a reporter from the *Wall Street Journal* was speaking with one of Cigna's lawyers about another transaction, when the reporter mentioned that "she was talking to Anthem and they were complaining about Cigna dragging its feet." JX 1778. The

---

[187] *See id.* at 240–41; *Cir. Ct. Op.*, 855 F.3d at 359–60.

[188] *See* JX 1652; JX 1860.

reporter also indicated that "she heard some chatter about the David/Joe relationship not being good and asked [the lawyer] to comment." *Id.* Stephen Cohen of Teneo followed up with the *Wall Street Journal.* By May 12, the reporter was saying that she had heard about a letter Cigna sent "in early April with a list of complaints." JX 1848. She seemed to know Anthem's side of the story, including that one of Cigna's issues was "nonsensical" and that Anthem was being "aggressive" because Cigna was "dragging [its] feet." *Id.*

The Cigna team believed that Anthem had been speaking with the *Wall Street Journal.*[189] Cohen sent the dispute letters that the parties had exchanged to the reporter.[190]

Around May 20, 2016, the *Wall Street Journal* told Anthem and Cigna that it had the letters and would be running a story.[191] After receiving this outreach, Anthem's public relations advisor spoke with the *Wall Street Journal* in an effort to make the story more favorable to Anthem.[192]

---

[189] *See* Cohen Tr. 2346, 2351; Jones Tr. 2677.

[190] Cohen Tr. 2374. Jones was the source of the letters, but she and Cohen structured the leak so that they could plausibly deny the existence of any direct exchange. Jones testified that she did "not specifically" authorize Teneo to leak the letters. Jones Tr. 2677. She also denied knowing specifically that Teneo had leaked the letters until this litigation. Jones Tr. 2737. Based on the contemporaneous documents, it is difficult to credit Jones's denials as anything other than the product of willful blindness. *See* JX 1529; JX 1620; JX 1763; JX 1771; JX 1810; JX 1840; JX 1897; Jones Tr. 2738–39 (agreeing that she knew that Cigna had sent the dispute letters to Teneo and that she participated in a call with Teneo about an upcoming story concerning the dispute letters, yet supposedly did not know that Teneo had leaked the dispute letters). She clearly provided the letters to one of Cohen's colleagues, who passed them along to Cohen. *See* JX 1529; JX 1620; Cohen Tr. 2375–77, 2379–80. Cohen understood what he was supposed to do.

[191] *See* JX 1903; JX 1905; Zielinski Tr. 376.

[192] *See* JX 1919; JX 4073; JX 4074; JX 4091; JX 4307; JX 4368; Zielinski Tr. 376.

In response to the *Wall Street Journal* inquiry, Zielinski asked Jones whether Cigna would issue a joint statement with Anthem. JX 1907. The draft statement read,

> Anthem's acquisition of Cigna remains on track to close in the second half of 2016 and all required steps to seek and obtain regulatory approval have been completed in a timely manner. The transaction has already achieved key milestones, including shareholder approvals and regulatory clearance in 11 states. . . . The parties are fully committed to closing and integrating this transformative transaction . . . .

JX 1906. Cigna refused. Jones told Anthem that Cigna would simply say "no comment" in response to the story. JX 1909. She also told Anthem that "any representation that Cigna believes the transaction is on track for a closing this year or that the parties are working cooperatively together would be misleading at best and we would be compelled to issue a clarification." *Id.* When Zielinski asked Jones to draft a joint statement that Cigna would support, she again refused. From that point on, Cigna declined to issue any joint statements with Anthem.[193] Although Jones's representation that Cigna itself would say "no comment" was technically accurate, she knew that Cohen was speaking on background with reporters to convey anti-Merger messages and the strength of "Sovereign Cigna." *See* JX 2877.

---

[193] *See* JX 2032; JX 2054; JX 2159 at '358; JX 2292; JX 2296; JX 2306; JX 2420; *see also* JX 2055 (editing draft press releases so that none were joint; removing all positive language in press releases anticipating DOJ approval of the Merger; striking all negative language from press releases anticipating negative DOJ action toward the Merger); JX 2095 (Cigna Vice President of Corporate Communications expressing disbelief that "if the deal is approved, and Anthem is our new boss, we won't issue a joint statement saying we are pleased?").

During his exchanges with Jones, Zielinski expressed Anthem's belief that "either Cigna or a Cigna representative contacted the WSJ and provided the confidential letters." JX 1907. He asked Jones to "immediately investigate to determine who leaked these confidential and privileged communications." *Id.*

Jones had sent the dispute letters to Teneo herself,[194] but she pretended to conduct an internal investigation into the leak.[195] She tasked John Bogan, Cigna's head of litigation, with conducting the investigation. Bogan collected and reviewed emails from Cigna executives who might have leaked the letters, but Bogan did not know that Teneo existed, and Jones did not mention that she had sent the letters to Teneo. She also did not tell Bogan about Wachtell Lipton.[196] As Jones admitted at trial, she had material information, central to Bogan's investigation, and kept it to herself.[197]

---

[194] *See* Cohen Tr. 2374–80; Jones Tr. 2740. In her response to Zielinski, she did not deny Cigna's involvement. She instead took "issue with the implication that Cigna has done anything improper with respect to the correspondence or otherwise." JX 1909 at '224.

[195] Jones Tr. 2677–78, 2740; Jones Dep. 485.

[196] *See* Jones Tr. 2741–43; Jones Dep. 1658–67.

[197] Jones Tr. 2743. During this litigation, Anthem served interrogatories asking whether Cigna or one of its advisors provided information to the *Wall Street Journal* or *New York Post*. *See* JX 3172 at 15. Despite knowing about Teneo's communications with the *Wall Street Journal* and the *New York Post*, Jones verified the accuracy of a response that did not mention Teneo. *See id.* at 15–16; Jones Tr. 2883–84, 2889–90. Anthem then served follow up interrogatories asking specifically about the stories published on May 23, 2016. Jones knew that Teneo had provided information to the *Wall Street Journal*, yet verified interrogatory responses which only stated generally that "Teneo and Brunswick had regular interactions with the press, including representatives of the *Wall Street Journal*, during the pendency of the Merger Agreement." *See* JX 3026 at 31–32. Anthem followed up again, and Jones verified a third set of interrogatory responses in which Cigna claimed that "it [was] not aware of any Cigna Advisors providing or otherwise facilitating the

103

On May 22, 2016, the *Wall Street Journal* ran a story titled, "Anthem, Cigna Privately Bicker as They Seek Merger Approval." JX 1914. The next day, the *Wall Street Journal* ran a follow-up story titled "What Anthem and Cigna Are Fighting About" and released a podcast titled "Anthem and Cigna's Disagreeable Merger Agreement." JX 1935. Other media outlets picked up the story. They all projected that it would be difficult for the parties to secure regulatory approval.[198]

Investors contacted Cigna and questioned why the companies had not put out a joint statement.[199] In a positioning document, Teneo recommended capitalizing on the leak to

transfer of any information or documents to the *Wall Street Journal* . . . ." JX 3040 at 8–11. After Anthem impeached Jones with the interrogatory responses that she verified, Cigna claimed that its responses were accurate because it had lodged a general objection to the definition of Cigna as "vague and overbroad" on the ground that it included "agents or representatives." Dkt. 669 at 3 (internal quotation marks omitted). Cigna's general objection was not sufficiently specific to put Anthem on notice that Cigna was relying on it to withhold material information. Cigna's responses were materially misleading and incomplete.

[198] *See* JX 1920 ("Anthem, Cigna merger squabbles could delay antitrust approval"); JX 1923 ("Anthem, Cigna Shares Fall After Reports of Infighting"); JX 1927 ("Health Insurer Deals Face Market Review That Felled Past Tie-Ups"); JX 1939 ("Anthem-Cigna May Not Get to the Altar"); JX 1951 ("Amid Doubts, Anthem-Cigna Deal Near Halfway Home").

[199] *See* JX 1928; JX 1929; JX 1933. After seeing the story, Cigna's advisors at Bain and Deloitte inferred that Cigna had leaked the letters. *See* JX 1916 (Bain representative, "They must be leaking this sh*t. Yikes."); JX 3002 (Deloitte representative, "From the start Cordani was working to secure his longer term role (only 50) and rather publicly lobbying for his parochial interests. There is now more bitterness than before and Cordani has no lock on succession and will be without board control. This is either real brinksmanship to secure his position (something I have seen before in other consolidation discussions he was engaged in) or an effort to derail and get the penalty cash so he can make another target run.").

reaffirm "the strength of our standalone position."[200] Moelis prepared a set of "Escalation Strategies" for the Cigna ELT to consider, including "covert approaches" to analysts, investors, proxy firms, the media, and customers. JX 1991 at '904, '907–08. Internally, Cigna prepared a messaging document explaining why it would be entitled to the Reverse Termination Fee if the Merger did not close.[201]

Meanwhile, the DOJ had started taking depositions.[202] During Cordani's deposition, the DOJ asked whether there were dispute letters between the parties in addition to the ones that the *Wall Street Journal* had discussed. Cordani had to say that there were. JX 1842 at 217. Just before the Swedish deposition, Cigna provided the DOJ with the letters that Cigna sent to Anthem on April 9 and April 29. Cigna notified Anthem, but timed the notice so that Anthem could neither respond effectively nor prepare Swedish.[203] The DOJ questioned Swedish about the letters during his deposition. *See* JX 1863 at 348–89.

### 5. Cigna Attempts To Re-Engage On Integration Planning.

In mid-May 2016, Cordani told Swedish that Cigna wanted to work on NewCo's go-to-market strategy. *See* JX 1856. Cordani indicated that Cigna had been working with

---

[200] JX 1942 at '269. Teneo contemplated putting Cigna's "CEO and CFO in front of investors and analysts" by having them attend "investor conferences" and conduct a "[r]oadshow . . . to meet with top shareholders and key sell-side analysts." *Id.* Teneo sent the plan to Cordani by routing through Wachtell "for privilege purposes." JX 1956; *see* JX 1958. Teneo subsequently prepared a "David Cordani Positioning Campaign." JX 1984.

[201] *See* JX 1992; JX 1994; JX 1997.

[202] *See* JX 1749; JX 1784; JX 1842; JX 1863; JX 1973; JX 2029.

[203] *See* JX 1855; JX 1862.

Bain on the issue. *See* JX 1858. Cordani was consulting simultaneously with Bain about Cigna's strategic alternatives as a "sovereign" company, including deals in which Cigna would be the acquirer.[204]

The go-to-market strategy was one of the areas on which Cigna had stopped work in February 2016. Because the go-to-market strategy was critical for NewCo's success and for achieving regulatory approval, Anthem's Phase 2B team had continued to work on it. Now, four months after stopping go-to-market-strategy work and one month before the DOJ was slated to make a decision on the Merger, Cigna wanted to rejoin the discussions.

Later in May 2016, Cigna indicated that it wanted to resume work on value capture and to explore the implications of the affiliate clauses.[205] Because Cigna had stopped all of its work on these subjects, Cigna's integration team leaders scrambled to re-start the effort.[206]

---

[204] *See* JX 1870; JX 1884; JX 1957; JX 1965.

[205] *See* JX 1901; Zielinski Tr. 351.

[206] *See* JX 1926; JX 1930; JX 1934; JX 1937.

### 6. "Bias-to-Blue" As A Go-To-Market Strategy

At a meeting of the Steering Committee on June 9, 2016, the commercial integration team presented a go-to-market strategy for the first 180 days after closing.[207] The strategy was developed by a team comprised of Anthem and Cigna associates.[208]

Recognizing that Anthem and Cigna competed for commercial accounts, the plan contemplated an "Air Traffic Control Playbook" to determine which company would bid which accounts. JX 2006 at '228. The go-to-market strategy for the first 180 days distinguished between (i) renewals of existing business and new business and (ii) clients headquartered in the fourteen Anthem Blue States and clients headquartered in the thirty-six other states where Cigna operated (the "Cigna Green States").

For an existing client in a Cigna Green State that sought to renew its business, NewCo only would quote a Cigna product. For an existing client in an Anthem Blue State, NewCo would determine whether the client wanted to renew its existing plan or whether it was putting the business out to bid. If the client wanted to renew its existing plan, then only the incumbent provider (Anthem or Cigna, as applicable) would quote the business. If the client was putting the business out to bid, then both Cigna and Anthem would submit quotes. *See id.* at '239.

---

[207] *See* JX 2006; JX 2016.

[208] *See* JX 1219; Zielinski Tr. 101–02; DeRosa Tr. 1719–21, 1725, 1742–43; Manders Tr. 2537.

For new clients, different rules applied. In a Cigna Green State, only Cigna would quote the business, unless (i) the customer requested a quote from Anthem and (ii) there was a strategic advantage to ceding the business to Anthem. Under this framework, Cigna generally would provide the quote. *See id.*

For new clients in the Anthem Blue States, NewCo would pursue a strategy called "Bias to Blue." Under this strategy, if the broker for the new client expressed a preference for Anthem, then only Anthem would provide a quote. If the broker for the new client expressed no preference as to brand, then both Anthem and Cigna would provide quotes. If the broker for the new client expressed a preference for Cigna, then both Cigna and Anthem would provide quotes. *See id.*

The "Bias to Blue" strategy thus (i) only applied during the first 180 days after closing, (ii) only applied in the Anthem Blue States, (iii) only applied to new clients, and (iv) only contemplated that new clients that expressed a preference for Cigna (or no preference) would receive quotes from both Cigna and Anthem, but then could choose between them.[209] In other words, the "Bias to Blue" strategy offered "the Blue choice to the Cigna customers." DeRosa Tr. 1743. It did not force customers to go Blue.

Cigna had known from the start that NewCo would need to move Cigna customers in the Anthem Blue States to Blues-branded plans to comply with the 2/3 Rule. In 2014, when Cigna approached Anthem about a transaction that would have resulted in the Cigna ELT managing the combined company, the Cigna ELT told the Cigna Board that NewCo

---

[209] *See generally* Zielinski Tr. 106–113; Hocevar Tr. 2337–39.

would need to comply with the Blues Rules, but that compliance could be achieved by having "[Cigna] business in Blue licensed territories . . . substantially migrate to Blue business, resulting in compliance with the [2/3 Rule] at or shortly after closing." JX 105 at '751. The Cigna ELT also told the Cigna Board that "[i]f compliance would not be attained, [Cigna] business in non-Blue licensed territories may have to be divested." *Id.* Before the relationship between Anthem and Cigna fractured, Cigna ELT did not see a problem with either option.

During the June 2016 meeting of the Steering Committee, however, Cordani and the Cigna ELT reacted vehemently to the Bias-to-Blue strategy and categorically opposed Cigna business in the Anthem Blue States moving to Anthem.[210] Cordani claimed that "if the Department of Justice saw this strategy, they'd kill us . . . because it's not pro-choice."[211] Matheis and Zielinski defended the Bias-to-Blue strategy as a reasonable first step to achieving compliance with the 2/3 Rule.[212]

---

[210] *See* Zielinski Tr. 104; Cordani Tr. 1828–29; Manders Tr. 2538–39, 2548–49. After the June 2016 meeting, Cigna began portraying the Bias-to-Blue strategy as involving "forced migrations." JX 2018; *see* JX 2010 at '685; JX 2012 at '357; Cordani Tr. 2082–84 (asserting that "Bias to Blue" involved forced migrations). That was not accurate.

[211] Cordani Tr. 1828; *accord id.* at 2089.

[212] *See* DeRosa Tr. 1727–28; Zielinski Tr. 104–05. Matthew Manders, Cigna's business lead on the committee, also objected, but his concern was not with the Bias-to-Blue strategy for the first 180 days. He was concerned with what NewCo would do after the first six months. Manders Tr. 2535–38. Manders' testimony demonstrated that there was a considerable amount of planning that needed to be done over longer-term horizons and that by June 2016, very little headway had been made on those issues. *See* Manders Tr. 2538–39, 2551–52, 2558. That complaint was ironic, because it was Cigna's decision to limit integration planning to Day 1 activities that prevented the integration teams from making progress on that work. *See* JX 2238 at '859 (July 2016 Steering Committee

109

After the discussion, Cordani asked Swedish to rework the strategy.[213] Swedish agreed.[214] During the same meeting, Anthem informed Cigna that Anthem would not exercise the affiliate clauses to give Cigna members access to Anthem's rates.[215]

## J. The DOJ Opposes The Merger.

In June 2016, the parties had a series of meetings with the antitrust division. The initial meetings were with the division staff (the "Staff"). The later meetings were with the "front office," which consisted of the principal decision-makers for the antitrust division (the "Front Office").

### 1. The June 10 Meeting With The Staff

On June 10, 2016, the parties met with the Staff to hear its views on the Merger. The Staff reported that "the Division has very serious concerns." JX 2024 at '958.

The Staff's pervasive concern was the "maverick" theory that the parties had anticipated before entering into the Merger Agreement. The Staff described Cigna as

> an innovative company that is disrupting Anthem's business model. . . .
> Anthem has the perception of being dominant in their states and getting by

---

presentation noting that for post-180-day strategy, "[a]dditional data is required to move forward on our goal of combining the best capabilities of both companies to create more choice and value for the marketplace").

[213] JX 2100; Zielinski Tr. 116; Cordani Tr. 1830.

[214] Zielinski Tr. 113–14; Manders Tr. 2545–46, 2568. Cordani and Jones testified that when discussing the Bias-to-Blue strategy during the June 2016 meeting, Matheis was red in the face, pounded the table, and yelled. Cordani Tr. 2080; Jones Tr. 2651, 2721. None of the other attendees, including two members of the Cigna ELT, agreed with their account. *See* Zielinski Tr. 105; Swedish Tr. 1127; Manders Tr. 2565; McCarthy Dep. 588–589. The testimony that Cordani and Jones gave on this point was not credible.

[215] Cordani Tr. 1826; *see* JX 2022 at '460–61.

largely on their provider discount advantage. . . . Anthem is perceived as being slow to innovate and has a reputation for being difficult in the industry in terms of provider relations and customer service. By contrast, . . . Cigna has found a way to differentiate itself based on new products, high-quality customer service, excellent wellness programs, and leading provider collaborative efforts.

*Id.* The Staff expressed concern that the Merger would "remove that pressure and the benefits and innovation that Cigna has brought to the marketplace." *Id.*

The Staff next discussed for specific areas where they had concerns.

- **National Accounts.** The Staff "viewed the transaction as a '4 to 3' in the National Accounts market and because of that, the merger was presumptively unlawful." *Id.* The Staff "also suggested that the efficiencies touted by the parties are insufficient to outweigh their concerns." *Id.*

- **Local markets for commercial health insurance sold to large group employers.** The Staff "had concerns in at least 35 local areas" and indicated that "the transaction would be presumptively anticompetitive in these areas . . . ." *Id.* at '958–59.

- **Local markets for the purchase of healthcare services.** The Staff was concerned that the Merger would "lower provider payments in a way that [would] reduce the quality and output of medical care" because NewCo would be "so large it [could] force providers to accept unprofitable [prices], which in turn [would] reduce the quality and output of medical care." *Id.* at '959. The Staff viewed this theory as "undercut[ting] the parties' arguments that the medical cost savings that would result from the merger [would] benefit consumers." *Id.*

- **Local individual public exchange markets.** The Staff cited "concerns in the individual public exchanges in St. Louis, Denver, and Boulder." *Id.* Although recognizing that Cigna was generally not a significant player in the public exchanges, the Staff believed that Cigna could grow to become a competitor in the future. *Id.*

During the meeting, "not a lot of time at the meeting was spent on Blues issues," although the Staff raised "Blues-related concerns . . . at various times." *Id.* For example, the DOJ mentioned that the 2/3 Rule could "constrain Cigna's growth post-closing" and might give

Cigna "a reduced incentive or ability to compete as aggressively against (and an increased incentive to collaborate with) other blues." *Id.*

The Staff expressed skepticism that the Merger could be fixed, but they also said they were open to a remedial proposal. As part of any proposal, the DOJ wanted to know

> (1) what the parties propose[d] to divest; (2) who the potential buyers are; (3) whether the parties have discussed the divestitures with any buyers and the status of those discussions; and (4) why the remedy will not harm competition in the short or long term, (i.e., why the divestees [sic] would immediately restore the competitive status quo).

*Id.* One of Anthem's economists from Compass Lexecon described the Staff's reaction bluntly: "They hate the merger."[216]

### 2. The Remediation Effort

After the meeting with the Staff, Anthem and Cigna discussed a potential remediation plan. *See* JX 2030. In May 2016, Anthem had sent a proposed framework for a divestiture remedy to Cigna.[217] McCarthy, Cigna's CFO, had reviewed it and commented, "This looks like a reasonable approach to me." JX 1963 at '950. Jones was likewise "ok with the approach as a starting point." *Id.* at '949. When Cordani saw it, he rejected it out of hand as "uninformed and theoretical." *Id.* Cordani and Jones then spoke with Wachtell Lipton. *See* JX 1963. Cigna did nothing with the framework.[218]

---

[216] JX 2053; *accord* Rosen Tr. 884.

[217] JX 1963; JX 4141; *see* JX 1793; JX 1904; Jones Tr. 2911–12.

[218] *See* Jones Tr. 2930–32; Rule Tr. 3140–41. At trial, Cordani testified that he instructed his team to support Anthem's divestiture efforts. Cordani Tr. 1832. The record evidence did not support that testimony.

With the Staff having identified its areas of concern, Anthem began work on a divestiture plan that focused on the thirty-five regional markets that the Staff had identified. Anthem reached out initially to other Blues members as potential buyers, hoping "to keep the business 'Blue.'"[219] Anthem also contacted Centene Corporation. JX 2031. Although Cigna has denigrated Centene as a possible buyer in this litigation, Cigna's antitrust counsel had identified Centene as a candidate, describing Centene as "[a] large company that, in addition to its substantial government [healthcare] presence, is a notable regional commercial player (especially in certain western states) with the resources to grow."[220]

Anthem asked Cigna to help by identifying other potential buyers. JX 2062. Rather than cooperating, Jones sent a lengthy email to Zielinski in which she attacked how Anthem had handled the regulatory process. JX 2074. Beginning a narrative that Cigna would repeat many times, she claimed that Anthem had not done anything to prepare for a divestiture, and she accused Anthem of "either misrepresenting the situation or significantly underestimating the task at hand while being unwilling to take any suggestions from [Cigna]." *Id.* She then asserted that "Cigna does not have the responsibility or the

---

[219] JX 2070 at '602; *see* JX 2046; JX 2070; JX 2104. Having a fellow Blues buyer could have set the stage for the buyer to cede part of its Blues business to Anthem after closing to help comply with the 2/3 Rule. JX 2104.

[220] JX 567 at '571; *see* Zielinski Tr. 494 (describing Centene as a primarily regional carrier with a few national accounts).

information required to set up the strategy on divestitures" and therefore would not attempt to identify qualified buyers.[221]

Anthem entered into a nondisclosure agreement ("NDA") with three potential buyers: Centene, HCSC, and Independence. PTO ¶ 169. Cigna entered into an NDA with Centene, but then provided only a one-page spreadsheet that listed the number of lives in the thirty-five areas and high-level revenue figures.[222] Before providing any additional data to Centene, Cigna insisted on a second, non-market NDA, which included broad standstill provisions.[223] Cigna refused to enter into an NDA with or provide due diligence to the two Blues buyers unless the DOJ indicated that a Blues buyer was a viable option.[224]

Without due diligence from Cigna, the three potential buyers could not evaluate the assets, make an offer, or advocate to the DOJ. Zielinski, Jones, and their outside counsel exchanged contentious emails over Cigna's refusal to sign NDAs and provide due diligence.[225] Zollars, a Cigna director, testified that Cigna refused to sign the NDAs because "things had broken down to the point" that Cigna was "concerned that the deal

---

[221] *Id.* Cigna did not take any steps to identify potential buyers. *See* Zielinski Tr. 63.

[222] *See* JX 2068; Zielinski Tr. 56; Paul Tr. 640, 652–54, 750; Jones Tr. 2930.

[223] Zielinski Tr. 56–57; Paul Tr. 653–54, 655.

[224] *See* JX 2076; JX 2101; Zielinski Tr. 51; Jones Tr. 2659–60; Rule Tr. 3094–95.

[225] *See* JX 2076; JX 2079; JX 2080; JX 2083; JX 2084; JX 2090; JX 2091.

may not go through and, if it didn't go through, that we were putting ourselves at risk" by providing due diligence to potential buyers.[226]

In anticipation of the June 20 meeting, Anthem sent a letter to the DOJ that identified its proposed buyers and offered to divest all of Cigna's assets in the thirty-five regional markets.[227] Just before the meeting, Cigna's counsel told Anthem's lead regulatory counsel, George Paul, that "the viability of Blues as divestiture candidates must be raised" with the DOJ and threatened, "If you don't plan to raise it, we will." JX 2101 at '171. Paul was "stunned, angered, and a little unsure how to proceed." Paul Tr. 643. As he saw it,

> I am going in on the first time I had the chance to talk to the Department of Justice about, "Here is my solution to the problems you've raised and, by the way, I have the best three buyers on the planet all lined up. All are going to be great. And this is the best proposal you've ever seen. You need to sign on it today. And oh, by the way, are you comfortable with the Blues as a buyer, because there's some question as to whether or not they would be viable or not." That's just not a good way to start off a negotiation for settlement.

*Id.* at 644. He viewed Cigna's insistence on raising the issue as a failure to cooperate with Anthem and an effort to highlight Anthem's membership in the Blues Association. *See id.* at 642, 644, 647.

---

[226] Zollars Tr. 2516. The record supports Zollars' assertion that the Cigna ELT made a decision not to support the divestiture process because the relationship with Anthem had broken down. After the meeting with the DOJ Staff, Cigna's regulatory counsel initially appeared willing to negotiate NDAs and work on a divestiture strategy. That changed after Cordani and Jones spoke with Wachtell Lipton about how to proceed. The meeting with Wachtell Lipton resulted in a decision not to support Anthem's divestiture efforts. *See* JX 2030; JX 2079; Jones Tr. 2913–20, 2930–32.

[227] PTO ¶ 167; JX 2087; Zielinski Tr. 49–50.

During the meeting with the Staff, Anthem presented its proposal and flagged that two of the buyers were Blues licensees. Anthem had asked Cigna to help argue that a Blues buyer was suitable, but Cigna refused. *See* Paul Tr. 641–42, 647–48.

The Staff did not express any view on Anthem's proposal. *See* JX 2123 at '405. Paul did not expect anything different. In his experience, the DOJ usually resists an initial divestiture proposal and raises questions, expecting that the "buyer is going to come in with a business plan, with financials that show that it can profitably run that business on day one and step into the shoes of where the [seller] was going to be." Paul Tr. 645. Because of Cigna's position on NDAs and due diligence, the proposed buyers could not do that.

### 3. The June 21 Meeting With The Front Office

On June 21, 2016, the parties held their first meeting with the Front Office. The top DOJ representative was Deputy Assistant Attorney General Sonia Pfaffenroth, who was the number two person in the antitrust division. Paul. Tr. 706, 728.

Like the Staff, the Front Office expressed "'significant concerns' with the transaction both at a national and local level." JX 2123 at '406. Like the Staff, the Front Office cited "the loss of 1 of 4 national competitors" and Cigna's status as an innovator who was "unique in some ways," such as value-based care. *Id.* at '408.

To a greater degree than the Staff, the Front Office expressed concern about Cigna "joining a Blue" and whether that would result in coordination between Cigna and the Blues Association. *Id.* at '407. The Front Office also expressed concern that "the very nature of the Blues network" would curtail Cigna's growth. *Id.* At this point, Zielinski represented that "he believed the [Blues] MDL in Alabama would settle and change the

116

[2/3] rule." *Id.* At trial, Zielinski acknowledged that the mediation had been unsuccessful and that he lacked any factual basis for that representation. Zielinski Tr. 443–45

Anthem then presented its remediation proposal. Like the Staff, the Front Office was skeptical that a buyer could step into Cigna's place. The Front Office also expressed skepticism that another Blues member could be a viable buyer.[228]

On June 24, 2016, the parties had a second meeting with the Front Office. This time, the top representative from the DOJ was Associate Attorney General William Baer, the head of the division. *See* Paul Tr. 728.

Anthem gave a presentation, which argued that the Merger was not anticompetitive and provided detail about its proposed remedy. Only Anthem representatives made the presentation. Cigna's counsel did not even sit at the table with Anthem.[229] When Baer asked about the 2/3 Rule, Zielinski again represented that it would be eliminated or modified through a settlement in the Blues MDL. Zielinski predicted, again without factual support, that a settlement could happen before the end of 2016.[230] Baer pushed Zielinski to agree that absent a modification, NewCo would be "growth constrained." JX 2193 at '773.

During the meeting, Anthem argued that the Merger would enable Anthem to build on Cigna's model of integrated specialty care and wellness products. Baer asked why Anthem had not already created similar products, and Anthem's counsel stated that it was

---

[228] JX 2123 at '409; *see* JX 2112; Zielinski Tr. 490–91.

[229] *See* Paul Tr. 729, 762; JX 2132; JX 2193.

[230] *See* JX 2830; JX 2193 at '773, '782, '794; Zielinski Tr. 443–44.

not Anthem's focus and hard to build from scratch. Zielinski also suggested that many industry professionals questioned whether Cigna's wellness programs actually reduced costs, with many regarding the programs as a "waste of time." *Id.* at '774.

Baer also asked about Anthem's ability to achieve medical cost savings, suggesting that Cigna's providers might not be willing to provide the more intensive services that Cigna's programs contemplated at the lower rates that Anthem paid to providers. Zielinski told the DOJ that Anthem could trigger the affiliate clauses in its provider agreements, under which the providers would be obligated to offer the same rates to Cigna customers. That theoretically was true, but by then the Anthem ELT had decided not to exercise the clauses broadly. *See* Part II.I.3, *supra*. Baer maintained there was the "tension" between Anthem paying lower rates to Cigna's providers and Anthem's claim that it would improve collaborative relationships with those same providers. JX 2913 at '774.

Baer expressed skepticism about a potential remedy, noting that the DOJ had never approved a divestiture of the scale that Anthem was proposing. *Id.* at '775–76. Because of how the DOJ viewed the Blues, the DOJ saw a divestiture to a Blues buyer as Anthem selling to itself. Zielinski Tr. 477, 490–91.

At the end of the meeting, Baer asked to have a separate session with Cigna. That meeting took place one week later, on June 27, 2016.[231]

---

[231] *See* JX 2913 at '776; JX 2149; JX 2196.

Coming out of the meetings with the DOJ, Anthem and Cigna suspected that that the DOJ would not approve the Merger.[232] Anthem also received the bad news that Centene was not interested in a potential purchase of Cigna's assets.[233] Centene had not received any due diligence from Cigna. Paul Tr. 654, 656–67. After Centene walked away, only Blues buyers remained as potential divestiture buyers. Anthem began to explore whether selling assets to a combination of buyers might be a solution. *See* JX 2165; JX 2177.

Over the following weeks, the parties continued to meet and correspond with the DOJ. Faced with the DOJ's argument that Cigna was uniquely innovative, Anthem sought to convince the DOJ that although Cigna was innovative, it was not *uniquely* innovative. Anthem prepared and submitted a letter to the DOJ designed to address "the Division's apparent misconception that Cigna is the only insurer providing [collaborative] services" and explaining that "many other health insurance carriers" offer similar services.[234] Anthem also submitted a letter arguing that a Blues buyer would be a good candidate for a

---

[232] Zielinski Tr. 448–49; Rule Tr. 3098.

[233] *See* JX 2163; JX 2177.

[234] JX 2250 at '671. Anthem researched Cigna's collaborative care relationships and began developing an argument that Anthem's comparable programs were similarly effective or even superior to Cigna's. *See* JX 2138; JX 2139; JX 2148; JX 2153. As part of that process, Anthem located a study that characterized Cigna's collaborative programs as relatively small and ineffective. *See* JX 2129; JX 2134. Anthem also spoke with and obtained a declaration from Stuart Piltch, a regional consultant for large healthcare clients who was skeptical of the value of Cigna's collaborative programs. *See* JX 2127; Zielinski Tr. 453–58. Anthem's counsel worked with Piltch to prepare a declaration explaining that Cigna's collaborative care options were neither unique nor significant. *See* JX 2131. The Piltch declaration did not figure prominently in the Antitrust Litigation. It was "a tree that fell but wasn't heard in the forest." Curran Tr. 1511.

remediation proposal.[235] And Anthem submitted a letter arguing that the Merger would expand individual access to health insurance. *See* JX 2190. Cigna objected to Anthem's submissions and refused to join them.

After extensive effort, Anthem succeeded in bringing Centene back to the table.[236] Anthem again asked Cigna to populate a data room so that Centene and the two Blues buyers could conduct due diligence. Cigna objected that Anthem was "unilaterally driving Cigna asset divestitures" and complained that Cigna's assets were the "only ones on the block."[237] Cigna continued to refuse to enter into customary NDAs with the two Blues buyers on the theory that the DOJ would never approve a sale to a Blues buyer. *See*

---

[235] *See* JX 2181; Zielinski Tr. 51–56.

[236] *See* JX 2251; JX 2327; Paul Tr. 717.

[237] JX 2219; *see* Zielinski Tr. 63–64 (describing Cigna's opposition to the divestiture of its assets). This was obstructive. The divestiture transaction would have been conditioned on the Merger closing, at which point the divested assets would be NewCo's assets, not Cigna's assets. Cigna's opposition was also inconsistent with its analysis during the merger discussions with Anthem, when the Cigna ELT expected to be managing NewCo. During that phase, the Cigna ELT clearly understood that divestitures would be necessary and that they would most likely involve Cigna assets. *See* JX 78 at '721 (Cigna analysis of transaction with Anthem; "Local market depth may require divestitures"); JX 79 (McCarthy and Gray discussing that "[r]egulatory divestitures would be best from Cigna"); JX 99 at '545 (Cigna ELT memorandum on deal with Anthem noting that "Regulatory divestitures, if required, will tend to be [Cigna] revenue/membership in the [Anthem Blue States]"); *see also* Zielinski Tr. 63 (explaining that "even before we signed the Merger Agreement, we talked about that given this transaction, it was very likely that the government would request us to do divestitures as part of the remediation plan, [and] in order to address that, we would divest Cigna assets in our 14 Blue states"); Gray Tr. 1682–83 (anticipating in September 2015, shortly after signing of Merger Agreement, that divestitures were manageable and likely would come from Cigna).

120

JX 2220. The DOJ had said that it had "serious concerns" about a divestiture to a Blues buyer, but the DOJ also was willing to speak with both buyers. JX 2222.

On July 10, 2016, Anthem formally presented its divestiture proposal to the DOJ and argued that it would address any concerns about the Merger being anticompetitive. JX 2225. Cigna did not join the letter, which was a "red flag to the Department of Justice." Paul Tr. 762. Instead, Cigna's counsel sent a detailed letter to Anthem attacking the proposal. JX 2227. Among other things, Cigna took the position that its provider contracts did not authorize it to rent its network to a buyer. *Id.* at '659. Anthem had analyzed Cigna's form agreements and had not identified any restrictions on renting its network.[238]

With Cigna continuing to refuse to enter into an NDA with either of the Blues buyers, Anthem charged Cigna with failing to use its reasonable best efforts to support the Merger. Cigna's lead counsel then contacted the Staff to find out if the DOJ would consider a sale to a Blues buyer, explaining that Cigna did not want to provide its confidential information to a non-viable acquirer. The Staff confirmed that "**a divestiture to a Blue plan is <u>not</u> a path forward.**"[239] The Staff added that its position would not change even if Cigna entered into NDAs and shared information with the two Blues buyers.[240]

---

[238] JX 3119 at '779; Paul Tr. 755–57.

[239] JX 2254 at '481; *accord* JX 2258.

[240] *See* JX 2254 at '482; JX 2258.

Shortly thereafter, talks broke down with Centene, which was the only potential non-Blues buyer. Cigna never gave Centene access to the data room.[241] Centene also had asked to buy a combination of Cigna and Anthem assets, rather than just Cigna assets. Anthem was unwilling to sell the assets that Centene wanted and believed that it could find other buyers for the Cigna assets.[242]

### 4. Cigna Continues To Analyze Its Standalone Options.

While the meetings with the DOJ were taking place, the Cigna ELT continued to work with Bain on the strategies available to "Sovereign Cigna."[243] Cordani and the Cigna ELT also consulted with Moelis about its strategic options for if the DOJ blocked the Merger, including "lessons learned on broken deals."[244] The Cigna Board spent much of its July 2016 meeting reviewing Cigna's standalone strategy and alternatives.[245]

Cigna simultaneously began preparing to shape the narrative if the DOJ challenged the Merger. Cigna crafted a story in which the parties' interests diverged because of Anthem's regulatory strategy, rather than Cigna's opposition to the L2/L3 selection process

---

[241] *See* JX 2163; JX 2177; Paul Tr. 654, 656–67; Gray Tr. 1667.

[242] *See* JX 2330; JX 2339; Zielinski Tr. 500–01; Paul Tr. 717–19.

[243] *See* JX 2040; JX 2125; JX 2198; JX 2213; JX 2214; JX 2224; JX 2233.

[244] JX 2260; *see* JX 2282.

[245] JX 2357; JX 2358; JX 2293.

122

and other aspects of integration planning.[246] Teneo developed a communications plan that involved "proactive outreach to key media on background." JX 2298 at '547. Teneo would

- attack Anthem's regulatory strategy,

- claim that the Blues Rules would have limited NewCo's ability to grow,

- criticize Anthem's remediation proposal,

- argue that the Merger would have favored shareholders over customers,

- portray Anthem as financially constrained and "not a well-run company,"

- attack Swedish, including by suggesting that he made misleading statements about the status of the transaction and the degree of cooperation between the parties, and

- praise Cigna's potential for standalone success.

*Id.* at '547–49.

Meanwhile, on July 12, 2016, the Steering Committee met for what would be the last time. During the meeting, the commercial integration team presented a modified go-to-market strategy for the first 180 days that replaced "Bias to Blue" with a brand-agnostic strategy, which the Steering Committee adopted. *See* JX 2238 at '861. Under the brand-agnostic strategy, if a new client in an Anthem Blue State expressed a preference for a Cigna product, then only Cigna would provide a quote. The full "Air Traffic Control Playbook" confirmed that NewCo would deploy the brand-agnostic strategy, retain both

---

[246] *See, e.g.*, JX 2295. As part of that work, Cigna's attorneys collected and analyzed Delaware cases addressing "reasonable best efforts" provisions. *See* JX 2197; JX 2248. Cigna also prepared for "the 'walk away' scenario," in which the parties agreed to terminate the Merger Agreement. JX 2284 at '930.

the Anthem and Cigna brands, and seek to preserve NewCo's full book of business. *See* JX 2303.

## K. The Antitrust Litigation

On July 21, 2016, the DOJ sued to enjoin the merger. On the same day, the DOJ sued to enjoin the pending merger between Aetna and Humana.[247] The DOJ contended that the mergers would "eliminat[e] two innovative competitors—Cigna and Humana—at a time when the industry is experimenting with new ways to lower healthcare costs," reducing the number of large national health insurers from five to three.[248]

The DOJ's public comments included criticisms of Anthem's divestiture proposal. JX 2323 at 8–9. During the press conference, a reporter asked, "[I]s there something that [the] companies could do? Put something -- could they fix it in a way to get a settlement?" *Id.* at 12. The DOJ responded, "We have seen nothing that suggests that. Absolutely nothing." *Id.*

### 1. The Parties' Initial Responses To The Antitrust Litigation

Anthem responded to the filing of the Antitrust Litigation by issuing a press release criticizing the DOJ's decision and by running advertisements touting the Merger in major newspapers.[249] Swedish appeared on CNBC and spoke in support of the deal.[250] Swedish

---

[247] PTO ¶ 178; JX 2304.

[248] JX 2314 ¶ 4 (the "Antitrust Complaint"); *accord* JX 2319 ¶ 4.

[249] *See* JX 2302; JX 2313; JX 2324; JX 2343; JX 2344; JX 2353; Zielinski Tr. 83–84.

[250] *See* JX 2355. During that interview, Swedish stated that Cigna had done "nothing that has led us to believe they want[ed] to leave this deal." *Id.* at '147. At trial, Swedish

and Zielinski also met with the *Wall Street Journal* and gave them an exclusive "sources close to Anthem" interview about the state of the deal and the disagreements with Cigna.[251]

Cigna declined to join Anthem's press release.[252] Cigna issued its own press release stating that it was "evaluating its options" in light of "the concerns raised by the DOJ and the overall status of the regulatory process," which Cigna pointed out "was led by Anthem." JX 2312. Cigna said that it did "not believe the transaction [would] close in 2016" and that "the earliest it could close [was] 2017, if at all."[253] Cigna also said that it

---

strangely described that statement as "truthful and accurate." Swedish Tr. 1213. He also testified that in the fall of 2016, he thought that Anthem and Cigna were "working together" to defend the Antitrust Litigation and that "Cigna was committed to the trial and hoping that the deal would get approved." *Id.* at 1216. Swedish's statements to CNBC about Cigna's level enthusiasm were not accurate, nor was his testimony regarding his views of Cigna in the fall of 2016.

[251] Zielinski Tr. 382–83. In response to an interrogatory asking about Cigna's communications with the *Wall Street Journal* about the disputes between the parties, Anthem failed to identify this meeting. *See* JX 4065 at 8. The meeting should have been identified. During the same period, Swedish asked Zielinski and Anthem's public relations advisors to look into developing stories that attacked Cigna's prospects as a standalone entity, but Zielinski convinced Swedish not to go forward with that strategy. *See* Zielinski Tr. 390–95; *see also* JX 2273; JX 2618.

[252] *See* PTO ¶ 180; JX 2312; JX 2313.

[253] *Id.*; *see* JX 2285; JX 2347. McCarthy, Cigna's CFO, felt that Cigna should have said that it was disappointed in the DOJ's decision to sue, attributing the failure to Teneo's advice. McCarthy Dep. 603–04. Cigna's head of investor relations questioned the language of the release, writing, "Don't know what tone we are looking for, but to me, this sounded like we really don't care whether or not [the Merger] gets rejected." JX 2228. He noted that "the conventional wisdom on the Street" was that Cigna was "not interested in this deal," and he explained that "[a] disclosure like this would further that thesis." *Id.* One of Cigna's investors suspected "[b]ased on the tone of [the] release" that Cigna was "looking for a way out." JX 2331 at '791. Other investors expressed similar sentiments. *See* JX 2334; JX 2335; JX 2354.

had developed "an [a]ttractive Plan B" that it would deploy if the deal did not go through.[254]

Cordani began meeting with Cigna's investors to tout Cigna's prospects as an independent company. *See* JX 2402. Cigna also formally engaged to Bain to further develop its "Sovereign strategy."[255]

After the DOJ filed suit, all joint work on integration planning stopped.[256] Anthem and its consultants continued to work on integration, but without input from Cigna.[257]

### 2. Cigna's Covert Communications Campaign

Officially, Cigna declined to comment on the Antitrust Litigation. Unofficially, Teneo waged a covert communications campaign against the Merger.[258]

Because the DOJ complaint mentioned Anthem's status as a Blues licensee, Cigna charged Teneo with developing stories about the Blues Rules being an impediment to the

---

[254] JX 2392 at '391; *see* JX 2409.

[255] *See* JX 2405; JX 2457; JX 2705.

[256] *Dist. Ct. Op.*, 236 F. Supp. 3d at 186, 235; Cordani Tr. 1834. The parties dispute who stopped the joint effort first. The record shows that after the DOJ's announcement, Anthem instructed its integration teams to "cease all conversations with Cigna" and to cancel all joint meetings. JX 2326; *see* JX 2332. Cigna followed suit. JX 2339; JX 2403. Anthem then reconsidered and proposed continuing to work on a "90 day action plan for Day 1 readiness that would be implemented upon receiving a positive outcome in the DOJ litigation." JX 2404; *see* JX 2403. Cordani declined, claiming that Cigna would "continue to focus on regulatory and litigation priorities and support." JX 2404 at '243; *see* JX 2406. Contrary to that claim, Cigna did not provide any ongoing support.

[257] *See, e.g.*, JX 2341; JX 2370; JX 2394; JX 2443.

[258] Anthem also engaged in efforts to "shape pre-trial coverage" by "creating a new narrative in the DC media market where this trial will take place." JX 2386. The fundamental difference was that Anthem was trying to promote a narrative that supported the Merger and would make it more likely for the DOJ to settle. *Id.*; *see* JX 2388.

126

Merger. To that end, Teneo and Wachtell Lipton began gathering litigation filings from the Blues MDL and using them to develop arguments against the Merger. [259]

Jones used information gleaned from the Blues MDL to write a letter to Zielinski that questioned NewCo's ability to comply with the 2/3 Rule and "Anthem's good faith in its dealings with Cigna over the last year plus." JX 2467 at '305. She accused Anthem of "misrepresenting the scope and nature of its relationship with the [Blues Association], failing to provide access to Cigna to important documents regarding that relationship and failing to brief Cigna on the extent of its 'conflict of interest.'" *Id.* at '307.

Teneo used information gleaned from the Blues MDL to prepare its "Blues [P]itch," a sixteen-page document, which used the Blues Rules to advance arguments against the Merger.[260] The Blues Pitch included the following messages:

- "If Cigna merges with Anthem, its freedom to compete with Blues across the country could be constrained." JX 2484 at '001.

- "As a [Blues] organization, Anthem's obligations mandate certain actions that limit the size and resources of its non-Blues business." *Id.*

- "[Blues] rules oblige Anthem to prioritize its Blues business, implying that the legacy Cigna business will be neglected within the merged organization." *Id.*

- "A merged Anthem-Cigna will empower Anthem, exacerbate the market segmentation employed by the Blues, and cause the erosion of the innovation and value Cigna brings, harming consumers and the healthcare market more broadly." *Id.*

- "To [comply with the Blues Rules], the company will have to decrease the percentage of Cigna customers in the merged company. Practical implementation

---

[259] *See* JX 2462; *See* Cohen Tr. 2405, 2407–08.

[260] JX 2484; *see* Cohen Tr. 2408–09.

127

implies that Anthem will get bigger and do away with Cigna plans. By shifting plans and resources from Cigna to Blues, the merged company will limit Cigna's innovation." *Id.* at '002.

- "[A] merger would create a clear conflict of interest between [Anthem's] Blues and non-Blues plans." *Id.*

- "Anthem and its Blues partners are already being accused of negatively impacting the healthcare market and its consumers." *Id.*

- "Anthem has failed to address the grave concerns outlined in this document." *Id.*

- "Anthem is well aware of its obligations to the Blues. To retain its Blues license, which is core to the company's value, Anthem will have to either compete with other Blues or weaken Cigna's position." *Id.*

- "To ensure a successful merger without anti-trust violations, Anthem should have developed a solution to address these concerns. However, Anthem and its leadership continue their refusal to tackle these pivotal issues." *Id.*

Cohen developed the Blues Pitch knowing that it would support the DOJ's position against the Merger. He had no factual basis for the arguments in the Blues Pitch, other than what he saw in the Blues MDL filings. *See* Cohen Tr. 2413–14, 2416.

Shortly after preparing the Blues Pitch, Cohen met with Jones. She told Cohen "to play this as all roads go to the blues." JX 2486 at '490. She admitted that Cigna was "going through the motions of moving this deal forward." *Id.* at '491. Cohen understood that by "all roads go to the Blues," Jones meant that she wanted to pursue "a strategy to blame the Blues rules no matter what." Cohen Tr. 2427–28.

One day after receiving his marching orders, Cohen sent Jones a memorandum titled "Strategic Positioning Initiatives," which identified three key themes.[261] The first was "[t]he leadership style and focus of [the] Anthem CEO and its effect on the merger process." JX 2488 at '888. The messages for this theme included the following:

- "The leadership style and focus of the Anthem CEO has proven a detriment to the success of this transaction." *Id.*

- "While suggesting . . . that the successful completion of the merger was his top priority, his actions have been anything but . . . ." *Id.*

- "The CEO's repeated public statements about the parties being aligned and advancing the process together are entirely inconsistent both with realit[y] as well as statements made by Anthem's counsel in court . . . ." *Id.*

The attacks recalled earlier efforts by Teneo to undermine Swedish, including an attempt to locate a picture of Swedish smoking a cigar on the cover of *Cigar Aficionado* magazine, which Teneo believed would hurt his credibility as a healthcare CEO.[262]

The second theme was "[t]he emerging complexity related to the Blues and related litigation and this complexity's impact on the merger process as well as Anthem's handling/lack of handing of this complexity." JX 2488 at '888. The talking points for this theme came straight from the Blues Pitch.[263]

---

[261] JX 2488 at '888; *see* Cohen Tr. 2430–32. Cohen sent the document to Jones by routing it through Wachtell Lipton in an effort to manufacture a claim of privilege. *See* JX 2489; *see* Cohen Tr. 2429–30.

[262] JX 1922; *see* Cohen Tr. 2381–83; *see also* JX 2781 (Teneo developing "Story Points" for article attacking Swedish).

[263] *See id.* at '889; JX 2484.

129

The third theme was "a lack of credibility and consistency in the statements advanced by Anthem with regard to the completion of the transaction and its approach to so doing, particularly with regard to the lack of a remediation plan . . . ." JX 2488 at '888. Talking points for this theme included the following:

- "It is a widely held view in the financial community and the media that the likelihood of completing the Anthem-Cigna merger is *de minimus* [sic]." *Id.* at '890.

- "Anthem is not advancing a mitigating approach nor does it have time to construct such an alternative scenario at this point if it wanted to." *Id.*

- "Anthem CEO has recently left investors and other audiences wanting as to how the company could secure a victory in completing the transaction." *Id.*

Cohen reported that he was "actively pursuing and developing storylines with [the] media" involving these themes, including with the *Wall Street Journal*, the *New York Post*, and the *Financial Times*.[264] Cohen spoke with reporters, attorneys, and law professors who might help spread Cigna's anti-Merger narrative.[265] Cohen provided reporters with draft language, quotations, and other material that reflected poorly on Anthem for the reporters

---

[264] JX 2488 at '888, '890–91; *see also* JX 2578. Wachtell Lipton assisted Cohen by assembling information that he could provide to reporters. *See* JX 2499; JX 2500; JX 2598; JX 2600. Wachtell Lipton also connected Cohen with reporters *See* JX 2515.

[265] *See* JX 2526; JX 2533; JX 2537; JX 2553; JX 2555; JX 2564; JX 2565; JX 2607.

to drop into their stories.[266] Teneo separately worked on messaging that attacked the health of Anthem's business.[267]

Cohen's efforts produced stories that advanced the anti-Anthem, anti-Merger themes that he and Jones had developed.[268] When Cohen forwarded one of the articles to Teneo's CEO, he congratulated Cohen on a job "[w]ell done."[269]

---

[266] *See* JX 2556; JX 2561; JX 2566; JX 2567; JX 2569. Cordani testified at trial that the communications initiative was never "activated." Cordani Tr. 2042–43. That testimony was inaccurate. The record makes clear that Teneo carried it out at Cigna's request. *See* Cohen Tr. 2433, 2437; JX 2488 at '888. Cordani also claimed inaccurately that he had not received the Strategic Positioning Initiatives. Cordani Tr. 2039. The metadata showed that the document was produced from his files. JX 3137; Cordani Tr. 2039–40. Cordani even testified that he "had very little involvement with Teneo." Cordani Tr. 2021. The record shows that Cordani directly engaged with Teneo on numerous occasions, including with its CEO, Declan Kelly. *See, e.g.*, JX 2611; JX 2638. Cohen testified that he "worked regularly" and "closely" with a "core team" consisting of Cordani, Jones, Baucus, and Wachtell Lipton, and that he had "a substantial amount of contact" with Cordani and Jones. Cohen Tr. 2373–74.

[267] JX 2509 at '101; *see* JX 2516. Cordani testified that Teneo did not run a campaign criticizing the Merger. *See* Cordani Tr. 2020, 2027–28. Jones similarly testified that Cigna did not hire Teneo to criticize the Merger, that there was no strategy to criticize the Merger, and that Teneo did not perform any work to promote or generate stories about the Merger. Jones Tr. 2760–62. That testimony was obviously inaccurate. *See, e.g.*, JX 2565; JX 2567; JX 2798; JX 2803; JX 2890; JX 3110; Cohen Tr. 2433. Jones went so far as to claim that Teneo's job was to correct any misperception that Cigna was not committed to the Merger. Jones Tr. 2744–46. She was forced to admit that there is not a single Teneo document that includes a message indicating that Cigna was interested in the Merger. *Id.* at 2773–74.

[268] *See* JX 2570; JX 2571; JX 2574; JX 2576. Ironically, Cohen's efforts resulted in reporters asking Cigna to comment on stories Cohen had planted. *See, e.g.*, JX 2571.

[269] JX 2576. Cigna accuses Anthem of engaging in comparable conduct. There is evidence that in July 2016, after Teneo's initial leaks led to articles in the *Wall Street Journal* and the *New York Post*, Swedish and Zielinski met with the *Wall Street Journal* and provided information as "sources close to Anthem." JX 2572. There also is evidence that after the DOJ sued and as trial approached, Anthem's public relations advisor worked on talking points and prepared a media plan. *See* JX 4288; JX 4295. Just before trial,

131

### 3. The Initial Phase Of The Antitrust Litigation

As it had the right to do under the Merger Agreement, Anthem took the lead in defending the Antitrust Litigation. Cigna purported to defer to Anthem, while working to undermine the defense.

Cigna initially undermined Anthem's efforts to obtain a prompt schedule in the Antitrust Litigation. Either party could terminate the Merger Agreement after April 30, 2017, so Anthem sought an expedited trial before the end of 2016 to provide the District Court with time to rule, an opportunity for appeal, and a window to obtain other necessary approvals. *See* JX 2382. To show that it was serious about moving quickly, Anthem filed its answer on July 26, 2016. Cigna proceeded leisurely. Cigna did not file its answer until September 19, 2016. Cigna did not make any arguments in support of an expedited trial date, but instead submitted a one-page submission stating, "Cigna defers to Anthem's scheduling request . . . ."[270]

---

Anthem hired an additional public relations firm to help promote coverage that supported the Merger. *See* JX 2604; JX 2618; JX 2665. And when Anthem considered sending Cigna a formal notice of breach and making a public announcement in July 2016, Anthem also considered having its public relations firm speak on background with reporters about the notice. *See* JX 2273. Anthem, however, did not send the notice of breach and did not proceed with the story. *See* Zielinski Tr. 390–95. Anthem also had its public relations firm monitor and summarize stories in the press. *See* JX 4077.

There are at least two critical distinctions between Anthem's and Cigna's conduct. First, Anthem's level of activity was less extensive than Cigna's. Second, Anthem sought to promote the Merger and facilitate closing, while Cigna sought to undermine the Merger and prevent closing.

[270] JX 2381. Because the divergence between Anthem and Cigna's positions on scheduling was self-evident, Anthem's counsel addressed it during the initial case conference on August 4, 2016. In support of its request for an expedited schedule,

Cigna also resisted mediation. During a case management conference on August 12, 2016, the District Court encouraged the parties to explore mediation, suggesting that "potential settlement discussions" could proceed "on a parallel track" with the litigation and potentially result in "a negotiated solution." JX 2414 at 34. The DOJ responded that "[there was] absolutely a willingness" to consider settlement, and clarified, "We're always willing to hear any [settlement] proposals that the defendants have." *Id.* Anthem also endorsed the prospects of settlement.[271]

Based on the District Court's comments, Anthem proposed that the parties mediate.[272] The DOJ asked for "Cigna's position" and expressed skepticism that mediation would be productive. JX 2451. Anthem later asked Cigna to support a motion to appoint a mediator and to assist with a local market divestiture. Cigna refused, asking Anthem "how

---

Anthem's counsel explained, "[W]e have a situation here where Anthem, the acquiror [sic], wants to do the deal, [and] Cigna, at least its top management, is . . . no longer interested . . . ." JX 2424 at 32. Cigna's counsel did not argue in favor of an expedited trial, saying only, "[W]e would defer to Anthem." *Id.* at 40.

[271] *Id.* at 36. During the conference, the District Court recognized the adversity between Anthem and Cigna and asked, "Does it makes sense to force the government and the Court and the special master and the third parties and the state regulators to abide by an extremely ambitious schedule in order to review a merger between two parties that don't seem to want to merge?" *Id.* at 24; *see id.* at 40; *see also* JX 2418. Anthem's counsel indicated that Anthem wanted to complete the deal. *See* JX 2414 at 37. The District Court then turned to Cigna's counsel and asked whether there was flexibility as to the Termination Date, commenting that it was "a bizarre situation that we are doing all of this for the benefit of a merger that may not be desired." *Id.* at 52. Cigna's counsel claimed that Cigna was committed to the Merger, but noted, "On April 30th either party can withdraw." *Id.* at 54.

[272] *See* JX 2451; Curran Tr. 1606–07; Rule Tr. 3186–88.

133

a local market divestiture plan that addresses the DOJ's concern [could] reasonably be executed within the current Anthem requested court schedule." JX 2476.

During a case management conference on September 30, 2016, the District Court again endorsed mediation, describing it as an "excellent idea."[273] Cigna's counsel disagreed, arguing that mediation would distract from trial preparation. Cigna's counsel also posited that it would be difficult to support a mediation effort "without understanding sort of the path that the mediator is going to take." *Id.* at 58. The District Court pushed back, expressing skepticism that the parties lacked the resources to proceed on two tracks and observing that "it's difficult to anticipate what the proposals would be or how the mediation would proceed without actually initiating mediation." *Id.* at 59. In a subsequent call, the DOJ made clear that it regarded mediation "as a waste of time." JX 2540.

During the early phases of the case, Anthem tried to speak with potential NewCo customers to identify witnesses who might give trial testimony in favor of the Merger.[274] Under Anthem's confidentiality agreement with Cigna, Anthem could not contact Cigna's clients without Cigna's consent.[275] Cigna opposed any effort by Anthem to contact nineteen entities that Cigna identified as its customers. JX 2438.

---

[273] JX 2523 at 59; *see id.* at 57.

[274] *See* JX 2423; JX 2435.

[275] JX 2416 at '532; *see* JX 2428; JX 2436.

## 4. Discovery In The Antitrust Litigation

During discovery, Anthem did all the work. Anthem prepared all the discovery requests, took or defended 109 out of 115 depositions, and identified, retained and worked with all of the experts. The only depositions that Cigna defended were those of its six witnesses. Cigna did not take any depositions, and it asked limited questions of only three witnesses—Cordani and two Anthem witnesses—in each case eliciting testimony that supported the DOJ's case and harmed the defense.[276]

Instead of helping, Cigna continued to undermine Anthem's efforts. During a teleconference on August 16, 2016, Cigna volunteered that the parties' in-house counsel had exchanged additional dispute letters.[277] The DOJ moved to compel production of the letters, and Anthem asserted privilege. Cigna submitted a response in which it argued that only parts of the documents were privileged and asked the Special Master to review the documents in camera. Anthem believed that only eleven documents were at issue, but Cigna had submitted fifty documents to the Special Master and argued in favor of the broader submission.[278] Cigna then disputed Anthem's proposed redactions, and when Anthem stated its position to the Special Master in neutral terms, Cigna responded with an over-the-top email about the "inaccurate insinuations of Anthem's counsel." JX 2514. The

---

[276] *See* Curran Tr. 1416–25, 1434–35; ADX 9; *see also* Rule Tr. 3168–69.

[277] *See* JX 2494 at 2; *see also* JX 3065; Curran Tr. 1410–14, 1434–35.

[278] *See* JX 2501 at '034–35; JX 2534; Curran Tr. 1425.

135

Special Master recommended that many of the documents be produced, and the court adopted the recommendation.[279]

One of the more significant developments during discovery was Cordani's deposition. Cordani was shown an advertisement that Anthem had run in support of the Merger after the DOJ filed suit, JX 2353, then asked about an email in which Jones wrote, "Not only are these ads misguided as a tactical matter, they contain statements which we do not believe to be true," JX 2596 at 147. When asked about what was untrue, Cordani launched into talking points from the Blues Pitch, including the theme that the Merger would damage Cigna outside the Anthem Blue States:

> An example, to answer your question, is our prior dialogue—a prior topic of the proposed forced migration of Cigna customers that we talked about earlier, which took place either a month or two prior to this event transpiring, raised significant concern in our corporation that choice would be constrained and the ability to harness our clinical programs and our collaboratives would not only be constrained but essentially disrupted and further concern that our network outside of the 14 states would ultimately systematically be dismantled as the volume in the 14 states in [sic] the Cigna platform decreased.
>
> By definition you would be taking volume outside of the 14 states, so choice. And then, secondly, we continued to register concerns just in terms of how the $2 billion was being estimated on medical cost savings because the combination of network optimization but clinical program optimization assumptions continued to change on a regular basis there.

JX 2596 at 148–49. Later in his deposition, Cordani claimed that the "migration strategy" was called "Bias [to] Blue."[280]

---

[279] *See* JX 2541; JX 2580.

[280] *Id.* at 164, 195. During the June 2016 Steering Committee meeting, Cordani had claimed that "if the Department of Justice saw this strategy, they'd kill us . . . because it's

The contemporaneous documents contradict Cordani's testimony that Bias to Blue was a forced migration strategy. The Bias-to-Blue strategy contemplated that new customers within the Anthem Blue States who expressed a preference for a Cigna product would receive quotes for both an Anthem product and a Cigna product. After Cordani objected to this approach, Anthem shifted to a brand-agnostic strategy in which the customer in that scenario only would receive a quote for a Cigna product. *See* Part II.I.6 & II.J.4, *supra*.

The DOJ lawyers were sufficiently pleased with Cordani's testimony that they were ready to wrap up the deposition by lunchtime. Anthem's counsel asked to resume the deposition after lunch, thinking that he might "try to offset the tremendous damage that Mr. Cordani was doing." Curran Tr. 1433–34. After lunch, Curran asked a limited line of questions about Cordani's role as CEO of Cigna and his potential responsibilities as NewCo's COO. *See* JX 2596 at 175–79. Cigna's counsel then cross-examined Cordani and elicited additional testimony that was favorable to the DOJ's case. Despite knowing that the DOJ was pursuing a theory that Cigna was a uniquely innovative competitor, Cigna's counsel asked a series of leading questions about Cigna's innovation:

> Q:  So earlier today in response to some questions by Mr. Severt, you talked about -- you mentioned an example of innovation at Cigna called, I think, Health Esystem?
>
> A:  Health Eview.

---

not pro-choice." Cordani Tr. 1828. During his deposition, Cordani voluntarily brought up the issue. *See* Curran Tr. 1431. Cordani was the only witness to bring up the Bias-to-Blue strategy. *See* Rule Tr. 3174–76.

. . .

Q: Would someone be able to re-create the innovativeness or the innovations of Cigna by simply taking a license to Health Eview?

A: I don't believe so.

Q: Is there any other single innovation that you could license that essentially would create a -- basically the innovations of Cigna?

A: No. I don't believe so.

Q: Is there any way to realize or appropriate the innovativeness of Cigna other than taking its management team or its employee team, the people, in other words, that you talked about, who basically achieved that innovativeness in those innovations?

A: I guess the way I'd answer that is the intellectual property is the important part of what makes the engine run and, again, the cadre of people are the field to make the intellectual property run. . . . [Y]ou need the people to take technology and turn it into actionable information and then engage an employer, an individual, a health care professional and drive an action or outcome.

That's what we are -- we are all about. We are about driving the action of the outcome, not perpetuating technology.

JX 2596 at 186–88. Anthem's lead counsel concluded after Cordani's deposition that "Cigna . . . and their legal team were dedicated to killing the merger." Curran Tr. 1439.

### 5. Pre-Trial Preparations

During the pre-trial phase, Cigna became more aggressive and obstructionist. Cigna also shifted its anti-Merger communications campaign into overdrive.

As trial approached, Cigna continued to oppose mediation. On November 11, 2016, during an impromptu office conference, the District Court asked the parties to consider mediation. Rule Tr. 3190. Two days later, Richard Levie, a retired federal judge who had been serving as the Special Master for the case, offered to mediate. Anthem asked Cigna

to agree, but Cigna declined.[281] On November 23, Judge Levie reached out again, but Cigna still would not agree to mediation.[282] Cigna insisted that Anthem first had to propose "a credible path (i.e., proposal) to a settlement" and the DOJ had to "indicate[] a willingness to mediate." JX 2672. Because the DOJ opposed mediation, Cigna would not even express support for the idea. Rule Tr. 3193. Cigna's refusal meant that the DOJ never faced any pressure to mediate. *See* Curran Tr. 1605, 1607–08.

During the trial preparation, Cigna proposed trial exhibits that (i) undermined Anthem's case on efficiencies and (ii) supported the DOJ's position that there was a distinct market for national accounts with only four major participants. *See* JX 2602. Cigna did not provide any comments on Anthem's pre-trial brief and did not sign the pre-trial brief.[283]

One week before trial, Cigna reversed course on the handling of its witnesses. Four weeks earlier, on October 13, 2016, Cigna had told Anthem that Cigna's counsel would "take the lead in defending Cigna employees who are called as trial witnesses, including putting those witnesses on for direct (to the extent they are called by the defense) and crossing them to the extent they are called by plaintiffs."[284] At the same time, Cigna asserted that Anthem was

> pursuing an unsupportable and fundamentally flawed argument that could undermine the parties' defense of the transaction. Namely, Anthem appears to be pursuing the specious argument that Cigna's total medical cost

---

[281] *Id.* at 3191; Zielinski Tr. 67.

[282] Zielinski Tr. 71–74; Rule Tr. at 3191–93.

[283] *See* JX 2627; Curran Tr. 1441, 1520; Rule Tr. 3180–83.

[284] JX 2579; *see* Curran Tr. 1441.

139

> containment efforts (e.g., customer and provider collaboration, wellness programs specialty integrations, etc.) are basically a marketing sham (or worse), that Cigna is not really a competitive force in the market, and that Anthem will be doing Cigna's customers a favor by moving them to the Anthem model.
>
> Such an argument would be both contrary to fact and a violation of the merger agreement.

JX 2579. That assertion mischaracterized Anthem's argument. Anthem was attempting to show that Cigna was not a maverick with *uniquely* innovative products, as asserted by the DOJ.[285]

Cigna understood Anthem's argument, and the Cigna ELT previously had anticipated making that exact argument. Before the Merger Agreement was signed, when Cigna was analyzing the Merger's prospects for antitrust clearance, Cigna recognized that the DOJ might argue that Cigna was a "unique, procompetitive 'maverick.'" JX 209 at '484. Cigna also identified the obvious response: arguing that Cigna was not "a uniquely disruptive maverick." *Id.* Now, Cigna's interests were different, and by creating a strawman version of Anthem's argument, Cigna manufactured grounds for introducing evidence adverse to Anthem's theory of the case. Cigna told Anthem that it was "planning on putting into evidence the fact that Cigna is an effective and innovative competitor that goes to market differently from Anthem." JX 2579. Cigna also told Anthem that if

> Anthem attempt[ed] to disparage Cigna and dispute[] our competitive prowess, we will have to respond by pointing out how Cigna's strengths . . . compare to Anthem's competitive weaknesses. That is, we will highlight for the court the anachronistic features and weaknesses of Anthem's (and the

---

[285] *See* JX 2601; Zielinski Tr. 453, 458, 461−63, 468; Paul Tr. 661–62; Rosen Tr. 836–37, 907–08; *see also* JX 1836; JX 2148; Curran Tr. 1393−95.

Blues as a group) model and the "holes" in Anthem's model that Cigna's strengths will fill.

*Id.* Based on a contrived interpretation of Anthem's argument, Cigna's counsel threatened to litigate openly against Anthem during the trial.[286]

Four weeks later, on November 17, 2016, Cigna told Anthem to prepare and present the three Cigna witnesses whom the DOJ intended to call at trial.[287] Cigna gave Anthem *only one hour* to prepare each witness.[288] When Anthem asked for additional time, Cigna refused, characterizing Anthem's request as an "abuse of a courtesy."[289]

Cigna foisted responsibility for preparing its witnesses onto Anthem just one day before Cordani was scheduled for preparation. Despite the fast turnaround, Anthem quickly prepared witness outlines.[290] For Cordani, Anthem's counsel noted that the DOJ appeared interested in the "Bias to Blue" strategy and asked Cigna's counsel to remind Cordani that the concept had "evolved into a brand agnostic strategy." JX 2649.

---

[286] Cigna's threat expanded on a position that Cigna took during a case management conference on September 30, 2016, when Cigna asked the District Court to confirm that Cigna could object to questions that Anthem asked at trial. JX 2523 at 40. Judge Jackson regarded the request as "completely extraordinary" and said that it was something that she had "never seen." *Id.* at 41; *accord id.* at 42. Judge Jackson declined to rule it out, but held that Cigna would need to "clearly present . . . the justification and legal authority" for any objection. *Id.* at 42; *see also* Curran Tr. 1414–16 (describing exchange).

[287] JX 2647; Curran Tr. 1441–43.

[288] *See* JX 2647 at '792; Curran Tr. 1444–46.

[289] JX 3084 at '794; *see* Rule Tr. 3228–29; *see also* JX 3126; Curran Tr. 1446–50.

[290] *See* JX 2646; JX 3082; Curran Tr. 1442–43.

141

Anthem's lead trial counsel personally handled Cordani's preparation, which Cigna limited to approximately forty-five minutes. During the session, Anthem's counsel gave Cordani a copy of Anthem's pre-trial brief, which Cordani had never reviewed. Anthem's counsel then went over the Bias-to-Blue strategy in an effort to remind Cordani that it did not involve forced conversions. Cordani resisted, maintaining that the Bias-to-Blue strategy was much more extensive and harmful to Cigna. After the session, Anthem's counsel emailed the relevant presentations to Cigna's counsel and with an explanation of what they showed.[291]

In contrast to the limited preparation time that it provided to Anthem, Cigna spent twenty-one hours preparing Cordani. JX 2908 at 14. As discussed below, Cordani gave testimony that was damaging to Anthem's defense. Cigna's lawyers agreed that he testified consistently with how he was prepared.[292]

Meanwhile, Teneo intensified its anti-Merger campaign.[293] Teneo engaged in "Proactive Pre-Trial Activity" and "[w]ork[ed] with reporters" to write "curtain raisers" for the trial, which would "[h]ighlight [Cigna] as innovative and positively impacting health outcomes."[294] Consistent with the DOJ's theory, Teneo sought to portray Cigna as

---

[291] *See* JX 2652; Curran Tr. 1444–46, 1450–52, 1558–60.

[292] *See* Jones Dep. 448–50; Rule Dep. 614–16; Jones Tr. 2803.

[293] *See* JX 2611; JX 2613; JX 2629; JX 2636; JX 2715. Cigna's public position was "to refrain from litigating in [the] media." JX 2585 at '521.

[294] JX 2613 at '581; *see* JX 2617.

uniquely innovative, describing this messaging as a "Trojan horse" because Cigna was attacking the Merger from inside the defense.[295]

### 6. Trial In The Antitrust Litigation

As late as November 15, 2016, the Cigna ELT believed that "[i]t is possible that Anthem gets a favorable ruling on the national markets issue," a possibility that the Cigna ELT described as "very unsettling for our team." JX 2639. To mitigate this risk, Cigna provided additional assistance to the DOJ during trial.

Anthem sought to defeat the DOJ's argument that Cigna was an innovative maverick by showing that Cigna was not uniquely innovative in the area of value-based care. Colin Drozdowski, an Anthem executive and the network integration team lead, testified that Anthem had "a unit price advantage and a medical management advantage" over Cigna. JX 2660 at 1650. He also testified that Anthem had "a better discount than Cigna," "more ACO [(i.e., collaborative care)] relationships than Cigna," and "more enhanced personal healthcare, [i.e.,] patients who have medical home relationships, than Cigna." *Id.* at 1667. Shubham Singhal, a McKinsey representative who had worked on integration, testified that "Anthem's medical management results in a medical utilization that is 4 to 6 percent better than Cigna's." *Id.* at 1820.

Anthem's economist, Dr. Mark Israel, testified about the magnitude of the efficiencies that NewCo could achieve. Cigna's counsel cross-examined Israel, questioning his credentials and undercutting the projections on which the efficiencies were based. *See*

---

[295] *See* JX 2614; Cohen Tr. 2443–44.

143

*id.* at 2067–94. Anthem's counsel specifically asked Cigna's counsel not to cross-examine Israel, but Cigna's counsel did so anyway.[296] At trial in this action, Cigna's counsel claimed that he had to make a quick decision about whether to cross-examine Israel, but Israel's direct examination had finished at the end of the trial day. Contrary to counsel's testimony, he could have conferred with Anthem, pointed out issues for clarification, and coordinated on strategy. Instead, Cigna's counsel developed his own cross-examination, consulted with Jones, and carried out the cross-examination the next day. *See* Rule Tr. 3197–3207. Cigna's counsel sought to "blow Dr. Israel's testimony out of the water" on the question of whether Cigna had better utilization. *Id.* at 3202. Cigna's counsel did not elicit from Israel the fact that if Cigna had better utilization, and if NewCo used Cigna's medical management programs, then the efficiencies actually would be greater than what Israel had estimated. *See id.* at 3203.

Cigna's counsel also cross-examined Swedish, highlighting the dispute over Cordani's responsibilities at NewCo and bolstering the DOJ's argument that the efficiencies could not be achieved because of disputes between the parties. *See* JX 2660 at 378–86. As he had before Cigna's counsel cross-examined Israel, Anthem's counsel specifically asked Cigna's counsel not to cross-examine Swedish.[297] During trial, Cigna's counsel did not question any witnesses other than Israel and Swedish. Curran Tr. 1460.

---

[296] JX 2732; Curran Tr. 1454–55.

[297] JX 2732; Curran Tr. 1454–56.

Through his testimony at trial, Cordani became the DOJ's "star witness." Curran Tr. 1442. Expanding on the testimony that he gave in his deposition, Cordani claimed that the Bias-to-Blue strategy was the "framework in terms of how we would go to market, the so-called go-to-market with existing clients and new clients in the overlap 14 states and then outside those 14 states." JX 2660 at 429. That was not accurate. It was an option that the go-to-market team presented, and it was promptly changed to a brand-agnostic strategy after Cordani objected to it. The Bias-to-Blue strategy did not apply to existing clients, nor did it apply outside of the Anthem Blue States. *See* Part II.I.6 & II.J.4, *supra.*

Cordani testified that the Bias-to-Blue strategy would be "extraordinarily disruptive in the marketplace" and "make the existing [Cigna] offering less competitive in both Anthem and non-Anthem states." JX 2660 at 432, 440. Elaborating on these points, Cordani agreed with a series of leading questions from the DOJ:

Q. And, as I think you said, the Bias Blue strategy will destroy the value of Cigna?

A. It will erode it pretty rapidly.

Q. Including the network?

A. Correct.

Q. Provider relationships?

A. Correct.

Q. Customer choice will be reduced?

A. Correct.

Q. Innovation will be at risk?

A. I think it would be at risk.

145

Q.      And one plus one will not equal three?

A.      To be determined, but harder to achieve.

*Id.* at 441.

Cordani also helped the DOJ's case with a colorful metaphor, describing the rebranding of Cigna members in the Anthem Blue States as pulling a string that would unravel the entire network.

Q.      Okay. And the way Bias Blue works is those lives will also be rebranded from Cigna to Blue, right?

A.      That was a concern that we raised as we were working through that strategy as it was presented because it would be the risk of unwinding or pulling a string and unwinding it. . . .

        So, yes, you'd pull a thread, and it would have an unwinding effect on the network, not just in the overlap states, but in the stand-alone states.

Q.      So it's fair to say that the Cigna network would be harmed, not just in the Anthem states, but also the non-Anthem states?

A.      That was the concern we registered, correct.

Q.      And it would also harm provider collaborations in the non-Anthem states?

A.      That was the concern we registered, correct.

Q.      And as the Cigna network becomes weaker, fewer clients will find that network attractive?

A.      That's correct.

Q.      Which will, in turn, cause the network to become even weaker?

A.      Correct.

Q.      In other words, the effects will snowball?

A.      Correct. That was a concern, again, we registered.

Q.      And all of this will make Cigna less competitive in the Anthem states?

146

A.     Well, it would make the existing offering less competitive in both Anthem and non-Anthem states.

Q.     The Cigna branded products would be less competitive?

A.     For medical.

Q.     And then for medical, the Cigna branded product would also be less competitive in the non-Anthem states?

A.     That's correct.

*Id.* at 430–32. The District Court understood Cordani to have testified "quite adamantly, that branding Blue will drain members from his provider networks and, therefore, do harm to the value-added proposition that is Cigna's contribution to the marketplace . . . ." *Id.* at 1540.

Cordani's vibrant testimony ran contrary to the conclusions that Cigna had reached when Cordani still expected the Cigna ELT to manage NewCo. Then, Cigna did not view moving its members in the Anthem Blue States to Blues-branded products as a problem, regarding it instead as a logical and manageable solution to address the 2/3 Rule.[298] Cordani's testimony also ran counter to the statements that Cigna and Anthem jointly made in a white paper submitted to the DOJ, in which the parties represented that if a national account was headquartered in an Anthem Blue State, then plan members located inside the Anthem Blue States could use the Blues Association network, and plan members located

---

[298] *See, e.g.*, JX 79; JX 91 at '163–64; JX 98 at '964; JX 100 at '451; JX 119 at '884–86; JX 351 at '076; JX 565 at '215; JX 590 at '835; JX 732 at '552; JX 3121 at '376.

outside the Anthem Blue States could continue to use the Cigna network.[299] Cordani admitted at trial in this action that Cigna had not done any analysis to support his claims about the effects of moving Cigna members to Blue products in the Anthem Blue States. *See* Cordani Tr. 2108–10.

Cordani also testified against the opportunity to achieve $2.4 billion in efficiencies through medical cost savings:

> It's not our number, so it's hard to agree with it. . . . [The calculation] ignores both utilization in terms of the number of services, but the mix of the services, as well as the venues in which the services are consumed. . . . So the point is, it's an incomplete -- it's an important -- the discount's important, but an incomplete part of the equation. . . . So all that being said, we view that it is, at best, incomplete and, therefore, inaccurate.

JX 2660 at 442–43. The efficiencies figure came from a white paper that Cigna and Anthem submitted jointly. JX 1948 at '299–300. Cordani had not done any work to assess the number and was not familiar with the analysis that Anthem's expert had conducted. *See* Cordani Tr. 2130–35. Cordani had not read the expert report, and during the antitrust trial, testified, "I was told [Dr. Israel's] name, but I do not know the analysis nor the gentleman."[300]

Reporters observing the trial immediately perceived how damaging Cordani's trial testimony was. The *Wall Street Journal* wrote,

> Some of Mr. Cordani's testimony appeared to cut against Anthem's defense of the deal. He said the integration strategy favored by Anthem, not

---

[299] *See* JX 2075 at '906, '912, '919; Cordani Tr. 2107–08 (impeaching with deposition testimony).

[300] JX 2660 at 505; Cordani Tr. at 2135

> supported by Cigna, could hurt competition by eroding Cigna's offerings—
> an argument being posed by the Justice Department.
>
> In fact, he said, Cigna disagreed with an ad run by Anthem that touted the
> merger's competitive benefits, because Cigna believed "choice would
> potentially be constricted" for insurance clients under Anthem's preferred
> setup.

JX 2682. After Cordani's testimony was unsealed, a Cigna investor wrote that "Cordani's testimony to [the] DOJ seems designed to give the agency ammunition to block this value creating merger." JX 2687 at '910. Commenting on the email to his team, Cordani wrote, "[H]aving read the testimony, this is a concern I had." *Id.* at '906. Cordani's solution was to rev up the Cigna narrative machine to pump out talking points about Cigna's supposed commitment to integration and Anthem's purported lack of commitment. *See id.* The Cigna team jumped into action, responding that they would get "talking points . . . coupled with some previously approved language" out quickly. *Id.*

During trial in the Antitrust Litigation, Anthem renewed its effort to mediate. JX 2674 at '005. Cigna refused, asserting that it would not mediate unless Anthem put a specific settlement structure on the table for the DOJ to consider. JX 2673 at '674–75.

During trial, Anthem prepared 159 pages of proposed findings of fact, which it sent to Cigna on December 1, 2016. Anthem prepared thirty-six pages of proposed conclusions of law, which it gave to Cigna on December 2. The submissions were not due until December 13. Cigna never commented on the drafts. Just two days after receiving Anthem's first draft, and ten days before the filing was due, Cigna told Anthem that it would not sign them and instructed Anthem to remove Cigna's name from the signature

block.[301] Cigna's counsel asserted that "[t]he case Anthem has put on at trial with its own personnel and its own retained consultants (and without consulting Cigna) has raised serious questions about whether Anthem is more focused on harming Cigna rather than actually securing clearance for the transaction." JX 2712. The evidence in this case does not support that assertion.[302]

Cigna's litigation counsel did not do any of the things that a party supporting a Merger typically would do. Cigna did not make an opening statement in support of the Merger. Cigna did not make a closing argument in support of the Merger. Cigna's counsel, however, did make a point of rebutting an argument that Anthem's counsel made during a question-and-answer session with the court that took place between the two phases of the trial. In response to the court's questions about the dispute letters, Anthem's counsel represented that the letters reflected disagreements between the CEOs and would not

---

[301] JX 2712; JX 2717 at '786; JX 2737; Curran Tr. 1462–66. Cigna had been working on proposed findings of fact and conclusions of law for months, but neither shared them with Anthem nor submitted them to the District Court. Rule Dep. 413–15. Jones denied that Cigna had prepared any findings of fact at any point in time. Jones Dep. 369–70. That testimony was inaccurate.

[302] To justify its refusal, Cigna claimed that Anthem's proposed findings and conclusions contained statements that Cigna believed were inaccurate, citing a quotation from an Anthem witness who said that Anthem "lead[s] the competition" in value-based care, JX 2796 ¶ 295 (alteration in original) (internal quotation marks omitted), and a section heading stating "There Is Nothing Uniquely Innovative About Cigna," *id.* at 150. Cigna exaggerated the problematic nature of Anthem's proposed language. Anthem was not asserting that Cigna was not innovative, only that Cigna was not *uniquely* innovative. Paul Tr. 661–62. Rather than coordinating and cooperating with Anthem to develop an acceptable set of proposed findings of fact and conclusions of law, Cigna refused to engage.

impair Anthem's ability to integrate the two companies if the Merger closed.[303] Cigna's

counsel disagreed:

> [W]hile deferring to my colleague, Mr. Curran, I would take issue with the notion that the dispute that's in the record simply reflects a disagreement between CEOs.
>
> I think Your Honor can tell from the letters that have gone back and forth, those were written and provided on behalf of Cigna [C]orporation and reflects the views, not just [of] senior management, but the board and the company as a whole.[304]

Cigna's counsel also highlighted the fact that Cigna would not be signing Anthem's

proposed findings of fact. JX 2660 at 2706. The District Court was incredulous, asking,

> What am I supposed to make of that? I wasn't going to ask you that question in open court because they're just drafts to this point, but since you brought it up, your name isn't on them; Cigna's name isn't on them.
>
> What am I supposed to think that tells me? What does that mean?

*Id.* at 2705–06. Cigna's counsel stated that Cigna was not signing them because they

"reflect Anthem's perspective" and "certain of those findings of fact . . . are inconsistent

with the testimony of Cigna witnesses."[305] By taking this position, Cigna instantiated its

opposition to the Merger. Curran Tr. 1463.

Cigna's actions inside the courtroom made it fairly easy for observers to perceive

what Cigna was doing. *Law360* published a story titled, "Anthem, Cigna Discord Could

Give DOJ Edge In Merger Trial." JX 2749. The story noted,

---

[303] JX 2660 at 2701; *see* Curran Tr. 1468–69.

[304] JX 2660 at 2706; *see* Curran Tr. 1472–73.

[305] *Id.* at 2706; *see* JX 2734; JX 2735; JX 2761.

151

One of Anthem's critical defenses in the case has been that the merger will generate billions of dollars in savings from reduced medical costs and administrative efficiencies. However, the DOJ has homed in on the well-documented contentiousness between Anthem and Cigna to argue otherwise.

Now a matter of public record, the discord is potentially fatal to Anthem's efficiencies defense, various competition and health care lawyers tell Law360.

"If efficiencies is your major defense, and one of the parties is not willing to work on integrating the two companies, how in the hell can you work on achieving the efficiencies?" said Jeff Miles, an antitrust lawyer in the Washington office of Ober Kaler Grimes & Shriver PC.

Andrea Murino, an antitrust lawyer for Goodwin Procter LLP, said merging partners are normally expected to be "cheerleaders for each other." . . .

The tension between Anthem and Cigna, however, doesn't appear to be limited to the back office. During a "question and answer" session on Dec. 13, Cigna attorney Charles F. Rule of Paul Weiss Rifkind Wharton Garrison LLP openly disavowed an assertion from Anthem's attorney that the "rift" the government had made so much of was in reality nothing more than a dispute between the two companies' CEOs.

Remarkably, Rule said Cigna's misgivings stretch all the way down the board of directors and represent the views of the company itself.

Hearing about Rule's statements, Ober Kaler's Jeff Miles was incredulous. "To put it in certain vernacular, if I were Anthem, I would be pissed off out of my mind," Miles said.

JX 2749. The story predicted that "Cigna's antics might . . . be the merger's undoing." *Id.*

The *Wall Street Journal* similarly observed that "during trial proceedings that began in November, Anthem mounted a legal defense of the merger singlehandedly. Cigna lawyers said very little during the proceedings, and when they did, it usually didn't help Anthem's position." JX 2845.

Meanwhile, outside the courtroom, Cigna and Teneo continued their efforts to control the narrative. Cohen had numerous exchanges with reporters, in which he provided

them with talking points and quotations that criticized Anthem and the Merger.[306] In one example, Cohen asked a Teneo colleague to help place a story "W. No fingerprints" about "how poorly [A]nthem and its CEO have run process."[307] A set of Teneo talking points included the overall message that "[a]s [J]udge Jackson prepares to rule, by all accounts, the Government has proven its case and is likely to prevail."[308] Jones admitted that parties generally do not tell the press that their adversary proved its case. Jones Tr. 2794.

Teneo also prepared a communications strategy to be deployed if the District Court enjoined the Merger.[309] It contemplated limited on-the-record statements while in the background Teneo would explain "how the situation played out and all of Anthem's shortcomings that led to this point." JX 2760 at '697. Teneo's themes were as follows:

- "The merger agreement makes clear that Anthem had responsibility for completing the regulatory process. . . . Anthem did not fulfill this obligation and is therefore in breach of the agreement." *Id.*

- "Anthem's approach to the regulatory process was disorganized and insufficient. They made numerous missteps during the litigation, did not adequately prepare for priority topics such as the Blues obligations, and would not even consider potential actions such as divestitures . . . ." *Id.*

- "Anthem's approach to the integration process was inadequate and poorly-led. It focused predominantly on cost synergies, with little coordination and minimal

---

[306] *See, e.g.*, JX 2694; JX 2727; JX 2769; JX 2773; JX 2781; JX 2783; JX 2784; JX 2785; JX 2793; JX 2794; JX 2798; JX 2803; JX 2805; JX 2806; JX 2807; JX 2810; *see also* JX 2812.

[307] JX 2782. Wachtell Lipton, Cordani, Jones, and the Cigna ELT remained deeply involved in the process. *See* JX 2766; JX 2780; JX 2786; JX 2788; JX 2789; JX 2788.

[308] JX 2780 at '451; *see* JX 2793 (Cohen providing talking points to reporter).

[309] *See* JX 2760; JX 2778.

153

planning for other key value-drivers that were promised to the financial markets and the public." *Id.*

Teneo also began developing a communication plan for "potential break fee litigation." *Id.* at '697–980

## L. Anthem Extends The Termination Date.

On January 18, 2017, Anthem notified Cigna that it was extending the Termination Date from January 31 to April 30. JX 2800; *see* MA § 7.1(b). Zielinski informed Jones that if the District Court ruled in favor of the Merger and if the DOJ appealed, then "Anthem intends to resist the appeal vigorously." JX 2801. He also informed Jones that if the District Court ruled against the Merger, then Anthem "intends promptly to seek an expedited appeal of the decision." *Id.* He added that Anthem intended to pursue settlement with the newly elected Trump administration. *See id.*

Cigna issued a Form 8-K announcing its receipt of Anthem's notice. Cigna did not express any commitment to the Merger. Instead, Cigna stated, "Following the issuance of the Court's opinion, Cigna intends to evaluate its options in accordance with the Merger Agreement." JX 2799.

During a meeting on January 30, 2017, the Cigna Board resolved to terminate the Merger Agreement following "any issuance of a decision . . . to enjoin the Merger." JX 2824 at '471. The Cigna Board also authorized a lawsuit against Anthem "to assert [Cigna's] rights under the Merger Agreement." *Id.* On January 31, Cigna issued another Form 8-K in which it stated:

> As Cigna previously disclosed, Cigna still intends to evaluate its options in accordance with the Merger Agreement once the Court issues its opinion in

the pending civil antitrust lawsuit. Cigna has made no determination with respect to Anthem's notice seeking to extend the termination date, including whether Cigna will seek to terminate the Merger Agreement, and has informed Anthem that it is reserving all of its rights in this regard.

JX 2826. Cigna's disclosures about "evaluat[ing] its options" and having "made no determination" were inaccurate. The Cigna Board had decided on Cigna's course of action the day before.

**M.    The District Court Enjoins The Merger.**

On February 8, 2017, Judge Amy Berman Jackson issued an order that permanently enjoined the Merger and summarized her reasoning for doing so. *See United States v. Anthem, Inc.*, 2017 WL 527923 (D.D.C. Feb. 8, 2017). Judge Jackson also entered a lengthy and detailed opinion that incorporated the order as its introduction. A redacted copy of the memorandum opinion was released publicly on February 21. *See Dist. Ct. Op.*, 236 F. Supp. 3d 171.

The District Court permanently enjoined the Merger because the transaction would have a substantial anticompetitive effect in two product markets: (i) the market for national accounts in the fourteen Anthem Blue States and (ii) the local market for large employers in Richmond, Virginia. *See id.* at 178–79. In light of these findings, the District Court did not reach the questions of whether the Merger would have substantial anticompetitive effects on the markets for (i) national accounts in the United States as a whole, (ii) large group employers in thirty-four other local regions within the Anthem Blue States, or (iii) the purchase of healthcare services from hospitals and physicians in those locations.

The District Court Opinion began by explaining the general legal principles that governed the case.

> Section 7 of the Clayton Act prohibits mergers or acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18. "Congress used the words '*may* be substantially to lessen competition' . . . to indicate that its concern was with probabilities, not certainties." *Brown Shoe Co. v. United States*, 37 U.S. 294, 232 . . . (1962).

*Id.* at 191 (emphasis and alteration in original). The opinion used a burden-shifting framework, under which "Plaintiffs bear the initial burden to prove that the merger would result in 'undue concentration in the market for a particular product in a particular geographic area.'" *Id.* (quoting *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982 (D.C. Cir. 1990)). "If plaintiffs establish the prima facie case, defendants must present evidence to rebut the presumption by 'affirmatively showing why a given transaction is unlikely to substantially lessen competition, or by discrediting the data underlying the initial presumption . . . .'" *Id.* at 192 (citations omitted). At that point, the burden shifts back to the plaintiffs to "prove the alleged Clayton Act violation by a preponderance of the evidence." *Id.*

The District Court Opinion first defined the relevant market. The court held that "the market for the sale of health insurance to national accounts is a properly drawn product market for purposes of the antitrust laws . . . ." *Id.* at 179; *see id.* at 195–202. The Court also held that Anthem Blue States constituted "a relevant geographic market for that product." *Id.* at 179; *see id.* at 202–06. In reaching the latter conclusion, the District Court

156

cited the effects of the Blues Rules, which it concluded "have a significant impact on the commercial conditions governing the sale of medical coverage to national accounts."[310]

For purposes of the market for national accounts headquartered in the Anthem Blue States, the District Court found that the DOJ had established a prima facie case by showing that the Merger would create a "high level of concentration" that was "presumptively unlawful." *Id.* at 179; *see id.* at 206–12. The District Court also found that the defendants rebutted the DOJ's prima facie case by introducing evidence that showed that the Merger would promote competition, including evidence showing the existence of competition between health insurers, customer sophistication and bargaining, new market entrants and competitors, and innovation. *Id.* at 213–15. The District Court therefore had to determine based on the totality of the circumstances whether the Merger was likely to substantially lessen competition. *Id.* at 215.

The District Court found that the Merger would have the anticompetitive effect of "eliminating direct competition" for national accounts between Anthem and Cigna in the

---

[310] *Id.* at 179. Anthem disputed whether those were the proper markets, but the District Court explained that its findings were supported by "how Anthem conducts its business on a day to day basis." *Id.* at 203. The Blues Rules gave Anthem an exclusive territory, barred other Blues from pursing national account customers within Anthem's territory, and prohibited Anthem from competing for customers headquartered outside its fourteen states without obtaining a "cede" (meaning permission) from the Blues licensee in that state. *Id.* at 189, 203; *see id.* at 210 (describing "the Blue network" as "an integral part of Anthem's ability to win and woo national accounts and the source of Anthem's greatest competitive strength: its discounts"); *id.* ("The evidence shows that Anthem and the other Blues work together to win national business."); *id.* ("It is the combination of Blue networks that enables Anthem's customers to obtain a single national network for their employees.").

Anthem Blue States by "reducing the number of national carriers from four to three . . . ." *Id.* at 216. As part of its defense, Anthem attempted to show that Cigna was not its closest competitor among the other national carriers, but the District Court rejected that characterization as "beside the point," explaining that "the acquired firm need not be the other's closest competitor to have an anticompetitive effect." *Id.* The District Court found that "[t]he evidence in this case, including Anthem records and testimony from Anthem witnesses, firmly establishes that United, Cigna, Aetna, and the Blues compete against each other for national accounts, and that together, they dominate the market." *Id.* Anthem also tried to show through its expert that Anthem and Cigna did not compete to a significant degree, but the District Court found that "Anthem's ordinary course documents tell a consistent story that contravenes the firm's litigation position" and which showed that "Anthem unquestionably competes directly and aggressively against Cigna for national accounts." *Id.* at 219. The District Court found that the Merger would eliminate Cigna as a competitor and that "reducing the number of national carriers from four to three is significant."[311] The District Court also found that the sophistication and bargaining power

---

[311] *Id.* at 220; *accord id.* at 203 ("[R]ight now, Anthem competes directly against Cigna for national accounts in the fourteen states at the very least, and . . . the merger would eliminate Cigna as a direct competitor there.").

In passing, the District Court observed that although it was not determining whether the Merger would affect competition for national accounts outside the fourteen Anthem Blue States, there were reasons to think that competition in those areas also might be diminished:

> It was also established that there are important aspects of Blue Cross Blue Shield Association membership—in particular, the mutuality and cooperation involved in the cedes, the potential for Blue card revenue, and

158

of national account customers would not offset the anticompetitive effects; that new entrants would not compete effectively in the relevant market with NewCo; and that other means of servicing national account customers, such as by slicing business, were not a viable solution. *See id.* at 221–29.

The District Court separately found that the Merger would reduce innovation in the Anthem Blue States. *Id.* at 180, 229–31. Citing Cordani's testimony, the District Court found that "because its provider discounts were not as strong as other carriers' discounts, particularly those offered by Anthem and the Blues, Cigna has relied upon innovation to compete, directing its focus on ways to improve member health and employer cost outcomes." *Id.* at 230. "Cigna's innovation in the market, in turn, spurred even those carriers with strong provider discounts to improve their products." *Id.* at 231–32. By eliminating Cigna as a separate competitor in the Anthem Blue States, the Merger also would eliminate this source of innovation.

In response, Anthem contended that "any anticompetitive effects will be outweighed by the efficiencies [that the Merger] will generate." *Id.* at 181. As "the centerpiece of its defense," Anthem cited the medical cost savings that NewCo's national account customers

---

the best efforts rules—that redound to the benefit of the Association as a whole, and that these give rise to an inherent conflict of interest that could affect Cigna's competitive conduct in the 36 states.

*Id.* at 220 n.22. By contrast, the District Court rejected the argument that there would be coordination between Cigna and the non-Anthem Blues after the Merger, finding that the plaintiffs had not met their burden to prove that the Merger would result "in a greater risk of collusion or coordination." *Id.* at 231 n.28.

would receive. Anthem contended that the Merger would achieve a total of $2.4 billion in savings: Cigna's customers would save approximately $1.5 billion by accessing the more favorable rates that Anthem has negotiated with its provider network, *see id.* at 212–13, and Anthem's customers would save approximately $874 million by accessing services for which Cigna had obtained lower rates, *see id.* at 233–34. Anthem also cited "substantial general and administrative ('G & A') cost savings" that the Merger would achieve. *Id.* at 181.

The District Court noted in passing that the Supreme Court of the United States has yet to recognize an efficiencies defense and has stated that "[p]ossible economies cannot be used as a defense to illegality" under the Clayton Act. *Id.* at 235 n.33 (quoting *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 579 (1967)). But several circuit courts and district courts, including the DC Circuit Court and its trial courts, had considered evidence of efficiencies, and the District Court therefore credited Anthem's argument that they should be considered. *Id.* at 235–36. The District Court, however, noted, "The law is clear that a defendant must both substantiate any claimed efficiencies and demonstrate that they are 'merger-specific,' which means that it must show that the savings cannot be accomplished by either company alone in the absence of the proposed merger." *Id.* at 181; *see id.* at 236–37.

The District Court found that the claimed medical cost savings were not merger-specific. *Id.* at 237. In the only ruling that would be reversed on appeal, the District Court noted that "Anthem and Cigna have already obtained the provider discounts alone." *Id.* at 181; *see id.* at 238. Therefore, the Merger was not necessary to achieve them.

160

The District Court also found it plain that "the companies do not have to merge for customers to be able to access Anthem's lower provider rates," which provided the bulk of the efficiencies. *Id.* at 181. This was because "any customers that value the discounts above other aspects of the contractual arrangement can choose Anthem as their carrier today." *Id.*; *see id.* at 238. The District Court separately found that Anthem's principal method for achieving the savings—convincing Cigna customers in the Anthem Blue States to move from Cigna products to Anthem products—did not result in merger-specific efficiencies because it was "no different from Anthem's ongoing marketing of its products on a daily basis." *Id.* at 181; *see id.* at 239.

In evaluating whether to credit the claimed efficiencies that Cigna' customers would receive, the District Court found that because of NewCo's need to comply with the 2/3 Rule, rebranding would be NewCo's principal strategy. *Id.* at 239–40. Anthem witnesses had testified that the opportunity to purchase an Anthem product was a pro-choice opportunity that could be accomplished "by offering such an attractive Anthem product that Cigna customers would choose to switch, or by simply declining to renew existing Cigna contracts." *Id.* at 241. The District Court noted that if Anthem chose not to renew existing Cigna contracts, then those customers would not have a choice. *Id.* The District Court also cited testimony from Cordani, which "cast doubt on whether there would be much value to the choice if it were offered" because "the only way a client of Cigna, current client of Cigna, would get access to the improved medical costs of NewCo is to migrate the business to a Blue Cross offering." *Id.* The District Court concluded that "[t]hus, a large portion of the projected $1.5 million of Cigna customer medical cost savings is attributable

161

to the planned transfer of existing Cigna customers to the Anthem brand to comply with the best efforts rules, and since rebranding cannot be considered to be merger-specific, those dollars should not have been included" in the claimed efficiencies. *Id.* at 241.

Having concluded that the medical cost savings were not merger-specific, the District Court next analyzed whether they were achievable. Anthem argued to the District Court that it could deliver the savings by triggering the affiliate clauses in its contracts with providers. The District Court correctly inferred that Anthem was unlikely to trigger the affiliate clauses because doing so would not help Anthem comply with the 2/3 Rule. [312]

Assuming that Anthem exercised the affiliate clauses, the District Court questioned whether the efficiencies were achievable because Anthem's providers might terminate their agreements rather than extend their lower fee schedules to Cigna's customers. On this point, the District Court again cited Cordani's testimony, this time for the proposition that "Anthem's predicted cost savings are unreliable in part because they are based on an unproven assumption that providers will not react and renegotiate their fee schedules upwards." *Id.* at 243. The same problem would exist if Anthem attempted to negotiate with its providers to establish lower rates. Renegotiation also would take time, meaning that the efficiencies might take years to be realized. *Id.* at 243–44.

---

[312] *Id.* at 182–83; *see id.* at 233, 244–45. As noted previously, Anthem's witnesses in the Antitrust Litigation implied that Anthem had not yet determined whether NewCo would exercise the affiliate clauses. At the end of April 2016, the Anthem ELT unanimously determined not to trigger the affiliate clauses. *See* Part II.I.3, *supra.* That decision was not set in stone, and Anthem could have revisited it, but Anthem was not fully candid with the DOJ or the courts in pressing its argument about the affiliate clauses.

The District Court also noted that Cordani had described Anthem's cost savings estimates as "'narrow-minded' and 'incomplete'" because they did "not factor in utilization." *Id.* at 244. The District Court observed that Cigna's counsel had cross-examined Anthem's expert on the same issue:

> Despite the fact that he was testifying as the defense expert, Dr. Israel was subjected to a not particularly friendly cross examination conducted by counsel for Cigna. . . . . This unusual exercise underscored that the expert's analysis of Anthem's cost advantage was based strictly on Anthem's fee schedules and that it did not take into account any savings generated by the reductions in utilization that result from Cigna's collaborative approach.

*Id.* at 244 n.46 (quoting from cross-examination).

Having cited difficulties verifying that Cigna's customers could access Anthem's rates, the District Court noted that "the record is devoid of plans specifying what method could be employed to enable existing Anthem members . . . to enjoy any existing superior Cigna discounts." *Id.* at 244. Cigna's provider agreements did not contain affiliate clauses, and if they did, the Blues Rules would prevent Anthem from invoking them. *Id.* at 244–45. The District Court noted that some of Cigna's discounts were obtained as a means of supporting collaborative, making it unlikely that the same providers would extend their rates to NewCo. *Id.*

The District Court then turned to the hostility between the two parties, which it concluded undermined the likelihood that the efficiencies could be achieved. In the introduction to its opinion, the District Court had referred to this issue as "the elephant in the courtroom" and cited "the doubt sown into the record by Cigna itself." *Id.* at 183.

> In this case, the Department of Justice is not the only party raising questions about Anthem's characterization of the outcome of the merger: one of the

163

two merging parties is also actively warning against it. Cigna officials provided compelling testimony undermining the projections of future savings, and the disagreement runs so deep that Cigna cross-examined the defendants' own expert and refused to sign Anthem's Findings of Fact and Conclusions of Law on the grounds that they "reflect Anthem's perspective" and that some of the findings "are inconsistent with the testimony of Cigna witnesses." Anthem urges the Court to look away, and it attempts to minimize the merging parties' differences as a "side issue," a mere "rift between the CEOs." But the court cannot properly ignore the remarkable circumstances that have unfolded both before and during the trial.

*Id.* The District Court summarized the state of the parties' integration efforts and its effect on the verifiability of merger-related efficiencies as follows:

The documentary record and the testimony reflect that the pre-merger integration planning that is necessary to capture any hoped-for synergies is stalled and incomplete. Much of the work has not proceeded past the initial stage of identifying goals and targets to actually specifying the steps to be taken jointly to implement them. Moreover, the relationship between the companies is marked by a fundamental difference of opinion over the effect the Anthem strategy to impose lower rates on providers and move members away from Cigna's network will have on the collaborative model of care that is central to the Cigna brand. Both Cigna witnesses and providers have testified that effective collaboration requires more of the physicians and hospitals, and they expect to be paid for it, and the engage with members to improve behaviors that can affect wellness requires an investment of resources on the part of the insurer. All of this raises serious questions about when, how, and whether the medical savings can be achieved whether the G&A savings can be verified, and whether there is any basis in the record to believe in the rosy vision being put forward by Anthem of a new national carrier that delivers the Cigna product at the Anthem price.

*Id.*

Returning to this issue later in the opinion, the District Court observed that "Anthem's internal documents make it clear that the [integration] effort has not yet proceeded from general 'high level' planning to the essential progress of detailing actual strategies and 'budget level' initiatives," that "Cigna's input is required before the real

164

work can be done," and that "the two parties have not been working together for some time." *Id.* The District Court then summarized the problems that began in December 2015, when Cordani and Cigna responded to Swedish's effort to begin interviewing candidates for the L2 and L3 roles by withdrawing from integration planning.

> The record contains compelling evidence of the deterioration of the merging parties' relationship. On December 29, 2015, five months after the two firms publicly announced their plans to combine, Joe Swedish voiced a series of complaints to David Cordani and Cigna. In an email in early March, he reiterated his concerns that the companies were not yet aligned. Cigna responded with its objections to Anthem's proposals for the new company's organization and management structure, and by April 2016, Cigna's disengagement was so complete that Anthem established an independent team to proceed with integration planning on its own. Meanwhile the two companies through counsel, began to exchange increasingly heated letters accusing the other of being the first to breach the terms of the merger agreement.
>
> All of these circumstances impair the Court's ability to credit the total estimated network cost savings and G&A efficiencies. Anthem's former CFO . . . testified that having the leadership in place is fundamental to undertaking an integration, but the two firm here have not yet agreed on the identity of a single member of the new company's management structure beyond naming the "NewCo" President . . . and CEO . . . . And even that basic allocation of authority has not been fully negotiated; the parties have been at odds since March 2016 over Swedish's proposed diminution of Cordani's span of control.
>
> What's more, Anthem's own leadership has predicted that given these circumstances, it may be extremely difficult to get back on track. . . . So Anthem is hard pressed to argue that a green light from the Court will be sufficient to cure the problems caused by the disruption in the integration effort.

*Id.* at 246. The District Court cited "the highly unfinished nature of the planning to capture the G&A efficiencies in particular" and noted that "the final quantification of the synergies, the development of detailed implementation plans, and the establishing of an

organizational structure remain in abeyance." *Id.* The District Court also cited the absence

of a detailed plan for achieving the medical cost savings for Cigna customers and the lack

of anything more than a general plan for coming into compliance with the 2/3 Rule. *Id.* at

247.

The District Court then returned to the problem of convincing providers to engage

in the collaborative efforts required by Cigna's programs if they were forced to accept

Anthem's lower rates. *Id.* Here again, the District Court cited Cordani's testimony:

> The testimony of the CEO of Cigna, David Cordani, inflicted significant damage on the synergies defense when he advanced his opinion that both rebranding Cigna customers and imposing lower fee structures would unravel the collaborative relationship with providers that are essential to accountable care and better clinical outcomes. Cordani Tr. 492–93.

> Cordani explained that given the rate and the amount that healthcare costs have been rising, the healthcare industry recognized that it had to change. In his view, the approach could not be limited to lowering the cost of care when a patient got sick—the effort had to be refocused on encouraging and sustaining health. . . . Cigna has endeavored to differentiate itself and become more competitive with a two-sided model that engages both the customer and the provider . . . , and Cordani maintained that replacing an old structure of remuneration based on volume with a new structure of value based care requires working closely with providers to be sure that the risk is shared and both parties' incentives are aligned.

*Id.*

Again citing Cordani's testimony, the District Court discussed how rebranding

Cigna's lives would hurt Cigna's collaborative model.

> Cordani voiced concerns that a post-merger Blue Bias strategy to rebrand Cigna lives—especially if it included lives outside the fourteen states as part and parcel of the rebranding of their employers headquartered within the fourteen states, would reduce the volume Cigna could bring to its providers. This would, according to Cordani, "dramatically unwind" Cigna's collaborate relationships, and rapidly destroy the Cigna value proposition,

166

diminishing Cigna's prospects for growth in the non-Anthem states and weakening its offerings to existing customers. It would also diminish Cigna's ability to innovate.

*Id.* at 248 (citing Cordani Tr. 492–93). The District Court found that "[e]ven if one discounts the Cordani testimony in recognition of the fact that a certain amount of marketing, along with some posturing for potential breach litigation, was on display on the part of both companies in the courtroom, it becomes clear when one considers the entire record . . . that people 'like something Cigna offers.'" *Id.* at 249. Returning to Cordani's testimony for support, the District Court rejected the idea that Anthem could make the Cigna product available to customers at an Anthem price as "an oversimplification that is not supported by the evidence." *Id.* (citing Cordani Tr. 437).

Finally, the District Court questioned "whether Anthem's ability to drive a hard bargain with providers by virtue of its size" even could be "characterized as an 'efficiency.'" *Id.* at 181. The opinion noted that NewCo would sell ASO plans to most of its customers. The District Court saw "no evidence that the claimed network savings [would] rise because of the cost of what the merged firm produces, and what it sells in the relevant market, will go down." *Id.* Instead, NewCo would have the market power to force providers to accept lower fees for their services. *See id.* at 182. The District Court expressed concern that the claimed efficiencies resulted from market concentration, rather than competition. *Id.* The court also noted that "Anthem's own documents reveal that the firm has considered a number of ways to capture the network savings for itself and not pass them through to its customers as it insisted to the court that it would." *Id.*

167

The District Court reached similar conclusions regarding the market for large employers in Richmond, Virginia. *Id.* at 254. The DOJ presented substantial evidence of market concentration, and "Anthem witnesses did little to refute these undeniable statistics." *Id.* at 258. The District Court did not rely on any testimony from Cordani in this section of its opinion. The District Court cited evidence from only two Cigna witnesses, and only did so when defining the relevant market. *Id.* at 255.

## N.    Anthem Appeals.

On February 9, 2017, Zielinski told Jones that Anthem was filing an appeal and would seek an expedited schedule. He asked Jones whether Cigna would join in the appeal. Jones responded that "until we have had an opportunity to receive and review with counsel the full decision, we believe that it is premature and imprudent to take any action." JX 2851.

Later that day, Anthem filed its notice of appeal. PTO ¶ 200. Anthem simultaneously issued a press release announcing the appeal and stating that it would "request an expedited hearing of its appeal to reverse the Court's decision so that Anthem may move forward with the merger . . . ." JX 2841.

Cigna did not join in the appeal. Cigna issued its own press release, which stated, "Cigna intends to carefully review the opinion and evaluate its options in accordance with the merger agreement." PTO ¶ 200. On February 11, 2017, the Cigna Board reaffirmed its earlier decision to terminate the Merger Agreement and authorized the Cigna ELT to "send[] notice of termination to Anthem and fil[e] litigation to assert the Corporation's rights under the Merger Agreement." JX 2860.

On February 13, 2017, Anthem asked the DC Circuit Court to consider its appeal on an expedited basis and filed its opening brief on the same day. PTO ¶¶ 201, 205. Cigna did not join Anthem's papers. Jones Tr. 2898, 2900.

## O.    This Litigation

On February 14, 2017, Cigna delivered notice that it was terminating the Merger Agreement under Section 7.1(b) because the Merger had not been consummated on or before the original Termination Date of January 31, 2017. Cigna claimed that Anthem's notice extending the Termination Date until April 30, 2017, was invalid because Anthem had not complied with its contractual obligations. JX 2872. Cigna simultaneously filed suit in this court, seeking a declaratory judgment that it could terminate the Merger Agreement, recover the Reverse Termination Fee, and obtain damages for breach of contract.

Later that day, Anthem filed suit in this court seeking a temporary restraining order that would block Cigna from terminating the Merger Agreement. Anthem contended that Cigna did not have a right to terminate because Anthem validly extended the Termination Date. Anthem also argued that Cigna could not terminate because Cigna breached its contractual obligations under the Merger Agreement. Dkt. 226 at 6–7. Anthem contended that it would suffer irreparable harm if Cigna were permitted to terminate the Merger Agreement and thereby to jeopardize Anthem's prospects for appeal. The DOJ already was

arguing that the DC Circuit Court should not expedite Anthem's appeal because Cigna had terminated the Merger Agreement and rendered the appeal moot.[313]

On February 15, 2017, this court entered a temporary restraining order that blocked Cigna from terminating the Merger Agreement. The court directed the parties to engage in expedited litigation in anticipation of a hearing to determine whether the temporary restraining order would be converted into a preliminary injunction that would keep the Merger Agreement in place pending a final decision on the merits.[314]

With the Merger Agreement still in place, the DC Circuit Court expedited Anthem's appeal. JX 2886. On February 17, 2017, Cigna finally filed its own appeal from the District Court's decision, which was consolidated with Anthem's. JX 3096. In support of its appeal, Cigna filed a five-page brief. It repeatedly asserted a single substantive statement: "In accordance with the merger agreement, Cigna has appealed, and defers to Anthem."[315] Anthem's antitrust counsel described Cigna's filing as "probably worse than nothing because it signal[ed] a lack of interest in getting relief." Curran Tr. 1481.

While these efforts were underway, Donald Trump took office. Anthem reached out to members of the new administration, including Jeff Sessions, the new Attorney General.

---

[313] JX 2877 at '504. Jones sent the DOJ's opposition to Teneo, writing, "In case you did not see—this is very good." *Id.*

[314] *See* PTO ¶ 203; Dkt. 74 at 45, 48–49.

[315] JX 2894 at 6. Jones testified that Cigna "tried as best we [] could to support Anthem in . . . whatever arguments they were making on appeal." Jones Tr. 1602–03. Given that Cigna did not make any arguments in support of the appeal, that testimony was not persuasive.

Anthem also contacted the DOJ to re-open settlement discussions. The DOJ declined to engage. Anthem then opened up a line of communication with Vice President Mike Pence.[316]

Cigna and Teneo continued to try to sabotage Anthem's efforts. After seeing a news report about Anthem's efforts to engage with the Trump administration to salvage the deal, Teneo's CEO instructed Cohen to work with contacts at a lobbying firm to "kill this immediately."[317]

## P. The DC Circuit Court Decision

The DC Circuit Court issued its decision on April 28, 2017. The DC Circuit Court affirmed the District Court's decision in a majority opinion authored by Circuit Judge Judith W. Rogers and joined by Circuit Judge Patricia Ann Millett (the "Majority"). Then-Circuit Judge Brett Kavanaugh wrote a lengthy dissent (the "Dissent"). Judge Millett wrote a concurring opinion that amplified her reasoning on some of the issues raised by the Dissent.

Anthem's appeal focused only on a subset of the issues addressed in the District Court Opinion. The Majority noted that, based on Anthem's arguments,

> It is undisputed that the government met its burden to demonstrate a highly concentrated post-merger market, which would be reduced from four to just three competing companies. Anthem also does not dispute the definition of the national accounts market, nor that such a market will be even more highly

---

[316] *See* JX 2862; JX 2903; JX 2912; JX 2914.

[317] *See* JX 2914; Cohen Tr. 2463–65; *see also* JX 2890 (Teneo trying plant stories with reporters who would write that the Blues Association was "monopolistic.").

concentrated post-merger. *Anthem's appeal instead hinges on the district court's treatment of its efficiencies defense.*

855 F.3d at 353 (emphasis added).

Like the District Court, the Majority questioned whether efficiencies could be used to justify the Merger, observing that notwithstanding "widespread acceptance the potential benefit of efficiencies as an economic matter, it is not at all clear that they offer a viable legal defense to illegality under Section 7." *Id.* at 353 (citation omitted). Like the District Court, the Majority observed that in *Procter & Gamble*, the Supreme Court of the United States held that "[p]ossible economies cannot be used as a defense to illegality." *Id.* (citations omitted). The Majority explained that no matter what may be the more-accepted view of efficiencies today, "the Supreme Court held otherwise, and no party points to any subsequent step back by the Court." *Id.* (citation omitted). Responding to the Dissent's argument that *Procter & Gamble* was old law and no longer controlling, the Majority explained that none of the Dissent's authorities explicitly or implicitly suggested that the Supreme Court had overruled *Procter & Gamble*. *Id.* at 354.

The Majority then acknowledged that "[d]espite the clear holding of [*Procter & Gamble*], two circuit courts, and our own, have subsequently recognized the use of efficiencies evidence in rebutting a prima facie case." *Id.* The Majority noted that none of the decisions had relied on efficiencies to permit an otherwise anticompetitive merger to proceed. *Id.* The Majority interpreted these decisions as recognizing only that "evidence of efficiencies could rebut a prima facie showing, which is not invariably the same as an ultimate defense to Section 7 illegality." *Id.* The Majority thus read the precedents as

172

consistent with the rule that "once it is determined that a merger *would* substantially lessen competition, expected economies, however great, will not insulate the merger from a [S]ection 7 challenge." *Id.* (citation and internal quotation marks omitted).

Although the Majority's reasoning suggested that efficiencies could not be used to justify the Merger as a matter of law, the Majority did not reach that holding. Instead, the Majority held that "this court, like our sister courts, can simply assume the availability of an efficiencies defense to Section 7 illegality because Anthem fails to show that the district court clearly erred in rejecting Anthem's efficiencies defense."[318] The Majority also found it unnecessary to decide whether the type of "redistributional savings" that Anthem claimed were cognizable as efficiencies, but noted that "those other issues pose potentially substantial additional obstacles to this merger." *Id.* at 356.

The Majority instead held that the District Court had not clearly erred "in rejecting Anthem's purported medical cost savings as an offsetting efficiency." *Id.* at 355. The Majority also held that "the efficiencies defense failed" because once non-cognizable efficiencies were eliminated, "the amount of cost saving that is both merger-specific and verifiable would be insufficient to offset the likely harm to competition." *Id.* at 355–56.

Like the District Court, the Majority started from the premise that efficiencies must be "merger-specific, meaning that they cannot be achieved by either company alone." *Id.*

---

[318] *Id.*; *see id.* ("[P]rudence counsels that the court should leave for another day whether efficiencies can be an ultimate defense to Section 7 illegality. We will proceed on the assumption that efficiencies as presented by Anthem could be such a defense under a totality of the circumstances approach.").

(citation and internal quotation marks omitted). The Majority described "[t]he crux of Anthem's argument" as "the theory that the combined company will allow Anthem to create a 'new product' that is 'unavailable on the market today'" and which "features both 'Cigna's customer-facing programs' and Anthem's 'generally lower . . . rates." *Id.* Anthem argued that it could achieve this result through rebranding, but the Majority cited evidence in the record that supported the District Court's finding that in the short term, rebranding simply would mean offering Anthem products to Cigna customers. *Id.* at 357. It was only "over the long haul" that rebranding "might result in a former Cigna customer obtaining some semblance of the former Cigna product at the new Anthem rate." *Id.* Any short-term switching of Cigna customers to Anthem products was therefore "just more successful marketing of the existing Anthem product" and not a merger-specific efficiency. *Id.*

On the question of whether the Merger would permit Anthem to roll out an improved, Cigna-like product over the long haul, the Majority agreed with the District Court that "the evidence offered by Anthem is woefully insufficient to show that it cannot develop better customer-facing programs" on it its own. *Id.* Two Anthem witnesses testified that Anthem had encountered difficulty replicating Cigna's products "for reasons unknown." *Id.* The witnesses "did not indicate how intensive the effort has been, how many hours were devoted to it, or how much money Anthem has allocated toward it." *Id.* The Majority concluded that "rebranding does not create a merger-specific benefit in either the short- or long-term." *Id.* at 358; *accord id.* at 365 ("Those who rebrand with Anthem will see no merger-specific savings.").

The Majority suggested that Anthem potentially could have created "some brief, interim benefit in the mid-term by integrating Cigna's product faster than it could develop a comparable product of its own," but the Majority found that Anthem failed to make the necessary factual showing. Anthem "offered no evidence to show how long it would take, once the necessary resources were allocated, to develop an improved product. Nor has it shown how long it would take to roll out a hybrid Anthem-Cigna product." *Id.* at 358. The Majority cited Matheis's trial testimony indicating that Anthem "might not be able to do so within two-and-a-half years." *Id.*

Out of the $2.4 billion in medical cost savings that Anthem claimed the Merger would achieve, the Majority noted that $1.517 billion resulted from Cigna members accessing Anthem's rates. Without a viable mechanism for delivering those efficiencies, the posited savings were not achievable. The Majority regarded rebranding as "the linchpin of Anthem's post-merger strategy, because it is the only option that helps Anthem comply with its 'Best Efforts' obligations" under the Blues Rules. *Id.* But rebranding did not generate merger-specific savings, and as a result, "the inability to credit rebranding savings seriously undermine[d] Anthem's efficiency defense." *Id.*

The Majority, however, disagreed with the District Court's conclusion that "none of the medical cost savings are merger-specific because they are based on an application of rates that each of the Company has already achieved on its own." *Id.* The record showed that Cigna had been unable to match Anthem's rates, so "a true Cigna product at Anthem rates would not be achievable absent the merger." *Id.* Thus, although the District Court was correct to find that customers shifting to an Anthem product did not give rise to merger-

175

specific efficiencies, the Majority found that the District Court "clearly erred in finding that the application of Anthem rates to customers that choose to remain with Cigna is not merger-specific." *Id.* at 359. In other words, if Anthem had triggered the affiliate clauses to extend its rates to Cigna products, then those medical cost savings would have been merger-specific, and if NewCo had renegotiated any of Cigna's rates to achieve greater discounts for Cigna's products, then those medical cost savings would have been merger-specific.

The District Court's error, however, was "immaterial" because the medical savings as a whole were "not sufficiently verifiable." *Id.* Anthem claimed that it could achieve the savings using three mechanisms: (i) exercising the affiliate clauses to require Anthem's providers to extend their rates to Cigna customers, (ii) renegotiating provider contracts, and (iii) moving Cigna customers to Anthem products. *Id.* The Majority agreed with the District Court's finding that exercising the affiliate clauses was not a viable option for Anthem because of "the potential for provider discontent if the lower Anthem rates are forced on providers that must expend extra effort and resources to deliver the Cigna product." *Id.* The Majority agreed with the District Court that some providers who were forced to accept lower Anthem rates would terminate their contracts or decline to renew them when they expired. *Id.* In support of this threat, the Majority cited Cordani's testimony that "some providers will eventually 'react [by] renegotiating . . . and putting upward pressure on rates, which has been a market force to date.'" *Id.*

The Majority also found that the District Court properly had rejected the affiliate clauses as a viable option because it would not help Anthem comply with the Blues Rules,

176

citing Matheis's testimony that Anthem intended to rebrand the "lion's share" of Cigna's customers in the Anthem Blue States, and "widespread exercise of the affiliate clause[s] would remove any incentive for Cigna customers to convert to Anthem because those customers would then be receiving the Cigna product at Anthem prices." *Id.* The Majority observed that Anthem's expert had assumed that the affiliate clauses could be used to deliver 80% of the anticipated efficiencies—an assumption that was contrary to the facts.

The Majority similarly found that the District Court properly had rejected renegotiation as a viable option, explaining that if Anthem could not cause providers to extend their lower rates to Cigna under the affiliate clauses—when the providers would be contractually required to do so—"then it is speculative that Anthem could get them to agree to do the same thing through negotiations absent compulsion." *Id.* at 360. Anthem and its expert had assumed that renegotiation would result in providers accepting Anthem's lower rates, but the Majority regarded that assumption "as questionable in the case of a provider that has just terminated a contract because Anthem mandated, through an affiliate clause, the acceptance of *those very rates*." *Id.* Here again, the Majority relied on Cordani's testimony, noting that he had predicted that "renegotiation would put upward pressure on the Anthem rate, and to the extent Anthem were to adopt a take-it-or-leave-it approach, the provider could simply choose to walk away." *Id.*

The Majority further found that the District Court properly had questioned "how long" any savings from renegotiation "would take to be realized." *Id.* The Majority observed that "[t]he longer it takes for an efficiency to materialize, the more speculative it

177

can be, so the district court was on solid ground to give less weight to the claimed renegotiation savings." *Id.*

The Majority concluded that although renegotiation could lead to a decrease in Cigna's rates, it was "farfetched" for Anthem and its expert to argue that "it will in every instance lead to the Anthem rate." *Id.* On this point, the Majority quoted the District Court's observation that "'the Department of Justice is not the only party raising questions about Anthem's characterization of the outcome of the merger' because Cigna itself had 'provided compelling testimony undermining the projections of future savings.'" *Id.* (quoting *Dist. Ct. Op.*, 236 F. Supp. 3d at 182).

The Majority next explained that whatever mechanism Anthem planned to use to achieve the medical cost savings, the District Court had not erred by finding that the quality of the Cigna offering "'will in fact degrade' as a result of the merger," quoting a snippet of Cordani's testimony on which the District Court had relied. *Id.* (quoting *Dist. Ct. Op.*, 236 F. Supp. 3d at 251 (quoting Cordani's testimony)). For customers who stayed with Cigna and accessed lower rates through contract renegotiation or affiliate clauses, the abrasion problem would arise "because providers would be asked to continue offering the high-touch collaborative Cigna service . . . for less money." *Id.* at 361. The Majority cited Cordani's testimony for the related point that "the value of the Cigna offering will be diminished because Anthem's rebranding strategy will siphon business away from Cigna, leaving behind an atrophied Cigna customer base that is less attractive to providers," which would "in turn diminish Cigna's capacity for further renovation with its collaborative model." *Id.* The Majority also saw a problem of provider abrasion for Cigna customers that

178

migrated to Anthem products because Anthem's providers would be asked to offer "better, and more resource-intensive, collaborative service for the same rates they have historically received." *Id.* The Majority therefore concluded that the District Court had not erred by finding it "'dubious' that Anthem would be able to offer a true Cigna-like product, or that legacy Cigna would be able to maintain the quality of its own product." *Id.* (citing *Dist. Ct. Op.*, 236 F. Supp. 3d at 247). The Majority considered the resulting "threat to innovation" to be "anticompetitive in its own right" and "neither answered by Anthem's evidence nor offset by its purported efficiency of offering a degraded Cigna product at a lower rate." *Id.*

The Majority next turned to the projected $874.6 million in savings that would be realized if Anthem's customers could access superior rates that Cigna had negotiated. *Id.* The Majority saw no evidence that Anthem's customers could access these rates through rebranding or under an affiliate clause. The Blues Rules "would prohibit Anthem" from using the Cigna rates under an affiliate clause, and rebranding Anthem customers to Cigna "would only exacerbate Anthem's 'Best Efforts' problem." *Id.* Renegotiation would be the only way to achieve the projected savings for Anthem's customers, but the Majority questioned how Anthem could achieve any incremental savings, noting that "Anthem, unlike Cigna, has already achieved whatever economies of scale are available." *Id.* If Cigna had a better discount, it was due to factors other than patient volume, and the District Court "reasonably questioned whether those atypical discounts would remain available post-merger." *Id.* at 362. The Majority therefore concluded that the District Court correctly had rejected as unverifiable the $874.6 million in efficiencies that ostensibly would come from delivering Cigna discounts to Anthem customers. *Id.*; *see id.* at 365 ("[T]he few [Cigna

179

customers] that Anthem fails to rebrand will see far fewer savings than Anthem claims, due in large part to provider abrasion and big hospital systems that will stand their ground in renegotiation.").

Continuing, the Majority held that the District Court "rightly cast doubt" on the assumption made by Anthem's expert that 98% of the medical cost savings would be passed through to Anthem's customers. The Majority agreed that "[b]ecause ASO customers pay their employees' medical costs directly, any reduction in medical rates would result in savings that automatically pass through," at least "absent some corresponding price increase by Anthem." *Id.* But the Majority noted that the District Court had cited evidence that Anthem was exploring ways to keep the savings for itself, and the Majority agreed that this evidence "corroborates rather than remediates anticompetitive concerns." *Id.*

For the $619.8 million in projected medical cost savings from fully insured customers, the Majority found that "the estimated pass-through is even less likely given that the savings would automatically inure to Anthem's benefit absent some corresponding price decrease to consumers." *Id.* at 363. The Majority saw no evidence of any mechanism by which customers could learn about the savings, and thus could not seek to extract a share of them through a lower negotiated price. The Majority also saw no evidence as to when the renegotiation would occur, given that existing contracts would not pass through any savings. *Id.*

The Majority finally found that the District Court had not clearly erred in criticizing Anthem for failing "to account in its projected savings for utilization which is a signature

aspect of the Cigna product." *Id.* For the importance of utilization, the Majority relied on the following testimony by Cordani: "'[I]f you're looking [only at] a discount calculation, if [Anthem has a 2 percent lower discount for the emergency room savings, you would assume that's a savings,' unless Cigna's wellness program helps the patient avoid the emergency room visit altogether." *Id.* The Majority held that "the failure to account for utilization "undermined the district court's confidence in the reliability and factual credibility of those savings calculations." *Id.* The Majority also criticized Anthem's projections as having used a different market definition than the District Court, meaning they were "unmoored from the actual market at issue." *Id.* at 364.

Although Anthem's claimed efficiency figures "were without a doubt enormous," the Majority concluded that "those projections fall to pieces in a stiff breeze." *Id.* Having considered "the totality of the circumstances," the Majority held that the District Court "reasonably determined that Anthem failed to show the kind of extraordinary efficiencies that would be needed to constrain likely price increases in this highly concentrated market, and to mitigate the threatened loss of innovation." *Id.* The Majority rejected the argument that the District Court was supposed to make a "dollar-for-dollar comparison" of efficiencies with anticompetitive effects, noting that such a rule would have required the District Court "to calculate, for instance, a more realistic pass-through rate than the rejected 98% figure, or to estimate what percentage of the claimed $2.4 billion was attributable to customers with fewer than 5,000 employees." *Id.* More generally, the Majority observed that "because the state of the science does not permit such refined showings, commentators have recommended simply giving the government the benefit of the doubt in a close case."

181

*Id.* (citation and internal quotation marks omitted). For the Majority, the evidence on efficiencies meant that "this [was] not a close case." *Id.*

The Majority also observed that Anthem had not meaningfully challenged the District Court's "independent and alternative determination" that the Merger should be enjoined "on the basis of it anticompetitive effect in the Richmond, Virginia market for the sale of health insurance to 'large group' employers with more than fifty employees." *Id.* at 367. "There, the government's prima facie case was even stronger than in the market for national accounts in the fourteen Anthem states." *Id.* In response, Anthem challenged the District Court's reliance on aspects of testimony by the DOJ's expert, and the Majority held that the District Court had not clearly erred in relying on that testimony. *See id.* at 367–68. The District Court also properly concluded that the Merger would have anticompetitive effects by giving NewCo's control over 64% to 78% of an already concentrated market, with "two or three other companies fighting to maintain relevance." *Id.* at 368.

In its opinion, the Majority included an extensive section that responded to arguments advanced by the Dissent *See id.* at 364–66. Among other things, the Dissent criticized the Majority for ostensibly relying "on friction between the Anthem and Cigna CEOs" as undermining the efficiencies. *Id.* at 365. Retorting that it "did not so rely," the Majority cited the opening footnote to its opinion, which stated,

> Cigna has become a reluctant supporter of the merger, stating in its appellate brief that "[i]n accordance with the merger agreement Cigna has appealed and defers to Anthem." Indeed, the district court noted the "elephant in the courtroom," for at trial Cigna executives dismissed various of Anthem's claims of savings, cross-examined the merging parties' expert witness, and

> refused to sign Anthem's proposed findings of fact and conclusions of law. Anthem suggested this is a "'side issue,' a mere 'rift between CEOs.'" That their relationship may have deteriorated has little to do with the anticompetitive effects of the proposed merger.

*Id.* at 348 n.1.

Judge Millett filed a concurring opinion that largely responded to points raised by the Dissent. She stressed that the District Court properly had found that "even accepting all of Anthem's claimed cost savings," the Merger "would still have substantial anticompetitive effects." *Id.* at 369. She observed that "to have any legal relevance, a proffered efficiency cannot arise from anticompetitive effects." *Id.* As a result, the generic possibility that prices might go down as a result of the merger "proves nothing by itself," and she noted that NewCo's medical cost savings could result from extracting price concession through anticompetitive behavior. *Id.* She also observed that whether any medical cost savings would be passed through to customers was "very much denied." *Id.* And she agreed with the District Court's finding that decreased provider rates "would lead to an inferior health care product," noting that "[p]aying less to get less is not an efficiency; it is evidence of the anticompetitive consequences of reducing competition and eliminating an innovative competitor in a highly concentrated market." *Id.* at 370. She observed that to the extent the Dissent claimed there was overwhelming evidence that NewCo would deliver health care for less, "one half of this merger disagrees," citing the District Court's finding that Cigna was "actively warning against" the Merger. *Id.*

The Dissent diverged from the Majority (as well as from the District Court) by arguing at length that the federal courts were obligated to consider the value of efficiencies

and balance them against any anticompetitive effects. *See id.* at 373, 375–77, 379. The Majority (like the District Court) had questioned whether *Procter & Gamble* permitted reliance on efficiencies to validate an otherwise anticompetitive merger. The Dissent asserted strongly that later decisions called for a balancing of procompetitive efficiencies against anticompetitive effects. *Id.*

Using this analytical framework, the Dissent concluded that the District Court had "clearly erred" by concluding that the Merger "would substantially lessen competition in the markets in which insurance services are sold to large employers." *Id.* at 375. According to the Dissent, "the record convincingly demonstrates" that the Merger "would significantly reduce healthcare costs for the large employers that purchase insurance services from Anthem and Cigna" across all of the fourteen Anthem Blue States, including in the Richmond market. *Id.* at 375. From the Dissent's perspective, those efficiencies outweighed the increased costs that customers might pay to the combined firm. *Id.*

Unlike the Majority (and the District Court), the Dissent expressed confidence that NewCo could generate efficiencies of $1.7 to $3.3 billion annually by obtaining reduced rates from healthcare providers. *Id.* at 374. The Dissent maintained that because Anthem and Cigna largely sold ASO policies to large employers who self-insured for the underlying costs, any savings from lower provide rates necessarily would be passed through to their employer-customers, resulting in customers capturing nearly all of these efficiencies. *Id.* at 374, 380. The Dissent recognized that some portion of the provider savings would inure to fully insured plans and not necessarily be passed through, but the Dissent maintained that the savings passed through to self-insured employers "would still be at least $1.7 billion

184

annually." *Id.* The Dissent accepted that NewCo would charge its customers more as the price of delivering those savings, but it viewed the record as indicating that large employers would pay increased fees of $48 million to $980 million annually, far less than the $1.7 billion in anticipated savings. *Id.* at 373.

Unlike the Majority, the Dissent did not credit arguments that the DOJ had advanced to question whether the efficiencies were verifiable. *See id.* at 380. The Dissent did not differentiate between the lower provider rates that would be generated by moving Cigna members to Anthem plans versus those resulting from moving Anthem members to Cigna plans; the Dissent viewed both types of synergies as resulting from "enhanced bargaining power [that] would come from the merger." *Id.* at 373. The Dissent dismissed the idea that Anthem or Cigna could achieve the savings on their own as a "made-up notion." *Id.* at 375. The Dissent rejected the DOJ's argument that lower prices would degrade the quality of healthcare as "speculation and guesswork." *Id.* at 374 n.1; *accord id.* at 380. The Dissent similarly rejected the argument that utilization could increase, undermining the savings projections, as "highly speculative" and a fear that "does not square with the record, which shows that current Anthem employer-customers have *lower* utilization rates than the current Cigna employer-customers." *Id.*; *accord id.* at 380–91. Summarizing its view of the evidence, the Dissent wrote,

> The majority opinion offers up a smorgasbord of reasons to think that provider rates would not be lower or would not really be passed through, ranging from provider "abrasion," to secret Anthem plans to dramatically raise the fees it charges employers, to Anthem's supposed inability to fore or negotiate with providers to obtain Anthem rates for Cigna customers, to friction between the Anthem and Cigna CEOs. All of that seems at best, highly speculative. The plural of anecdote is not data. Of course, lots of bad

things *could* happen after the merger. But the courts have to assess what is *likely*.

*Id.* at 380. According to the Dissent, the Majority was "accepting the worst-case possibility." *Id.* As the Dissent saw matters, "the overwhelming evidence of what is likely is that provider rates would go down, that the saving would be passed through to employers, and that the savings to employers would greatly exceed any increase in fees paid by employers." *Id.*

The Dissent nevertheless agreed that if the increased provider savings resulted from NewCo exercising monopsony power in the provider market, then the medical cost savings could not be considered. *Id.* at 377. The Dissent proposed remanding the case to the District Court to rule on whether the medical cost savings would result from ordinary bargaining power or unlawful monopsony power. *Id.* at 378, 381.

## Q. Anthem Terminates The Merger Agreement.

While the appeal was pending, the parties engaged in expedited litigation in this court in anticipation of a hearing on Anthem's application for a preliminary injunction to bar Cigna from terminating the Merger Agreement pending a final decision on the merits in this action. The hearing took place on May 11, 2017, after the DC Circuit Court issued its opinion. In light of the DC Circuit Court's ruling, this court denied Anthem's application, holding that Anthem had not demonstrated a reasonable likelihood that the Supreme Court of the United States would issue a writ of certiorari and reverse the DC Circuit Court, which in turn made it futile to enjoin Cigna from terminating the Merger Agreement when the parties could not close with the District Court's injunction in place.

186

Dkt. 226 at 13–14. This court stayed its decision to deny the application for a preliminary injunction and lift the TRO so that Anthem could pursue an expedited appeal to the Delaware Supreme Court.

While this court was in the midst of issuing its ruling, Cigna hurriedly delivered a second notice of termination, again relying on Section 7.1(b) of the Merger Agreement. JX 2927. After the court stayed its ruling to permit Anthem to appeal, Cigna claimed that the notice had been inadvertent. JX 2930. Discovery proved that statement to be inaccurate. *See* Jones Dep. 1589–90. Consistent with Cigna's behavior during other stages of the process, Cigna sought to get the jump on Anthem by issuing its termination notice while the court was in the midst of its ruling, then had to walk back its actions after the court stayed its decision. Because the TRO remained in effect when the notice was issued, Cigna violated the TRO by sending it.

On the morning of May 12, 2017, while the TRO remained in place, Cigna delivered a third notice of termination, again relying on Section 7.1(b) of the Merger Agreement. JX 2928. Because the TRO remained in effect when the third notice was issued, Cigna violated the TRO by sending it.

Several hours later, on May 12, 2017, Anthem notified this court that it would not appeal the denial of the preliminary injunction, causing the TRO to lift. Dkt. 206. Anthem simultaneously delivered a notice of termination to Cigna that relied on Section 7.1(i) of the Merger Agreement. JX 2929.

With the Merger Agreement terminated, the Anthem Board began searching for a new CEO to replace Swedish. He resigned effective November 5, 2017. JX 2953.

In March 2018, Cigna announced that it was acquiring Express Scripts in a transaction valued at approximately $67 billion. JX 2958. Cordani became CEO of the combined company, and Cigna appointed a majority of the board. Cigna hired Teneo for the public relations work on the merger. Teneo did not solicit a single negative story about the deal. *See* Cohen Tr. 2461.[319]

## R.    This Litigation Proceeds To Trial.

Over the course of two years, the parties conducted discovery and prepared for trial. During discovery, Bain produced emails that showed Hocevar acting as a conduit for backchannel advice to Cordani about becoming CEO of NewCo. Cordani viewed the emails as having "created difficulties for us in the litigation." JX 3099 at '121. Hocevar had worked at Cigna for over sixteen years, was promoted at least five times, and ended up on the Cigna ELT as President, of Strategy, Segments, and Solutions. He was identified as one of a handful of possible successors to Cordani as CEO.[320] Cordani waited until Hocevar had been deposed, then fired him.[321]

Trial took place from February 25 through March 4, 2019. After extensive post-trial briefing, post-trial argument took place on November 26, 2019. The court requested supplemental submissions on causation, which were filed on March 6, 2020. Shortly after those submissions were received, the novel coronavirus and the resulting COVID-19

---

[319] Cordani denied that Teneo worked on the Express Scripts deal. Cordani Tr. 2049. That testimony was not accurate. Cohen Tr. 2461.

[320] *See* JX 715 at '221; JX 3077 at '663; Hocevar Tr. 2299–300, 2303–07.

[321] *See* JX 2963; Hocevar Tr. 2304–06.

pandemic affected the court's operations and delayed this decision. The preparation of this decision also required additional time given the magnitude of the record. As a result of these factors, this overly lengthy opinion was sadly too long delayed.

## III.   LEGAL ANALYSIS

Despite high-profile protagonists, a sprawling record, and billions of dollars in damages claims, this is a breach of contract case. Each side claims that the other breached its obligations under the Merger Agreement. All but one of the claims involve the Efforts Covenants. In the remaining breach of contract claim, Cigna contends that Anthem breached its contractual obligation to pay the Reverse Termination Fee.

This decision begins by setting out the legal framework that governs a claim for breach of contract. It next describes the plain meaning of the Efforts Covenants and the No Injunction Condition. The decision then analyzes the parties' claims for breach of the Efforts Covenants. It finally turns to Cigna's claim for the Reverse Termination Fee.

### A.   The Legal Framework

The Merger Agreement is a contract governed by Delaware law. *See* MA § 8.6(a). Delaware law accordingly governs the parties' breach of contract claims.

"Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiffs." *WaveDivision Hldgs. v. Millennium Digital Media*, 2010 WL 3706624, *13 (Del. Ch. Sept. 17, 2010). When determining the scope of a contractual obligation and measuring the parties' conduct against that obligation to determine breach, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy*

189

*Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted). "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

For the claims based on the Efforts Covenants, the complexity surrounds the issue of "a resulting damage." *See WaveDivision*, 2010 WL 3706624, at *13. Put more plainly, the complexity involves the element of causation. Both sides seek damages measured by the benefits that they expected to receive from the completion of the Merger. Each side thus seeks damages resulting from the other side's failure to perform at closing. The parties' obligations to perform at closing were subject to the No Injunction Condition. The District Court enjoined the Merger from closing, and the DC Circuit Court affirmed that ruling, which caused the No Injunction Condition to fail. As a result, neither side become obligated to perform.

To guide the analysis of causation in this setting, Delaware has adopted the framework set forth in the *Restatement (Second) of Contracts*. *See Williams Cos. v. Energy Transfer Equity, L.P.*, 159 A.3d 264l 273 (Del. 2017); *WaveDivision*, 2010 WL 3706624, at *14-15. That framework recognizes that "[p]erformance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused." *Restatement (Second) of Contracts* § 225(1) (1981); *accord id.* § 235 cmt. b. But the framework also recognizes that "[w]here a party's breach by non-performance contributes

190

materially to the non-occurrence of a condition of one of his duties, the nonoccurrence is excused." *Id.* § 245.

To establish that a party's breach contributed materially to the non-occurrence of a condition, "it is not necessary to show that [the condition] would have occurred but for the lack of cooperation. It is only required that the breach have contributed materially to the non-occurrence." *Id.* § 245 cmt. b. A breach "contributed materially" to the non-occurrence of a condition if the conduct made satisfaction of the condition "less likely." *WaveDivison*, 2010 WL 3706624, at *18. But "if it can be shown that the condition would not have occurred regardless of the lack of cooperation, the failure of performance did not contribute materially to its non-occurrence and the rule does not apply. The burden of showing this is properly thrown on the party in breach." *Restatement (Second) of Contracts* § 245 cmt. b.

Under this framework, if the non-breaching party proves by a preponderance of the evidence that the breach contributed materially to the failure of the condition by making its satisfaction less likely, then the non-occurrence is excused, and the breaching parties' obligations were due even if the condition was not satisfied. *Id.* §§ 225(1), 245. In those circumstances, the breaching party is liable for the failure to perform its obligations. *Id.* §§ 235, 346. "When the non-occurrence of a condition of a duty is excused . . . the obligor is liable for the same damages for which he would have been liable had the duty originally been unconditional." *Id.* § 225 cmt. c. But if the breaching party proves by a preponderance of the evidence that its breach could not have contributed materially to the non-occurrence of the condition because the condition would have failed regardless, then the breaching party is not liable in damages. *Id.*

191

The *Restatement* includes helpful illustrations of these principles. One illustration shows how the failure of a condition can be excused, resulting in liability for the party whose conduct made the satisfaction of the condition less likely:

> A contracts to sell and B to buy A's rights as one of three lessees under a mining lease in Indian lands. The contract states that it is "subject only to approval by the Secretary of the Interior," which is required by statute. B files a request for approval but A fails to support B's request by giving necessary cooperation. Approval is denied and A cannot convey his rights. B has a claim against A for total breach of contract. A's breach of his duty of good faith and fair dealing contributed materially to the non-occurrence of the condition, approval by the Secretary of the Interior, excusing it.

*Id.* § 245 cmt. a, illus. 4. A later illustration shows how a party can avoid liability, despite having made the satisfaction of the condition less likely:

> The facts being otherwise as stated in Illustration 4, A shows that even if he had given his cooperation, the Secretary of the Interior would have withheld approval on other grounds. B has no claim against A for breach of contract. A's breach of his duty of good faith and fair dealing did not contribute materially to the non-occurrence of the condition, and its non-occurrence is not excused.

*Id.* § 245 cmt. b, illus. 7. Avoiding liability thus requires a showing that even if the breaching party "had given his cooperation," i.e., fulfilled its contractual obligations, the condition nevertheless would have failed "on other grounds."

These rules only apply where the breaching party's lack of cooperation in satisfying the condition "constitutes a breach, either of a duty imposed by the terms of the agreement itself or of a duty imposed by a term supplied by the court. There is no breach if the risk of such a lack of cooperation was assumed by the other party or if the lack of cooperation is justifiable." *Id.* cmt. a. In the *Restatement*'s illustrations, the obligation to cooperate flowed from the implied covenant of good faith and fair dealing, which is "a duty imposed by a

term supplied by the court." *Id.* In this case, the obligation to cooperate flows from the Efforts Covenants, which are duties "imposed by the terms of the agreement itself." *Id.*; *see id.* cmt. b.

**B.       The Plain Meaning Of The Efforts Covenants And The No Injunction Condition**

All but one of the claims in the case concern the Efforts Covenants and the No Injunction Condition. The language of these provisions is plain and unambiguous.

**1.       The Reasonable Best Efforts Covenant**

The Reasonable Best Efforts Covenant generally required that both parties use their reasonable best efforts to complete the Merger. In pertinent part, the provision stated,

> Upon the terms and subject to the conditions hereof (including Section 5.3(c)), each party will use its reasonable best efforts to take, or cause to be taken, all actions, to do, or cause to be done, all things reasonably necessary to satisfy the conditions to Closing set forth herein and to consummate the Mergers and the other transactions contemplated by this Agreement.

MA § 5.3(a).

Under this provision, each side was obligated to "use its reasonable efforts" to accomplish two goals: (i) "satisfy the conditions to Closing set forth herein" and (ii) "consummate the Merger[]." *Id.* The first goal focused on the specific conditions to closing set forth in Sections 6.1, 6.2, and 6.3. The second goal addressed the Merger generally and committed the parties to work together to achieve its consummation.

The mandatory requirement that "each party will use its reasonable best efforts" was "subject to the conditions hereof (including Section 5.3(c))." MA § 5.3(a). That section stated,

193

Nothing contained in this <u>Section 5.3</u> or in any other provision of this agreement shall be construed as requiring Anthem to agree to any terms or conditions that would

> (i) impose any limitation on Anthem's ownership or operation of all or any portion of its or Cigna's . . . business or assets or compel [Anthem] to dispose of or hold separate all or any portion of its or [Cigna's] businesses or assets,

> (ii) impose any limitations on the ability of Anthem to acquire or hold or to exercise full rights of ownership of Cigna Common Stock,

> (ii) impose any obligations on [Anthem] or [Cigna] in respect of or relating to [their] facilities, operations, places of business, employment levels, products or businesses,

> (iv) require [Anthem] or [Cigna] to make any payments or

> (v) impose any other obligation, restriction, requirement, limitation, qualification, condition, remedy or other action

> which, in the case of any such term or condition described in clauses (i) through (v) above, would have, or would reasonably be expected to have, individually or in the aggregate with all other such terms and conditions, a material adverse effect on Anthem, Cigna and their respective subsidiaries, taken as a whole, after giving effect to the Mergers, including the synergies expected to be realized from the Mergers.

MA § 5.3(c) (the "Burdensome Condition Exception"). Under its plain terms, the Burdensome Condition Exception only protected Anthem. Cigna did not enjoy similar protection.

A "reasonable best efforts" obligation requires a party "to take all reasonable steps to solve problems and consummate the transaction." *Williams*, 159 A.3d at 273. It does not require a party "to sacrifice its own contractual rights for the benefit of its counterparty." *Akorn v. Fresenius*, 2018 WL 4719347, at *91 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018) (ORDER). Recently, this court found that the defendant breached a best efforts

194

obligation during the period leading up to a purported termination. *Channel Medsystems, Inc. v. Boston Sci. Corp.*, 2019 WL 6896462, at \*38 (Del. Ch. Dec. 18, 2019). The defendant contended that it had received material information that made termination necessary, but the court found that the defendant "made no reasonable efforts to engage with [its counterparty] or to take other appropriate actions to keep the deal on track." *Id.* Among other things, the defendant did not seek additional information from its counterparty, did not engage in forthright discussions with its counterparty, and did not conduct a meaningful analysis of the grounds it raised for termination. *Id.* The court found that the defendant's actions showed both a failure to use reasonable best efforts and a lack of good faith. The court further observed that "[t]he lack of good faith here is corroborated by contemporaneous evidence that [the defendant] was looking for a way out of its deal." *Id.* The evidence of the defendant's motives added "credence to and corroborat[ed] other robust facts demonstrating that [the defendant] did not fulfill its obligations to engage with [its counterparty] in a commercially reasonable manner to vet any concerns . . . and to keep the transaction on track." *Id.* at \*39.

Applying these principles to this case, the Reasonable Best Efforts Covenant obligated Cigna "to take all reasonable steps to solve problems and consummate the transaction." *Williams*, 159 A.3d at 273. Cigna would breach the Reasonable Best Efforts Covenant by failing to take reasonable steps to consummate the transaction or by not attempting to solve problems. Cigna certainly would breach the Reasonable Best Efforts Covenant by working actively against the Merger and trying to prevent it from closing. Anthem faced the same obligations, albeit subject to the Burdensome Condition Exception.

195

## 2. The Regulatory Efforts Covenant

The Regulatory Efforts Covenant imposed a stronger contractual duty than "reasonable best efforts," but that duty was limited to the narrower task of addressing legal impediments to the Merger. In pertinent part, the provision stated,

> Without limiting the foregoing, but subject to Section 5.3(c), the reasonable best efforts of Anthem and Cigna shall include Anthem and its Affiliates and Cigna and its Affiliates taking any and all actions necessary to avoid each and every impediment under the HSR Act, any Healthcare Law, antitrust law, insurance law or other applicable law that may be asserted by or on behalf of any Governmental Entity with respect to this Agreement, the Mergers and the other transactions contemplated hereby or . . . so as to enable the Closing to occur as promptly as practicable . . . .

MA § 5.3(b).

The Regulatory Efforts Covenant was thus stronger than the Reasonable Best Efforts Covenant in that it required the parties to "tak[e] any and all actions necessary to avoid each and every impediment." *Id.* The concept of "reasonable best efforts" recognizes that some extreme actions may be beyond a party's best efforts. The obligation to "tak[e] any and all actions" does not admit exclusions. *Id.*

At the same time, the Regulatory Efforts Covenant was narrower than the Reasonable Best Efforts Covenant in that it did not obligate the parties to use this level of effort to close the Merger by satisfying *all* of the conditions to closing. The Regulatory Efforts Covenant applied only with respect to the "discrete regulatory subject" covered by the provision.[322] It thus only obligated the parties to use this level of effort to address

---

[322] *See All. Data Sys. Corp. v. Blackstone Capital P'rs V L.P.*, 963 A.2d 746, 763 (Del. Ch. 2009), *aff'd*, 976 A.2d 170 (Del. 2009); *see also* ABA Model Merger Agreement

"impediments" that a Governmental Entity could assert "under the HSR Act, any Healthcare Law, antitrust law, insurance law or other applicable law that may be asserted by or on behalf of any Governmental Entity." In framing the obligation in this fashion, the Regulatory Efforts Covenant did not use the concept of "impediment" in the general sense of any hurdle or obstacle to be overcome.[323] The provision used the concept of "impediment" to refer specifically to a legal objection that a Governmental Entity could raise.

Unlike the more general Reasonable Best Efforts Covenant, the Regulatory Efforts Covenant also identified categories of actions that the parties were required to take to the extent they were either "requested by or on behalf of any Governmental Entity" or "necessary and appropriate" to achieving three enumerated goals:

(I)     obtain[ing] all Necessary Consents;

(II)    resolv[ing] any objections that may be asserted by or on behalf of any Governmental Entity with respect to the mergers and the other transactions contemplated hereby; and

(III)   prevent[ing] the entry of, and have vacated, lifted, reversed or overturned, any order that would prevent, prohibit, restrict or delay

---

for the Acquisition of a Public Company 197 (2011) (explaining that provision applies if "the antitrust agency demands divestiture or other action to avoid an antitrust challenge").

[323] *Impediment*, *Oxford English Dictionary,* (3d ed. 2020) ("The fact of impeding or condition of being impeded; hindrance, obstruction; *concrete* something that impedes, hinders, or obstructs; a hindrance, an obstruction"); *Impediment*, *Merriam-Webster Online Dictionary*, (accessed August 21, 2020) ("something that impedes"); *Impediment*, *Cambridge Dictionary*, (2020 update) ("[S]omething that makes progress, movement, or achieving something difficult or impossible").

the consummation of the Mergers and the other transactions contemplated hereby.

MA § 5.3(b) (formatting added). In the current case, a Governmental Entity never made any requests, so the operative test is whether any of the three specified categories of actions were "necessary and appropriate" to achieve any of the three enumerated goals.

Under the first category of actions, if necessary and appropriate to achieving an enumerated goal, the parties were required to

comply with all restrictions and conditions, if any, imposed, compelled, required, or requested by any Governmental Entity in connection with granting any Necessary Consent of any such Governmental Entity or in connection with the expiration or termination of any applicable waiting period under the HSR Act or any other antitrust laws or any clearance under any Healthcare Laws, insurance laws, or other applicable laws . . . .

MA § 5.3(b)(i) (the "Compliance Requirement"). The Merger Agreement defined "Necessary Consents" to encompass eight categories of legally required consents, including any those required under "the Hart-Scott-Rodino Antitrust Improvements Act of 1976." MA § 3.1(c)(iii). The Compliance Requirement never came into play because neither the DOJ nor any other Governmental Entity ever "imposed, compelled, required or requested" that Anthem or Cigna take any action.[324]

---

[324] If the DOJ or any Governmental Entity had imposed, compelled, required, or requested any action, then the range of action that the parties were required to take was quite broad, including

(I) proposing, negotiating, committing to and effecting, by consent decree, hold separate order or otherwise, the sale, divestiture, disposition, license or other disposition of any Subsidiaries, operations, divisions, businesses, product lines, contracts, customers or assets of Anthem or any of its Affiliates (including Cigna or any of its Subsidiaries),

Under the second category of actions, if necessary and appropriate to achieving an enumerated goal, the parties were required to

> agree to . . . enter into, suspend, amend or terminate any contract or other business relationship of Anthem or any of its Subsidiaries or Affiliates or Cigna or any of its Subsidiaries or Affiliates (including any contract with any Governmental Entity) . . . .

MA § 5.3(b)(ii) (the "Contracting Requirement").[325]

Under the third category, if necessary and appropriate to achieving an enumerated goal, the parties were required to oppose fully and vigorously

---

> (II) taking or committing to take such other actions that may limit or impact Anthem's or any of its Subsidiaries' or Affiliates' (including Cigna's or any of its Subsidiaries') freedom of action with respect to, or its ability to retain, any of Anthem's or any of its Subsidiaries' or Affiliates' (including Cigna's or any of its Subsidiaries') operations, divisions, businesses, product lines, contracts, customers or assets and
>
> (III) entering into any orders, settlements, undertakings contracts, consent decrees, stipulations or other agreements to effectuate any of the foregoing or in order to vacate, lift, reverse, overturn, settle or otherwise resolve any order that prevents, prohibits, restricts or delays the consummation of the Mergers and the other transactions contemplated hereby, in any case, that may be issued by any court or other Governmental Entity.

MA § 3.1(c)(iii) (formatting added).

[325] The Contracting Requirement also obligated the parties to "agree to . . . any additional obligations relating to any contract imposed by any Governmental Entity, in each case in connection with granting any Necessary Consent of any such Governmental Entity or in connection with the expiration or termination of any applicable waiting period under the HSR Act or any other antitrust laws or any clearance under any Healthcare Laws, insurance laws or other applicable laws." *Id.* This aspect of the Contracting Requirement never came into play because a Government Entity never imposed any additional obligations in connection with granting any Necessary Consent.

(I) any administrative or judicial action or proceeding that is initiated (or threatened to be initiated) challenging this [Merger] Agreement, the Mergers or the other transactions contemplated hereby and

(II) any request for, or the entry of, and seek to have vacated or terminated, any order that could restrain, prevent or delay the consummation of the Mergers and the other transactions contemplated hereby,

including, in the case of either clause (I) or clause (II), by defending through litigation, any action asserted by any Person in any court or before any Governmental Entity, and vigorously pursuing all available avenues of administrative and judicial appeal.

MA § 5.3(b)(iii) (the "Litigation Requirement") (formatting added).

As with the Reasonable Best Efforts Covenant, the Regulatory Efforts Covenant was subject to the Burdensome Condition Exception. The condition again protected Anthem and not Cigna, making the parties' obligations asymmetrical. Cigna was contractually obligated to "tak[e] any and all actions necessary to avoid each and every impediment under . . . antitrust law . . . that may be asserted by or on behalf of any Governmental Entity with respect to this Agreement, the Mergers and the other transactions contemplated hereby." MA § 5.3(c). Anthem was not obligated to agree to take any action or agree to any terms or conditions that would have a material adverse effect on NewCo.

The parties dispute whether the overarching obligation in the Regulatory Efforts Covenant qualifies as a "hell or high water" provision. Cigna contrasts the Regulatory Efforts Covenant with the provision at issue in *Akorn*, which expressly stated that the parties' regulatory efforts "shall be unconditional." 2018 WL 471937, at *46. Anthem cites decisions in which the court described provisions containing language substantially identical to the Regulatory Efforts Covenant as a "hell or high water" provision. *See*

*Vintage Rodeo Parent, LLC v. Rent-A-Center, Inc.*, 2019 WL 1223026, at \*6 (Del. Ch. Mar. 14, 2019) (describing an obligation to use "commercially reasonable efforts" to take "any and all action necessary or advisable" to obtain regulatory approvals" as a "hell or high water" provision); *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 716, 756 (Del. Ch. 2008) (describing an obligation to "take any and all action necessary" to obtain antitrust approval as a "come hell or high water" obligation).

The label does not matter. What counts is the plain language of the provision. Under the Regulatory Efforts Covenant, the parties were obligated to "tak[e] any and all actions necessary to avoid each and every" legal impediment that a Governmental Entity could raise. MA § 5.3(a). To the extent that an action fell within the scope of the provision, the parties were required to take it.

### 3.  The Regulatory Cooperation Covenant

The Regulatory Cooperation Covenant was an important adjunct to the other Efforts Covenants. That provision generally gave Anthem the authority to take the lead in communicating with regulators and developing a regulatory strategy, including for purposes of any litigation. It did so by stating that "Anthem, in consultation with Cigna, shall take the lead in coordinating communications with any Governmental Entity and developing strategy for responding to any investigation or inquiry by any Governmental Entity related to any of the Necessary Consents." MA § 5.3(e). A necessary corollary of this grant of authority to Anthem was that Cigna was obligated to follow Anthem's lead and adhere to Anthem's strategy.

201

Like the Regulatory Efforts Covenant, the Regulatory Cooperation Covenant contained more specific requirements. First, the parties agreed that "each party shall as promptly as practicable make such filings with Governmental Entities as are required in connection with this Agreement and the transactions contemplated hereby on its respective behalf." *Id*.

Second, the parties agreed that

[p]rior to submitting any filing, substantive written communication, correspondence or other information or response by such party or any of its representatives, on the one hand, to any Governmental Entity, or members of the staff of any Governmental Entity, on the other hand, subject to Section 5.2, the submitting party shall permit the other party and its counsel a reasonable opportunity to review in advance, and consider in good faith the comments of the other party provided in a timely manner, in connection with any such filing, communication, correspondence, information, or response. . . .

To the extent practicable under the circumstances, none of the parties hereto shall agree to participate in any substantive meeting or conference with any Governmental Entity, or any member of the staff of any Governmental Entity, in respect of any filing, proceeding, investigation (including any settlement of the investigation), litigation, or other inquiry related to the mergers unless it consults with the other party in advance and, where permitted, allows the other party to participate.

*Id.*

Third, the parties agreed to exchange information and provide assistance to each other:

Subject to Section 5.2 and the terms and conditions of the Confidentiality Agreement, Anthem and Cigna shall coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other party may reasonably request in connection with the foregoing.

*Id.*[326]

[326] Titled "<u>Access to Information</u>," Section 5.2 provided as follows:

Upon reasonable notice, each of Anthem and Cigna shall . . .

[1] afford to the other party hereto and its officers, employees, accountants, counsel, financial advisors, and other representatives of the other party reasonable access during normal business hours, during the period prior to the Effective Time, to such of its properties, books contracts commitments, records, officers, employees and consultants as the other party may reasonably request and,

[2] during such period, each of Anthem and Cigna shall . . . furnish promptly to the other party, subject in the case of competitively sensitive information, to any "clean room" arrangement between the parties

    (a) to the extent not publicly available, a copy of each report, schedule, registration statement, and other document filed, published, announced or received by it during such period pursuant to the requirements of federal or state securities laws as applicable . . . , and

    (b) consistent with its legal obligations, all other information concerning it and its business, properties and personnel as such other party may reasonably request;

<u>provided</u>, <u>however</u>, that either may restrict the foregoing access to the extent that, in such party's reasonable judgment, (i) providing such access would violate such party's . . . obligations under the terms of a confidentiality agreement with a third party . . . , (ii) providing such access would result in the waiver of any attorney-client privilege . . . or (iii) any law, treaty, rule or regulation of any Government Entity . . . requires such party . . . to restrict access to such properties or information.

MA § 5.2. Section 5.2 thus provided a separate avenue for the parties to obtain information from each other. By making aspects of Section 5.3(e) "subject to <u>Section 5.2</u>," the Merger Agreement made clear that these requirements did not displace Section 5.2. Although the record suggests that Anthem might have been able to assert a claim for breach of Section 5.2 based on Cigna's withdrawal from integration planning and failure to provide assistance during the Antitrust Litigation, those claims largely would parallel Anthem's existing claims for breach of the Efforts Covenants. Neither side has asserted a breach of Section 5.2.

## 4. The No Injunction Condition

The parties' obligations to perform at closing and consummate the Merger were subject to conditions that appeared in Sections 6.1, 6.2, and 6.3 of the Merger Agreement. For purposes of the claims for breach of the Efforts Covenants, the key condition was the No Injunction Condition, which states,

> <u>No Injunctions or Restraints, Illegality</u>. (i) No Governmental Entity or federal or state court of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, executive order, decree, judgment, injunction or other order (whether temporary, preliminary or permanent), in any case that is in effect and that prevents or prohibits consummation of the Mergers (collectively, the "**Legal Restraints**") . . . .

JX 468 § 6.1(a).

The permanent injunction against the Merger constituted a Legal Restraint within the plain language of the No Injunction Condition. The District Court was a "federal . . . court of competent jurisdiction." By entering the permanent injunction, it "issued [an] . . . order . . . that prohibit[ed] consummation of the Merger[]." PTO ¶ 199. The DC Circuit Court affirmed its decision. PTO ¶ 206. The No Injunction Condition therefore was not satisfied, bringing into play the *Restatement* framework for analyzing causation.

## C. Anthem's Claims For Breach Of The Efforts Covenants

For its claims against Cigna, Anthem sought to prove that Cigna breached the Efforts Covenants by engaging in conduct that fell into five broad categories: (i) conducting a covert communications campaign against the Merger, (ii) withdrawing from integration planning, (iii) opposing a divestiture, (iv) resisting mediation, and (v) undermining Anthem's defense in the Antitrust Litigation. The first two categories

204

implicate Cigna's obligations under the Reasonable Best Efforts Covenant. The next three categories implicate Cigna's obligations under the Regulatory Efforts Covenant and the Regulatory Cooperation Covenant.[327]

### 1. Cigna's Covert Communications Campaign Against The Merger

Anthem proved that Cigna breached the Efforts Covenants by conducting a covert communications campaign against the Merger. But Anthem failed to prove that Cigna's covert communications campaign contributed materially to the failure of the No Injunction Condition. Anthem therefore failed to establish a basis to recover damages under this theory.

### a. Cigna's Contractual Obligations Regarding A Covert Communication Campaign

To state the obvious, Cigna had a contractual obligation *not* to run a covert communication campaign against the Merger. The two Cigna directors who testified at trial understood this fact.[328]

As a technical matter, the underlying obligation arose under the Reasonable Best Efforts Covenant, not the Regulatory Efforts Covenant. The Reasonable Best Efforts covenant obligated Cigna to support the Merger and seek to consummate it. Taking action with the goal of undermining the Merger breached the Reasonable Best Efforts Covenant.

---

[327] Anthem's presented its arguments in a different order and combined Cigna's opposition to a divestiture and its resistance to mediation into a single category. When addressing these claims, the parties did not clearly distinguish among Cigna's obligations under the different Efforts Covenants. This decision strives to be more precise.

[328] Zollars Tr. 2510–12; Harris Tr. 3268–69.

205

Because Cigna sought to influence the regulatory approval process, it is possible to conceive of the obligation as implicating the Regulatory Efforts Covenant. That covenant, however, committed Cigna to take action to avoid any legal impediment that could be asserted by or on behalf of any Governmental Entity. MA §5.3(b). The covert communication campaign was not specifically part of the regulatory approval process, nor did it respond to a legal impediment. It therefore falls under the Reasonable Best Efforts Covenant.

### b. Cigna Breached The Reasonable Best Efforts Covenant By Conducting A Covert Communications Campaign.

Anthem proved that Cigna conducted a covert communications campaign against the Merger. Through Teneo, Cigna carried out a campaign that depicted the Merger as anti-competitive, anti-consumer, and anti-innovation, which were the very grounds on which DOJ was seeking to block it. *See* Cohen Tr. 2386.

The idea to conduct a covert communications campaign originated in January 2016 as part of Project Alpha. The playbook for Project Alpha included escalation strategies if Anthem did not make the commitments Cigna wanted. One escalation strategy was a covert communications campaign. *See* Part II.G.3–4, *supra.*

Teneo's campaign against the Merger began in May 2016, after Cohen leaked the dispute letters to the *Wall Street Journal*. *See* Part II.I.3, *supra.* Teneo began speaking with reporters on background to spread the following anti-Merger messages:

- "It remains unclear that Anthem is properly managing the processes necessary to bring the deal to completion." JX 1860 at '114.

- "Many of the core regulatory work streams have fallen behind schedule." *Id.*

206

- "The transaction leverages Cigna's unique and robust capabilities." *Id.*

- "In the event the merger does not obtain regulatory approval, we are well positioned for standalone success," citing a "[w]ell-balanced diversified business model," "substantial 'dry powder' of $6-8 billion," and "M&A possibilities and market leading revenue, earnings, and capital efficiency." *Id.*

*See generally* JX 2298 (circulating and discussing a "Communications Campaign and Execution Plan").

After the DOJ filed suit, Cigna instructed Teneo to develop stories that the Blues Rules would prevent the Merger from being cleared. *See* Part II.K.2, *supra*. Jones told Cohen "to play this as all roads go to the blues." JX 2486 at '490. Cohen understood that Jones wanted "a strategy to blame the Blues rules no matter what."[329]

Teneo and Cigna knew that the DOJ was challenging the Merger as anti-competitive.[330] Teneo sought to spread the message that "the combined company will not compete as vigorously against the Blues . . . and that this will inhibit the growth of the combined company."[331]

---

[329] Cohen Tr. 2427–28; *see* JX 2488; Cohen Tr. 2432.

[330] *See* Cordani Tr. 2190–91; Cohen Tr. 2392.

[331] JX 2298 at '547; *see* JX 2484 at '835.001 ("If Cigna merges with Anthem, its freedom to compete with Blues across the country could be constrained.").

207

Teneo and Cigna knew that it would hurt the prospects for antitrust clearance if the Merger harmed consumers.[332] Teneo sought to spread the message that the Merger was "anti-consumer" and "does not take the best internet of customers in mind."[333]

Teneo and Cigna knew that the DOJ was attacking the Merger because it would reduce Cigna's capacity for innovation.[334] Teneo sought to spread the message that "the transaction is being largely viewed by customers as . . . non-innovative."[335]

Cohen spoke with reporters, attorneys, and law professors to spread the anti-Merger narrative.

- As trial approached, Teneo engaged in "Proactive Pre-Trial Activity" and "worked with reporters" to write "curtain raisers" that would "[h]ighlight [Cigna] as innovative and positively impacting client health outcomes."[336]

- During and after trial, Cohen spoke with reporters and provided them with talking points and quotations that criticized Anthem and the Merger.[337]

---

[332] *See* Cohen 2394–96; Jones Tr. 2766–67.

[333] JX 2298 at '548; *see* JX 2484 at '002 ("Anthem and its Blues partners are already being accused of negatively impacting the healthcare market and its consumers.").

[334] Cohen Tr. 2394–96; Jones Tr. 2767.

[335] JX 2298 at '548; *see* JX 2484 at '002 ("The merged company will limit Cigna's innovation").

[336] JX 2613 at '581; *see* JX 2617; *see also* JX 2611; JX 2613; JX 2629; JX 2636; JX 2715.

[337] *See, e.g.*, JX 2694; JX 2727; JX 2769; JX 2773; JX 2781; JX 2782; JX 2783; JX 2784; JX 2785; JX 2793; JX 2794; JX 2798; JX 2803; JX 2805; JX 2806; JX 2807; JX 2810; *see also* JX 2812.

208

- Teneo continued its communication campaign after the District Court enjoined the Merger.[338]

Cohen's efforts produced stories that advanced anti-Anthem, anti-Merger themes. *See* Part II.K.5*, supra.*

Teneo developed and implemented the covert communications campaign with the understanding that Cigna was not interested in obtaining antitrust approval for the Merger. Cohen Tr. 2391, 2403. Cigna never asked Teneo to develop any messaging or communications to support the Merger. *Id.* at 2384.

Cigna has argued that its conduct could not have breached the Merger Agreement because Cigna did not subjectively believe that Teneo's work would or could influence DOJ or the courts. Dkt. 700 at 68. Intent is not a requirement for a breach of the Reasonable Best Efforts Covenant. MA § 5.3(b). Regardless, Cigna sought to do precisely that. Before Teneo's activities became a focus in this litigation, its website advertised its "strategy and communications advisory" capabilities relating to "litigation and enforcement actions" and argued that "[a] well-run communications strategy can *dramatically change the outcome* of high-stakes litigation and/or enforcement action matters." JX 2976 (emphasis added). Jones argued to Anthem that an "effective advocacy strategy" required "public relations support." JX 1763 at '909. Cigna's head of public relations recognized that Cigna was trying to "influence what the judge thinks." Sandberg Tr. 343.

---

[338] *See* JX 2760; JX 2778; JX 2760.

Cigna also invokes a form of preemptive self-defense, claiming that it unleashed Teneo "to counter any investor perception that Cigna was the cause of the Merger being blocked." Dkt. 700 at 78. If Cigna wanted to be perceived as supporting the Merger, then Cigna could have actively supported it. If Cigna wanted to criticize Anthem, Cigna could have waited until it was no longer bound by the Merger Agreement. Cigna instead chose to attack its merger partner and the Merger in secret.

In any event, Cigna did not in fact seek to "counter . . . investor perception." Cigna sought to shape investor perception and, if possible, influence the DOJ and the courts by attacking Anthem and the Merger.[339]

Cigna's covert communications campaign breached the Reasonable Best Efforts Covenant. Attacking the Merger was the exact opposite of "us[ing] its reasonable best efforts to take, or cause to be taken, all actions, to do, or cause to be done, all things reasonably necessary to satisfy the conditions to Closing set forth herein and to consummate the Merger[]." MA § 5.3(a).

### c. Cigna's Covert Communications Campaign Did Not Contribute Materially To The Failure Of The No Injunction Condition.

Although Anthem proved that Cigna's covert communications campaign breached the Reasonable Best Efforts Covenant, Anthem did not prove that the breach contributed materially to the failure of the No Injunction Condition. There is no evidence that the covert

---

[339] *See, e.g.*, JX 1522 at '065; Cohen Tr. 2384–86, 2402.

communications campaign actually affected the DOJ, the District Court, or the DC Circuit Court.

The strongest evidence in the record indicates that the District Court was not influenced by Cigna's communication strategy. During a status conference on August 12, 2016, the District Court engaged with counsel about whether Anthem and Cigna would extend the termination date of April 30, 2017. Cigna's counsel claimed that Cigna was committed to the Merger, but that the termination date was nevertheless "a real deadline." JX 2414 at 55. Anthem's counsel started to explain the implications of the termination date and referenced press accounts about the parties' disputes, but Judge Jackson interrupted him, stating, "I have enough materials on the docket, I'm not going to make any decisions based on what I read in the press. I think that would be completely inappropriate." *Id.* at 56–57. At trial in this litigation, Anthem's antitrust counsel would not say that the court was influenced by the press. Curran Tr. 1496 ("Q: But you believe that Judge Jackson was influenced by the press; is that right? A. I think that's—it's hard for me to know that."). One of Anthem's antitrust experts similarly testified that the DOJ would be not influenced by press accounts. Baker Dep. 57–58.

Ultimately, there is no reliable way to assess how much of an impact Cigna's covert communication campaign had. Anthem bore the burden of proving that Cigna's breach materially contributed to the failure of the No Injunction Condition. Anthem failed to meet that burden. Anthem thus failed to prove that Cigna's covert communications campaign had a significant effect on the DOJ or the courts. Instead, Cigna's covert communications

211

campaign provides powerful evidence of Cigna's intent to oppose the Merger and undercuts the credibility of Cigna's positions.

### 2. Cigna's Withdrawal From Integration Planning

Anthem proved that Cigna breached the Reasonable Best Efforts Covenant by withdrawing from integration planning. Anthem also proved that Cigna's withdrawal from integration planning contributed materially to certain rulings in the Antitrust Decisions. But Anthem failed to prove its two key theories: first, that Cigna's withdrawal prevented Anthem from advancing an efficiencies defense based on NewCo offering hybrid products, and second, that Cigna's withdrawal prevented Anthem from relying on additional medical cost savings driven by Cigna's medical utilization programs.

### a. Cigna's Contractual Obligations Regarding Integration Planning

Under the Reasonable Best Efforts Covenant, Cigna was contractually obligated to support the Merger by engaging in integration planning. The Reasonable Best Efforts Covenant required that Cigna "use its reasonable best efforts" to satisfy the conditions to closing and consummate the Merger. MA § 5.3(a). One condition to closing was the receipt of government approvals, including antitrust approvals. *See* MA § 6.1(b) (the "Governmental Approval Condition").

Integration planning was necessary to make the case for the Merger to government regulators, and Cigna understood that regulatory approval and integration planning were

212

deeply intertwined and interdependent.[340] From the outset, Anthem and Cigna planned to argue to the DOJ and, if necessary, litigate based on the theory that the Merger would generate substantial efficiencies.[341]

Because of the connection between integration planning and regulatory approval, it is possible to argue that the Regulatory Efforts Covenant obligated Cigna to engage in integration planning. That provision, however, focused narrowly on actions necessary "to avoid" any legal impediments that a Governmental Entity could raise. MA § 5.3(a). Reinforcing this narrow purpose, the provision listed categories of actions that the parties were obligated to take, but only if they were "requested by or on behalf of any Governmental Entity" or "necessary and appropriate" for achieving three objectives:

(I)     obtain[ing] all Necessary Consents;

(II)    resolv[ing] any objections that may be asserted by or on behalf of any Governmental Entity with respect to the mergers and the other transactions contemplated hereby; and

(III)   prevent[ing] the entry of, and hav[ing] vacated, lifted, reversed or overturned, any order that would prevent, prohibit, restrict or delay the consummation of the Mergers and the other transactions contemplated hereby.

MA § 5.3(b) (formatting added).

Participation in integration planning was at least one step removed from the subjects addressed by the Regulatory Efforts Covenant. The integration planning process provided the informational foundation necessary for the parties to evaluate what actions needed to

---

[340] *See, e.g.*, Harris Tr. 3252; JX 1522 at 3, 7. *See generally* Part II.G, *supra*.

[341] *See, e.g.*, JX 522 at '806–07. *See generally* Part II.G, *supra*.

be taken in response to the legal impediments that a Governmental Entity could raise. It was essential preparatory work, but it was not itself a response to an actual or potential legal impediment. The obligation to participate in integration planning therefore did not arise under the Regulatory Efforts Covenant, but rather under the Reasonable Best Efforts Covenant.

### b. Cigna Breached The Reasonable Best Efforts Covenant By Withdrawing From Integration Planning.

Anthem proved that Cigna withdrew from integration planning. By withdrawing, Cigna did not "take all reasonable steps to solve problems and consummate the transaction." *See Williams*, 159 A.3d at 272. Cigna sought to create problems that would give it leverage against Anthem.

In February 2016, Cigna "de-scoped" its integration planning efforts. *See* Part II.G.9, *supra*. The dominos that led to that decision started falling in December 2015, when Swedish tried to schedule the interviews of Cigna executives that would kick off the L2/L3 selection process. Cordani and the Cigna ELT reacted angrily and defensively. Anthem viewed leadership selection as necessary for a successful integration (as would the District Court), and Anthem believed that the integration process already was running 30–40% behind schedule. Swedish's attempts to get the process back on track produced the initial dispute letters between Swedish and Cordani. *See* Part II.G.1–3, *supra*. Those exchanges in turn led to the fateful meeting on January 11, 2016, when Swedish reduced Cordani's responsibilities as President and COO and informed him that Anthem would develop

214

alternative CEO candidates. *See* Part II.G.4, *supra*. Cordani and the Cigna ELT viewed this as a hostile act, and they embarked on Project Alpha in response. *See* Part II.G.5–6, *supra*.

The initial goals of Project Alpha were to (i) limit Swedish's authority over integration planning and (ii) restore Cordani's role and path to CEO. *See id.* The Cigna ELT viewed the two as linked because the scope of integration planning included selecting NewCo's ELT and determining NewCo's organizational structure. The Cigna ELT did not want Swedish making "critical high-level decisions for NewCo (such as overall business strategy and leadership structure)." JX 1075 at '617. To stop this from happening, they wanted to "[r]efocus integration planning on Day 1 priorities." *Id.* at '619.

Project Alpha initially targeted the February 2016 meeting of the designees to the NewCo Board. *See* Part II.G.6–7, *supra.* When that meeting failed to produce the commitments that the Cigna ELT wanted, they decided to escalate. *See* Part II.G.8, *supra*. During a meeting on February 23 and 24, 2016, the Cigna Board authorized the Cigna ELT to "de-scope the Corporation's integration planning efforts." JX 1350 at '843–844. Ostensibly that de-scoping was a response to "the pace and progress of regulatory efforts." *Id.* at 844. The real reason was to create near-term leverage against Anthem.

On the day after the Cigna Board meeting, Hocevar sent an email to all of the Cigna integration team leaders telling them to prioritize Day 1 planning and not engage in detailed planning for later periods. JX 1367. He stressed,

- "Day 1 activities are the key priority on integration planning now . . . . We are a long way off from locking down Day 1 requirements." *Id.* at '253.

- "We have enough information shared at this point and truly need insights at this point rather than more information." *Id.*

215

- "We know at a high level that there is a line of sight to the $2B of shareholder synergies and while we need to validate high level thinking on the synergies, we do not need to lock down the details of any lever at this point." *Id.* at '252.

- "The details of 'how we make money' or 'our secret sauce' should continue to be held closely to the vest at all times as it is truly the competitive advantage we have." *Id.*

The Cigna integration team followed these instructions.[342]

At the monthly meeting of the Steering Committee on March 11, 2016, Anthem tried to get the integration plaining process back on track, but Cigna stood firm. Anthem and Cigna spent the next six weeks debating what areas Cigna would support beyond Day 1 activities. The District Court found that "Cigna's disengagement was so complete that Anthem established an independent team to proceed with integration planning on its

---

[342] *See, e.g.*, JX 1338 at '028 ("The primary focus of our activities right now should be on Day 1 and Day 2-180[.]"); JX 1344 at '452 (emphasizing work on "Day 1 activities" was "where we should plan to focus more of our time as a project team"); JX 1348 at '049 (Hocevar reporting that he told Matheis that Cigna's priorities were "to lock the book and growth agenda down, day 1 planning and put the stakes in high level assumptions"); JX 1382 at '278 ("We had a Cigna integration team call this morning and we were instructed that our efforts are to be focused on Day One objectives . . . . This current focus on value levers and corresponding information requests goes well beyond Day One objectives."); JX 1387 (Cigna team lead reporting that "our plan for the immediate future should be focusing on Day 1 activities"); *see also* JX 1398 (Anthem noting Cigna's reorientation to Day 1 activities); JX 1432 (same). *See generally* Part II.G.9, *supra*.

own."[343] That was a reference to Anthem's "Phase 2B" team, an internal group that continued planning in areas where Cigna refused to help.[344]

As Cordani testified, Anthem "wanted to expend more energy on detailed expense synergy analysis, planning, and detailed operational planning." JX 1842 at 205. That was the detailed planning that was necessary to support the regulatory approval process. Cigna only was willing to take that "body of work . . . to a certain threshold level, but then, stop." *Id.* As a result of Cigna's withdrawal, by May 2016, integration planning was running approximately a quarter behind schedule. JX 1830 at '076.

The integration planning that Anthem wanted to conduct was necessary to support the regulatory approval process and consummate the Merger. By withdrawing from integration planning, Cigna breached the Reasonable Best Efforts Covenant.

### c. The Effect Of Cigna's Withdrawal From Integration Planning On The Efficiencies Defense

To prove that Cigna's withdrawal from integration planning contributed materially to the failure of the No Injunction Condition, Anthem sought to prove that Cigna's withdrawal impaired the efficiencies defense by (i) depriving Anthem of its ability to

---

[343] *Dist. Ct. Op.*, 236 F. Supp. 3d at 246. The District Court, like this decision, found that Cigna withdrew from the integration planning process. Based on the record in the Antitrust Litigation, the District Court found that "Cigna began to disengage from the process in April of 2016, and Cigna ceased participation completely in July when the [DOJ] sued to stop the merger." *Id.* at 235 (internal citation omitted). The extensive record developed in this case shows that Cigna's withdrawal began even earlier, in February 2016.

[344] *See* Zielinski Tr. 41; Drozdowski Tr. 947–48; Matheis Dep. 315. *See generally* Part II.H.2, *supra*.

217

defend the Merger based on NewCo's ability to introduce hybrid products and (ii) preventing Anthem from obtaining the information necessary to show that NewCo would generate efficiencies by improving medical utilization. The evidence on both issues is mixed. Ultimately, the evidence indicates that Anthem made tactical decisions on both issues that were independent of Cigna's withdrawal from the integration planning process.

### i. New Products

The Antitrust Decisions primarily analyzed the medical cost savings that the Merger would generate based on the assumption that NewCo would offer Cigna's existing products at Anthem's discounted rates. Both the District Court and the Majority found it implausible that Cigna's providers would keep doing the same work for less money, or that Anthem's providers would do more work for the same money. An obvious solution would have been for Anthem to show that NewCo would offer new products that blended aspects of Cigna's existing offerings (i.e., some value-based care, but less than the full Cigna product) at a cheaper price than Cigna could achieve on its own (i.e., better discounts than Cigna standing alone, even if not as low as what Anthem could obtain for its traditional offerings). Cigna correctly points out that Anthem did not attempt to defend the Merger based on blended products. Dkt. 700 at 66. The question is, "Why?" If Cigna's withdrawal from integration planning interfered with Anthem's ability to defend the Merger based on blended products, then Cigna's breach caused Anthem to advance the efficiencies defense in the form it did.

Viewed at a high level, the evidence could support a finding that Cigna's withdrawal from integration planning prevented Anthem from relying on new products to defend the

218

Merger. At trial in this action, Anthem witnesses testified that the parties planned to present an efficiencies defense based on blended products, but that Cigna never provided the information necessary to advance that defense.[345] The commercial integration team developed two lines of blended products—Essentials and Signature—each of which provided a different mix of features from Anthem and Cigna's offerings.[346] But NewCo's Day 1 go-to-market plan did not contemplate any new products; only go-to-market plans over longer time horizons would incorporate new products.[347] When Cigna limited integration planning to Day 1 activities, Cigna shut down the planning for new products.

Although this account is plausible, the record demonstrates that Anthem never viewed the blended products as sources of efficiencies that could be used to defend the Merger. Developing and introducing those products would take time. Before NewCo could sell them, it needed an IT system that could *both* support the new product features *and* comply with the Blues Rules. Cigna's system supported the features, but did not comply with the Blues Rules. Anthem's platform complied with the Blues Rules, but did not support the features. Anthem determined that using its system was the best option, but the upgrades would be rolled out over time, with the first features not in place until the second

---

[345] *See* Zielinski Tr. 37, 128; *see also* Rosen Tr. 836 ("I was clearly in agreement that we should emphasize the way in which Cigna's strength complemented Anthem's and would lead to a better combined product. That was always our argument. We never got the ammunition to make that argument effectively.").

[346] *See* DeRosa Tr. 1697–98; JX 1173 at '158; JX 1241 at 47; JX 1345 at 2. *See generally* Part II.I.3, *supra*.

[347] *See* Hocevar Tr. 2335–36; Manders Tr. 2573–74; DeRosa Dep. 123–36.

year after closing. Because of this timeline, Anthem viewed the new products as a source of additional value that NewCo could create over a medium to long-term horizon, not as a source of efficiencies. *See generally* Part II.I.3, *supra.*

The record also demonstrates that Anthem's lawyers made the decision to ground the efficiencies defense on "best-of-breed" discounts when preparing the white papers in April and May 2016. After consulting with McKinsey and Anthem's economics expert, Anthem's lawyers believed that this was the strongest and most straightforward way to present the efficiencies defense. The record does not contain evidence of Anthem's lawyers meaningfully exploring a way to ground the efficiencies defense on new and blended products. *See* Part II.I.2, *supra.*

Anthem's approach was logical. The underlying economic theory was easy to comprehend: NewCo would get the best discounts that each company could obtain on its own. The basis for calculating the medical cost savings was straightforward. The resulting medical cost savings was large. And the approach did not emphasize Cigna's status as an innovative company, meaning that it did not play into the DOJ's theory that Cigna was a uniquely innovative maverick.

Anthem's actions during trial in the Antitrust Litigation demonstrated that it did not give meaningful consideration to a defense based on new products. As the District Court noted, it was not until the last days of trial that Anthem made noises about a hybrid product. *See* JX 2660 at 4911–12.

220

Anthem failed to prove that Cigna's withdrawal from integration planning affected Anthem's ability to present an efficiencies defense based on new products. Anthem made a tactical choice to present an efficiencies defense based on best-of-breed discounts.

### ii.    Utilization

The Antitrust Decisions found that Cigna had developed innovative programs that reduced the total cost of care by improving the utilization of medical services. Both the District Court and the Majority criticized Anthem's efficiencies defense for failing to account for utilization. In this action, Anthem sought to prove that Cigna's withdrawal from integration planning deprived Anthem of data on utilization, which prevented Anthem from defending the Merger based on efficiencies that accounted for utilization.

Whether Cigna's withdrawal from integration planning impaired Anthem's efficiencies defense presents a close question. Cigna provided Anthem with *some* information, but Cigna also withheld information. Ultimately, as with new products, Anthem's lawyers made a tactical decision to argue that Anthem had a better total cost of care, including better utilization, in an effort to defeat the DOJ's argument that Cigna was uniquely innovative.

The record supports a finding that Cigna did not provide Anthem with meaningful information on how utilization affected its cost of care. At trial in this action, Anthem witnesses testified that Cigna failed to provide sufficient information about its utilization programs.[348] Colin Drozdowski was the Anthem executive who led an integration team

---

[348] *See* Zielinski Tr. 90–91; Paul Tr. 626–28, 736–39; Drozdowski Tr. 924–47.

responsible for evaluating the parties' provider networks, including their medical management programs and value-based care offerings. Drozdowski testified that Cigna refused to provide detailed information about value-based care.[349] Cigna resisted providing the information when integration began in October 2015, and by January and February 2016, the flow of information had stopped. Drozdowski Tr. 936, 938, 947. Drozdowski correctly inferred that Cigna was attempting to defer sharing information until after closing "and trust/hope that David Cordani as President and Chief Operating Officer will have more direct control and influence and thus will prevent the 'Cigna disruption' that they anticipate." JX 3105 at '899. The integration teams were able to make calculations based on high-level assumptions, but they could not conduct more detailed analyses.[350] Cigna formalized its withdrawal from integration planning in February 2016, when the Cigna

---

[349] *See* Drozdowski Tr. 924–47; JX 3105; JX 1211; JX 1212; JX 1214; JX 1256 at '499.

[350] *See* Drozdowski Tr. 937–38. At trial, Drozdowski was shown internal analyses that Cigna and Bain prepared to evaluate how Cigna's value-based care programs would operate using Anthem rates. He explained that Anthem had wanted that type of analysis, but that it was never provided. *See id.* at 940–46; JX 879.

There was tension between Drozdowski's testimony in this action and his testimony at trial in the Antitrust Litigation, where he described the working relationship between his team and their counterparts at Cigna as follows: "It was good. We worked very well. They were engaged. As I mentioned, we had 100 meetings." JX 2660 at 1644. During the Antitrust Litigation, Anthem sought convince the District Court that the integration planning process provided credible support for its medical cost savings calculations, giving Anthem an incentive to gloss over problems. Having failed to convince the District Court, Anthem sought in this action to explain how Cigna contributed materially to that failure. The two positions are not fatally inconsistent, but they suggest a willingness to shade the truth depending on the goal.

ELT stopped work on everything other than Day 1 activities. As a result of this instruction, work on value-capture and medical costs savings was delayed, and Cigna continued to withhold information about the cost implications of its value-based programs.[351]

In response to this significant evidence, Cigna assembled what appears at first blush to be a powerful response.[352] Upon close review, much of that evidence was either not on point or unpersuasive, and a critical aspect of it supports Anthem's position.[353]

Cigna's strongest evidence came from Shubham Singhal, a McKinsey executive who led the integration team's analysis of medical cost savings. After his direct examination during trial in the Antitrust Litigation, the District Court asked, "Was there information you sought from either side that you weren't able to obtain?" JX 2660 at 1793. Singhal responded, "No, Your Honor. I think we—we had all of the detailed information that we needed." *Id.* at 1793. He later testified during cross-examination that his team used

---

[351] *See* JX 1548; JX 1617; JX 1626 at '124; JX 1937; JX 3109; Drozdowski Tr. 1036–39, 1052–56, 1060–61, 1063–68. *See generally* Part II.G.9 & II.H.2–3, *supra*.

[352] *See* Dkt. 700 at 67; Dkt. 711 at 7; *see also* CDX 4 (collecting testimony).

[353] In one example, Cigna cites an email between an Anthem representation and his Cigna counterpart from May 2016 in which they "confirmed that we are agreed to proceed with the Med cost value creation across network, Med mgmt., claims editing, and Med policy including the refinement of analysis." JX 1937. Cigna claims that this email shows that Cigna continued to work on the implications of utilization. Dkt. 700 at 67. What actually happened is that Cigna withdrew from the integration planning process, and Anthem and its consultant, McKinsey, continued the work. Cigna then sought to resume participating in integration planning on certain subjects. *See* Part II.I.5, *supra*. The email refers to Cigna's efforts to resume participation. *See* JX 1937 at '510; JX 4063; JX 2096.

the data that it received to calculate the savings achieved by both companies' utilization programs.[354]

A closer review of the record reveals that Singhal was testifying about the claims data that Anthem and Cigna submitted to the clean room for McKinsey to analyze. In a declaration in the Antitrust Litigation, Singhal explained that

> [t]o determine the amount of annual medical cost savings available to the Combined Company, McKinsey's Clean Team collected detailed claims, enrollment, and provider data from both Anthem and Cigna for claims with service dates of January 1, 2014 through September 30, 2015, and paid by September 30, 2015. This data consisted of 2.4 billion claim line items which captured all the claims payments between Anthem, Cigna, and their contracted and out-of-network providers; 250 million enrollment records defining product, segment, enrollment period, and other membership information; and 2 million provider records, including all Anthem and Cigna participating and nonparticipating providers for the period.

JX 2547 ¶ 1. McKinsey thus received twenty-one months' worth of claims data. For its analyses, McKinsey primarily used data for the eight months from January through August 2015. *Id.* ¶ 5.

---

[354] JX 2660 at 1820–21; *see* JX 2546, ¶¶ 51–52, 78–87. On appeal, Anthem's lead counsel represented to the DC Circuit Court that McKinsey's analysis of medical cost savings took utilization into account. Relying on Singhal's testimony, Anthem's counsel stated, "All the data was in there, and McKinsey analyzed the data and confirmed the two point whatever billion dollar medical cost savings that were achievable." JX 2904 at 81. During post-trial argument in this case, Cigna claimed that Anthem's counsel had invented a missing data story for trial, because the same lawyer testified that Israel, Anthem's economist in the Antitrust Litigation, did not have data on utilization. *See* Curran Tr. 1619. Cigna's argument was misleading. The Anthem lawyer was talking about two different analyses. Consistent with the Anthem lawyer's testimony, Israel testified in the Antirust Litigation that he did not have or use any data on utilization. See JX 2660 at 2087–89; Curran Tr. 1581–82.

The admittedly massive amount of claims data that McKinsey received was basically a data dump:

> The total database exceeded 7 terabytes of data for claims only. The Clean Team members wrote hundreds of queries and scripts to summarize the information. These queries and scripts were written in SQL and were programs that summarized the data so that it could be further organized and analyzed. These scripts queried the different databases containing claims, enrollment, and provider information, and merged information together, summarizing the billions of rows of information until the Clean Team members got to a small enough output, usually a few hundred thousand output lines. These outputs were put into Microsoft Excel Worksheets, from which the team performed additional analysis to get to the efficiency amounts. . . . Many of these queries took several days to process. In addition, prior to and in writing these queries and scripts, the Clean Team spent countless hours with Anthem and Cigna SMEs understanding each company's precise data definitions, and the criteria needed to get an "apples-to-apples" comparison of Anthem and Cigna data.

JX 2547 ¶ 5. At trial, Paul explained the difference between a data dump and what Anthem wanted:

> It's the equivalent of saying -- if somebody wanted a book on how to repair a bike and they went to the library, the librarian saying it's in here somewhere, go find it. And what we wanted them to do was to pull up the book and take us to the page and show us how to repair a bike. So it was inadequate.

Paul Tr. 630.

McKinsey did not receive any Cigna analyses of how its utilization programs reduced the cost of care. McKinsey also did not receive longitudinal data showing how Cigna's value-based programs improved patient health and reduced cost over time, which was Cigna's core value proposition. *See* DeRosa Tr. 1694–96. Cordani testified at trial in this action that Cigna typically used the rate of growth in medical expenses as its principal benchmark for cost trends. Cordani Tr. 1749. During trial in the Antitrust Litigation,

Cordani explained that a brief snapshot of claims data fails to take into account the long-term benefits of improved utilization, "both utilization in terms of the number of services [and] in the mix of the services, as well as the venues in which the services are consumed." JX 2660 at 442. Cigna's counsel emphasized the same points when cross-examining Israel in an effort to undermine his efficiency estimates. *See* JX 2660 at 2077–90. Cigna therefore cannot persuasively rely on Singhal's testimony to claim that it provided Anthem with information about utilization. Analyzing claims data could provide a basic level of insight, but not the more nuanced and detailed analysis that Cigna could have conducted.

Cigna also cites the testimony of Israel, Anthem's economics expert, who performed his own analysis of medical cost savings.[355] Israel testified that his team calculated potential medical cost savings using the claims data that was produced to the DOJ. JX 2660 at 1844. The District Court asked about any differences between the claims data that Israel used and what McKinsey possessed. *Id.* Israel responded that the claims data was "fairly complete" and that he had no need to rely on McKinsey's data. *Id.* When Cigna's counsel cross-examined Israel and sought to impeach his analysis by establishing that he did not have access to data on utilization, Israel responded that the purpose of his analysis was "to calculate the effect of reduced discounts." JX 2660 at 2088. He testified that he did not conduct "an analysis to compare the success of [the companies'] programs or to claim any additional benefit from applying those the merged firm." *Id.* at 2087. When Israel testified that he had sufficient data for his analysis, he was speaking about the analysis he conducted,

---

[355] *See* CDX 4; Dkt. 700 at 67; Dkt. 711 at 7.

226

not the analysis that Cigna now tries to imply that he conducted.[356] Cigna therefore cannot persuasively rely on Israel's testimony to claim that it provided Anthem with information about utilization. Israel only had claims data.

In this litigation, Cigna has argued that claims data is sufficient to calculate the effect of utilization. *See* Dkt. 711 at 8. Cigna executive Matthew Manders testified that the standard measure of utilization is expenditures per member, per month ("PMPM"), and that claims data is sufficient to perform that calculation.[357] Manders made the same point that Singhal made in the Antitrust Litigation, namely that claims data is sufficient to compare two different programs (or plans or service categories) based on total spending PMPM. If the populations are comparable and the analysis was normalized for different discounts, then any remaining variation in spending should be due to utilization. *See* JX 2546 ¶ 82. The resulting comparison reveals which program saved more healthcare expense during the relevant period. The resulting comparison does not show whether additional benefits could be achieved by combining aspects of the two programs, nor does it show how spending would change over a longer time horizon.[358]

---

[356] *See* JX 2660 at 2087; Curran Tr. 1619.

[357] Manders Tr. 2560–62. Manders also testified that Cigna used a different measure of risk-adjusted expenses, which requires information about health risks in the underlying population. *Id.* at 2561. He did not testify that Anthem received that data. *Id.* at 2652.

[358] Cigna also cites Hocevar's trial testimony about providing detailed data to Anthem, but the cited testimony does not support this assertion. *See* Dkt. 711 at 8 (citing Hocevar Tr. 2285–87). Hocevar only testified that Cigna provided "utilization claim data," then testified could not recall what was included in the data. *See* Hocevar Tr. 2286–87.

Cigna thus provided claims data that was sufficient to enable Anthem to compare spending on a PMPM basis over a short time horizon. Cigna did not provide Anthem with its own analyses of utilization or with longer-term data. That finding is supported by direct testimony by Anthem witnesses.[359]

Cigna separately argues that even if it did not otherwise provide Anthem with information on utilization, Cadwalader provided the necessary information in May 2016 when commenting on the medical cost synergies white paper. *See* Dkt. 700 at 33–34. On May 4, 2016, Cadwalader sent a lengthy email to White & Case that was highly critical of the draft white paper and argued that Anthem should use data on Cigna's risk-adjusted cost of care (PMPM) to show that the Merger could achieve additional efficiencies by applying Cigna's strategies. *See* JX 1789. Anthem asked for the data to make this argument. In response, Cadwalader emailed to White & Case and Anthem's economist approximately a dozen PowerPoint presentations from 2012, 2013, and 2014. *See* JX 4070. The presentations were high-level materials that Cigna used when pitching potential customers to argue that Cigna could lower their cost of care despite not having the best network discounts.[360] In a subset of those presentations, Cigna compared its claims data from with third-party claims data to show how its total cost of care (PMPM) compared with third-party claims data in the New York, Atlanta, Houston, and Southern California markets. *See* JX 4070.

---

[359] *See* Paul Tr. 625–27; Rosen Tr. 909–10; Curran Tr. 1618–20.

[360] *See* Paul Tr. 628–29, 674, 737–39; *see also* Rosen Tr. 913–14.

Using these materials, Anthem's economists suggested the following language for the white paper:

> [I]n 2015 the allowed charges for Cigna members were $252 PMPM, while Anthem's were $295 PMPM, or l7 percent more. Cigna estimates that its medical cost trend is between 2 percent and 6.75 percent less than some of its competitors on a cumulative basis. Cigna's estimates indicate that between 2008 and 2015 Anthem's medical costs increased by 7.1 percent, while Cigna's grew by 5.8 percent, or 1.3 percentage points less. If this reduction in medical cost growth could be applied to Anthem's in footprint medical costs, total medical costs could be reduced by $704 million.

JX 4096 at '984 (footnotes omitted).

Anthem's lawyers, however, could not verify the calculation, which conflicted with the analyses that Anthem's experts had developed based on claims data.[361] Anthem's lawyers viewed the information that Cigna had provided as too generalized to be persuasive to the DOJ.[362] Cadwalader failed to provide additional detail in response to Anthem's requests.[363] Anthem's lawyers therefore dropped the language from the white paper.[364]

Cigna argues that this incident shows that it fulfilled its obligation to provide information on utilization to Anthem, but the back-and-forth suggests the opposite. If Cigna already had provided sufficient information about its utilization programs, then

---

[361] *See* JX 4098; JX 4184; Paul Tr. 674, 737–38; Rosen Tr. 840–50, 858–59, 909–10, 915–16.

[362] *See* Paul Tr. 737–38; Rosen Tr. 859, 913–15. Rosen explained that some of the cost-trend information in the decks relied on numbers from Cigna analyst calls, which was not sufficient for a submission to the DOJ. Rosen Tr. 913–14.

[363] JX 3118; Paul Tr. 39–40.

[364] JX 4098; *see* JX 1953; Rosen Tr. 855.

Cadwalader would not have needed to email a handful of PowerPoint presentations to White & Case and suggest that Anthem use them to revise a white paper. The exchange also illuminates a particular type of information that Cigna failed to provide: how its programs reduced health care spending over time by limiting the rate of growth. That was information that McKinsey could not derive from a snapshot of claims data.[365]

Although the record shows that Cigna did not provide Anthem with important data on utilization, Cigna proved that Anthem made a tactical choice not to pursue an efficiencies defense based on NewCo's ability to use Cigna's programs to limit the total cost of care. As the DOJ's investigation unfolded, it became clear that the DOJ sought to portray Cigna as a uniquely innovative maverick. To respond to this argument, Anthem sought to prove that Anthem, not Cigna, was the more innovative company and had developed better programs to control the total cost of care. When drafting the white papers, Anthem prioritized its own medical management programs and utilization rates. Anthem

---

[365] Cigna also relies on an email that Zielinski sent to Jones in early May 2016 in which he stated that Anthem was not seeking additional information for the efficiencies white papers but only seeking to share data which already existed in the data room. *See* Dkt. 700 at 67 (citing JX 1815). This email addressed the actual analyses in the white paper, which were based on claims data, not other analyses that Anthem might have conducted with additional data. *See* Paul Tr. 694–95, 736. To similar effect, Matheis testified during a deposition taken by the DOJ in July 2016 that he believed Anthem had all the data that it needed from Cigna to analyze efficiencies. *See* JX 2593 at 178–79. The District Court cited this testimony, writing that "[a]ccording to Matheis, the fact that Cigna disengaged from the integration planning effort in the spring of 2016 should not undermine confidence in the projected medical cost savings since they were based on actual claims data." *Dist. Ct. Op.*, 236 F. Supp. 3d. at 233. Like Israel, Matheis was describing the analyses that Anthem prepared using claims data, not other analyses that Anthem might have conducted with additional data. Drozdowski testified to the same effect in this litigation. *See* Drozdowski Tr. 991–94.

did not want to emphasize Cigna's programs on the provider side because it risked playing into the DOJ's argument that Cigna was uniquely innovative.[366] During trial in the Antitrust Litigation, Anthem continued this strategy.[367]

Anthem failed to prove that Cigna's withdrawal from integration planning affected Anthem's ability to present an efficiencies defense that relied on NewCo's ability to use Cigna's programs to control the total cost of care. Anthem made a tactical choice to de-emphasize Cigna's programs on utilization in response to the DOJ's claim that Cigna was uniquely innovative.

### d.  Cigna's Disengagement From Integration Planning Contributed Materially To The Failure Of The No Injunction Condition.

Anthem proved that Cigna's withdrawal from integration planning contributed materially to the failure of the No Injunction Condition by leading to at least two findings in the Antitrust Decisions. But as discussed below, Cigna's withdrawal did not contribute materially to the principal bases for the Antitrust Decisions, which were that the medical cost savings were not merger-specific and that Anthem had not shown a viable means of achieving them. *See* Part III.D, *infra.*

Anthem's principal defense in the Antitrust Litigation was that "any anticompetitive effects will be outweighed by the efficiencies [that the transaction] will generate." *Dist. Ct.*

---

[366] *See* JX 1886; Curran Tr. 1389; Rule Tr. 3076. *See generally* Part II.I.2 & II.J.3, *supra*.

[367] *See, e.g.*, JX 2660 at 1650, 1820, 1978; *see also* Rule Tr. 3111–12 (describing testimony of Ken Goulet). *See generally* Part II.K.6, *supra*.

*Op.*, 236 F. Supp. 3d. at 181. As "the centerpiece of its defense," Anthem asserted that NewCo's national account customers "will save a combined total of owner $2 billion in medical expenditures because Cigna members will be able to access the more favorable discounts that Anthem has negotiated with its provider network" and vice versa. *Id.*; *see id.* at 231.

For this defense to prevail, Anthem needed to prove that the medical cost savings were both merger-specific and verifiable. *Dist. Ct. Op.*, 236 F. Supp. 3d. at 181; *see id.* at 236–37. The District Court identified multiple reasons why the medical cost savings were neither merger-specific nor verifiable.

Anthem proved that Cigna's withdrawal from integration planning led to one of the District Court's reasons for finding that the medical cost savings were not verifiable. After discussing the hostility between the two companies, the District Court described the integration planning process as "stalled and incomplete" and noted that "[m]uch of the work has not proceeded past the initial stage of identifying goals and targets to actually specifying the steps to be taken jointly to implement them." *Id.* at 183. The District Court also observed that "the [integration] effort has not yet proceeded from general 'high level' planning to the essential progress of detailing actual strategies and 'budget level' initiatives," that "Cigna's input is required before the real work can be done," and that "the two parties have not been working together for some time." *Id.* The District Court later mentioned "the highly unfinished nature of the planning to capture the G&A efficiencies in particular" and noted that "the final quantification of the synergies [and] the development of detailed implementation plans, and the establishing of an organizational

structure remain in abeyance." *Id.* at 246. Cigna's withdrawal from the integration planning process led directly to these findings.

When discussing why the parties were not likely to be able to generate the claimed efficiencies, the District Court also cited the disputes over the leadership selection process, which was an aspect of integration planning. *See id.* at 243. The District Court found that "having the leadership in place is fundamental to undertaking an integration, but the two firms here have not yet agreed on the identity of a single member of the new company's management structure" beyond Swedish and Cordani. *Id.* Cigna had refused to cooperate with the leadership selection process and had restricted the integration planning process as a means of blocking leadership selection. *See* Part II.G, *supra*. Cigna's actions led directly to these findings.

In affirming the District Court's finding that the savings that Anthem claimed were not sufficiently verifiable, the Majority quoted the District Court's observation that "'the Department of Justice is not the only party raising questions about Anthem's characterization of the outcome of the merger' because Cigna itself had 'provided compelling testimony undermining the projections of future savings.'" *Cir. Ct. Op.*, 855 F.3d at 360 (quoting *Dist. Ct. Op.*, 236 F. Supp. 3d. at 182). Cigna's actions led directly to the findings that the Majority adopted.

Cigna points out that in the first footnote in its decision, the Majority de-emphasized the personal disputes between Anthem and Cigna executives, writing "[t]hat their relationship may have deteriorated has little to do with the anticompetitive effects of the proposed merger." *Id.* at 348 n.1. As to the DOJ's prima facie case, that was true. The

233

disputes did not affect the market concentration calculations or the fact that the Merger would combine two of the four largest health care insurers. But the disputes had implications for Anthem's ability to support its efficiencies defense, and it led to Cordani and other Cigna witnesses giving the "compelling testimony undermining the projections of future savings" on which the District Court and the DC Circuit Court relied. *Id.* at 360 (quoting *Dist. Ct. Op.*, 236 F. Supp. 3d at 182).

In light of these aspects of the Antitrust Decisions, Cigna's withdrawal from integration planning contributed materially to the issuance of the Antitrust Decisions and led directly to certain findings in those decisions. Cigna's withdrawal from integration planning did not, however, cause Anthem to decide to ground its efficiencies defense on best-of-breed discounts, nor did it cause Anthem to de-emphasize NewCo's ability to use Cigna's medical management programs to reduce the total cost of care. As discussed below, Anthem's tactical decisions on those points have critical implications for the Cigna's ability to prove that the No Injunction Condition would have failed even if Cigna had fulfilled its contractual obligations under the Efforts Covenants. *See* Part III.D, *infra.*

### 3. Anthem's Claim Against Cigna For Obstructing A Divestiture

Anthem proved that Cigna breached the Regulatory Efforts Covenant and the Regulatory Cooperation Covenant by opposing a divestiture. Anthem also proved that Cigna's opposition contributed materially to the failure of the No Injunction Condition by making it less likely that the DOJ would approve the Merger and more likely that the DOJ would file the Antitrust Litigation. Cigna's opposition to divestitures also prevented Anthem from pursuing a divestiture on its own and "litigating the fix." The absence of a

234

divestiture addressing the DOJ's claims regarding competition in local markets made it less likely that the District Court would approve the Merger and that the DC Circuit Court would take a different view on appeal.

### a. Cigna's Contractual Obligations To Support A Divestiture

Cigna was contractually obligated under the Efforts Covenants to support a divestiture. Although both the Reasonable Best Efforts Covenant and the Regulatory Efforts Covenant could provide the source of that obligation, the Regulatory Efforts Covenant speaks to it directly.

Under the Reasonable Best Efforts Covenant, Cigna was obligated to "use its reasonable best efforts to take, or cause to be taken, all actions, to do, or cause to be done, all things reasonably necessary to satisfy the conditions to Closing set forth herein and to consummate the Merger[]." MA § 5.3(a). One of the conditions to closing was the Governmental Approval Condition, which required that the parties obtain regulatory approval. If a divestiture was reasonably necessary step to obtain regulatory approval, then Cigna was obligated to use its reasonable best efforts to achieve a regulatory divestiture.

For purposes of seeking regulatory approval, the Regulatory Efforts Covenant defined reasonable best efforts to include "taking any and all actions necessary to avoid each and every impediment under the HSR Act . . . so as to enable the Closing to occur as promptly as practicable . . . ." MA § 5.3(b). Cigna further was obligated to take any action "necessary and appropriate" (i) to "obtain all Necessary Consents," including antitrust approval, (ii) to "resolve any objections that may be asserted by or on behalf of any Governmental Entity with respect to the mergers and the other transactions contemplated

235

hereby," and (iii) to "prevent the entry of . . . , any order that would prevent, prohibit, restrict or delay the consummation of the Merger[]." *Id.* If the DOJ raised an objection to the Merger and a divestiture was "necessary and appropriate" to resolve the objection, then Cigna was obligated to pursue the divestiture. MA § 5.3.

The Regulatory Cooperation Covenant allocated responsibility for the regulatory strategy to Anthem. *See* MA § 5.3(e). To comply with the Regulatory Cooperation Covenant, Cigna was obligated to follow Anthem's strategy. If Anthem believed that making a divestiture was necessary and appropriate, then Cigna was obligated to pursue that strategy. Cigna could not refuse simply because it disagreed with Anthem's strategy or thought the strategy was unlikely to succeed.

Cigna's obligation to support a divestiture thus could arise under either the Reasonable Best Efforts Covenant or the Regulatory Efforts Covenant, but the latter is the better fit. Anthem's efforts to pursue a divestiture responded to specific areas of concern that the Staff identified on June 10, 2016. *See* Part II.J.1–2, *supra.* One of the Staff's concerns was the local market for commercial health insurance sold to large group employers in thirty-five areas in the Anthem Blue States. Another concern was the local market for purchasing provider services in the same thirty-five areas. Anthem sought to address those concerns through a divestiture. Cigna's opposition to a divestiture therefore is best analyzed under the Regulatory Efforts Covenant.

**b.** **Cigna Breached The Regulatory Efforts Covenant And The Regulatory Cooperation Covenant By Opposing A Divestiture.**

Anthem proved that Cigna opposed Anthem's efforts to complete a divestiture. Cigna's opposition to a divestiture both breached the Regulatory Efforts Covenant and constituted a reversal of Cigna's position on whether divestitures were warranted.

From the outset of their discussions, Anthem and Cigna expected the DOJ to clear the Merger, conditioned on NewCo divesting overlapping business in local markets within the Anthem Blue States. When Cigna was evaluating a transaction with Anthem, the Cigna ELT identified divestitures as one of the primary means of both complying with the Blues Rules and obtaining antitrust approval.[368] Before approving the Merger, the Cigna Board understood that divestitures likely would be required:

- In June 2015, the Cigna ELT told the Cigna Board that if the DOJ had to confront both an Anthem-Cigna deal and an Aetna-Humana deal, then "the most likely scenario (~65%~75%) is that both are cleared *subject to local divestitures consistent with past DOJ precedent in the industry*." JX 209 (emphasis added). The analysis stressed that "[i]n order to maximize the odds of clearance, it should be clear to the DOJ that the parties would put up a fight in court," noting that "DOJ has a mixed record in litigation and the Front Office may be dissuaded from suing based on

---

[368] *See* JX 78 at '721 (Cigna analysis noting that "[l]ocal market depth may require divestitures"); JX 79 (McCarthy and Gray discussing that "[r]egulatory divestitures would be best from Cigna"); JX 78 at '721 (Cigna evaluation of transaction with Anthem; "Local market depth may require divestitures"); JX 99 at '545 (Cigna ELT memorandum on deal with Anthem noting that "Regulatory divestitures, if required, will tend to be [Cigna] revenue/membership in the license states"); JX 531 (Cigna executive writing "any divestitures more likely from our side"); Zielinski Tr. 63 (explaining that "even before we signed the merger agreement, we talked about that given this transaction, it was very likely that the government would request as to do divestitures as part of the remediation plan [and] in order to address that, we would divest Cigna assets in our 14 Blue states"); Gray Dep. 294 (agreeing that during 2014 and early 2015, Cigna contemplated divestitures as part of transaction with Anthem); *id.* at 322 (agreeing that the divestitures "would include Cigna or Cigna-associated accounts and clients"). *See generally* Part II.C & D, *supra*.

237

concerns about arguments that are more likely to resonate in a court than with Staff." *Id.* '484. The analysis also noted that "reasonable remedies can sometimes still be achieved after a suit has commenced, even when national theories are asserted." *Id.* at '485.

- Later in June 2015, the Cigna ELT told the Cigna Board that "[a]t a minimum, divestitures in local geographies likely would be required for antitrust clearance . . . , although litigation challenges . . . are a distinct possibility . . . ." JX 4000 at '240.

- In August 2015, approximately one month after the Merger Agreement was signed, Cigna's regulatory counsel expressed similar views. Cigna's counsel posited that "[l]ocalized remedies are sufficient to address both potential customer and any provider monopsony concerns, consistent with past DOJ precedent." JX 567 at '584. Cigna's counsel anticipated the possibility of agreeing to divestitures and litigating the fix, noting that "[d]oing the deal despite divestitures indicates the deal is not about creating market power, but rather about creating pro-competitive efficiencies." *Id.*; *see also* JX 1020 (Cigna timeline for regulatory approval from January 2016, noting that "[r]emedies could include divestitures").

After the Staff identified its areas of concern, Anthem moved quickly to develop a divestiture proposal that focused on the thirty-five local markets that the DOJ had identified. A divestiture could have addressed the DOJ's concern about excessive concentration in the sale of commercial health insurance in those markets *and* the concern about monopsony in the purchase of healthcare services in those markets. A divestiture also would have shown the DOJ that the parties were committed to the Merger. No one regarded the DOJ's concern about public exchanges as terribly serious, and the DOJ later dropped that claim voluntarily. *See Dist. Ct. Op.*, 236 F. Supp. 3d at 187 n.2. A divestiture thus could have substantially narrowed the Antitrust Litigation to a dispute over national market issues.

By June 2016, however, the Cigna ELT had turned solidly against the Merger, and they saw the failure to obtain regulatory approval as their ticket out. Rather than helping with the divestiture plan, Cigna raised roadblocks:

- Anthem asked Cigna to help identify buyers. Cigna refused.

- After Cordani put a stop to divestiture planning in May 2016, Cigna made no effort to develop a remediation plan.

- Cigna entered into a standard NDA agreement with Centene, but only provided Centene with a one-page spreadsheet of information.

- Before Cigna provided additional data to Centene, Cigna insisted on a second and non-market NDA that included broad standstill provisions.

- Even after entering into a second NDA with Centene, Cigna refused to provide meaningful due diligence.

- Cigna refused to enter into an NDA with the two Blues buyers unless the DOJ indicated that a Blues buyer was a viable option.

- Cigna forced Anthem to raise the viability of a Blues buyer with the DOJ.

- Cigna contacted the Staff unilaterally to find out if the DOJ would consider a sale to a Blues buyer.

- Cigna objected that Anthem's divestiture proposal only involved Cigna's assets, which had been the plan all along.

- Cigna refused to advocate in favor of a Blues buyer.

- Once Anthem made a specific divestiture proposal, Cigna refused to advocate in favor of it.

*See* Part II.J.2–3, *supra*. Taken as a whole, Cigna's actions breached the Regulatory Efforts Covenant.

Cigna also took actions that independently breached the Regulatory Efforts Covenant. Under the Contracting Requirement, Cigna was obligated to "agree to . . . enter

into . . . any contract" if "necessary and appropriate" to obtain regulatory approval. MA § 5.3(b)(iii). Entering into NDAs with the potential buyers met this standard. Under the Regulatory Cooperation Covenant, deciding whether or not buyers were viable was not Cigna's decision to make.

In addition, under the Regulatory Efforts Covenant, Cigna was obligated to advocate in favor of a Blues buyer. As a company that competed daily for business against the non-Anthem Blues, Cigna could have explained that it had lost business to non-Anthem Blues and made compelling arguments in favor of them as divestiture buyers. *See* Paul Tr. 647–48; Zielinski Tr. 55. Cigna breached its obligations under the Regulatory Efforts Covenant by refusing to support a Blues buyer. Cigna also breached the Regulatory Cooperation Covenant by forcing Anthem to raise the viability of the Blues buyers when introducing its divesture proposal to the DOJ, then by contacting the DOJ unilaterally to ask whether a Blues buyer was viable.

In its post-trial briefing, Cigna never goes so far as to maintain that its opposition to a divestiture did not breach the Regulatory Efforts Covenant and the Regulatory Cooperation Covenant. Cigna instead argues that its actions could not have been problematic because the DOJ was not interested in a divestiture remedy and Anthem's proposal would not have addressed all of the DOJ's concerns. Those are causation arguments and addressed in the next section.

Cigna also attacks Anthem for not engaging earlier and to a greater degree with the DOJ. Based on what the parties knew at the time, Anthem pursued a viable regulatory strategy. The parties' regulatory counsel had discussed divestitures in August 2015, then

240

again in December 2015. The lawyers decided that the process was not far enough along to plot out specific divestitures and agreed to wait to make a proposal until the DOJ had evaluated the Merger and identified its concerns.[369]

Cigna stresses a discussion during a meeting of the Steering Committee in March 2016, when Cigna argued for submitting a remediation proposal to the DOJ. Using one of the escalation strategies set out in Project Alpha, Cigna had withdrawn from the integration planning process two weeks earlier, citing the premise that resources needed to be allocated to regulatory approval. During the meeting, Jones thoroughly criticized Anthem's strategy for obtaining regulatory approval, including Anthem's plan to wait for the DOJ to identify its concerns before making a divestiture proposal. Anthem continued to believe that it was better to wait for the DOJ to identify its concerns before making a proposal.[370]

---

[369] *See* Part II.G.10, *supra*. Consistent with this strategy, Swedish stated in an interview with the press in October 2015 that Anthem had not made a divestiture proposal and *that* Anthem was "not expecting divestitures." JX 4186; *see* JX 1863 at 258. Cigna regards this statement as a blunder, but that assessment seems overblown. Swedish only said that Anthem was not expecting divestitures, not that Anthem would not agree to or consider divestitures. Anthem and Cigna's joint proxy statement had identified as a risk factor that divestitures could be required, and in their September 2015 presentation to the DOJ, the parties stressed their commitment to engagement and cooperation with the DOJ. *See* Part II.F.1 & II.F.2.b, *supra*. That said, reasonable minds could differ about the effect of Swedish's comment, and by February 2016, some within Anthem viewed the statement as a mistake. JX 1352; *see* Zielinski Tr. 480–81. Later that month, in a meeting with the DOJ on February 17, 2016, Anthem made a point of signaling that it was prepared to discuss divestitures, but asked the DOJ to provide guidance on what types of divestitures would be helpful. *See* JX 1292; JX 1326. After the meeting with the DOJ, Anthem's counsel prepared and sent Cigna's counsel a discussion document about potential divestiture strategies that built on concepts that counsel had discussed in December 2015. *See* JX 901; JX 1304.

[370] *See* Part II.H.2, *supra*. Even before Cigna started criticizing Anthem's regulatory strategy as part of its effort to escape from the Merger Agreement, the contemporaneous

Given how badly the regulatory process turned out, it is easy to question Anthem's strategy, but Anthem adopted a reasonable approach.[371] Under the Regulatory Efforts Covenant, Anthem had the right to determine the regulatory strategy. Cigna was obligated to accept Anthem's judgment and follow Anthem's lead. Once the DOJ identified the thirty-five local markets as an area of concern, and once Anthem opted to pursue a divestiture involving those markets, Cigna was required to support Anthem's divestiture efforts by identifying potential buyers, assisting with the development of a divestiture plan, entering into NDAs, providing due diligence, and advocating for the buyers and the divestiture proposal to the DOJ. Cigna breached its obligations by doing none of those things.

### c. Cigna's Opposition To A Divestiture Contributed Materially To The Failure Of The No Injunction Condition.

Anthem proved that Cigna's opposition to a divestiture contributed materially to the failure of the No Injunction Condition. First, Cigna's opposition made it less likely that the DOJ would settle in exchange for a divestiture remedy. Second, Cigna's opposition prevented Anthem from lining up a divestiture and litigating the fix. Among other things, a divestiture would have eliminated one of the bases on which the District Court enjoined

---

documents support a finding that Cigna wanted greater and more proactive engagement with the DOJ. *See, e.g.*, JX 768 at '844; JX 991 at '002; JX 1020 at '130; JX 1359; JX 1368; Zielinski Tr. 478–79. Zielinski does appear guilty of giving short shrift to Jones' input. *See, e.g.*, JX 769 at '954; JX 814 at '506; JX 2067 at '505.

[371] *See* JX 2972 ¶¶ 55–56; JX 2973 ¶¶ 32, 84.

the Merger—the degree of concentration in the commercial healthcare market for large employers in Richmond, Virginia.

Anthem's antitrust experts explained persuasively that divestitures play a critical role in obtaining regulatory approval and are the principal means by which challenges to mergers are resolved.[372] The DOJ favors settlements to conserve resources and minimize litigation risk. *See* JX 2972 ¶¶ 48–49. Although most settlements take place at the pre-complaint stage, cases are often resolved consensually even after the DOJ files suit.[373] Parties also can improve their negotiating leverage by lining up a divestiture and litigating the fix. *See id.* ¶¶ 84–87. For serious settlement negotiations to take place, the parties to a merger need to identify committed, qualified buyers who can provide a structural solution by acquiring overlapping assets. *See* JX 2972 ¶¶ 48–49. The parties' regulatory counsel

---

[372] *See* JX 2972 ¶¶ 20, 47, 60 (estimating that the DOJ resolves over 96% of the merger investigations in which it has identified competitive concerns, typically without filing litigation, by approving a voluntary modification of the transaction or by entering into a consent decree); JX 2973 ¶¶ 6, 25, 66–68 (calculating that federal antitrust regulators only challenge 2.6% of HSR-notified mergers, with about 58% of those challenges being resolved).

[373] *See* JX 2972 ¶¶ 20, 48. 50. Between 2002 and 2017, the DOJ challenged approximately 246 mergers. Only nine cases, or less than 4%, were litigated to judgment. *Id.* ¶¶ 51–52. Of the 246 challenges, fifty-nine were resolved without the filing of a formal complaint. The DOJ filed suit in 140 cases, but in 106 of those cases, filed a proposed consent decree along with the complaint. In other words, those were cases in which a settlement already had been reached. The DOJ settled eleven other cases after the complaint was filed. *See id.* ¶ 54. Most notably, in the US Airways-American Airlines merger case in 2013, the DOJ settled two weeks before trial and three months after the DOJ, six states, and the District of Columbia had filed suit. *Id.* ¶ 79. The DOJ also sued to block Anheuser-Busch's acquisition of Grupo Modelo, but agreed to a settlement three months later. *Id.*

expressed similar views when evaluating the Merger before the Cigna ELT turned against it. *See* Part II.D.3, *supra.*

Most clearly, Cigna's opposition to a divestiture contributed materially to the failure of the No Injunction Condition by preventing Anthem from mooting the District Court's alternative basis for issuing the permanent injunction: the degree of market concentration in the commercial healthcare market for large employers in Richmond, Virginia. *See Dist. Ct. Op.*, 236 F. Supp. 3d at 258; *see also Cir. Ct. Op.*, 855 F.3d at 367. A divestiture could have removed Richmond and other local markets from the case, making it less likely that the District Court would enjoin the Merger.

More broadly, by refusing to help identify buyers, by putting up roadblocks through a non-market NDA, and by resisting due diligence, Cigna eliminated any chance that a divestiture could be used to achieve regulatory clearance.[374] Instead, Cigna questioned the viability of the Blues buyers, thereby signaling to the DOJ that Cigna opposed the Merger.[375]

To contend that its opposition to a divestiture could not have had any effect, Cigna has asserted that by the time the Staff identified its concerns about the Merger on June 10, 2016, it already was too late to craft a divestiture remedy. *See* Dkt. 700 at 74–75. That is not accurate. Despite Cigna's opposition, Anthem formally presented the DOJ with a

---

[374] *See* JX 2972 ¶ 77; JX 2973 ¶¶ 76, 92–93.

[375] *See* JX 2972 ¶¶ 69–70; Paul Tr. 644–47, 649, 658; Rosen Tr. 791–92.

divestiture proposal on July 10, 2016. *See* JX 2225. With Cigna's cooperation, there was adequate time to complete a deal. *See* Paul Tr. 637-38.

Cigna also argues that the DOJ was skeptical about Anthem's proposed remedy. *See* Dkt. 700 at 84. Anthem's lead regulatory counsel testified credibly that this was the DOJ's customary approach. In his experience, whenever regulatory counsel presented a divestiture proposal to the DOJ, they would resist and raise questions, and "what they are anticipating and fully expecting is that that buyer is going to come in with a business plan, with financials that show that it can profitably run that business on day one." Paul Tr. 645. Cigna's opposition to a divestiture prevented any potential buyers from advocating in favor of a deal. Anthem's antitrust expert opined persuasively that Anthem's proposal "offered a promising resolution of the investigation" and "was very much in line with what the DOJ had accepted in other horizontal merger cases."[376]

Cigna ultimately hangs its hat on the fact that the DOJ eventually said that a Blues buyer was not suitable. *See* Dkt. 700 at 84. Whether the DOJ believed a Blues buyer was unsuitable was not dispositive because Anthem could have entered into a divestiture agreement with a Blues buyer and litigated the fix. Cigna's opposition to a divestiture prevented Anthem from pursuing this strategy and contributed materially to the failure of the No Injunction Condition.

---

[376] JX 2972 ¶¶ 62–63; *see id.* ¶ 64 ("Anthem's strategy was exactly what I would expect experienced antitrust counsel to pursue as appropriate."); *id.* ¶¶ 64–65 (opining that the proposal "should have opened the door to the type of ongoing dialogue between the merging parties' counsel and DOJ . . . over possible settlement proposals to resolve the investigation").

#### 4.    Anthem's Claim Against Cigna For Resisting Mediation

Anthem proved that Cigna breached the Efforts Covenants by resisting mediation during the Antitrust Litigation. Anthem also proved that Cigna's refusal to mediate during the Antitrust Litigation contributed materially to the failure of the No Injunction Condition by making it less likely that the DOJ would settle. Particularly when considered in conjunction with Cigna's opposition to a divestiture, Cigna's opposition to mediation made it significantly more likely that the No Injunction Condition would fail.

#### a.    Cigna's Contractual Obligations To Engage In Mediation

Cigna was contractually obligated under the Efforts Covenants to support mediation. As with Cigna's obligation to support a divestiture, this obligation can be derived from either the Reasonable Best Efforts Covenant or the Regulatory Efforts Covenant. The Regulatory Efforts Covenant is more specific and therefore is the more appropriate clause to analyze.

The Regulatory Efforts Covenant obligated Cigna to "tak[e] any and all actions necessary to avoid each and every [legal impediment] so as to enable the Closing to occur as promptly as practicable . . . ." MA § 5.3(b). Cigna further was obligated to take any action "necessary and appropriate" to "resolve any objections that may be asserted by or on behalf of any Governmental Entity" and to "prevent the entry of . . . , any order that would prevent, prohibit, restrict or delay the consummation of the Merger[]." *Id.* Cigna was obligated to engage in mediation as a step that was "necessary and appropriate" to resolve the objection raised by the Governmental Entity and to "prevent the entry of . . . , any order that would prevent, prohibit, restrict or delay the consummation of the Merger."

246

MA § 5.3. Under the Regulatory Cooperation Covenant, once Anthem determined that engaging in mediation was necessary and appropriate, then Cigna was obligated to support that strategy. Cigna could not refuse simply because Cigna disagreed with Anthem's strategy or thought it was unlikely to succeed.

### b. Cigna's Breached The Regulatory Efforts Covenant And The Regulatory Cooperation Covenant By Resisting Mediation.

Anthem proved that Cigna resisted mediation. On multiple occasions, both the District Court and a special master appointed by the Court encouraged the parties to mediate. Anthem repeatedly asked Cigna to mediate. Cigna never agreed.

The District Court encouraged mediation on at least three occasions: (i) during early case management conference on August 12, 2016, (ii) during a case management conference on September 30, and (iii) during an office conference on November 11. The special master in the case contacted the parties about mediation on November 13, and again on November 23. Each time, Anthem supported mediation. Each time, Cigna obstructed Anthem's efforts to mediate. Anthem also tried to initiate mediation on its own, but Cigna refused to support Anthem's efforts. *See* Part II.K.3 & 5, *supra*.

In this litigation, Cigna claimed that it was willing to mediate. Dkt. 700 at 76 (citing JX 2523 at 60). But Cigna always conditioned mediation on Anthem first providing a viable divestiture proposal that the DOJ would consider. By doing so, Cigna effectively insisted that the parties reach agreement on a framework for settling the case before engaging in mediation to develop a possible framework for settling the case. Because of the conditions that Cigna imposed, its claims that it supported mediation were illusory.

247

Cigna also argues in this litigation that a letter sent by Anthem on November 16, 2016, demonstrates that Anthem was not serious about mediation, but only trying to create a record for purposes of this litigation. *See* Dkt. 700 at 58 (citing JX 2648). Cigna points out that on November 14, after the DOJ refused to mediate in response to the District Court's third invitation, Zielinski wrote to Swedish in an email, "Mediation is dead. DOJ has no interest." JX 2637. After Zielinski expressed that view, Anthem's litigation counsel sent Zielinski a privileged email, and Anthem then sent the November 16 letter, which Zielinski described as "[b]ased on [litigation counsel's] suggestion." JX 4176. Anthem responds that Judge Levie had just proposed mediation, which prompted the letter. *See* Dkt. 707 at 14–15. It is possible to view Anthem's letter as having a tactical component without discharging Cigna from its obligations to support mediation at earlier points in the process.

There was no conceivable harm to Cigna from supporting mediation. *See* Curran Tr. 1601–02. Cigna's persistent refusal to mediate demonstrates that Cigna was actively opposing the Merger.

### c. Cigna's Opposition To Mediation Contributed Materially To The Failure Of The No Injunction Condition.

Cigna's failure to support mediation contributed materially to the failure of the No Injunction Condition. Cigna's resistance to mediation made settlement less likely. If the case had settled, then the No Injunction Condition would have been satisfied.

The District Court strongly encouraged the parties to mediate. There was no guarantee that mediation would produce a settlement, but Cigna's opposition to mediation

248

foreclosed that possibility. Cigna's resistance reduced the chances of settlement from something to zero.

To justify its opposition to mediation, Cigna argues that the DOJ never was willing to settle. *See* CDX 2. For starters, Cigna contributed to the environment in which the DOJ took that position by signaling that it was not aligned with Anthem and resisting a divestiture remedy. And Cigna's description of the DOJ's position is not fully accurate. When the District Court first suggested mediation in August 2016, the DOJ responded that "[there was] absolutely a willingness" to consider settlement, and clarified, "We're always willing to hear any [settlement] proposals that the defendants have." JX 2414 at 34. Anthem and Cigna could have capitalized on this response. The DOJ's willingness to settle other major cases after filing suit, including on the eve of trial, shows that settlement was not out of the question.[377]

Cigna's consistent opposition to mediation took the pressure off the DOJ and made it less likely that the No Injunction Condition would be satisfied through a mediated resolution. Because Cigna opposed mediation, the DOJ did not face any risk that Anthem and Cigna would go to the District Court jointly, complain about the DOJ's refusal to

---

[377] *See* JX 2972 ¶ 80; *see id.* ¶¶ 81–82 (describing DOJ's public opposition to the US Airways and Grupo Modelo acquisitions); *see also id.* ¶ 81 (noting that the settlement in the US Airways litigation did not directly address "[m]ost of the competitive harms trumpeted in the complaint and in public statements); *id.* ¶ 82 (making same observation regarding Grupo Modelo acquisitions).

mediate, and make the DOJ look unreasonable. Cigna's refusal to mediate meant the DOJ never faced any pressure to reconsider its stance.[378]

Cigna's resistance to mediation was particularly significant in light of Cigna's earlier opposition to a divestiture. If Cigna had supported a divestiture that addressed the problems with the thirty-five local markets, then Anthem could have argued that its proposed remedy mooted the DOJ's claims about excessive market concentration and monopsony in those areas. The DOJ dropped its claim about the public exchange markets after the District Court questioned the strength of the DOJ's position. *See Dist. Ct. Op.*, 236 F. Supp. 3d at 187 n.2. After a local market divestiture, the DOJ would have been left with only its challenge to the market for national accounts. Under those circumstances, if Cigna had supported mediation when the District Court repeatedly encouraged it, then the DOJ would have been more likely to mediate, and the case would have been more likely to settle. By both opposing divestitures and resisting mediation, Cigna made it less likely that the DOJ would settle.

The strongest evidence that Cigna's conduct did not affect the DOJ's position on settlement comes from the DOJ's approach to the Aetna/Humana deal. When advising the Cigna Board before entering into the Merger Agreement, the Cigna ELT believed that the Merger was "likely to appear to regulators as relatively more complex." JX 209 at '483. The Aetna/Humana deal was somewhat smaller, weighing in at $37 billion compared to the Merger's $54 billion, and Aetna and Humana were the fourth and fifth largest insurers

---

[378] *See* JX 2972 ¶ 78; Curran Tr. 1605, 1607–08.

of national accounts rather than the second and third. *See* JX 2314 ¶ 4. There also is evidence that Aetna and Humana took a more proactive approach to settlement. *See* Zielinski Tr. 480. Yet the DOJ also sued to enjoin Aetna's acquisition of Humana. JX 2319.

These high-level similarities are not enough to defeat Anthem's showing that Cigna's opposition to mediation contributed materially to the failure of the No Injunction Condition. The Aetna/Humana deal doubtless had many twists and turns of its own. At most, the example of the Aetna/Humana deal suggests that Cigna's breaches of the Efforts Covenants were not a but-for cause of the DOJ's failure to settle, but Anthem did not have to show causation in fact. Anthem only had to show that Cigna's breaches made it less likely that the No Injunction Condition would be satisfied. Anthem proved that Cigna's conduct had that effect by making settlement less likely.

### 5. Cigna's Undermining Of Anthem's Defense In The Antitrust Litigation

Finally, Anthem proved that Cigna breached its obligations under the Efforts Covenants by undermining its defense in the Antirust Litigation. Anthem also proved Cigna's conduct contributed materially to the failure of the No Injunction Condition by making it less likely that the District Court would deny the DOJ's application for a permanent injunction or that the DC Circuit Court would take a different view on appeal.

#### a. Cigna's Contractual Obligations Regarding The Antitrust Litigation

Under the Efforts Covenants, Cigna was obligated to defend against the Antitrust Litigation. Here again, Cigna's obligation could be derived from the Reasonable Best Efforts Covenant, but the Regulatory Efforts Covenant addresses the matter explicitly. The

251

Litigation Requirement obligated Cigna to "oppose [the Antitrust Litigation] fully and vigorously," including "by defending through litigation . . . and vigorously pursuing all available avenues of administrative and judicial appeal." MA § 5.3(e).

Within this framework, the Regulatory Cooperation Covenant allocated responsibility for litigation strategy to Anthem. *See* MA § 5.3(e). Cigna was therefore obligated to follow Anthem's chosen litigation strategy. The Regulatory Cooperation Covenant also required that Cigna to make its legal filings "as promptly as practicable" and "provide such assistance as [Anthem] may reasonably request." *Id.*

### b. Cigna Breached The Regulatory Efforts Covenant And The Regulatory Cooperation Covenant By Undermining Anthem's Defense.

Anthem proved that Cigna undermined Anthem's defense in the Antitrust Litigation. Although certain aspects of Cigna's conduct would not have breached its obligations if considered in isolation, the totality of Cigna's conduct breached its contractual commitments by a wide margin.

During the Antitrust Litigation, Cigna undermined Anthem's defense in numerous ways:

- Cigna failed to file its answer to the DOJ's complaint in the Antitrust Litigation as promptly as practicable.

- Cigna failed to make any arguments in support of an expedited trial date.

- Cigna blocked Anthem from contacting seventeen Cigna customers to determine whether they would testify as witnesses in support of the Merger.

- Cigna failed to take or defend any depositions other than defending the depositions of the six Cigna witnesses.

252

- Cigna elicited deposition testimony from Cordani and two Anthem witnesses that was favorable to the DOJ's case and harmed the defense.

- Cigna proposed trial exhibits that undermined Anthem's case on efficiencies and supported the DOJ's position that there was a distinct market for the sale of insurance for national accounts..

- Cigna reversed position one week before trial on who would present Cigna's witnesses.

- Cigna gave Anthem only one hour to prepare each of the three Cigna witnesses and discourteously rejected Anthem's request for more time to prepare the three Cigna witnesses.

- Cigna cross-examined Swedish, highlighting the disagreement over Cordani's responsibilities at NewCo and bolstering the DOJ's argument that the claimed efficiencies could not be achieved because of the parties' disputes.

- Cigna counsel cross-examined Israel, Anthem's key expert on medical cost savings, questioning his credentials and undercutting the projections on which the efficiencies were based.

- Cigna did not help Anthem with its proposed findings of fact or conclusions of law.

- Cigna claimed during oral argument that the dispute letters between the parties reflected the views of the boards of directors and the companies as a whole, rather than disagreements between the CEOs, as Anthem had argued.

- Cigna did not make an opening statement in support of the Merger.

- Cigna did not make a closing argument in support of the Merger.

Viewed collectively, these actions permit only one conclusion: Cigna undermined Anthem's defense by litigating against its merger partner.

Cigna inflicted the most damage on Anthem's defense through Cordani's testimony. Cigna's witnesses were legally obligated to testify truthfully. *See* 18 U.S.C. §§ 1621, 1623. It therefore could not have been a breach of the Merger Agreement for Cigna's witnesses to testify truthfully in the Antitrust Litigation, even if it lessened the likelihood of

regulatory approval.[379] But under the Merger Agreement, Cigna's witnesses could not testify untruthfully, nor could they provide exaggerated and embellished testimony against the Merger or offer unsupported opinions that harmed it.

Cordani provided exaggerated and embellished testimony and expressed unsupported opinions that helped the DOJ's case and harmed Anthem's defense. During his deposition in October 2016, Cordani worked in themes from the Blues Pitch. One of the goals of the Blues Pitch was to expand the DOJ's focus beyond the Anthem Blue States to encompass "other markets where Cigna competes with non-Anthem [Blues] members."[380] During his deposition, Cordani claimed that if the Merger closed, Cigna's "network outside the 14 states would ultimately be systematically be dismantled," "choice would be constrained" and Cigna's clinical programs would be "essentially disrupted." JX

---

[379] *See Restatement (Second) of Contracts* § 178 ("A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable . . . ."); 17A Am. Jur. 2d *Contracts* § 290 (2019) ("No court will lend its assistance in any way toward carrying out or enforcing the terms of a contract . . . that is illegal . . . .").

[380] JX 2484 at '001. Cigna points out that the DOJ had identified markets beyond the Anthem Blue States in its complaint. *See* Dkt. 700 at 73 (citing JX 2314 ¶ 23 (DOJ complaint alleging that "[t]he proposed merger would harm national accounts . . . in the United States generally.")). Cigna then argues that the DOJ did not need Cigna or Teneo's help to identify that argument. *Id.* That is misleading. In the Blues Pitch, Teneo expressed concern that "[o]n September 1st, the DOJ dropped its claim concerning competition in public exchanges" and "is now largely focused on competition in the 14 states where Anthem operates its Blues license." JX 2484 at '001. Teneo thought that although the DOJ might originally have identified the issue, by that point the DOJ was "neglecting to consider the severe impact this merger could have on other markets." *Id.* By stressing the themes that appeared in the Blues Pitch, Teneo and Cigna hoped to reinvigorate this aspect of the DOJ's case.

2496 at 148–49. Cordani also testified that the NewCo's go-to-market strategy was a forced-migration strategy called "Bias to Blue." Cordani Tr. 164. After the DOJ lawyer completed his examination, Cigna's counsel walked Cordani through a series of leading questions that supported the DOJ's theory that Cigna was uniquely innovative. *See* JX 2484 at 186–88. Cordani's testimony was so favorable to the DOJ's case that the DOJ's expert relied on it in his rebuttal report. *See* JX 4219 ¶ 78.

During trial, Cordani expanded on the harmful testimony he gave in deposition. He claimed that the Bias-to-Blue strategy was the "framework in terms of how we would go to market, the so-called-go-to-market with existing clients and new clients in the overlap 14 states and then outside of those 14 states." JX 2660 at 428–29. He claimed that the strategy would be "extraordinarily disruptive in the marketplace" and make "the existing [Cigna] offering less competitive in both Anthem and non-Anthem states." *Id.* at 439–40. Elaborating on these points, Cordani agreed with a series of leading questions from the DOJ in which he asserted that the Bias-to-Blue strategy would "erode the value of Cigna," reduce customer choice, and put Cigna's innovation at risk. *Id.* at 441. He compared the rebranding of Cigna's members in the Anthem Blue States to pulling a string that would unravel Cigna's entire network. Using the theme from the Blues Pitch, he claimed that Cigna's network would be harmed not only in the Anthem Blue States, but also in the non-Anthem states. *See id.* at 430–42. He also questioned the Merger's ability to deliver $2.4 billion in medical cost savings. *See id.* at 442–43.

Cordani's testimony about Bias to Blue conflicted with the weight of the evidence.

- The Bias-to-Blue strategy was not NewCo's actual go-to-market strategy. It was an option that the go-to-market team presented. It was never adopted as NewCo's strategy. After Cordani objected, it was changed to a brand-agnostic strategy.

- The Bias-to-Blue strategy only addressed (i) new customers who were (ii) within the Anthem Blue States and (iii) expressed a preference for a Cigna product.

- The only consequence of the Bias-to-Blue strategy was to provide that subset of customers with a quote for a Cigna product *and* a quote for an Anthem product.

- The Bias-to-Blue strategy was not a forced migration strategy.

*See* Part II.I.6 & II.J.4, *supra*.

Cordani knew the truth about the Bias-to-Blue strategy. He participated in the Steering Committee meetings when it was proposed and changed. And during the forty-five minutes during which Cigna permitted Anthem to prepare Cordani, Anthem's counsel specifically covered the Bias-to-Blue strategy. After the session, Anthem's counsel supplied the relevant presentations and walked through how they demonstrated that the Bias-to-Blue strategy did not involve forced conversions, only applied to new business in the Anthem Blue States, and was replaced with a brand-agnostic strategy. *See* Part II.I.6 & II.J.4, *supra*.

At trial in this action, Cordani claimed that he subjectively believed that Anthem was pursuing a forced migration strategy with all of the connotations he had described. Cordani's credibility problems in other areas make it difficult to accept that assertion, particularly given the clarity of the contemporaneous record. But accepting that Cordani did not consciously lie under oath, he nevertheless gave testimony that was embellished and exaggerated in an effort to harm the Merger.

The same is true for other aspects of Cordani's testimony, such as his metaphor about the string that would unravel Cigna's network. That vivid testimony was a boon for the DOJ's case, yet Cordani admitted that he did not know of any analysis that Cigna had performed on that subject. Cordani Tr. 2109–10. His opinion conflicted with the conclusions that Cigna had reached about rebranding its members in the Anthem Blue States when Cordani thought that he had a path to become the CEO of NewCo. At that juncture, Cigna did not view the move as a problem, regarding it instead as a logical and manageable solution to address the 2/3 Rule.[381] It also conflicted with a white paper about the Blues Rules, in which Cigna and Anthem jointly represented that the Merger would *not* weaken Cigna outside of the Anthem Blue States. JX 2075 at '914 ("Nor will the merger weaken Cigna as a competitor outside of Anthem's 14 Blue States."). The fact that

[381] *See, e.g.*, JX 79 (email from Gray to McCarthy dated October 22, 2014 ("To avoid being in default [under the 2/3 Rule], we would need to rebrand revenue and members; practically this means moving members in license states to a product written on a blue license"; "Complying will mean reduced volumes to our network outside of the license states"); JX 91 at '163 (November 2014 presentation suggesting need to rebrand approximately all of Cigna revenue in Blues States); JX 98 at '964 (Cigna analysis of Merger in November 2014, "[W]e would need to rebrand between 23 and 27% of revenue nationally and between 64 and 73% of [Cigna] revenue in the [Anthem] license areas (the most likely lever"); JX 119 at '884 (Cadwalader analysis of Merger for Cigna in December 2014, "Cigna membership associated with a client contract in [Blue] state rebranded to Blue"); *id.* at '885 ("Rebranding will divert volumes from [Cigna's] network"); JX 351 at '076 (Cigna Board presentation dated July 1, 2015, "Rebrand [Cigna] revenue as Blue in [Anthem] license markets"); JX 565 at '215 (Cigna Board presentation dated July 1, 2015, predicting that "Rules stay in place as is and we adopt our model to comply through a mixture of rebranding and other actions, in line with the current business case"); JX 590 at '835 (Hocevar notes of meeting with Cordani, "Will CIGNA have any legacy [networks] in 14 states? No"); JX 732 at '552 (Cordani notes, "Bias in 14 State → Rebrand Anthem"); JX 3121 at '376 (Cigna presentation for meeting with Anthem in December 2014, "[Cigna] membership associated with a client contract in a license state rebranded to Blue").

257

Cordani's testimony tracked a theme from the Blues Pitch further undermines its credibility. JX 2484 at '001.

Similar problems undercut Cordani's testimony about the $2.4 billion in efficiencies posited by Anthem's expert. Cigna and Anthem jointly submitted that figure to the DOJ. *See* JX 1948. Cordani did not do any work to assess the number and was not familiar with the analysis. *See* Cordani Tr. 2130–3529. Cordani had not even read Israel's report. *Id.* at 2135. Logically, if Cigna had superior utilization rates and a better mix of services than Anthem, then incorporating those variables would have made the medical cost savings figure higher, not lower, but Cordani portrayed the omissions as a problem.

So too with Cordani's testimony about Cigna being uniquely innovative. Before the Merger Agreement was signed, Cigna anticipated that the DOJ might argue that Cigna was a "unique, procompetitive 'maverick'" and identified the obvious response—arguing that Cigna was not "a uniquely disruptive maverick." JX 209 at '484. Cordani did not have to agree that Cigna was not innovative. Cordani only had to concede that Cigna was not uniquely disruptive.

After listening to Cordani testify in this case and reviewing his depositions, it is clear that he is a skilled communicator who can resist hostile questioning by becoming evasive, obfuscating with complex jargon, or simply sticking to his guns on a not-credible point that helps his side. When the DOJ questioned Cordani, he testified eagerly, as if he were a friendly witness offering supportive testimony during direct examination. Cordani could have been a powerful defender of the Merger. Instead, he attacked it.

After the issuance of the District Court Opinion, Cigna continued to undermine Anthem's defense. The Litigation Requirement obligated Cigna to "vigorously pursu[e] all available avenues of administrative and judicial appeal." MA § 5.3(b)(iii). Instead of pursuing an appeal, Cigna took the following actions:

- Cigna declined to support Anthem's appeal.

- Cigna filed a misleading press release saying that it was reviewing the District Court Opinion and evaluating its options.

- Cigna issued a termination notice.

- Cigna filed a lawsuit in this court.

- After this court issued a TRO blocking Cigna from terminating the Merger Agreement, Cigna filed a five-page brief that stated only that Cigna deferred to Anthem.

- Cigna sought to interfere with Anthem's efforts to reach a deal with the new Trump administration.

*See* Part II.L, N & O, *supra*.

Cigna's actions, taken as a whole, establish a clear pattern. Cigna engaged in a knowing and intentional effort to undermine Anthem's position in the Antitrust Litigation.

### c. Cigna's Actions During The Antitrust Litigation Contributed Materially To The Failure Of The No Injunction Condition.

Anthem proved that Cigna's litigation conduct contributed materially to the results in the Antitrust Decisions and hence the non-occurrence of the No Injunction Condition. Both of the Antitrust Decisions evidence the effects of Cigna's actions.

The District Court Opinion highlighted Cigna's opposition to the Merger, calling it "the elephant in the courtroom" and citing "the doubt sown into the record by Cigna itself."

259

*Dist. Ct. Op.*, 236 F. Supp. 3d 171 at 183. The District Court explained that "[i]n this case, the Department of Justice is not the only party raising questions about Anthem's characterization of the outcome of the merger: one of the two merging parties is also actively warning against it." *Id.* This characterization was accurate: Cigna actively litigated against Anthem and in support of the DOJ.

The District Court noted the significance of the testimony given by Cordani and other Cigna witnesses, as well as the message sent by Cigna's conduct during the litigation:

> Cigna officials provided compelling testimony undermining the projections of future savings, and the disagreement runs so deep that Cigna cross-examined the defendants' own expert and refused to sign Anthem's Findings of Fact and Conclusions of Law on the grounds that they "reflect Anthem's perspective" and that some of the findings "are inconsistent with the testimony of Cigna witnesses." Anthem urges the Court to look away, and it attempts to minimize the merging parties' difference as a "side issue," a mere "rift between the CEOS." But the court cannot properly ignore the remarkable circumstances that have unfolded both before and during the trial.

*Id.*

The District Court explained that Cigna's opposition to the Merger affected its ability to credit Anthem's claimed efficiencies. *Id.* at 183. Later in the opinion, the District Court addressed these issues in detail, frequently relying on Cordani's testimony.

- The District Court relied on Cordani's testimony when finding that the Merger would have the anticompetitive effect of reducing innovation in the Anthem Blue States. *Id.* at 230.

- The District Court relied on Cordani's testimony when finding that NewCo would not give Cigna customers in the Anthem Blue States a meaningful choice to remain with a Cigna product. *Id.* at 241.

- The District Court relied on Cordani's testimony when questioning whether Anthem's providers might be unwilling to extend their lower fee schedules to Cigna's customers. *Id.* at 243.

- The District Court relied on Cordani's testimony when questioning Anthem's estimates of medical cost savings because they did "not factor in utilization." *Id.* at 244.

- The District Court cited the cross-examination of Anthem's expert by Cigna's counsel. *Id.* at 244 n.46.

- The District Court relied on Cordani's description of the Bias-to-Blue strategy when holding that the Merger would harm Cigna's network and its products. *Id.* at 247–48.

The District Court Opinion would have looked quite different without the discussion of Cigna's litigation conduct and without the references to Cordani's testimony.

The DC Circuit Opinion also was influenced significantly by Cigna's litigation conduct. The Majority affirmed the District Court's factual findings as supported by the record and not clearly erroneous. Because Cigna's litigation conduct contributed materially to those factual findings by the District Court, Cigna's litigation conduct likewise contributed materially to the outcome before the DC Circuit Court.

- The Majority cited Cordani's testimony when affirming the District Court's finding that Anthem faced a substantial risk of provider abrasion if Anthem attempted to use the affiliate clauses to force its providers to offer services under Cigna's existing products at Anthem rates. *Cir. Ct. Op.*, 855 F.3d at 365.

- The Majority cited Cordani's testimony when holding that the District Court had not erred by finding that Anthem would not be able to induce its providers to extend their rates to Cigna products by renegotiation. *Id.* at 360.

- The Majority quoted the District Court's observation that "'the Department of Justice is not the only party raising questions about Anthem's characterization of the outcome of the merger' because Cigna itself had 'provided compelling testimony undermining the projections of future savings.'" *Id.* (quoting *Dist. Ct. Op.*, 236 F. Supp. 3d at 182).

- The Majority relied on Cordani's testimony when holding that the District Court had not erred by finding that the quality of the Cigna offering would degrade as a result of the Merger. *Id.*

261

- The Majority relied on Cordani's testimony when holding that the District Court had not erred by finding that the value of Cigna's offerings would be diminished by Anthem's rebranding strategy. *Id.* at 361.

- The Majority relied on Cordani's testimony when holding that the District Court had not erred by finding that Cigna's capacity for innovation would be diminished by Anthem's rebranding strategy. *Id.*

- The Majority relied on Cordani's testimony when holding that the District Court had not clearly erred in criticizing Anthem for failing to account in its projected savings for the effects of utilization. *Id.*

Like the District Court Opinion, the Majority's opinion would have looked quite different without the references to Cordani's testimony.

Cigna relies heavily on a footnote in the Majority's opinion to argue that it opposition to the Merger could not have contributed materially to the outcome. The Majority included an extensive section in its opinion that responded to arguments advanced by the Dissent *See id.* at 364–66. Among other things, the Dissent criticized the Majority for ostensibly relying "on friction between the Anthem and Cigna CEOs" as a factor that undermined the claimed efficiencies. *Id.* at 365. Retorting that it "did not so rely," the Majority cited a footnote in its opinion, which stated that

> Cigna has become a reluctant supporter of the merger, stating in its appellate brief that "[i]n accordance with the merger agreement Cigna has appealed and defers to Anthem." Indeed, the district court noted the "elephant in the courtroom," for at trial Cigna executives dismissed various of Anthem's claims of savings, cross-examined the merging parties' expert witness, and refused to sign Anthem's proposed findings of fact and conclusions of law. Anthem suggested this is a "'side issue,' a mere 'rift between CEOs.'" That their relationship may have deteriorated has little to do with the anticompetitive effects of the proposed merger.

*Id.* at 348 n.1.

262

Although this passage indicates that the DC Circuit Court placed less weight on Cigna's opposition to the Merger than the District Court, it does not change the fact that the Majority (i) affirmed the District Court's factual findings, which were influenced by Cigna's litigation conduct and (ii) repeatedly cited Cordani's testimony against the Merger. Judge Millett's concurring opinion further demonstrates this reality. Her opinion largely responded to points raised by the Dissent, and she noted that to the extent that the Dissent claimed that there was overwhelming evidence that NewCo would deliver health care for less, "one half of this merger disagrees," citing the District Court's finding that Cigna was "actively warning against" the Merger. *Id.* at 370. She also wrote, "Importantly, 'Cigna officials provided compelling testimony undermining the projections of future savings' that Anthem proffered and the dissenting opinion embraces." *Id.* The footnote in the Majority's opinion thus does not prevent Cigna's litigation conduct from having contributed materially to the DC Circuit Court's affirmance.

Anthem proved that Cigna's litigation conduct contributed materially to the issuance of the Antitrust Decisions. Cigna's litigation conduct made the issuance of those decisions more likely and the satisfaction of the No Injunction Condition less likely.

**D.  Whether The No Injunction Condition Would Have Failed If Cigna Had Not Breached**

Once Anthem proved that Cigna's breaches of the Efforts Covenants contributed materially to the DOJ's failure to approve the Merger, the District Court's issuance of a permanent injunction, and the DC Circuit Court's affirmance of the District Court Opinion, the burden then shifted to Cigna to prove that even if Cigna had fulfilled its obligations

263

under the Efforts Covenants, the No Injunction Condition still would have failed. *Restatement (Second) of Contracts* § 245 cmt. a, illus. 4 & cmt. b, illus. 7. Cigna met its burden by proving that even if Cigna had fulfilled its obligations under the Efforts Covenants, the DOJ would not have approved the Merger because of its effect on the market for the sale of commercial insurance to national accounts, the District Court would have enjoined the Merger on that basis, and the DC Circuit Court would have affirmed.

### 1. The National Accounts Issue

The principal basis on which the DOJ challenged the Merger was its effect on the market for the sale of commercial insurance to national accounts, where the Merger would reduce the number of carriers from four to three and create presumptively unlawful levels of market concentration. *See* JX 2314 ¶ 8. The DOJ reached its conclusion regarding the market for national accounts after conducting a year-long investigation. As Zielinski recognized, Cigna's conduct did not play any role in causing the DOJ to view the market for national accounts as a distinct market. Zielinski Tr. 411.

Anthem sought to convince the DOJ that the Merger would generate sufficient efficiencies to overcome its anticompetitive effects. As this decision has found, Cigna's conduct did not lead Anthem to ground its defense of the Merger on efficiencies created on medical cost savings derived by applying best-of-breed discounts. *See* Part III.C.2.c, *supra*. The DOJ rejected that defense because it doubted that providers would agree to deliver the same services for less pay. Anthem's plan, the DOJ alleged, would lead to "less access to medical care, reduced quality, and fewer value-based provider collaborations." JX 2314 ¶¶ 64, 75, 77.

264

The District Court viewed the national accounts issue the same way. The District Court concluded that the market for the sale of commercial insurance to national accounts in the Anthem Blue States was a distinct market. *See Dist. Ct. Op.*, 236 F. Supp. 3d at 179. Cigna's breaches of the Efforts Covenants did not have any effect on the District Court's finding that the market for national accounts was a distinct market.

Once the District Court made that finding, it was essentially undisputed that the Merger would have the anticompetitive effect of reducing the number of competitors from four to three.[382] The District Court also found that the sophistication and bargaining power of national account customers was not enough to offset the anticompetitive effects; that new entrants would not be able to compete in the relevant market with NewCo; and that other means of serving customers, such as by slicing business, were not a viable solution. *See Dist. Ct. Op.*, 236 F. Supp. 3d at 221–29. Cigna's breaches of the Efforts Covenants did not contribute to these findings.[383]

In the face of this evidence of anticompetitive effects, it was incumbent upon Anthem to provide evidence of "extraordinary" efficiencies that were merger-specific and

---

[382] *Id.* at 216; *see* JX 2660 at 2014, 2018.

[383] The District Court separately found that the Merger would reduce innovation in the Anthem Blue States. *Id.* at 180, 229–31. The District Court cited Cordani's testimony when reaching this conclusion, and so this decision does not rely on the District Court's findings regarding harm to innovation when analyzing whether Cigna met its burden to show that the No Injunction Condition would have failed in any event.

verifiable.[384] The question thus became whether the $2.4 billion in efficiencies that Anthem claimed could overcome the anticompetitive effect.

As presented, Anthem's claimed efficiencies had two components: (i) $1.5 billion from applying Anthem's discounts to Cigna's customers, and (ii) $900 million from applying Cigna's discounts to Anthem's customers. In the only aspect of the District Court Opinion that would be reversed on appeal, the District Court held that the projected efficiencies attributable to Cigna customers benefitting from Anthem rates were not merger-specific because they resulted from rates that each of the companies already had

---

[384] *Dist. Ct. Op.*, 236 F. Supp. 3d at 236. Both the District Court and the DC Circuit Court were skeptical of the efficiencies defense as a matter of law. Both courts noted that in *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 579 (1967), the Supreme Court of the United States had stated that "[p]ossible economies cannot be used as a defense to illegality" under the Clayton Act. *See Cir. Ct. Op.*, 855 F.3d at 353; *accord Dist. Ct. Op.*, 236 F. Supp. 3d at 235 n.33. Ultimately, neither court relied on this precedent. The District Court cited it in passing, in the course of observing that several circuit courts and district courts, including the DC Circuit Court and its trial courts, had balanced procompetitive efficiencies against anticompetitive effects. *Dist. Ct. Op.*, 236 F. Supp. 3d at 235–36. On appeal, the Majority placed more emphasis on *Procter & Gamble* and interpreted the decisions that had relied on efficiencies as recognizing only that "evidence of efficiencies could rebut a prima facie showing, which is not invariably the same as an ultimate defense to Section 7 illegality." 855 F.3d at 353–54. But the Majority did not rule on this ground, explaining that "prudence counsels that the court should leave for another day whether efficiencies can be an ultimate defense to Section 7 illegality." *Id.* The Dissent responded at length to the Majority's potential reliance on *Procter & Gamble*, explaining why it would be dubious to use that precedent to reject the efficiencies defense as a matter of law. *See id.* at 373, 375–77, 379. The DOJ did not argue that an efficiencies defense was not cognizable as a matter of law, and the guidelines that the DOJ and the FTC use to review mergers contemplate considering efficiencies to offset anticompetitive effects. It thus seems unlikely that the District Court or the DC Circuit Court would have rejected the efficiencies defense as a matter of law. Nevertheless, it caused them to approach the efficiencies defense with skepticism. Cigna's conduct had no effect on the outcome of this legal issue.

achieved on its own. *See Dist. Ct. Op.*, 236 F. Supp. 3d at 181, 238. The DC Circuit Court explained that Cigna had been unable to match Anthem's volume-based discounts, so medical cost savings generated by extending Anthem's discounts to Cigna's customers that were receiving a Cigna product would be merger-specific. *Cir. Ct. Op.*, 855 F.3d at 358.

Importantly, the DC Circuit Court's disagreement on this one issue did not extend to the principal reason why the District Court held that the projected efficiencies attributable to applying Anthem's discounts to Cigna's customers were not merger-specific, which was the means by which Anthem planned to achieve those efficiencies. Anthem planned to convince Cigna customers in the Anthem Blue States to move from Cigna products to Anthem products. *Dist. Ct. Op.*, 236 F. Supp. 3d at 181; *see id.* at 239. The companies did not have to merge for Cigna customers to switch to Anthem products, which they could do just as easily without the Merger. *Id.* at 181. The District Court found that Anthem's principal method for achieving the savings was "no different from Anthem's ongoing marketing of its products on a daily basis." *Id.* at 181. Cigna's conduct did not contribute to the finding that these medical cost savings were not merger-specific. It resulted from Anthem's decision to continue offering separate Cigna and Anthem products and to encourage Cigna customers to move to Anthem products. *See* Part II.I.3, *supra*.

If Anthem had attempted to show that NewCo would achieve medical cost savings by designing and selling new products, then the resulting savings would have been merger-specific. There still would have been an issue about whether the resulting savings were verifiable, but Anthem would have at least cleared the initial hurdle. This decision has found that Anthem made a tactical decision not to defend the Merger based on NewCo's

267

ability to create and sell new products, and that Cigna's actions did not cause Anthem to make that decision. *See* Part III.C.2.c.i, *supra*.

The District Court also rejected the medical cost savings as not verifiable. The District Court found that requiring Anthem providers to extend their discounts to Cigna customers would result in some level of provider abrasion, meaning that providers would not accept the new lower rates. *See Dist. Ct. Op.* 236 F. Supp. 3d at 243, 247, 249. The District Court reached this finding independent of any breach by Cigna, noting that "Anthem's own witnesses" doubted that providers would continue to provide Cigna-style services at lower rates.[385] Anthem could have avoided this problem by attempting to show that NewCo would achieve medical cost savings through new products that provided some Cigna features (but less than the full product) with better discounts than Cigna could achieve alone (albeit not as low as Anthem's full discounts), but Anthem chose not to pursue that strategy for reasons unrelated to Cigna's conduct. *See* Part III.C.2.c.i, *supra*.

---

[385] *Id.* at 247. The District Court also found that the $1.5 billion from applying Anthem's discounts to Cigna's customers was not verifiable because it did not take into account Cigna's utilization. See *Dist. Ct. Op.*, 236 F. Supp. 3d at 244. The record supports a finding that Cigna withheld utilization information from Anthem during the integration process. *See* Part III.C.2.b, *supra*. Nevertheless, as this decision has found, Anthem made a tactical decision not to emphasize Cigna's medical management programs and their effect on utilization because it would play into the DOJ's argument that the Merger would eliminate Cigna as a unique competitor. *See id.* Anthem made its tactical decision independently, and Cigna thus proved that this aspect of the Antitrust Decisions was not caused by its conduct. But because the effect of the utilization information is a close call, this decision does not consider the District Court's reasoning on this point when analyzing whether the District Court would have ruled the same way if Cigna had fulfilled its contractual obligations.

The District Court rejected wholesale the $900 million in projected savings that Anthem customers could achieve by moving to Cigna products. The District Court found that Anthem had not identified any means of delivering those savings to its customers. *See Dist. Ct. Op.* 236 F. Supp. 3d at 244–45. Cigna's breaches of the Efforts Covenants did not contribute to that finding.

Finally, the District Court questioned whether the full $2.4 billion in medical cost savings was verifiable because Anthem's internal documents showed that Anthem had considered ways to keep a portion of those savings for itself. *See Dist. Ct. Op.*, 236 F. Supp. at 182, 237 n.36, 251. Cigna's breaches of the Efforts Covenants did not contribute to that finding.

On appeal, Anthem only challenged the District Court's treatment of the medical cost savings. *Cir. Ct. Op.*, 855 F.3d at 353. The DC Circuit Court agreed that the projected efficiencies attributable to moving Cigna customers to Anthem plans were not merger-specific because they simply reflected the continued marketing of Anthem's product to existing Cigna customers. *See id.* at 357. The DC Circuit Court also agreed that the savings that Anthem customers could achieve by moving to Cigna products were not verifiable because Anthem had not identified any means of delivering these savings to its customers. *See id.* at 361. And the Majority held that the District Court "rightly cast doubt" on the assumption made by Anthem's expert that 98% of the medical cost savings would be passed through to Anthem's customers. *Id.* Cigna's breaches of the Efforts Covenants did not contribute to these holdings.

The Antitrust Decisions thus concluded that the Merger was likely to reduce competition in the market for national accounts and rejected Anthem's efficiencies defense for reasons unrelated to Cigna's breaches of the Efforts Covenants. It follows that the Antitrust Decisions would have reached the same result even if Cigna had complied with its obligations under the Efforts Covenants.

Anthem's strongest argument against this outcome rests on the pervasiveness of Cigna's breaches and the reasoning in the Dissent. Cigna's breaches were so extensive that it seems possible that if Cigna and its advisors had truly expended their best efforts to achieve regulatory approval, then the process might have come out differently. The Dissent's reasoning shows how the analysis of the national accounts issue could have come out differently.

It is possible that the Antitrust Decisions could have come out differently. It is more likely than not, however, that District Court and DC Circuit Court would have reached the same conclusion on the national accounts issue, even if Cigna had fulfilled its obligations under the Efforts Covenants. Two of Cigna's experts submitted persuasive reports on that topic.[386] Cigna therefore met its burden of proof to show that the No Injunction Condition would have failed even if Cigna had fulfilled its obligations under the Efforts Covenants.

### 2. The Local Markets Issues

Cigna separately argues that the District Court would have enjoined the Merger based on harm to competition in the market for large-group commercial insurance in

---

[386] *See* JX 2969; JX 2971; JX 2978; JX 2979.

Richmond even if Cigna had complied with its obligations under the Efforts Covenants. Dkt. 700 at 88. Cigna did not carry its burden of proof on that issue. The problems in the Richmond market could have been addressed by a local-market divestiture, which is what Anthem sought to achieve. *See* Part III.B.3, *supra*. Cigna's opposition to a divestiture prevented Anthem from making headway in that direction. In a world in which Cigna fulfilled its obligations under the Efforts Covenants, the problem with concentration in the Richmond market could have been rendered moot or at least substantially mitigated. Cigna therefore failed to carry its burden of proving that the harm to the large-group market in Richmond would have doomed the Merger even if Cigna had not breached its obligations under the Efforts Covenants.

The same is true for Cigna's observation that the District Court did not reach two other grounds on which the DOJ challenged the Merger: (i) anticompetitive effects in thirty-four local markets other than Richmond and (ii) anticompetitive effects on the market for the purchase of medical services (monopsony) in all thirty-five local markets. In a world in which Cigna fulfilled its obligations under the Efforts Covenants and supported a divestiture of the overlapping business in those thirty-five markets, those issues would have been rendered moot or at least substantially mitigated. In addition, one of Anthem's antitrust experts opined persuasively that monopsony claims "are almost never litigated to judgment." JX 2972 ¶ 91. Cigna failed to carry its burden of proving that the DOJ would have prevailed on either of the challenges that the District Court did not reach even if Cigna had not breached its obligations under the Efforts Covenants.

271

### 3. Other Regulatory Approvals

Finally, Cigna argues that the Merger needed additional approvals from state regulators, contending that "[e]ven if the District Court had not enjoined the merger, it still could not have closed by the Termination Date [because] 13 state approvals remained outstanding." Dkt. 700 at 90. In August 2016, when seeking an expedited trial from the District Court, Anthem representatives testified that state approvals could take 120 days after a favorable judgment, while also representing that Anthem would keep working on the state-approval front to reduce that timeframe.[387] If a 120-day period started from February 8, 2017, the date of the District Court decision, then it would not end until June 8, 2017, after the Termination Date. *See* CDX1.

Cigna did not carry its burden of proof on this issue because the timeline on which Cigna relied is an artificial construct. In a world in which Cigna complied with the Efforts Covenants, antitrust approval could have been achieved earlier, potentially without the DOJ filing suit, through a settlement, or through an earlier victory in court. If Cigna had supported a divestiture that addressed the DOJ's challenges based on local markets, then there would not have been a need for a second phase of trial before the District Court, and the entire timeline would have shifted forward. Both Cigna's and Anthem's regulatory counsel believed that even after the District Court's decision on February 8, 2017, it was

---

[387] *See* JX 2382 at 3; JX 2383 ¶ 5; Curran Tr. 1491–95.

272

possible to obtain the necessary state regulatory approvals by April 30.[388] Cigna failed to carry its burden of proving that the need for other approvals would have been an impediment even if Cigna had not breached its obligations under the Efforts Covenants.

### 4. Judgment In Favor Of Cigna

Because Cigna proved that the DOJ would have sued to enjoin and the Antitrust Decisions would have ruled against the Merger on the national markets issue even if Cigna had complied with its obligations under the Efforts Covenants, the No Injunction Condition would have failed in any event, and Cigna never would have become obligated for the performance that was due at closing. Anthem therefore is not entitled to a damages award to remedy Cigna's breaches of the Efforts Covenants. Judgment will be entered in favor of Cigna on Anthem's claims for breach of the Efforts Covenants.

## E. Cigna's Claim Against Anthem For Breach Of The Regulatory Efforts Covenant

Cigna claims that Anthem breached the Regulatory Efforts Covenant by (i) failing to pursue every option to change the Blues Rules and (ii) omitting $704 million of potential merger-specific synergies from its white paper on medical cost savings. Cigna failed to prove its claims.

### 1. Cigna's Claim Regarding The Blues Rules

Cigna contends that Anthem failed to pursue all available avenues to change the Blues Rules. Cigna maintains that by not taking all possible steps to change the Blues

---

[388] *See* Danilson Dep. 52–53, 248–49; Holland Tr. 3288–89, 3291; JX 2792; *see also* Curran Tr. 1406–07 (expressing view that the states who were parties to the lawsuit would approve the Merger if Anthem prevailed in the lawsuit).

Rules, Anthem breached its obligation under the Regulatory Efforts Covenant to take "any and all actions necessary to avoid each and every impediment" to regulatory approval. Cigna failed to prove this claim. Cigna's argument instead is a manifestation of its own tactic of "play[ing] this as all roads go to the blues." JX 2486 at '490.

### a. Anthem's Interactions With The Blues Association

The length of the Factual Background makes it hard to fathom that there could be a dimension of the story that this decision has not yet described, but that is the case for Anthem's interactions with the Blues Association. Because those interactions were ultimately collateral to the Antitrust Litigation, the Factual Background did not address them. But evaluating Cigna's claim that Anthem breached its obligations under the Regulatory Efforts Covenant implicates them.

As discussed in the Factual Background, the parties entered into the Merger Agreement knowing that Anthem derived the vast majority of its revenue from its exclusive licenses to sell products using the Blues Brands in the Anthem Blue States. It therefore was essential that Anthem be the surviving entity and that NewCo comply with the Blues Rules.[389]

---

[389] *See* PTO ¶ 90; JX 105 at '752 (Cigna analysis of the consequences for NewCo of losing access to the Blues licenses, concluding that "[t]ermination of license would be significantly damaging to [Anthem] from a business perspective and require a substantial out-of-pocket payment"); JX 428 at '303, '312 (talking points for Cigna Board meeting on July 15, 2015, "Affiliation with Blues brings substantive benefits including access to the well regarded Blues brand and additional provider network choices for clients and customers."); *id.* at '312 (talking points for Cigna Board meeting on July 15, 2015, "We would need to comply with the 'Blues Rules' that regulate how the brand is used and overall mix of branded and unbranded business."); JX 4034 at '138 (Cigna Board presentation dated July 1, 2015, advising that "[o]perating outside the Blues Rules is not a

Throughout their discussions and when entering into the Merger Agreement, the parties anticipated that immediately after closing, NewCo would be out of compliance with the 2/3 Rule and would need to take steps to re-establish compliance.[390] The Cigna ELT viewed the issues presented by the 2/3 Rule as manageable, primarily by rebranding Cigna business in the Anthem Blue States.[391]

realistic option" and would result in "[f]inancial penalties . . . and loss of brand and out of area networks"); Gray Tr. 1677; Zollars Tr. 2489. *See generally* Part II.B, *supra*.

[390] *See* JX 351 at '076 (Cigna Board presentation observing that it was "[l]ikely that New[C]o will be out of compliance and closing and will need to submit a mitigation plan"); Zielinski Tr. 149 (explaining that Anthem and Cigna both understood that NewCo would be out of compliance with the 2/3 Rule and would need to come back into compliance); Cordani Tr. 2235–36 (same). *See generally* Part II.D.3 & 6, *supra*.

[391] *See* Part II.C, II.D.3 & II.D.6, *supra*; JX 64 at '182 (Cigna notes on Blues Rules, identifying primary lever as "rebrand local C business"); JX 79 (analyzing NewCo's compliance with Blues Rules for Cigna CFO; noting that "[t]o avoid being in default, [NewCo] would need to rebrand revenue and members; practically this means moving [Cigna] members in license states to a product written on a blue license and using the BlueCard network instead of ours"; observing that "[r]egulatory divestitures would be best from Cigna and dollar for dollar reduce the exposure to the Rules"; commenting that "[c]omplying will mean reduced volumes to our network outside of the license states"); JX 87 (McCarthy anticipating "a high degree of success in moving the C business [in the Anthem Blue States] to a branded status); JX 91 at '163−64 (same); JX 94 at '928 ("Although more homework to be done, did appear there was a path to comply with the [Blues Rules]."); *id.* at '929 ("Agreed we likely could get into compliance, and while growth limitations would erode some value, there was still significant value in a combination"); JX 97 at '344 (talking points for update to Cigna Board; noting that there "did appear there was a path to comply with the [Blues] rules" and that "actions to comply with the rules" included "[r]ebranding of acquired CI members," "[a]djusting growth strategies," and "[p]otential deal structure alternatives"); JX 98 (Cigna executive's summary of 2/3 Rule for Cordani, noting that NewCo would "fail the revenue test at ~57/43" and that "[t]o resolve this, we would need to rebrand between 23 and 27% of revenue nationally and between 64 and 73% of [Cigna] revenue in the [Anthem] license areas (the most likely lever)"; "Initial view [of both sides] is enough C[igna] revenue can be rebranded to come into compliance with [2/3 Rule] in the short term"); JX 105 at '751 (Cigna ELT presentation to Cigna Board advising that compliance with Blues Rules could

The parties entered into the Merger Agreement expecting that the Blues Rules were unlikely to change.[392] The Cigna Board knew that Anthem could not "change the rules without the support of other Blues."[393] Cigna's primary concern when entering into the Merger Agreement was that the Blues Association would change the Blues Rules to make it more difficult for NewCo to deliver value. From that standpoint, the pending Blues MDL was an advantage because it made it less likely that the Blues Association would make unfavorable changes to the Blues Rules.[394]

be achieved by having "[Cigna] business in Blue licensed territories . . . substantially migrate to Blue business, resulting in compliance with the [2/3 Rule] at or shortly after closing" and that "[i]f compliance would not be attained, [Cigna] business in non-Blue licensed territories may have to be divested"); JX 351 at '076 (presentation to Cigna Board identifying the most likely action to bring NewCo into compliance with the 2/3 Rule as "[r]ebrand [Cigna] revenue as Blue" in the Anthem Blue States).

[392] *See* JX 134; JX 793 at 75; Gray Tr. 1674; Cordani Tr. 1864, 2108–09, 2236; Zollars Tr. 2490; Jones Dep. 269.

[393] JX 351 at '072; *see id.* at '072, '075 (explaining that changes required both (i) 75% of unweighted vote, a metric in which each of the 36 licensees had one vote, and (ii) 75% of the revenue-weighted vote, where Anthem held 16% of the voting power, to make changes in the rules); JX 428 at '313 (talking points for Cigna Board meeting on July 15, 2015, "Changes in the overall structure of the rules ('standards') require a double supermajority vote"; "Changes in the practical application of the rules ('guidelines') require a simple majority of plans present"). *See generally* Part II.D.3 & 6, *supra*.

[394] *See* JX 99 at '546 (Cigna analysis noting that the Blues Association "has the ability to change the rules retroactively and interpret them in a way contradictory to the clear reading; they will likely be constrained by the current legal action, i.e. not giving the appearance of reducing competition; but could seek to negatively impact the deal through other amendments or guidelines"); JX 428 at '303, '313 (talking points for Cigna Board meeting on July 15, 2015, noting that "[u]nfavorable changes are unlikely while the current litigation is continuing"); *id.* at '313 (identifying the two most likely outcomes as either (i) "[r]ules stay in place as is and we adapt our model to comply through a mixture of rebranding and other actions, in line with the current business case," or (ii) "[g]uidelines are relaxed, which is favorable to the current business case"); JX 4034 at '130, '138

276

The parties understood and agreed that the best solution for changing the 2/3 Rule was through a settlement in the Blues MDL.[395] Anthem had told Cigna that the "[t]iming of resolution [in the Blues MDL] is unclear," but that Anthem "anticipate[d] a settlement within three years." JX 4034 at '146. No one thought that the Blues Association would act gratuitously to make it easier for NewCo to maintain its licenses.

The Blues Association responded to the Merger as the parties expected. When Scott Serota, the CEO of the Blues Association, saw media accounts suggesting that Anthem and Cigna were talking about a deal, he told Anthem that the Blues Board would discuss the potential merger as its first agenda item on June 19, 2015, one month *before* the Merger Agreement was signed. JX 263. He intimated that the Merger was an issue and that some members were "worried about competition in their own markets from a fellow [Blues] member." *Id.* He told Anthem that the Blues Association's staff had "done the math" and that NewCo would fail the 2/3 Rule, which "would result in Anthem losing its Blue license." *Id.* During the meeting, the Blues Board received a presentation about the

_____

(presentation to Cigna Board on July 1, 2015, advising that "[i]t is possible but very difficult to make unfavorable changes to the Blues Rules"); Zielinski Tr. 148 (describing discussions with Cigna about risk of adverse change in Blues Rules); *id.* at 167 (discussing benefits of Blues MDL as curb on adverse rule changes); Gray Tr. 1645 (same). *See generally* Part II.C, II.D.3 & II.D.6, *supra*.

[395] *See* JX 81 (referring to settlement in Blues MDL as best path for changing 2/3 Rule); JX 94 at '928 (same); JX 4034 at '145 (noting that as part of settlement in Blues MDL, Anthem was "[p]ushing for elimination or an increase in the cap"); Zielinski Tr. 153 (explaining that the parties expected the 2/3 Rule "would change as part of settlement of the MDL action"); *see also* JX 172 at '615 (Anthem talking points informing Cordani that Anthem was planning to attempt to change the 2/3 Rule through a mediated settlement of the Blues MDL).

277

licensure implications of the Merger, which identified both positive and negative implications of the Merger for the Blues Association. *See* JX 267.

After the Merger was announced, some Blues Association members expressed support, but others opposed the Merger vigorously.[396] Internally, the Blues Association examined the deal closely.[397] The Blues Association sent an early warning shot across Anthem's bow by asserting that aspects of a website that Anthem had created to support the Merger violated branding restrictions in the Blues Rules. *See* JX 557.

In February 2016, the Blues Board formed a Special Task Force to respond to the competitive threat that NewCo could pose.[398] The Special Task Force considered a number of changes to the Blues Rules that could affect NewCo's ability to operate as a member of the Blues Association, including,

- Reducing the amount of time that NewCo would have to achieve compliance with the Blues Rules. *See* JX 1197.

- Changing the definition of a "National Competitor" and "Major Competitor" to limit NewCo's ability to use the Cigna brand. *Id.*

- Increasing the termination fee that NewCo would have to pay to relinquish its Blues license. *Id.*

---

[396] *See* JX 264; JX 508; Zielinski Tr. 301–302, 307–08; Swedish Tr. 1267–68; *see also* Serota Tr. 2831.

[397] *See* JX 534; JX 535; JX 536; JX 573.

[398] PTO ¶ 164; JX 1197.

Anthem opposed the formation of the Special Task Force and objected to its work.[399] Anthem did not tell Cigna about the Special Task Force. PTO ¶ 164.

In March 2016, the Special Task Force made recommendations that would have impaired NewCo's ability to operate as a member of the Blues Association. The Special Task Force proposals included a rule that would prevent Anthem from providing its discounts to Cigna customers.[400]

Swedish was a member of the Special Task Force. Anthem personnel provided Swedish with analyses and talking points to argue against each of the proposals, and Swedish consistently declined to vote in favor of them.[401] Zielinski worked against them as well. He had a series of meetings with representatives of the Blues Association in an effort to convince them to change or eliminate the 2/3 Rule as part of the settlement of the Blues MDL. *See* JX 1581 at '070. He even lined up White & Case to be ready for litigation, explaining, "We will push back internally . . . . However, if we are unsuccessful, I will not rule out the possibility of suing the [the Blues Association] over the changes to the Rules which will have adverse consequences to Anthem."[402]

The Special Task Force backed off from its initial recommendations. Rather than reducing the timeline for compliance, the Special Task Force proposed giving a member

---

[399] *See* JX 1197; Serota Tr. 2866–70, 2879.

[400] *See* JX 1197; JX 1718; Zielinski Tr. 312–16.

[401] *See* JX 1483; JX 1498; JX 1596; JX 1636; *see also* JX 674; Zielinski Tr. 163–64, 522–23.

[402] JX 1507; *see* JX 1547.

an additional sixty days to propose a compliance plan. The Special Task Force, however, did recommend increasing the fee that a member plan would have to pay to voluntarily relinquish its Blues license. *See* JX 1690. By June 2016, in response to Anthem's opposition, the Special Task Force halted its work.[403]

Four days of mediation in the Blues MDL were scheduled for June 2016. JX 1849 at '002. After the mediation, Zielinski reported that the Blues Association members had "finally come to the realization that the settlement of the Blues antitrust litigation will result in a significant reduction, if not total elimination of the [2/3 Rule] rule."[404] Shortly thereafter, the Brands Committee of the Blues Association began working on rules that could be adopted to replace the 2/3 Rule.[405] The Blues Board subsequently formed a new special committee to evaluate possible alternatives. *See* JX 2508. As late as September 2016, the Blues Association was considering changes to the Blues Rules that could adversely affect the Merger. *See* Zielinski Tr. 323–24.

---

[403] *See* JX 1849 at '002; JX 2014.

[404] JX 2464 at '781. As noted previously, Anthem invoked the mediation privilege to block discovery into the mediation sessions that took place in the Blues MDL. Consequently, the court precluded Anthem "from submitting evidence of its efforts in connection with the joint defense or mediation of the Antitrust MDL, if any, to change the Association's National Best Efforts Rule." Dkt. 544 ¶ 5. The court permitted Anthem to introduce a document that it had produced, but precluded Anthem from going beyond the text of the document. *See id.* ¶ 4; Trial Tr. 159–61, 166. The admissible evidence nevertheless demonstrates that Anthem pursued a settlement of the Blues MDL as the optimal strategy for changing the 2/3 Rule.

[405] *See* JX 2464; JX 2479.

Ultimately, the Blues Association did not make any changes to the Blues Rules during the life of the Merger. They did not make the Blues Rules more onerous. Nor did they modify or eliminate the 2/3 Rule.

### b. The Applicable Efforts Covenant

As with Anthem's claims against Cigna, a threshold question exists as to whether Anthem's interactions with the Blues Association should be evaluated under the Reasonable Best Efforts Covenant or the Regulatory Efforts Covenant. The proper framework is the Reasonable Best Efforts Covenant, under which Anthem had a general obligation to expend efforts to satisfy the conditions to closing and consummate the Merger. The Regulatory Efforts Covenant, by contrast, obligated the parties to take action to address legal impediments that a Governmental Entity like the DOJ might raise. The Blues Rules were an impediment in the general sense that they constrained how NewCo would operate, and the DOJ or a court therefore would take the Blues Rules into account when assessing whether the Merger would have procompetitive or anticompetitive effects, but the Blues Rules themselves were not a legal impediment in the sense contemplated by the Regulatory Efforts Covenant.[406]

---

[406] *See* MA § 5.3(b). The Blues Rules could have implicated the Regulatory Efforts Covenant if the DOJ had conditioned its approval on changes to them or if the DOJ had identified them as a concern for the parties to address. *See id.* Neither the DOJ nor any other Governmental Entity ever made a request of that sort. Nor did the DOJ assert that the 2/3 Rule was itself anticompetitive. *See* Zielinski Tr. 167–68; Paul Tr. 667–68; Rosen Tr. 801, 816–17, 870–71, 892–93; Jones Tr. 2967–68. Zielinski testified at trial that he personally did not view the 2/3 Rule as anticompetitive. Zielinski Tr. 285. Cigna successfully impeached this testimony. *See id.* at 285–99; JX 611; JX 674.

In light of this distinction, the proper contractual framework for analyzing Anthem's actions regarding the Blues Rules is the Reasonable Best Efforts Covenant. Cigna's claim that Anthem breached the Regulatory Efforts Covenant by failing take additional actions to address the Blues Rules therefore fails because that is not the operative provision of the contract that governs Anthem's conduct. The balance of the analysis assumes that the Regulatory Efforts Covenant applies.

### c. Whether Anthem's Conduct Breached The Regulatory Efforts Covenant

Cigna failed to prove that Anthem breached the Regulatory Efforts Covenant by not taking more vigorous action to change the 2/3 Rule. Anthem selected a viable strategy seeking to change the 2/3 Rule as part of a settlement in the Blues MDL. Anthem pursued this strategy in a logical way. Anthem resisted efforts by the Blues Association to adopt rules that would harm the Merger, and Anthem appropriately chose not to take more aggressive actions that could have antagonized the Blues Association. Anthem thus fulfilled its obligations under the Regulatory Efforts Covenant.

As discussed in the preceding section, both sides entered into the Merger Agreement expecting that the Blues Rules would not be changed and that NewCo would have to comply with the 2/3 Rule. As the DOJ's investigation unfolded, Anthem came to understand that the DOJ's views about the implications of the 2/3 Rule would be critical to the parties' discussion with the DOJ and getting approval. After Schlegel's deposition in November 2015, Zielinski described the 2/3 Rule as his biggest worry inside the DOJ.

Anthem understood that if the 2/3 Rule were eliminated or modified, then it would eliminate one of the DOJ's areas of concern. *See* Part II.F.2, *supra*.

The question was how best to accomplish that goal. Under the Regulatory Cooperation Covenant, Anthem had the right to determine the parties' strategy for obtaining regulatory approval. Once it picked a strategy, Anthem was obligated to take any and all actions that were necessary and appropriate to carry out that strategy. Anthem was *not* contractually obligated to *achieve* regulatory approval.

The record establishes that Anthem sought to change the 2/3 Rule through a settlement of the Blues MDL.[407] Anthem explained to Cigna that it would pursue this and discussed the likely timeline for achieving a settlement.[408] Cigna understood this strategy and agreed with it. Zielinski Tr. 163.

Cigna's contemporaneous conduct demonstrates that it agreed with Anthem's strategy. As part of its opposition to the Merger, Cigna sent Anthem more than twenty-five letters alleging breaches of the Merger Agreement.[409] Cigna never asserted that Anthem had an obligation to change the 2/3 Rule or was breaching the Regulatory Efforts Covenant by following its selected course of action.[410]

---

[407] *See* JX 2464; Zielinski Tr. 157–60.

[408] *See* JX 94 at '927; JX 339 at '325; JX 4034 at '146; Zielinski Tr. 141, 162–63; Jones Tr. 2582, 2587–88.

[409] *See* Part II.H.4, *supra*; Jones Tr. 2963.

[410] *See* Zielinski Tr. 171–72; Cordani Tr. 2146; Jones Tr. 2965–67; Rule Tr. 3155–56.

Anthem had every reason to pursue the optimal strategy for addressing the 2/3 Rule. Anthem opposed the existence of the rule, which limited its ability to grow its non-Blues business. Eliminating or changing the 2/3 Rule also would make the Merger more accretive to NewCo because Anthem would not need to divest Cigna business to achieve compliance. *See* Zielinski Tr. 531.

Anthem's strategy was sound. The members of the Blues Association were not going to "voluntarily agree to change the [2/3 Rule] and get nothing in return for it." Zielinski Tr. 158. As demonstrated by their response to the Merger, the Blues Association was not interested in helping NewCo create value by competing with its members. If anything, the Blues Association wanted to impose greater restrictions on NewCo.[411] Unless linked to a settlement of the Blues MDL, any effort by Anthem to convince its fellow members to change the 2/3 Rule would have been "dead on arrival." Zielinski Tr. 553.

The same is true for other possible proposals that Anthem could have made. As Cigna points out, Anthem could have lobbied the Blues Board to exempt the Merger from the 2/3 Rule or to give NewCo a longer timeline for complying with the 2/3 Rule. No one asked the Blues Board to eliminate or modify the 2/3 Rule or exempt the Merger from its coverage.[412] It nevertheless seems likely that such an effort could have backfired and caused the Blues Association to become more suspicious of Anthem and more focused on

---

[411] *See* JX 2704; Zielinski Tr. 308–11; Serota Dep. 334–36.

[412] *See* JX 2911 at 8; Serota Tr. 2852–54; Zielinski Tr. 332–38.

imposing additional restrictions on NewCo.[413] As demonstrated by the work of the Special Task Force, the Blues Association actively opposed the Merger.[414] As late as September 2016, the Blues were considering "rules which [were] designed to restrict and eliminate [Anthem's] ability to compete against the Blues Plans with [its] non-Blue brands."[415] During post-trial argument, Cigna's counsel acknowledged that "the Blues were going to fight [the Merger] every step of the way. So there was no reason to think that the adjustments that the Blues would have had to make to make [the Merger] work were ever going to happen." Dkt. 728 at 217. Although it is true that the members of the Blues Board would have had to consider those proposals "in good faith," Serota Tr. 2850–51, they would have done so as fiduciaries of the Blues Association based on what was in the best interests of the Association, not what was helpful to the Merger.

Cigna also maintains that Anthem could have exploited its commercial leverage as the largest member of the Blues Association and threatened to leave if the Association did not change the 2/3 Rule. Anthem's territory consisted of the fourteen Anthem Blue States; the next largest member had a territory consisting of only five states. *See* JX 846 at '342. It would have created a large hole in the Blues network if Anthem left. Serota Tr. 2832. Anthem therefore had some commercial leverage, but the argument that Anthem should

---

[413] *See* JX 793 at 75; Zielinski Tr. 146–47.

[414] *See* JX 1197; JX 1456; JX 1476; JX 1624; JX 1718; Zielinski Tr. 147–48, 312–16.

[415] JX 2464; *see* Zielinski Tr. 322–24.

have used it against the Association is unpersuasive. Despite Anthem's leverage, the members of the Blues Association adopted the 2/3 Rule over Anthem's opposition as a condition to approving an acquisition by Anthem in 2005.[416] Anthem also could not leave the organization without losing its licenses, which would have breached its obligation under the Merger Agreement to continue to operate in the ordinary course of business.[417] In addition to preventing Anthem from using its Blues licenses to conduct business, leaving the Blues Association would have obligated Anthem to pay an exit fee of approximately $2.8 billion.[418] Anthem's threat might well have rung hollow.

Anthem theoretically could have refused to comply with the 2/3 Rule and either sued the Blues Association or forced them to sue.[419] Anthem and Cigna discussed that potential path, which they appropriately dubbed the "nuclear option."[420] Doing so would have jeopardized Anthem's licenses, and the loss of its licenses would have had disastrous effects on Anthem's business.[421] Under the Burdensome Condition Exception, Anthem was

---

[416] *See* JX 9 at '097–98; Zielinski Tr. 156.

[417] MA § 4.2; Zielinski Tr. 274.

[418] JX 793 at 75; *see* JX 1197 at '002.

[419] *See* JX 62; JX 94 at '928; Zielinski Tr. 195–202.

[420] Cordani Tr. 2143–44; Zielinski Tr. 173, 178. Cigna successfully impeached Zielinski's testimony on this point, demonstrating that during his deposition, he implausibly denied using the term "nuclear option." *See id.* 200–01.

[421] Zielinski Tr. 178; *see* JX 105 at '752.

not obligated to pursue that course of action. Cigna understandably never suggested that Anthem pursue it.[422] It was an avenue to consider, if at all, only after the Merger closed.

Anthem also could have tried a grassroots strategy to eliminate the 2/3 Rule or reduce the threshold. Shortly before the Merger was announced, Anthem told Cigna that it had reached out to approximately seventeen members of the Blues Association and received fourteen responses that were supportive of a transaction. *See* JX 339 at '325. During the same period, Anthem told Cigna that they believed there was a "coalition of 20 plans that are in agreement" on "[r]emoval of [the 2/3 Rule]." JX 351 at '079. The Merger would have conferred some benefits on the Blues Association, such as "the potential of adding millions of lives to the Blue system." Serota Tr. 2830–31. Anthem could have engaged in a vigorous lobbying effort to generate support for the Merger and either eliminate the 2/3 Rule or lower the threshold. Although eliminating the rule required a double-supermajority vote, amending the rule to reduce the percentage could have been accomplished by a simple majority of the plans.[423]

---

[422] *See* Zielinski Tr. 178; Cordani Dep. 245.

[423] *See* Serota Tr. 2830; Zielinski Tr. 191–92. Swedish also could have been more involved. During the relevant period, he chose not to attend a number of meetings of the Blues Board where he potentially could have advocated for a change in the Blues Rules. *See* CDX 5 (collecting evidence and testimony about Swedish's absences from Association meetings). At trial, Swedish's testimony about his involvement with the Blues Board and the Special Task Force did not suggest a meaningful effort to advocate in favor of the Merger. *See* Swedish Tr. 1287–90.

All of these ideas are ways to criticize Anthem's strategy with the benefit of hindsight. In real time, Anthem adopted a reasonable strategy and pursued it, consistent with its obligations under the Regulatory Efforts Covenant.

## 2. Cigna's Claim Regarding The $704 Million In Efficiencies

Cigna also argues that Anthem breached the Merger Agreement "by abandoning $704 million of potential merger-specific efficiencies." Dkt. 700 at 98. The record does not support Cigna's claim.

As discussed previously, in early May 2016, Cadwalader sent a lengthy email to White & Case that was highly critical of Anthem's draft white paper on medical cost synergies and argued that Anthem should use data on Cigna's risk-adjusted cost of care (PMPM) to show that the Merger could achieve efficiencies by applying Cigna's strategies more broadly. Because Cigna had withdrawn from integration planning in February, Anthem did not have the necessary data. White & Case asked for information to make the argument that Cadwalader was suggesting, and Cadwalader responded with PowerPoint presentations and marketing materials from 2012, 2013, and 2014. Using the high-level materials, Anthem's economists initially calculated an incremental $704 million in efficiencies. Anthem's lawyers, however, could not verify the total cost of care calculation, which conflicted with the results of analyses based on claims data. In an effort to understand the issue better, Anthem's lawyers asked for more detailed support from Cigna, but Cigna did not provide it. Anthem's lawyers therefore dropped the language from the white paper. *See* Part III.B.2, *supra.*

288

Anthem did not breach its contractual obligations by failing to include this information, which its lawyers could not verify. The incident instead shows the dire consequences of Cigna's withdrawal from the integration planning process for the efficiencies defense.

Cigna more generally argues that Anthem chose the wrong regulatory strategy, claiming that Anthem attacked Cigna and presented an efficiencies defense grounded on discounted prices rather than innovation. *See* Dkt. 700 at 98. That choice was reasonable. Anthem sought to blunt the DOJ's contention that Cigna was *uniquely* innovative, just as the parties had anticipated when Cordani thought he had a path to become CEO of NewCo. *See* Part III.B.2, *supra.*

Anthem sought at all times to complete the Merger. Anthem pursued the best regulatory strategy that it believed was available, given Cigna's withdrawal from integration planning and its ever-increasing opposition to the Merger. As this decision has noted, the Merger Agreement gave Anthem the right to "take the lead in . . . developing strategy for responding to any investigation or other inquiry by any Governmental Entity related to any of the Necessary Consents." MA § 5.3(e). Although the regulatory strategy that Anthem pursued ultimately did not succeed, Anthem did not breach its obligations under the Regulatory Efforts Covenant by acting as it did.

### 3. The Effect-Of-Termination Provision

Assuming for the sake of argument that Anthem had breached its obligations under the Merger Agreement, Anthem would not face any liability. The parties to a contract "can by agreement vary the rules" established by the common law, "as long as the agreement is

289

not invalid for unconscionability or on other grounds." *Restatement (Second) of Contracts* § 346 cmt. a (citation omitted). In the Merger Agreement, Cigna and Anthem agreed to modify the circumstances under which they potentially could recover damages. Titled "Effect of Termination," Section 7.2 states,

> In the event of the termination of this Agreement pursuant to Section 7.1, the obligations of the parties under this Agreement shall terminate, except for the obligations in the confidentiality provisions of Section 5.2, and all of the provisions of this Section 7.2 and Section 7.3, and there shall be no liability on the part of any party hereto; provided, however, that no party hereto shall be relieved or released from any liabilities or damages arising out of (i) any fraud by any party, (ii) the Willful Breach by any party of any representation or warranty on the part of such party set forth in this Agreement or (iii) the Willful Breach of any covenant or agreement set forth in this Agreement.

MA § 7.2 (the "Effect-Of-Termination Provision"). The Merger Agreement defines "Willful Breach" as "a material breach of this Agreement that is the consequence of an act or omission by a party with the actual knowledge that the taking of such act or failure to take such action would be a material breach of this Agreement."[424]

Under the Effect-Of-Termination Provision, it is not enough for Cigna to prove the elements of a claim for breach of contract that satisfies the common law framework. The parties agreed that once the Merger Agreement had been terminated, "there shall be no liability on the part of any party hereto" except in three defined situations. Only one is pertinent here: "the Willful Breach of any covenant or agreement set forth in this

---

[424] MA § 8.13. Although not relevant to this case, a second part of the definition of "Willful Breach" encompassed any failure by Anthem to pay the cash consideration on the date of closing (or to have the funds available to do so). *See id.* (defining Willful Breach as either a failure to act with actual knowledge that such action would be a material breach "or as otherwise contemplated by the last sentence of Section 5.14(h)").

Agreement." MA § 7.2(iii). Cigna thus had to demonstrate that Anthem's breach of the Efforts Covenants was (i) a material breach and (ii) committed "with the actual knowledge that the taking of such act or failure to take such action would be a material breach." *Id.* § 8.13.

The operative element for present purposes is whether Anthem acted "with the actual knowledge that the taking of such act or failure to take such action would be a material breach." At common law, a knowing and intentional breach occurs when a party knowingly takes an action that results in a breach. *Hexion Spec. Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 746 (Del. Ch. 2008). The knowledge requirement only modifies the action; the party does not also have to know that its conduct constitutes a breach. *Id.* In the definition of "Willful Breach," the parties to the Merger Agreement contracted around this common law rule by providing that liability would exist only if the breaching party acted "with the actual knowledge that the taking of such act or failure to take such action would be a material breach of this Agreement." MA § 8.13. Actual knowledge is "direct and clear knowledge, as distinguished from constructive knowledge."[425]

Determining actual knowledge requires a contextual judgment based on the record in a given case. An all-too-human trial judge lacks the ability to read a witness's mind and retrospectively determine the state of the witness's knowledge. *See Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 106 (Del. 2013) ("[T]he members of the Court of Chancery cannot

---

[425] Actual Knowledge, *Black's Law Dictionary* (11th ed. 2019); *accord Deutsche Bank Nat'l Trust Co. v. Goldfeder*, 86 A.3d 1118, at \*2 (Del. 2014) (ORDER) ("Actual knowledge is defined as 'direct and clear knowledge.'") (quoting *Black's Law Dictionary*).

peer into the hearts and souls of directors." (internal quotation marks omitted)). A judge must draw on a combination of direct evidence, indirect evidence, and circumstantial evidence. *See Voigt v. Metcalf*, 2020 WL 614999, at *25 (Del. Ch. Feb. 10, 2020); *cf. State v. Anderson*, 74 A. 1097, 1099 (Del. 1910) (recognizing that intent "may be found by direct evidence, such as the admissions or declarations of the accused, or by indirect evidence; that is by the rational inferences to be drawn from what the accused is proven to have done or said, and from all the facts and circumstances involved in the transaction").

Under the common law, a material breach is a breach of contract that is significant enough to excuse the other party from performance. *BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003) ("A party is excused from performance under a contract if the other party is in material breach thereof."). At common law, "[a] breach is material if it goes to the root or essence of the agreement between the parties, or touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract." *Mrs. Fields Brand, Inc. v. Interbake Foods LLC*, 2017 WL 2729860, at *28 (Del. Ch. June 26, 2017) (internal quotation marks omitted), *clarified on denial of rearg.* 2017 WL 3863893 (Del. Ch. July 27, 2017). Whether a breach is material "is determined by weighing the consequences in the light of the actual custom of men in the performance of contracts similar to the one that is involved in the specific case."[426]

---

[426] *BioLife Sols.*, 838 A.2d at 278 (internal quotation marks omitted); *accord* 23 *Williston on Contracts* § 63:3, Westlaw (database updated May 2020); *see Restatement (Second) of Contracts* § 241 (identifying five guiding factors to consider when determining whether "a failure to render . . . performance is material"). By using the common law term "material breach," the Willful Breach definition establishes a different standard than a

292

Cigna failed to prove that Anthem knowingly committed a material breach of the Efforts Covenants. The record indicates that Anthem acted at all times with the belief that it was complying with the Merger Agreement and using its utmost efforts to complete the Merger. Anthem expended approximately $800 million attempting to consummate the Merger. *See* Zielinski Tr. 180–81. So zealously did Anthem try to complete the Merger that it took aggressive positions on privilege in the Antitrust Litigation (and which it renewed into this litigation) that this court is unable to endorse. Anthem also argued that NewCo could exercise the affiliate clauses in its provider agreements when the Anthem ELT had already made a decision not to invoke those clauses broadly. Throughout the process, Anthem made judgments about what strategy to pursue. Although those judgments quite obviously failed to achieve Anthem's goal, Anthem did not willfully breach its obligations under the Efforts Covenants.

### 4. Judgment In Favor Of Anthem

Because Cigna failed to prove that Anthem breached its obligations under the Regulatory Efforts Covenant and further failed to prove that Anthem committed a Willful Breach, Cigna is not entitled to a damages remedy. Judgment will be entered in favor of Anthem on Cigna's claims for breach of the Efforts Covenants.

---

provision that requires compliance "in all material respects." For a discussion of the latter concept, see *Akorn*, 2018 WL 4719347, at *84–86.

**F.    Cigna's Claim Against Anthem For Failing To Pay The Reverse Termination Fee**

In a separate claim for breach of contract, Cigna contends that Anthem breached its obligation to pay the Reverse Termination Fee. Anthem maintains that it never became obligated to pay the Reverse Termination Fee.

**1.    The Provisions Governing The Reverse Termination Fee**

Section 7.3(e) of the Merger Agreement governs Anthem's obligation to pay the Reverse Termination Fee (the "RTF Provision"). It states,

In the event that this Agreement is terminated by either Anthem or Cigna

(i) pursuant to <u>Section 7.1(g)</u>, but only if the applicable Legal Restraint constitutes a Regulatory Restraint, or

(ii) pursuant to <u>Section 7.1(b)</u> and, in the case of this clause (ii), at the time of such termination, all of the conditions set forth in <u>Section 6.1</u> and <u>Section 6.2</u> have been satisfied (other than (x) <u>Section 6.1(a)</u> (but only if the applicable Legal Restraint constitutes a Regulatory Restraint) or <u>Section 6.1(b)</u> and (y) conditions that by their nature are to be satisfied at the Closing, but that are capable of being satisfied if the Closing were to occur on the date of such termination),

then Anthem shall pay to Cigna a fee . . . in the amount of $1,850,000,000 (the "**Reverse Termination Fee**");

<u>provided</u>, <u>however</u>, that no Reverse Termination Fee shall be payable pursuant to this Section 7.3(e) in the event that

(A) the failure of the condition set forth in <u>Section 6.1(a)</u> (but only if the applicable Legal Restraint constitutes a Regulatory Restraint) or Section 6.1(b) to be satisfied is caused by Cigna's Willful Breach of Section 5.3 or

(B) Anthem has waived the condition set forth in Section 6.1(b) and Cigna refuses to effect the Merger on the basis that the condition set forth in clause (iii) or (iv) of Section 6.1(b) has not been satisfied.

MA § 7.3(e) (formatting added).

References to the conditions in Section 6.1(a) and 6.1(b) permeate the RTF Provision. Section 6.1(a) is the No Injunction Condition. Section 6.1(b) is the Governmental Approval Condition.

As discussed previously, the No Injunction Condition makes it a condition to the obligation to close that

> [n]o Governmental Entity or federal or state court of competition jurisdiction shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, executive order, decree, judgment, injunction or other order (whether temporary, preliminary or permanent), in any case that is in effect and that prevents or prohibits consummation of the Mergers (collectively, the "Legal Restraints").

MA § 6.1(a)(i). A subtype of Legal Restraint is a "Regulatory Restraint," which is defined as "any Legal Restraint relating to (i) the HSR Act or any other antitrust laws, (ii) any Healthcare Laws or insurance laws or (iii) any [Blues] Licenses or [Blues] Rules." MA § 8.13. In this case, it is undisputed that the permanent injunction issued by the District Court was both a Legal Restraint and a Regulatory Restraint.

Generally speaking, the RTF Provision obligates Anthem to pay the Reverse Termination Fee if either side terminates the Merger Agreement under one of two possible sections. The first is Section 7.1(g), which states that the Merger Agreement may be terminated

> [b]y either Anthem or Cigna, if the condition set forth in <u>Section 6.1(a)</u> [the No Injunction Condition] is not satisfied and the Legal Restraint giving rise to such non-satisfaction has become final and non-appealable;
>
> <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 7.1(g)</u> shall not be available to any party that has failed to perform fully its obligations under this Agreement in a manner that shall have

295

proximately caused or resulted in the imposition of such Legal Restraint or the failure of such Legal Restraint to be resisted, resolved, or lifted.

MA § 7.1(g) (formatting added). Section 7.1(g) thus grants both sides the right to terminate the Merger Agreement if there is a Legal Restraint (such as a permanent injunction) that blocks the Merger from closing and which becomes final and not subject to any further appeal (the "Legal Restraint Termination Right"). Under the proviso, a party could not exercise the Legal Restraint Termination Right if its own failure to perform its obligation under the Merger Agreement "proximately caused or resulted in the imposition of" the Legal Restraint that caused the No Injunction Condition to fail.

The second section that could trigger payment of the Reverse Termination Fee is even more complex. Section 7.1(b) states that the Merger Agreement may be terminated

> [b]y either Anthem or Cigna, if the Merger shall not have been consummated on or before January 31, 2017 (the "**Termination Date**");
>
> provided, however, that the right to terminate this Agreement pursuant to this Section 7.1(b) shall not be available to any party that has failed to perform fully its obligations under this Agreement in a manner that shall have proximately caused or resulted in the failure of the Merger to have been consummated by the Termination Date;
>
> provided, further, that if all of the conditions to Closing shall have been satisfied or shall be then capable of being satisfied, other than the conditions set forth in Section 6.1(a) [the No Injunction Condition] (but only if the applicable Legal Restraint constitutes a Regulatory Restraint) and Section 6.1(b) [the Governmental Approval Condition], the Termination Date may be extended by Anthem or Cigna, by written notice to the other party, to a date not later than April 30, 2017.

MA § 7.1(b) (formatting added). Section 7.1(b) thus grants each side a right to terminate the Merger Agreement if the Termination Date for the Merger Agreement has passed and

that side's own conduct did not proximately cause the failure of the Merger to be consummated before the Termination Date (the "Temporal Termination Right").

Under the RTF Provision, however, for Anthem to become obligated to pay the Reverse Termination Fee in the event that a party exercised the Temporal Termination Right, it had to be true at the time of termination that

all of the conditions set forth in Section 6.1 and Section 6.2 have been satisfied (other than

(x) Section 6.1(a) [the No Injunction Condition] (but only if the applicable Legal Restraint constitutes a Regulatory Restraint) or Section 6.1(b) [the Governmental Approval Condition] and

(y) conditions that by their nature are to be satisfied at the Closing, but that are capable of being satisfied if the Closing were to occur on the date of such termination).

To reiterate, Section 6.1 identifies conditions to both parties' obligations to close. Section 6.2 identifies additional conditions to Anthem's obligation to close. The latter set of conditions includes Section 6.2(b), titled "Performance of Obligations of Cigna," which states,

Cigna shall have performed or complied in all material respects with all agreements and covenants required to be performed by it under this Agreement at or prior to the Closing Date. Anthem shall have received a certificate of the chief executive officer and the chief financial officer of Cigna to such effect.

MA § 6.2(b) (the "Cigna Compliance Condition"). Cigna's obligations under the Cigna Compliance Condition include its obligations under the Efforts Covenants.

Based on this portion of the RTF Provision standing alone, Anthem is obligated to pay the Reverse Termination Fee in the event a party exercises the Temporal Termination Right only if all of the conditions to closing in both Sections 6.1 and 6.2 have been satisfied

297

at the time of termination, *including the Cigna Compliance Condition* and *except for* (i) the No Injunction Condition, (ii) the Governmental Approval Condition, and (iii) "conditions that by their nature are to be satisfied at the Closing, but that are capable of being satisfied if the Closing were to occur on the date of such termination)." Put differently, Anthem is obligated to pay the Reverse Termination Fee regardless of whether or not the No Injunction Condition or the Governmental Approval Condition are met, but Anthem is not obligated to pay the Reverse Termination Fee if other conditions remain unsatisfied, including the Cigna Compliance Condition.

Matters become even more complicated because the RTF Provision contains a proviso, which states,

> provided, however, that no Reverse Termination Fee shall be payable pursuant to this Section 7.3(e) in the event that . . . the failure of the condition set forth in Section 6.1(a) [the No Injunction Condition] (but only if the applicable Legal Restraint constitutes a Regulatory Restraint) or Section 6.1(b) [the Governmental Approval Condition] to be satisfied is caused by Cigna's Willful Breach of Section 5.3.

MA § 7.3(e) (the "Willful Breach Exception"). Section 5.3 of the Merger Agreement contained the Efforts Covenants.

The parties disagree about how to interpret the Willful Breach Exception. Anthem maintains that the Willful Breach Exception applies only if Anthem is otherwise obligated to pay the Reverse Termination Fee. If so, then under the Willful Breach Exception, Anthem no longer is obligated to pay if either (i) the Governmental Approval Condition failed or (ii) the No Injunction Condition failed because of a Regulatory Restraint *and* the failure of either condition was "caused by Cigna's Willful Breach of Section 5.3."

298

As Anthem sees it, if Anthem is not otherwise obligated to pay the Reverse Termination Fee, then the Willful Breach Exception has no application. For purposes of a termination under the Temporal Termination Right, Anthem maintains that it is obligated to pay the Reverse Termination Fee only if Cigna has satisfied the Cigna Compliance Condition, including compliance with the Efforts Covenants in Section 5.3. If that condition is not met, then the analysis never reaches the Willful Breach Exception.

Anthem accepts that under its reading, the Willful Breach Exception never will apply for purposes of the Temporal Termination Right because before Anthem can become obligated to pay the Reverse Termination Fee, Cigna must have complied with the Efforts Covenants such that the Cigna Compliance Condition is satisfied. Anthem argues that this interpretation does not turn the Willful Breach Exception into surplusage because the Willful Breach Exception continues to apply to the Legal Restraint Termination Right.

Cigna responds that when the RTF Provision is read as a whole, the Willful Breach Exception is a more specific provision that displaces the more general obligation to satisfy the conditions set forth in Sections 6.1 and 6.2, including the Cigna Compliance Condition. Cigna maintains that the evident purpose of the RTF Provision is to entitle Cigna to the Reverse Termination Fee unless Cigna's breach of the Efforts Covenants "caused" the failure of the Government Approval Condition or the failure of the No Injunction Condition due to a Legal Restraint.

This decision need not resolve this dispute because Cigna failed to prove that it properly exercised the Temporal Termination Right.

299

## 2. Cigna's Attempt To Invoke The Temporal Termination Right

Cigna contends that Anthem was obligated to pay the Reverse Termination Fee because Cigna validly exercised the Temporal Termination Right. Cigna relies on two notices of termination: one delivered on February 14, 2017, and another on May 12, 2017. JX 2872; JX 2928. Neither was effective.

The notice that Cigna delivered on February 14, 2017, was ineffective when sent because Cigna could not exercise the Temporal Termination Right before the Termination Date had passed. Under Section 7.1(b), either party had the right to extend the Termination Date if all of the conditions to closing had been satisfied other than the absence of any Regulatory Restraint. When Cigna delivered its notice on February 14, Anthem had extended the Termination Date until April 30, 2017.

Cigna contends that Anthem could not have extended the Termination Date because that right was not available "to any party that has failed to perform fully its obligations under this Agreement in any manner that shall have proximately caused or resulted in the failure of the Merger to have been consummated by the Termination Date." MA § 7.1(b). The plain language of this provision states that *the right to terminate* under Section 7.1(b) is not available to such a party. The right to extend the Termination Date is not subject to this condition. Regardless, Cigna failed to prove in this action that Anthem failed to perform its obligations under the Merger Agreement, much less than any failure "proximately caused" the failure of the Merger to be consummated.

Anthem validly extended the Termination Date. Accordingly, Cigna could not exercise the Temporal Termination Right until after April 30, 2017.

300

In response, Cigna argues that its February 14 notice may have been temporarily ineffective, but that it became effective as of the first valid termination date, ostensibly the instant that the TRO lifted. Cigna's cases do not support this proposition; they address contracts where a party had the power to terminate, but only after giving a certain amount of notice.[427] When Cigna issued the February 14 notice, Cigna did not have the power to terminate the Merger Agreement. The February 14 notice therefore was ineffective.

The notice that Cigna delivered on May 12, 2017, also was ineffective. Between February 14 and May 12, Anthem had obtained a TRO from this court preventing Cigna from terminating the Merger Agreement. This court granted the TRO to preserve Anthem's ability to pursue an appeal from the District Court Opinion. Dkt. 8; *see* Dkt. 226 at 7. This court also granted the TRO to preserve the court's ability to issue a decree of specific enforcement requiring Cigna to close. *See* Dkt. 74 at 38–40.

The TRO enjoined Cigna "from terminating" the Merger Agreement and it remained in place "pending further order of this court." Dkt. 8. While that TRO was in place, Cigna could not terminate the Merger Agreement.

---

[427] *See Lyon v. Pollard*, 87 U.S. 403, 406–07 (1874) (interpreting employment contract which required thirty-days' notice for termination, finding it "probable" that a notice issued on July 11 was ineffective and that a second notice issued on September 19 became effective on October 19); *All States Serv. Station v. Standard Oil Co. of N.J.*, 120 F.2d 714, 715 (D.C. Cir. 1941) (holding that notice sent under contract which required a designated period for notice of termination, but which recited a shorter effective period, became effective after the designated period ran); *Shain v. Wash. Nat'l Ins. Co.*, 308 F.2d 611, 613–14 (8th Cir. 1962) (same); *G.B. Kent & Sons, Ltd. v. Helena Rubinstein, Inc.*, 47 N.Y.2d 561, 563, 565–66 (N.Y. 1979) (same).

After the entry of the TRO, Anthem moved for a preliminary injunction to prevent Cigna from terminating the Merger Agreement pending a final ruling on the merits. By the time of the hearing on Anthem's motion, the DC Circuit Court had affirmed the District Court's decision. Anthem still wanted to keep the Merger Agreement in place so that it could petition the Supreme Court of the United States to issue a writ of *certiorari*. Anthem also was in discussions with the Trump administration.

On May 11, 2017, this court denied Anthem's motion for a preliminary injunction. But this court did not immediately vacate the TRO. Instead, this court stayed its ruling to allow Anthem to decide whether to appeal. Dkt. 226 at 24–25.

The next day, Anthem notified Cigna that it was terminating the Merger Agreement under Section 7.1(i) of the Merger Agreement. JX 2929. That section granted Anthem a right to terminate

> if prior to the Closing Date there shall have been a breach of any . . . covenant or agreement on the part of Cigna contained in this Agreement . . . which breach . . . (A) would, individually or in the aggregate with all other such breaches . . . , give rise to the failure of a condition set forth in Section 6.2(a) or Section 6.2(b) [the Cigna Compliance Condition] and (B) is incapable of being cured prior to the Closing Date by Cigna or is not cured within 30 days of notice of such breach.

MA § 7.1(i) (the "Termination Right For A Cigna Breach"). Anthem proved in this litigation that Cigna failed to comply with its obligations under the Efforts Covenants, and the nature of those breaches meant that they could not be cured, so Anthem validly exercised the Termination Right For A Cigna Breach.

Anthem sent its notice of termination to Cigna so that it was received at 11:32 AM. JX 2929. Anthem's termination notice did not violate the TRO, because the TRO only restrained Cigna, not Anthem.

Anthem informed the court that it would not appeal by letter dated 11:33 AM. Dkt. 206. With the filing of that letter, the TRO lifted, and Cigna became entitled to terminate the Merger Agreement. Shortly thereafter, Cigna sent its notice of termination under the Temporal Termination Right. JX 2928.

Given the sequence of events, the termination notice that Cigna sent on May 12, 2017, was ineffective. By that point, Anthem already had terminated the Merger Agreement by exercising the Termination Right For A Cigna Breach. There no longer was a Merger Agreement in effect for Cigna to terminate.

In response, Cigna argues that under the Merger Agreement, notices in writing are deemed given "on the date of delivery." MA § 8.2. Cigna posits that this means that notices which are delivered on the same day must be treated as having been delivered simultaneously. The plain language of the provision does not say that. It rather appears designed to establish a set of timing rules for the effectiveness of notices that would eliminate uncertainty by displacing comparable common law doctrines such as the mailbox rule. *Cf.* 29 Am. Jur. 2d *Evidence* § 266, Westlaw (database updated May 2020). Cigna has not offered any authority to support interpreting a provision like Section 8.2 as creating a rule that notices received on the same day are deemed to be delivered simultaneously. By the time that Cigna's notice arrived, Anthem already had terminated the Merger Agreement.

Because neither of Cigna's termination notices were effective, Cigna did not validly exercise the Temporal Termination Right. Cigna thus cannot base a claim to recover the Reverse Termination Fee on a termination under the Temporal Termination Right.

### 3. Anthem's Obligation To Pay The Fee Under The Termination Right For A Cigna Breach

Anthem validly terminated the Merger Agreement under the Termination Right For A Cigna Breach. By its plain terms, that termination right does not obligate Anthem to pay the Reverse Termination Fee.

Cigna claims that this result is inequitable because Anthem exploited the TRO to gain a timing advantage over Cigna. Cigna points out that because the decision to pursue an appeal was Anthem's to make, Anthem (rather than Cigna) had control over when the TRO would end. Anthem could therefore deliver its notice of termination first.

Although Cigna perceives injustice in this result, the TRO was put in place because Cigna previously breached its contractual obligations by attempting to terminate the Merger Agreement on February 12 and moot Anthem's appeal. That attempt at preemptive termination failed to satisfy the Temporal Termination Right. It also violated the Regulatory Efforts Covenant, which required Cigna to "vigorously pursu[e] all available avenues of administrative and judicial appeal." MA § 5.3(b)(iii). Having previously sought to gain a timing advantage of its own in violation of the Merger Agreement, Cigna cannot now complain about the effects of a TRO that its own conduct made necessary.

More broadly, Cigna contends that its right to the Reverse Termination Fee should not be determined by a race to exercise a termination right. Parties can address this issue

by providing contractually that a Reverse Termination Fee would remain due even if the Merger Agreement is terminated on other grounds. The Merger Agreement did not contain such a provision. Moreover, the possibility of a race only arose because Anthem continued to fulfill its obligation to seek to close the Merger, even after Cigna's breaches of the Efforts Covenants became obvious and gave rise to a termination right. Had Anthem not been committed to the Merger, Anthem could have exercised the Termination Right For A Cigna Breach long before Cigna's ability to exercise the Temporal Termination Right ripened. Under those circumstances, Cigna would not have been entitled to the Reverse Termination Fee. There is no injustice to Cigna in recognizing Anthem's prior exercise of a termination right that it could have exercised months before.

### 4. Judgment In Favor Of Anthem

Cigna therefore is not entitled to the Reverse Termination Fee. By the time that Cigna purported to terminate under the Temporal Termination Right, Anthem already had terminated the Merger Agreement. When Cigna exercised its termination right, there was no longer a Merger Agreement in place to provide for the payment of the Reverse Termination Fee. Judgment will be entered in favor of Anthem on Cigna's claim for payment of the Reverse Termination Fee.

## IV. CONCLUSION

In this corporate soap opera, the members of executive teams at Anthem and Cigna played themselves. Their battle for power spanned multiple acts. Once the Cigna ELT concluded that Anthem had the upper hand and would not make the concessions that Cigna wanted, the Cigna ELT turned against the Merger. Anthem proved that Cigna breached its

305

obligations under the Efforts Covenants, but Cigna proved that it was more likely than not that the Merger would have been enjoined anyway. Cigna failed to prove that Anthem breached its obligations under the Efforts Covenants, and Cigna failed to prove that it is entitled to the Reverse Termination Fee. Each party must bear the losses it suffered as a result of their star-crossed venture.